UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                         CHARLOTTE DIVISION


UNITED STATES OF AMERICA  )    DOCKET NO. 3:10-CR-238
                          )
          vs.             )
                          )
GERREN DARTY              )
_____)


                  TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE ROBERT J. CONRAD, JR
            UNITED STATES CHIEF DISTRICT COURT JUDGE
                       NOVEMBER 16, 2011




APPEARANCES:

On Behalf of the Government:

          STEVEN R. KAUFMAN, ESQ.,
          Assistant United States Attorney
          227 West Trade Street, Suite 1700
          Charlotte, North Carolina 28202


On Behalf of the Defendant:

          JAMES J. EXUM, ESQ.,
          Hoover, Williams & Exum
          301 S. McDowell Street, Suite 310
          Charlotte, North Carolina 28204




                      LAURA ANDERSEN, RMR
                     Official Court Reporter
                  United States District Court
                    Charlotte, North Carolina

1                    P R O C E E D I N G S
2    NOVEMBER 16, 2011, COURT CALLED TO ORDER 11:30 a.m..
3              THE COURT:  We're here in the matter of United
4    States V Garren Darty for sentencing.  Mr. Darty pled guilty
5    before a magistrate judge on April 21st, at a hearing in which
6    he answered questions under oath and then the magistrate judge
7    found that his plea was knowingly and voluntarily made.  There
8    were no objections to these findings and the Court will adopt
9    them as its own today.
10             Do the parties stipulate that there is a factual
11   basis to support the entry of a plea of guilty and that the
12   Court may reply upon the offense conduct as set forth in the
13   Presentence Report to establish that factual basis?
14             MR. EXUM:  Yes.
15             MR. KAUFMAN:  Yes, Your Honor.
16             THE COURT:  Based upon that stipulation, as well as
17   Mr. Darty's admission before the magistrate judge, the Court
18   finds that there is a factual basis to support the entry of a
19   plea of guilty.
20             Mr. Darty, your case was referred to the Federal
21   Probation Department for the purpose of preparing a
22   presentence report.  I've received and reviewed that report.
23   Have you had a chance to read the Presentence Report?
24             THE DEFENDANT:  Yes, sir.
25             THE COURT:  Do you believe you understand it?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Have you had enough time to go over the

3   Presentence Report with your attorney?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  All right.  You may sit down at this

6   time.

7          Mr. Exum, I don't believe the defendant had any

8   objections to the Presentence Report?

9          MR. EXUM:  We did not, Your Honor.

10          THE COURT:  But I'll be glad to hear from the

11   government on your objections.

12          MR. KAUFMAN:  Thank you, Your Honor.

13          The first objection relates to the firearm.  I don't

14   believe that the facts are in dispute, I think its more the

15   interpretation.

16          Ultimately, Parker Coleman, not only a known leader

17   of the Charlotte part of this drug conspiracy, he was also

18   known to have firearms.  We have a witness we anticipate will

19   be testifying at the trial against Mr. Coleman that he

20   actually obtained firearms for him.

21          THE COURT:  And who is that witness?

22          MR. KAUFMAN:  Well, actually there are a couple, one

23   is Mark Hunt.  And Mr. Coleman was trying to obtain firearms

24   from him.  We know that another witness, Stephanie Peppers who

25   will be testifying, that she actually provided one of the

1    firearms seized -- provided one of the firearms to

2    Mr. Coleman.  The one that was seized on the first incident,

3    which is November 2nd at his house when the search warrant was

4    executed.

5              THE COURT:  How about evidence that Mr. Darty was

6    aware that Mr. Coleman possessed firearms?

7              MR. KAUFMAN:  We only have circumstantial evidence,

8    Your Honor.  We know that Mr. Darty and Mr. Coleman were close

9    friends.

10             THE COURT:  Was Mr. Darty interviewed?

11             MR. KAUFMAN:  Mr. Darty was interviewed.

12             THE COURT:  Was he asked about Mr. Coleman's firearm

13   possession?

14             MR. KAUFMAN:  He was asked about his -- he was asked

15   about his firearms possession.  And right now Agent McDonald

16   is reviewing the report.  I can say this:  We walked away from

17   that interview having confronted him.  We do not believe he

18   was truthful with us during his debrief.

19             THE COURT:  On this particular issue or other

20   issues?

21             MR. KAUFMAN:  On this and other issues.

22             THE COURT:  And so he was asked about his knowledge

23   of Mr. Coleman's firearm possession and you believe he was

24   less than candid with you in response?

25             MR. KAUFMAN:  Your Honor, may I have a moment just

1    to check?

2            THE COURT:  Well, I mean -- sure.

3    (Pause.)

4            MR. KAUFMAN:  Your Honor, when he was confronted

5    with the firearms issue with Mr. Coleman, he denied having

6    seen Mr. Coleman with firearms.  He only stated that he had

7    seen a firearm at Ms. Peppers' residence, but not at

8    Mr. Coleman's residence.

9            THE COURT:  And what evidence does the government

10   have that would indicate that that was a false denial?

11           MR. KAUFMAN:  Your Honor, the -- again, it's

12   circumstantial.  One is that he was known to have firearms.

13   And he was trying to get additional firearms.  He was a close

14   friend of Mr. Coleman's.  He had -- even when we executed the

15   search warrant on November 2nd, there was a picture of him,

16   that is Mr. Coleman, Mr. Darty, another co-conspirator in the

17   case and a fourth individual --

18           THE COURT:  Were there firearms in that picture?

19           MR. KAUFMAN:  They were not firearms in the picture.

20           THE COURT:  Just being a friend of Coleman's,

21   triggers a -- in your mind -- triggers a two-level enhancement

22   for possessing a firearm in connection with a drug trafficking

23   offense?

24           MR. KAUFMAN:  No, it doesn't, Your Honor.  It's a

25   matter of him being close friends with him.  With him being a

1 co-conspirator of his.

2     I would add that on November 16th, two weeks later

3 after that search warrant, Mr. Coleman and Mr. Darty were

4 arrested together.  What happened was, they had arrived

5 together in Mr. Darty's vehicle, to pick up Mr. Coleman's SUV.

6 Law enforcement was surprised to find Mr. Darty with

7 Mr. Coleman at that particular moment, thinking he had gone

8 back to California.

9     Mr. Coleman took possession of the keys from the

10 dealership where the SUV was being serviced -- or was being

11 repaired.  Mr. Coleman gave the keys to Mr. Darty, and for

12 reasons that we don't know right now, Mr. Coleman stayed in

13 Mr. Darty's Volkswagen and was leaving the scene in that, when

14 Mr. Darty was in the SUV, which is actually Mr. Coleman's

15 vehicle.

16     THE COURT:  So Coleman was in Darty's car and Darty

17 was in Coleman's car?

18     MR. KAUFMAN:  Yes, Your Honor.  And law enforcement

19 arrested both of the men on scene there.  And Mr. Darty was

20 driving the vehicle that had the two firearms in a non-factory

21 installed compartment behind the passenger seat.  Now it was

22 not in plain view and --

23     THE COURT:  Were there any drugs -- were there any

24 drugs seized from that vehicle at that time?

25     MR. KAUFMAN:  Not at that time, Your Honor, no.

1    THE COURT:  So what's the connection between the

2    firearms in the compartment of the vehicle and drug

3    trafficking?

4    MR. KAUFMAN:  The connection is that Mr. Coleman

5    would use the vehicle to drive around couriers,

6    co-conspirators, and the firearms being there, are a tool of

7    the trade to protect himself, his stash, his co-conspirators.

8    THE COURT:  Is there evidence that the firearms were

9    in that vehicle on other occasions?

10   MR. KAUFMAN:  We do have -- may I have a moment,

11   Your Honor?

12   (Pause.)

13   MR. KAUFMAN:  Your Honor, I'm sorry for consulting

14   with Agent McDonald every so often.  But what he was telling

15   me was that it wasn't those two particular guns that were

16   known to have been in that vehicle before.  But Mr. Coleman

17   was known to keep firearms and money, drug proceeds in that

18   very same compartment on prior occasions.  And so it is

19   circumstantial evidence that that's --

20   THE COURT:  Was the defendant asked about the

21   firearms in the car -- the firearms that were found in the car

22   on November 16th?

23   MR. KAUFMAN:  Your Honor, when he was asked about

24   his knowledge about firearms and Mr. Coleman, he denied having

25   any knowledge of firearms.

1     THE COURT:  How about on this particular occasion,
2 he was driving a car.  Did anybody ask him whether the car he
3 was driving, whether he knew there were guns in the car at the
4 time?
5     MR. KAUFMAN:  Your Honor, we believe that he was
6 asked that specific question, and he didn't know about the
7 firearm.  That's what he said.
8     THE COURT:  So -- and is there any evidence -- does
9 the government have any evidence that that was a false denial?
10    MR. KAUFMAN:  Well, Your Honor, I can say, yes,
11 indirectly.
12    THE COURT:  Just as general people, it was widely
13 known that Coleman had guns?  Is that --
14    MR. KAUFMAN:  That's part of it, Your Honor, yes.
15    THE COURT:  But there's nobody saying --
16    MR. KAUFMAN:  No one said --
17    THE COURT:  -- I put the guns in the car in Darty's
18 presence or any direct knowledge like that?
19    MR. KAUFMAN:  There's no statement like that, Your
20 Honor.
21    THE COURT:  So again, you're seeking a two-level
22 adjustment for something that's reasonably foreseeable to the
23 defendant that a co-defendant has done, and you're basing it
24 largely upon this widely known theory with some photographic
25 evidence of a relationship, but no -- no direct evidence that

1  the defendant ever had specific knowledge of the firearms

2  either on November 2nd or November 16th?

3          MR. KAUFMAN:  Correct, Your Honor.  It's

4  circumstantial evidence.

5          THE COURT:  All right.  I'm gonna overrule the

6  government's objection based upon the 2D1.1(b)(1), possession

7  of a firearm by a co-defendant.  I'm gonna find that the

8  government hasn't established by a preponderance that the

9  defendant had knowledge of the co-defendant's possession, or

10 that there was a nexus between any firearm possession and the

11 drug trafficking that forms the basis of the conspiracy.

12         Do you have any other objections to the Presentence

13 Report?

14         MR. KAUFMAN:  Yes, Your Honor.

15         One of them relates to the criminal history points,

16 as well -- and there's also relating to the safety valve.

17         THE COURT:  Let's deal with the criminal history

18 points first.

19         MR. KAUFMAN:  Yes, Your Honor.

20         There were -- this relates to paragraph 69.  In

21 paragraph 69 Mr. Darty was previously convicted on August 6th

22 of 2008 with possession with intent to sell and deliver

23 marijuana.  The conspiracy for which he was charged and which

24 he pled guilty -- I'm just double checking the indictment, but

25 I believe it was in 2009.  Yes, 2009, to the date of the

1    indictment.

2            Therefore this is a -- even if it were connected,

3    and we -- it would seem that it is close in time, so it

4    probably is connected, but it is -- to the current crime that

5    he's charged with, we submit that it is a prior offense.

6            THE COURT:  How could it be connected but prior?

7            MR. KAUFMAN:  Well, because he's charged with a

8    crime, a conspiracy, that we can prove from 2009 to the date

9    of the indictment.  Ultimately his stop was -- and I'm sorry.

10   When I quoted the date, that was the date of the incident.  He

11   ended up pleading guilty in 2009, but it was in 2008 that he

12   was stopped.  That precedes the charge date of the conspiracy.

13           THE COURT:  I understood your objection to say that

14   the conviction did not count as a prior conviction because

15   although it was related to the instant offense, that somehow

16   it was prior.  And I didn't understand that objection.  You're

17   now saying it was unrelated?

18           MR. KAUFMAN:  No, Your Honor.  What I'm saying is it

19   was related, but it is not part of the conspiracy period that

20   he's been charged with and convicted.

21           THE COURT:  In what way was it related?

22           MR. KAUFMAN:  Well, he had a large amount of

23   marijuana and U.S. currency.  And it would appear that that

24   was part of the same overall marijuana trafficking conspiracy.

25   I mean, it had the appearance of it.

1          And, you know, this case has multiple aspects of the

2    conspiracy.  Our understanding is, it came from an individual

3    named Ahmed Daniel Crockett, who is the lead defendant in

4    another related indictment.  So there's an argument as to

5    potentially being part of, but proceeding the charged

6    indictment in this -- sorry, charged conspiracy in this

7    indictment or in a related indictment.

8          THE COURT:  Isn't the question whether it came

9    within the time period of the charged conspiracy, whether that

10   was the same conspiracy that existed in 2009 as charged, but

11   may have started before that time period, or is it a separate

12   conspiracy or a separate unrelated substantive offense?

13         It seems to me that if it's part of the same

14   criminal agreement even though it was in August of the year

15   before, that it would be part of the instant offense, but that

16   if it was separate and apart from that, your argument might be

17   well taken.

18         So I'm trying to figure out from the government,

19   what the government's theory is with respect to the

20   August 2008 trafficking offense?

21         MR. KAUFMAN:  Your Honor, we actually struggled with

22   it ourselves, because not -- even putting aside the time

23   period.  Even if in theory the charged conspiracy period

24   preceded the date of his arrest and conviction in state court,

25   the source of that drug money and those drugs, it may be

1  Parker Coleman and the other 21 defendants, that indictment.

2  But we actually believe that it was from Ahmed Crockett, which

3  is in 3:10-cr-245.  And that's related to this investigation,

4  but it would be, I think considered potentially as a multiple

5  or separate conspiracy.

6           THE COURT:  That's what -- I'm asking you, what is

7  your theory and what are the facts that support that theory?

8           MR. KAUFMAN:  Your Honor, when we debriefed

9  with Mister -- Your Honor, our understanding of the facts is

10  that Mr. Darty was in a conspiracy with Mr. Crockett.  And in

11  January of 2009, there was a seizure by the investigative team

12  of this case that caused that relationship to end.

13           THE COURT:  In when, January of '09?

14           MR. KAUFMAN:  January of '09.  That's why we have

15  the conspiracy charge.  And it's our understanding that it was

16  Mr. Darty who then after that seizure, introduced the two

17  heads of this indictment, Mr. Adams in California and

18  Mr. Coleman here in Charlotte.  So it's our understanding that

19  Mr. Darty is the one who introduced them to each other after

20  the January 9, 2009 seizure.

21           So this is why we struggle with it because that --

22  this 2009 to the present indictment of 238, which is the one

23  to which he's -- for which he's pleading guilty and being

24  sentenced, it's not -- I have to tell the Court that there is

25  a connection to the other Daniel Crockett conspiracy, but

1    there was a break and a new relationship.  So it depends on
2    how you view a conspiracy, how expansive or limited you view
3    it.

4              THE COURT:  Would you view it as the same course of
5    conduct or common scheme or plan as the offense of conviction?

6              MR. KAUFMAN:  The course of conduct was different.
7    The Crockett indictment did not deal with the use of the
8    airlines and that whole connection.  The sources of supply in
9    California were different, but they knew each other.  So it's
10   not a clear-cut case, Your Honor.

11             It does appear that it was a separate different,
12   conspiracy, but they -- they knew each other and were -- there
13   was a relationship.  In fact, Mr. Darty really, in a lot of
14   senses, was the pivotal connection between those two groups of
15   indictments.

16             THE COURT:  What says the defendant?

17             MR. EXUM:  Thank you, Your Honor.

18             Your Honor, Mr. Darty was initially indicted with
19   events that say, from in or about 2007.  That is what's
20   referred to as the Crockett indictment.

21             Mr. Darty is only on the Coleman indictment because
22   he had not yet pled, and the other five individuals in the
23   Crockett indictment had pled.  And what was indicated to me
24   was that administratively, they would just simply move him to
25   the Coleman indictment because they are essentially part and

1    parcel of the same.

2             As it relates to the offense that was in Greensboro

3    that the prosecutor was talking about, I recall being told at

4    the beginning of the case, because he got a plea that is

5    somewhat unusual, unsupervised probation.  And that the

6    government was aware of that situation, and that to some

7    extent the government, they receipted in the plea that the

8    gentleman ultimately got.

9             Because this is all part and parcel of the same.

10   They were all intertwined.  They are all part of the same

11   conduct.  And as a result, that is why I believe -- and I

12   think in a court of law, the probation office when this

13   objection was filed, indicated that it would not count for any

14   of the two purposes that the government indicated.  It's part

15   of the same drugs, part of the same activity.  And was not

16   a -- was not prior in that sense, as you read the guidelines.

17   So I don't think that that applies.  I think this is a

18   criminal history level one as relates to that particular

19   conviction.

20            THE COURT:  All right.  I'm going to overrule the

21   government's objection to the criminal history computation.

22            It appears to the Court that the conviction

23   referenced in paragraph 69 of the presentence report, was part

24   of the same course of conduct or common scheme or plan as the

25   instant offense, and therefore is considered relevant conduct

1    under Section 1B1.3.  And as relevant conduct it doesn't
2    constitute a prior conviction.
3             So there does appear to be different sources of
4    controlled substances at different times.  But as I understand
5    the facts, the defendant was pivotal to the jointly undertaken
6    criminal activity.  Same type of drug, same type of controlled
7    substance, possibly different sources at different times.
8             But it appears to the Court that it's part of the
9    relevant conduct in the instant offense, and therefore not a
10   countable or counted conviction under 4A1.2.  So I'll overrule
11   the government's objection on that.  Do you have any other
12   objections?
13             MR. KAUFMAN:  Yes, Your Honor.  With regard to
14   criminal history, the last issue was --
15             THE COURT:  Oh, the safety valve.
16             MR. KAUFMAN:  Well Yes, Your Honor, that too.  But
17   even before we get to that, it would be mooted by this issue.
18   And I believe this -- obviously I say this after you already
19   overruled the prior objections.  But I believe this is a
20   stronger point, which is that he was on probation after
21   November 17th of 2009, but continued to be involved in the
22   conspiracy.
23             And so it's our position that it doesn't have to be
24   a prior offense.  4A1.1(d) only talks about committing the
25   instant offense while under any criminal justice sentence.

1    This is almost akin to when an individual has an 851
2    during the course of ongoing conspiracy --
3    THE COURT:  Where is your objection?  What paragraph
4    are you objecting to?
5    MR. KAUFMAN:  The objection is to paragraph 71, in
6    that there should be a two-level -- sorry, two criminal
7    history points assessed, because he was committing this
8    offense even after he was placed on probation by the state
9    authorities, which is that offense in paragraph 69.
10    THE COURT:  I'm just trying to figure out where you
11    raised this objection prior to the hearing.
12    MR. KAUFMAN:  I raised it in document 294, page two
13    of my third paragraph.
14    PROBATION OFFICER:  I think it may be objection
15    three, Your Honor.
16    THE COURT:  All right.  Let me read that.
17    PROBATION OFFICER:  They're all inclusive.
18    MR. KAUFMAN:  And that's a key issue, Your Honor.
19    When doing calculations under 4A1.1 A, B and C, it does have
20    to be a prior sentence.  However this objection doesn't hinge
21    upon Your Honor finding that the state conviction was a prior
22    sentence.
23    Paragraph 4A1.1(d) does not require it to be a prior
24    sentence, just that the defendant committed the offense while
25    under any criminal justice sentence to include, that we would

1    submit, probation as he received on November 17, 2009.

2         THE COURT:  And do you have any case law that

3    supports your position that a conviction -- a suspended

4    sentence resulting from a conviction that's part of the

5    relevant conduct may be considered separately for the two

6    point enhancement for committing the offense while under a

7    probationary sentence?

8         MR. KAUFMAN:  No, Your Honor.  I searched for hours

9    in this circuit and other circuits, and I was not able to find

10   anything on point for this specific issue.

11        But ultimately, if Your Honor thinks about what's

12   the reason for the two-level increase for when somebody's on

13   probation and committing an offense.  I mean, the idea is once

14   you've been placed on probation you should not be committing

15   further crimes.  And in this case he was placed on probation

16   November 17th of 2009 and he was -- he did not stop.

17        So our position is that while A, B and C under 4A1.1

18   speak in terms of a prior sentence, D does not, and it makes

19   sense for policy reasons.

20        THE COURT:  Is there any commentary that supports

21   your position?

22        MR. KAUFMAN:  No, Your Honor.  There's -- I don't

23   believe there's commentary that either supports or rebuts it.

24        THE COURT:  What says the defendant?

25        MR. EXUM:  Again, Your Honor, I agree with the

1    response given in the Presentence Report.  I think the
2    government's objections two and three go hand-in-hand.
3    Because their objection two, the determination is that that
4    offense was not countable.
5            THE COURT:  Well the argument is that A, B and C
6    have within it the limitation of it being a prior sentence,
7    whereas D does not.  And App. Note Four says that if the
8    defendant committed any part of the instant offense while
9    under a criminal justice sentence, including probation, you
10   add the two levels.  What do you say to that?
11           MR. EXUM:  I don't think the two levels should be
12   increased.  Again, I don't think it's applicable based upon
13   the determination of the non-countable offense.  And I think
14   there's a reason there's not any case law as it relates to
15   that.  And that reason would be, I don't think it applies
16   whatsoever.
17           THE COURT:  Well, wouldn't there be case law that
18   says that?
19           MR. EXUM:  I'm sorry?
20           THE COURT:  Wouldn't there be case law that says
21   that?  I mean, do you have any cases that --
22           MR. EXUM:  I think it generally stands silent unless
23   there's been a determination like the government wants to
24   make.
25           I think frankly in the government's objection, the

1   motivation is seen in paragraph -- where they indicate that

2   the defendant received an unexpected windfall based upon

3   sentencing.

4          THE COURT:  Well, I'm not concerned with the

5   government's motivation.  I'm concerned with whether this

6   applies or not.

7          MR. EXUM:  I don't think it does, Your Honor.

8          THE COURT:  What do you -- the argument's a

9   statutory interpretation argument where three subsections are

10  conditioned by prior sentence, and the fourth one -- actually

11  when you look at A through E, four of the five ways of

12  tabulating points are conditioned on a prior sentence, but D

13  is not.

14         What's the government's evidence that Mr. Darty

15  continued in the conspiracy after the conviction and placement

16  on probation in November of 2009?

17         MR. KAUFMAN:  May I have just a moment, Your Honor.

18  (A brief pause was taken in the proceedings.)

19         MR. KAUFMAN:  Your Honor, when obtaining information

20  from co-conspirators about Mr. Darty's involvement in the

21  offense, we don't -- at least at our fingertips -- have

22  anybody who specifically says in 2010, versus 2009, Mr. Darty

23  was a part of the conspiracy.  So for that I can't bring that

24  to you.

25         But I can say this:  You know, the reason why

1  Mr. Darty was even with Mr. Coleman on November 16th when they
2  were arrested, is because they were going to pick up the --
3  Mr. Coleman's vehicle, which the reason it was at the shop was
4  because they had to break into the window because they didn't
5  have Mr. Coleman's keys.  Co-conspirators had broken into the
6  vehicle to take marijuana out of it.  So he was facilitating
7  the conspiracy by helping him to pick up a vehicle that was
8  being used --
9          THE COURT:  That was the day before the conviction,
10 it appears no -- November 16, 2010.
11         MR. KAUFMAN:  Correct, Your Honor.  So I can't tell
12 you Witness X said that Mr. Darty in middle of 2010 was doing
13 certain acts.  I can only say there are people who put him
14 into the conspiracy.  But I can't give -- I can't parse it out
15 to a particular date.  He was -- the thing is, he was part of
16 the conspiracy.  He had not withdrawn.
17         So ultimately, until his arrest, and in fact
18 arguably under the case law, without an affirmative positive
19 withdrawal, all of his acts and the acts of co-conspirators
20 are attributable to him.
21         It would be one thing if we had evidence that he had
22 withdrawn from the conspiracy November 17th of 2009, but we
23 don't.
24         And Your Honor, Agent McDonald reminded me about an
25 incident in July of 2010 in which Mr. Darty had dropped off a

1    co-conspirator by the name of Eric McDonald at the airport.
2    Mr. Eric McDonald, he had dropped off with approximately
3    $72,000 of money that was intended to be used to purchase
4    marijuana.
5            So he was actually -- we do have evidence that after
6    the date he was placed on probation, he took specific overt
7    acts himself in furtherance of the conspiracy.
8            MR. EXUM:  My recollection of that part of the
9    debriefing was that it was part of the Coleman, with Mr.
10   McDonald, Mr. Darty was there, but Mr. Parker Coleman was the
11   one who gave an envelope to McDonald.  And whatever happened
12   with that situation, not Mr. Darty.
13           MR. KAUFMAN:  And Your Honor, that goes to part of
14   our concerns about Mr. Darty, if we were to even have to get
15   to the next issue, the safety valve, and his honest statements
16   about his full involvement.
17           Because -- well, I guess I can go into more detail
18   if Your Honor needs us to on that point -- on the point of him
19   dropping off the courier at the airport in his own vehicle
20   with the money.  And he was present when the courier was
21   handed, was given the money, in his vehicle.
22           Oh, I'm sorry.  He was the driver of the vehicle.  I
23   don't know who the owner of the vehicle was.  But Mr. Darty
24   was in the vehicle, driving the vehicle, was present when the
25   money was given to Mr. McDonald to then bring it to the source

1   of supply in July of 2010.

2           THE COURT:  I'm going to grant the government's

3   objection on the two-point adjustment for committing the

4   instant offense while under any criminal justice sentence.

5           I think the 4A1.1(d) provision is -- the absence of

6   the prior sentence caveat is an important one.  And that it

7   appears not to require a prior sentence.

8           So the defendant was placed on probation as a result

9   of the 2008 trafficking in -- or actually possession with

10  intent to sell and deliver marijuana, and received a suspended

11  sentence in November of 2009.  And was a member of this

12  conspiracy at a point in time past the time he was put on

13  probation.

14          And I think that 4A1.1(d) applies to the conduct of

15  a defendant who continues in a conspiracy after he was placed

16  on probation for a criminal justice sentence.

17          So I will grant the government's objection and

18  assess two criminal history points for committing a portion of

19  the instant offense while under a criminal justice sentence.

20          Any other objections to the Presentence Report?

21          MR. KAUFMAN:  Your Honor, we do not believe that we

22  need to go into detail.  The last issue is moot, but just for

23  the record we did object to the -- his satisfying the

24  requirement that he provide a full and truthful statement

25  about of all the facts within his knowledge about the instant

1    offense.  But because he has more than one criminal history

2    point he would not be safety valve eligible.

3              THE COURT:  What is the factual predicate for your

4    belief that he wasn't -- that Mr. Darty did not meet the fifth

5    factor in 5C1.2.

6              MR. KAUFMAN:  Your Honor, there are various things

7    that Mr. Darty stated when we met with him that were untrue.

8    The main theme throughout the interview was that he was trying

9    to, if anything, insulate Mr. Coleman from culpability,

10   placing the blame on his -- the co-conspirator Jerry Davis.

11             And as a couple of examples, he stated that he had

12   gone to California with Mr. Coleman.  And that while he

13   admitted that he had met Mr. Adams, he claimed that there was

14   nothing that was drug trafficking related.

15             When in fact what happened was, and we actually know

16   this from Mr. Adams, is that Mr. Darty introduced Mr. Coleman

17   to Mr. Adams.  And that they specifically were introduced to

18   conduct drug trafficking.  And after that meeting is when they

19   started in, I think it was some sort of prescription drugs

20   before they turned to the marijuana trafficking.

21             Oh, I'm sorry.  My mistake.  It was immediately

22   marijuana.

23             THE COURT:  And --

24             MR. KAUFMAN:  And that's one example, Your Honor.

25             THE COURT:  And so the defendant said that the

1   California trip did not involve drugs, and you have a witness

2   telling you that it did?

3             MR. KAUFMAN:  One of the -- yes, Your Honor.

4             THE COURT:  And who is that witness?

5             MR. KAUFMAN:  That's Milton Adams, one of the

6   participants in the conversation.

7             THE COURT:  And how does the Court resolve the

8   factual dispute that exists between Milton Adams and the

9   defendant?

10             MR. KAUFMAN:  Well, Your Honor, that's -- when you

11   take that in light of other facts which I can mention as well,

12   the July 2010 incident when Mr. Darty was driving Mr. Coleman

13   and Eric McDonald with the money -- well, actually the details

14   are quite significant.

15             He claimed during the debrief that he didn't see

16   anything about money exchanging hands.  It was just -- they

17   were just driving in a car together.

18             When in fact, Eric McDonald, the person who received

19   the money, said that Mr. Darty was driving, Mr. Coleman was in

20   the front passenger seat, and Mr. McDonald was in the back --

21   in the rear passenger seat.  That Mr. Coleman had -- while

22   they were all together -- past him this 70 plus thousand

23   dollars.

24             And it's significant that this money was contained

25   in approximately 37 individual envelopes.  He was handing him

1   37 different envelopes with approximately $2,000 in cash.  One

2   of them apparently, Mr. McDonald had even recalled, they were

3   all 2,000 except for one which he said may have been less,

4   maybe about $400.

5           THE COURT:  And what is the false information that

6   you believe the defendant provided the government with respect

7   to that incident?

8           MR. KAUFMAN:  That Mr. Darty was trying to say that

9   he didn't see Mr. Coleman do any -- give any money to

10  Mr. McDonald.  When in fact Mr. McDonald says that -- again,

11  this is somebody who was present for the transaction -- that

12  Mr. Coleman was handing him all of these envelopes with the

13  cash in it.

14          There are other issues as well.  There was a dinner

15  meeting where Mr. Darty was present with Mr. Coleman, and then

16  Goldie Crockett and another individual.  And this goes to the

17  idea that Mr. Coleman wasn't involved as far as he was aware

18  in this drug trafficking.  That they were -- we have multiple

19  witnesses -- or we have witnesses who talk about the dinner

20  and --

21          THE COURT:  Does any of this matter in light of the

22  conspiracy guidelines?  I mean, what impact --

23          MR. KAUFMAN:  Your Honor, I was just saying that

24  even if Your Honor hadn't found the two points, I was saying

25  that it's moot because of those two points.  But we would not

1    have found that he would have met the safety valve in any

2    event.  But because Your Honor's assessing the two criminal

3    history points --

4             THE COURT:  Well even if I didn't assess the two

5    criminal history points.  In terms of the safety valve

6    application, you get a two-level reduction, correct, under

7    5K1.2, if you meet the five separate criteria?

8             MR. KAUFMAN:  Correct.

9             THE COURT:  But when you look at the money

10   laundering conspiracy guidelines, those are more than the drug

11   conspiracy guidelines, and so you wind up at a 33 anyways.

12            MR. KAUFMAN:  Actually, Your Honor, there's a cross

13   reference.  The short answer is that money laundering, the

14   guideline that apply, is the drug trafficking guidelines plus

15   two.

16            THE COURT:  Plus the two.  So it does matter.

17            MR. KAUFMAN:  So it would impact the money

18   laundering guidelines.

19            THE COURT:  I see.  All right.

20            PROBATION OFFICER:  It would be, Your Honor, if you

21   found that safety valve, the two levels did not apply, I have

22   him being a 35, criminal history level II, based on your

23   rulings thus far.

24            THE COURT:  I see.  All right.

25            MR. KAUFMAN:  And Your Honor, so I think that where

1  we're at, at this point is, 33, Roman II.

2          PROBATION OFFICER:  35, Roman II.

3          MR. EXUM:  Criminal history points, correct, the

4  ruling so far --

5          MR. KAUFMAN:  I'm looking at page 15, paragraph 64

6  of the PSR.

7          PROBATION OFFICER:  Not contingent on whether or not

8  he takes away the two levels.

9          THE COURT:  Mewanda, come talk to me.

10          PROBATION OFFICER:  I'm sorry.

11  (Pause.)

12          THE COURT:  Mr. Exum, the government's argument is

13  that having made the ruling that I did on the criminal history

14  points, that the defendant is ineligible for safety valve

15  consideration.  What is your response to that?

16          MR. EXUM:  I would like to object to that, Your

17  Honor.  But frankly if he's not considered a criminal history

18  level I --

19          THE COURT:  So I'm either right or wrong on that

20  point.

21          MR. EXUM:  I think if he's not a criminal history

22  level I, then he's not eligible for the safety valve.  I would

23  like to argue otherwise, but I believe I cannot.

24          THE COURT:  All right.  Well I'm going to find that

25  as a result of the ruling that I made on the two-point

1   increase for being, committing a portion of the instant

2   offense while under the criminal justice system, bars safety

3   valve consideration.

4          And having made that ruling it appears to the Court

5   that once you factor in acceptance of responsibility, the

6   defendant's offense level is a 35, criminal history category

7   II.  Before any considerations of departure or variance, that

8   the correct guideline level to consult is 188 to 235.  Having

9   made the rulings that I have, do the parties agree those are

10  the correct guidelines to consult?

11         MR. KAUFMAN:  Your Honor, with respect, I actually

12  believe that Mr. Darty's sentencing range is lower.  I believe

13  that his total offense level is 33.

14         THE COURT:  And how do you get there?

15         MR. KAUFMAN:  The way that the PSR gets there

16  paragraph -- paragraphs 49 through 64.  I believe that those

17  are the correct calculations.  And we're not talking about a

18  loss of acceptance of responsibility.

19         THE COURT:  I know that.  So let's walk through

20  that.

21         Paragraph 50, you no longer -- based on the Court's

22  ruling, he doesn't get a two-level reduction --

23         MR. KAUFMAN:  Oh --

24         THE COURT:  -- correct?

25         MR. KAUFMAN:  You know what, Your Honor, I stand

1    corrected.  I think I was looking at Count Two and I didn't
2    realize.  My apologies.
3              THE COURT:  So I'm just asking you whether you agree
4    with the fact that in 50, there's not a two-level reduction
5    for --
6              MR. KAUFMAN:  I agree with you that there is no two
7    level --
8              THE COURT:  Then 54 is then 36; agreed?
9              MR. KAUFMAN:  Yes, Your Honor.
10             MR. EXUM:  If there's no two level reduction.
11             THE COURT:  Right.  Based on the Court's ruling.
12             MR. KAUFMAN:  My apologies.
13             THE COURT:  Then 55 would be 36.  Because it picks
14   up on the adjusted offense level from the drug count.  Do you
15   agree?
16             MR. KAUFMAN:  Yes, Your Honor.
17             THE COURT:  And then there's a two-level adjustment
18   for the money laundering offense, and a reduction for
19   acceptance of responsibility leading to 35.
20             Now Mr. Exum, I know that you disagree with the
21   two-point enhancement, but that is the Court's ruling.  And so
22   based upon that ruling, do either of the parties contend that
23   the advisory guidelines are something other than offense level
24   35, criminal history category II?
25             MR. KAUFMAN:  No, Your Honor.

1          MR. EXUM:  Not other than the objection.

2          THE COURT:  Noting your objection.  That is the

3    advisory guidelines that the Court consult.

4          Are there any other government objections to the

5    Presentence Report?

6          MR. KAUFMAN:  No, Your Honor.

7          THE COURT:  All right.  Mr. Exum, I'll be glad to

8    hear from you on behalf of Mr. Darty at this time.

9          MR. EXUM:  Thank you, Your Honor.

10          Your Honor, I think what you look at this point,

11    when you're considering the sentence, is you consider the

12    opportunity of the person to redeem themselves in the

13    situation that they are in that has brought them to the

14    court's attention.

15          I think when you look at the history of this young

16    man, there are many redeemable factors, and many facts

17    indicate and suggest very strongly that he's going to be a

18    very productive citizen once he is released from

19    incarceration.

20          You start with how he was reared.  He was reared by

21    two parents.  Which many people in this circumstance were not.

22    Both of his parents are successful and productive citizens.

23    You read the letter that they wrote to the Court and the

24    things that they said about the young man and how he was

25    raised.  His mother has risen up the corporate ladder.  His

1   father serves in the military, presently serves in the
2   probation office in Los Angeles, California.  He has a sister
3   who has been very successful in college at Villanova
4   University here.
5           And I think that Gerren's headed along on that same
6   path.  When you look at some of the things that he was
7   involved in and was successful with.  You see that he was
8   involved -- he was President and Vice President of Jack and
9   Jills during his teenage years, which wasn't all that long
10  ago, Member of the National Honor Society, outstanding athlete
11  in track and baseball.  The Court is aware of the type of
12  character that is developed when people participate in
13  athletics.  He was also first runner up in the California
14  State Church of Christ National Youth Conference and
15  Mr. Congeniality competition.
16          He has some college.  He did one year at Cal-Poly.
17  He was actually enrolled back at that university just prior to
18  the time that he was arrested and ultimately incarcerated in
19  this case.
20          At that point, and prior to arrest, he had realized
21  that the activities that he was involved in were wrong.  That
22  they were ultimately going to cause harm to him, to his
23  family, and to his ability to proceed forward in life.
24          So while he didn't send a formal letter or formal
25  cease and desist order, or anything of that nature, he had

1  essentially decided at that point that what he was doing at
2  that time was wrong and stopped doing that.
3          He became involved in a relationship with a young
4  lady that he hoped to develop and was moving along in that
5  capacity.
6          This young man is a parent who wants to provide a
7  positive role model to his son, set a good example to his son.
8  He knows the activity doesn't do that, but he wants to set
9  that positive activity.
10         Your Honor, we submitted several letters to the
11  Court that expound upon a variety of ways that different
12  people know Gerren.  One of the things that they indicate, and
13  one of the things that I've learned about him and seen several
14  times over the years that I've represented him, is that he is
15  a very caring and compassionate person.  That he sees nearly
16  anyone as a friend, and that he is very generous as it relates
17  to that.
18         Frankly, when you look at the drug conspiracy, lots
19  of money -- the Court's always going back and forth with these
20  conspiracies.  You don't see this guy with expensive homes,
21  cars, any of those trappings.  Because he really just let
22  those things go in relation to other people.
23         Even in jail, and I think probably one of the better
24  character letters that you can get is from someone who is not
25  your mom, not your dad, not your child's mom.  And that comes

1    from Pamela Blackburn.  That was Exhibit 2.  When he
2    participated in Mecklenburg County Area Mental Health
3    Substance Abuse and Treatment Program.
4         In that program he didn't simply do the things that
5    he needed to do to help himself in recognition of the drug
6    problem that he has as noted in the Presentence Report.  But
7    they went to the point of spelling out how he went and took
8    the opportunity to help other people when he could have been
9    doing other things with his time.  I think that is in large
10   measure who Gerren Darty actually is.
11        You see from the criminal history that the
12   significant criminal history is that which relates
13   specifically to this offense, the drug trafficking offense in
14   Greensboro.
15        So I think when you take the body of his history,
16   the fullness of his history, that a fair sentence would likely
17   be something -- the Court of course has the Guidelines.  The
18   Court is not controlled by the Guidelines.  That in comparison
19   to other individuals, the Guideline range of 36 is too high.
20        A criminal history or a prison term that perhaps
21   could be as low as 188 as high as 235 months is too high, and
22   I'm gonna ask the Court to consider a sentence below that
23   Guideline.
24        I'm going to ask as well that the Court allow the
25   young man to participate in any substance abuse programs that

1   may exist in the Bureau of Prisons while he is there and have
2   access to that.  That he have access to furthering his
3   education while he is in the Bureau of Prisons.  Ask that he
4   be designated to a facility as close to Los Angeles,
5   California as possible.
6           Now, as to his interaction with the government and
7   their agents.  To be certain, Mr. Darty did not agree to meet
8   with and be debriefed by the government in order to lie to
9   them.  He had already pled.  And if he was going to lie to
10  them -- and we discussed as I do with all my clients -- the
11  parameters of cooperation.  How that can be beneficial.  How
12  it would not be beneficial if deemed to be untruthful.
13  That -- I don't believe that's what he did.  Now they have a
14  broader finding of what I have.  I have what they sent me.  I
15  have what he said.
16          The things that they have indicated on lies, we
17  could go on all day about that, I don't want to go tit for tat
18  on that.  But the situation and the car with the money what he
19  said was, Parker Coleman gave the gentleman envelopes.  Those
20  envelopes contained money, then they contained money.  He did
21  not see money.  He's not going to lie on Parker Coleman or
22  anyone else.  That was the basis for that.
23          There are other circumstances that they indicated.
24  You'll always have situations in conspiracies where one person
25  says one thing, one person says something a little different.

1    The bottom line is that he acknowledged at his plea colloquy

2    that he was involved and he accepted his responsibility for

3    that.

4              He is a friend of Parker Coleman.  But he has no

5    interest in protecting Parker Coleman.

6              As a matter of fact, he did in fact, on a social

7    trip to Los Angeles for Parker Coleman, not so much to meet

8    other drug dealers, but to be friends of his and his family.

9    Parker Coleman developed a relationship with the other

10   individuals during that meeting.  That didn't have anything to

11   do with Mr. Darty.  That had to do with Parker Coleman, that

12   had to do with Milton Adams.  And Parker Coleman will have to

13   deal with these things at his trial and at his day of

14   sentencing, if in fact he is convicted.

15             Again, I think when you look at Mr. Darty, and you

16   look at his role, when you compare that to all of the other

17   individuals that will likely, ultimately, be before this

18   court.  It's not going to be fair to comparatively if this

19   fellow ends up with 188 months or more, where other people are

20   gonna end up with three years, five years, in time of that

21   nature.

22             So again, I ask that the Court fashion a sentence

23   that's not greater than necessary to achieve statutory

24   purposes of punishment.

25             And when you have someone with his background, with

1   his opportunities, with things that he's done, with his lack
2   of other criminal exposure, that a sentence that is below the
3   Guideline of 35, criminal history level II, would be
4   sufficient, would promote deterrence, but would also give this
5   gentleman an opportunity to look forward to getting out and
6   doing the positive things that he looks forward to doing.  I
7   think one of those things was the young lady indicated she has
8   a job waiting for him with a company she's developing.

9           That's our presentation, Your Honor.  Mr. Darty
10  would like to be heard.

11          THE COURT:  Mr. Exum, thank you.

12          Mr. Darty, it is your right to address the Court.
13  I'll be glad to hear from you anything you wish to tell me.

14          THE DEFENDANT:  First of all, Your Honor, I just
15  want to say that, you know, it took a lot of time for me to
16  understand that the things my parents did for me were, you
17  know, going to be beneficial to me when I got older.  Like he
18  said, I been given a lot of opportunity by my parents and I
19  didn't appreciate them.  I can be honest about that now, you
20  know.  And it took the time that I was in here for the last 13
21  months to really should have been.  The things as far as my
22  father did, as far as discipline, structure, and extra
23  curricular activity, to really understand my father had so
24  much pushed me to be anything I wanted to be.  I hate to have
25  to admit it now, but I will.  When I make the decision to do

1  what I was doing in 2008, early 2009, a large part of that was
2  because I was afraid of success, as far as how my parents set
3  me up for it. I thought I could do something different and
4  still be successful in the light of having money. And you
5  know, it was a bad decision. I made that mistake.
6       Early on in 2009, as they said when they especially
7  got taken up with my co-conspirators of my first indictment,
8  you know, they continued on. I decided to go back to
9  California to spend time with my son. And that's when I kind
10 of reassessed myself and the things I was doing. And I went
11 to school, got a job. I talked to my father and my mother.
12 And you know, at that time I had talked to the charge in
13 August 2008. And you know, I opened up my father, me and my
14 dad came to an understanding that, you know, in order to be a
15 father of his nature to my son, I had to, you know, try to
16 pace my life and not try to rush through it. And you know I
17 made the decision to do that.
18      You know, my attorney told me, you know, not to go
19 into it, I won't. But for the most part, Your Honor, I can
20 tell you honestly that I didn't participate in any illegal
21 activity at that time. I made my mind up to commit to my son,
22 period point blank. I've done wrong. You know, I'm not
23 trying to dispute that at all.
24      And, you know, ever since 2009 I've been just trying
25 to get my life back on track. Like he said, going to school.

1  I've been trying to study psychology, even though I found it
2  interesting just trying to help children, and anybody I can
3  really, because I believe in prevention rather than
4  rehabilitation.
5        I mean, personally, I mean I don't think jail is the
6  place to go for a person to change their life.  I think you
7  know, rather than have to make a person change their life, you
8  should just try to introduce them and give them opportunity
9  early on.
10       So, you know, I like you to really just be lenient
11 with me.  You know, I'm just begging for your mercy.  I want
12 to be a part of my son's life while he's still in the learning
13 stages of his life.
14       You know, I have a God son's that's eight years old
15 and he's going the wrong direction.  I want to be there for
16 him.  You know, I don't want to get out and hearing that he's
17 going through things I'm going through now.  Because the
18 opportunity wasn't afforded to him.  He doesn't have a father
19 in his life.  And I've done what I could with the time that
20 I've had to try to implement some kind of discipline in him
21 like my father did me, and give him opportunity.
22       You know, I have my friends and some of my family
23 members here to support me.  They been great to me.  I know
24 I'm not the best person, but I love people, man.  That's just
25 how I was raised to be selfless.  And I've done my part with

1   that, I feel.

2   And just to close out, I just want to say something.

3   I read a story. That's why I know this time was a mistake.

4   And at the end of this story was a quote, and I feel like this

5   describes exactly how I felt.

6   The story is "The Quiet Game" by Greg Iles who said,

7   our actions have consequences that last long after us,

8   entwining the present with the future in ways we can not

9   understand. I will do things that make me happy today, not

10  going to live with for the next 10 years of my life.

11  So thank you for your time, Your Honor.

12  THE COURT: I enjoy Greg Iles books. Let me ask you

13  this. When do you believe that you last participated in this

14  conspiracy? Was it after your August --

15  THE DEFENDANT: No. It was January, January 2009.

16  When that crate got taken, I was pretty much done. I mean, I

17  was just discouraged, to be honest with you. I mean, I lost a

18  lot of money in that crate. And at the time we thought

19  somebody stole it. There was no trust there. Like I said, I

20  went my separate way. I never -- I never broke my

21  relationship with Parker, because Parker was my friend. I

22  still consider Parker to be a friend. You know, I can't say

23  what he did or didn't do because I was in California. My life

24  was about my son, about going to school and trying to reassess

25  some things. I came out here, I visited him, you know what I

1    mean.  I'm not going to deny that.  I came for his sister's
2    graduation.  She graduated from high school, because that's a
3    friend.  I'm not gonna deny my friend.  But at the same time,
4    I can't say what he has and has not done.  Whether or not they
5    believe my honesty in that, you know, I can't -- I can't argue
6    with them.  But I mean, I have no reason to lie.  I signed my
7    plea.  The last time I plea I took my guilt.
8            THE COURT:  All right, thank you.
9            Mr. Kaufman.
10           MR. KAUFMAN:  Your Honor, I hear Mr. Darty saying
11   he's got no reason to lie.  I'm just dumbfounded quite
12   honestly, Your Honor.
13           Mr. Darty is a drug trafficker.  He's responsible
14   for over 1,000-kilograms of marijuana.  Over 1 million dollars
15   of marijuana and marijuana proceeds that he by his own
16   admission was reasonably foreseeable to him.
17           We've tried over and over to get Mr. Darty to plead
18   and to cooperate.  With Mr. Exum's permission, I even spoke to
19   Mr. Darty's father, because we were trying to get Mr. Darty to
20   do, at the time, pre-*Simmons*, he was looking at 20 years or
21   more.  And we were trying to get him to cooperate.
22           It's inexplicable to me at the time when we
23   debriefed him -- you got to understand, Your Honor,
24   Mr. Coleman seems to have a hold on people that just -- no one
25   wants to cross him.  He's in jail.  But there's just

1    something -- he's got a hold on people.  And I believe that

2    Mr. Darty was and actually still is under this control.

3            Mr. Darty just now said that his last activity was

4    after the crate.  I just consulted with Agent McDonald.  And

5    in addition to this July 2010 incident, which by the way he in

6    his debriefing denied seeing any exchange.  He did not admit

7    seeing the envelopes being transacted.

8            In addition to that, during his debrief he said that

9    after that crate was found, that he continued to work with

10   Jerry Davis, who is one of Mr. Coleman's co-conspirators, by

11   sending marijuana to Jerry by FedEx.  That was one of the

12   other methods.  Basically three methods were the crates, FedEx

13   and the airlines.

14           And so he, even in his own debrief with law

15   enforcement admitted that after that crate he continued to

16   send marijuana.  So I'm troubled.  I mean, I have to say that,

17   you know, the sentence he's looking at is because of his prior

18   conduct and his conduct in this conspiracy.

19           I do believe that the bottom of the guidelines of

20   188 months is sufficient, but not greater than necessary.

21           But at this point there's no reason to be trying to

22   exculpate or at least not say something about Mr. Coleman, and

23   it's just troubling.  But I am confident that he was in fact

24   taking part in this conspiracy after January 2009 even by his

25   own admission to law enforcement.

1          MR. EXUM:  Your Honor, if I did not, I do request

2    that he be designated to a facility close to Los Angeles.

3          THE COURT:  Yeah, you mentioned that, thanks.

4          This has been a protracted hearing, a lot of the

5    issues dealt with the legal significance of certain things.

6    Now the Court's sentence is required to accomplish the

7    sentencing purposes of Section 3553(a), which include the need

8    for the imposed sentence to reflect the seriousness of the

9    offense, promote respect for the law, just punishment,

10   adequate deterrence and protect the public from further crimes

11   of the defendant.

12         The Court is also instructed to take into

13   consideration the history and characteristics of the

14   defendant, and the nature and circumstances of the offense.

15         Appears to the Court that the defendant comes from a

16   strong family background; that he has had work, athletic and

17   other participations that have been positive in his life, and

18   those are all taken into consideration by the Court.

19         Does seem to be a strong relationship between the

20   defendant and his son.  And that at some point in this whole

21   conspiracy, that although the defendant did not formally

22   withdraw from the conspiracy, that he indicates that he focus

23   his life more on his family in California than the drug

24   activities.

25         The other side of the ledger is the seriousness of

1  this offense.  This was a conspiracy which involved the
2  distribution of thousands of kilograms of marijuana,
3  substantial amounts of money were laundered through the
4  defendants and others efforts.  And that the defendant played
5  a substantial role over a long period of time in the
6  trafficking of marijuana, in thousand kilogram quantities.
7          Pursuant to the Sentencing Reform Act of 1984, it is
8  the judgment of the Court that the defendant Garren Darty is
9  hereby committed to the custody of the Bureau of Prisons to be
10 in prison for a term of 188 months on each count to be served
11 concurrently.
12         A 188 month sentence is sufficient but not greater
13 than necessary to accomplish the sentencing objectives that
14 the Court's previously discussed.
15         Mr. Darty helped transport and distribute thousands
16 of kilograms of marijuana from California to Charlotte, aided
17 in the laundering of proceeds from those sales, and he did so
18 over a long period of time, and even an arrest within that
19 time period seemed not to deter him from his continued
20 involvement in the conspiracy and association with Coleman and
21 others.
22         And a substantial sentence is designed to protect
23 the public, to deter criminal conduct, and to reflect the
24 seriousness of the criminal activities among other purposes
25 set forth in 3553(a).

1    The Court calls to the attention of the custodial
2    authorities that the defendant has a history of substance
3    abuse and recommends that he be allowed to participate in any
4    available substance abuse treatment program while
5    incarcerated, and if eligible, receive the benefits of 18
6    United States Code Section 3621(e)(2).
7         The Court also recommends that the defendant be
8    allowed to participate in any educational and vocational
9    opportunities while incarcerated.
10        The Court recommends to the Bureau of Prisons that
11   the defendant be designated to a facility as close to Los
12   Angeles as possible, consistent with the needs of the federal
13   Bureau of Prisons.
14        Further ordered that the defendant be required to
15   support all dependents as outlined in the Presentence Report
16   from prison earnings while incarcerated.
17        Upon release from imprisonment, the defendant shall
18   be placed on supervised release for a term of three years.
19   This term consists of three years on Count One, and term of
20   three years on Count Two, both terms to run concurrently.
21        Within 72 hours of release from the custody of the
22   Bureau of Prisons the defendant shall report in person to the
23   probation office in the district to which he is released.
24   While on supervised release the defendant shall not commit
25   another federal, state or local crime, shall comply with the

1  standard conditions that have been adopted by the court in the
2  Western District of North Carolina.

3          It is ordered that the defendant pay to the United
4  States a special assessment of $200.  The Court finds that the
5  defendant does not have the ability to pay a fine or interest,
6  will waive payment of a fine and interest in this case.

7          The defendant shall forfeit any interest he has in
8  the property set forth in the forfeiture notice of the
9  indictment, and any other property seized by the United States
10 as a result of this investigation.

11         Special assessment is due and payable immediately.

12         Other than what we've already discussed, is there
13 any legal reason why sentence should not be imposed as stated?

14         PROBATION OFFICER:  Based on your rulings, Your
15 Honor, Count One, the statutory guideline range the supervised
16 release has to be at least five years now.  It can no longer
17 be three to five.  That was based on the safety valve which he
18 no longer has.

19         THE COURT:  So I do stand corrected.  And the term
20 of supervised release which I indicated was three years, I
21 should have indicated five, and I will correct myself and
22 order a term of supervised release of five years.

23         PROBATION OFFICER:  Thank you, Your Honor.

24         MR. KAUFMAN:  Yes, sir.

25         THE COURT:  Anything else?

1          MR. EXUM:  No, sir.

2          MR. KAUFMAN:  No, Your Honor.

3          THE COURT:  Any counts to be dismissed?

4          MR. KAUFMAN:  No, Your Honor.

5          THE COURT:  Very well.  Let the sentence be imposed.

6          Mr. Darty, you can appeal your conviction if you

7    believe that your guilty plea was somehow unlawful or

8    involuntary, or if there's some other defect in the proceeding

9    that was not waived by your guilty plea.  You also have a

10   right to appeal your sentence under certain circumstances,

11   particularly if you think the sentence is contrary to law.

12         Any notice of appeal must be filed within 14 days

13   from the entry of judgment.  If you are unable to pay the cost

14   of an appeal, you may apply for leave to appeal with no cost

15   to you.  And if you request, the clerk of court will prepare

16   and file a notice of appeal on your behalf.

17         The Court recommends that you talk to your attorney

18   about these appeal rights, especially about the impact on

19   these rights of any waiver of appeal provision in your plea

20   agreement.  But do you understand these rights as the Court

21   has read them to you?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  Anything further from either side?

24         MR. KAUFMAN:  No, Your Honor.

25         THE COURT:  This matter is concluded.

1              Mr. Darty is remanded to the custody of the marshals

2    at this time.

3    (The matter is concluded at 12:43 p.m.)

4                        *  *  *  *  *  *
     UNITED STATES DISTRICT COURT
5    WESTERN DISTRICT OF NORTH CAROLINA
     CERTIFICATE OF REPORTER
6
7              I, Laura Andersen, Official Court Reporter, certify
     that the foregoing transcript is a true and correct transcript
     of the proceedings taken and transcribed by me.
8
               Dated this the 21st day of February, 2012.
9

10

11                                   s/Laura Andersen
                                     Laura Andersen, RMR
                                     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25