UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA,    )   DOCKET NO. 3:10-cr-238
                             )
            Plaintiff,       )
                             )
            vs.              )   VOLUME II of IV
                             )
PARKER ANTRON COLEMAN,       )
                             )
            Defendant.       )
_____)


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
AUGUST 14, 2012

APPEARANCES:

On Behalf of the Government:

        STEVEN R. KAUFMAN, ESQ.,
        Assistant United States Attorney
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina 28202


On Behalf of the Defendant:

        NORMAN BUTLER, ESQ.,
        725 E. Trade Street
        Suite 115 Court Arcade Building
        Charlotte, North Carolina 28202

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1

I N D E X
AUGUST 14, 2012; VOLUME II of IV

2     GOVERNMENT WITNESSES:                          PAGE

3     SCOTT CLARKSON
         Direct Examination By Mr. Kaufman             203
4        Cross Examination By Mr. Butler               207

5     CARLOS LOPEZ
         Direct Examination By Mr. Kaufman             211
6        Voir Dire Examination By Mr. Butler           216
         Continued Direct Examination By Mr. Kaufman   219
7        Cross Examination By Mr. Butler               223
         Redirect Examination By Mr. Kaufman           232
8        Recross Examination By Mr. Butler             235

9     GREGORY SOWERS
         Direct Examination By Mr. Kaufman             236
10       Cross Examination By Mr. Butler               248
         Redirect Examination By Mr. Kaufman           252
11

      JAMES BEAVER
12       Direct Examination By Mr. Kaufman             252
         Cross Examination By Mr. Butler               322
13       Redirect Examination By Mr. Kaufman           348
         Recross Examination By Mr. Butler             356
14

      SAMANTHA JO SCHMIDLIN
15       Direct Examination By Mr. Kaufman             357
         Cross Examination By Mr. Butler               367
16       Redirect Examination By Mr. Kaufman           383
         Recross Examination By Mr. Butler             392
17

      NASTASHA RODRIGUEZ
18       Direct Examination By Mr. Kaufman             392
         Cross Examination By Mr. Butler               414
19       Redirect Examination By Mr. Kaufman           422
         Recross Examination By Mr. Butler             425
20

      HAROLD MANIGAULT
21       Direct Examination By Mr. Kaufman             426
         Cross Examination By Mr. Butler               436
22       Redirect Examination By Mr. Kaufman           446
         Recross Examination By Mr. Butler             452
23       Further Redirect Examination By Mr. Kaufman   453

24                    *  *  *  *  *  *

25

1  E X H I B I T S

GOVERNMENT EXHIBITS:

| NUMBER | ADMITTED |
|--------|----------|
| 3 | 271 |
| 4 | 271 |
| 8 | 271 |
| 11a | 301 |
| 11b | 301 |
| 11d | 303 |
| 11e-11u | 304 |
| 12c | 318 |
| 13 | 271 |
| 18a-c | 275 |
| 18d | 274 |
| 21 | 207 |
| 22b-f | 263 |
| 22h-m | 263 |
| 22o-s | 263 |
| 23 | 223 |
| 24a-c | 321 |
| 25 | 238 |
| 26a-d | 247 |
| 26e & f | 292 |
| 26g & h | 291 |
| 27b-f | 307 |
| 27g | 306 |
| 28b | 309 |
| 29 | 295 |
| 36b | 391 |
| 38a-f | 260 |
| 40a-c | 256 |
| 43a-b | 310 |
| 45 | 384 |
| 46a-b | 362 |
| 48 | 267 |
| 53a | 207 |
| 53c | 207 |
| 53e | 207 |
| 54 | 257 |
| 54b | 257 |
| 61 | 311 |

\* \* \* \* \* \*

1                    P R O C E E D I N G S

2    AUGUST 14, 2012, COURT CALLED TO ORDER 9:30 a.m.:

3              (Defendant Parker Antron Coleman present.)

4              THE COURT:  Good morning everyone.

5              ALL COUNSEL:  Good morning, Your Honor.

6              THE COURT:  Are we ready for the jury?

7              MR. KAUFMAN:  We are.

8              MR. BUTLER:  Yes, Judge.

9              THE COURT:  Do you have your next witness ready to

10   go?

11             MR. KAUFMAN:  We do, Your Honor.

12             THE COURT:  All right.  Call the jury.

13             (The jury was returned to the courtroom at

14   9:38 a.m.)

15             THE COURT:  Good morning, Members of the Jury.

16             THE JURY:  Good morning.

17             THE COURT:  I hope you had a restful evening and

18   you're ready to return to work this morning.  We're ready to

19   begin.

20             Call your first witness.

21             MR. KAUFMAN:  Thank you, Your Honor.

22             We call Mecklenburg County Sheriff's Sergeant Scott

23   Clarkson.

24         SCOTT CLARKSON, GOVERNMENT WITNESS, SWORN

25                    DIRECT EXAMINATION

1   BY MR. KAUFMAN:

2   Q    Good morning.

3   A    Good morning.

4   Q    If you would please tell the jury your name and spell it

5   for the record.

6   A    Scott Clarkson.  S-C-O-T-T.  C-L-A-R-K-S-O-N.

7   Q    Where are you employed?

8   A    With the Mecklenburg County Sheriff's Office.

9   Q    What's your current position?

10  A    I'm a sergeant with the Office of Professional

11  Compliance.

12  Q    How long have you been there?

13  A    I've been assigned to the Office of Compliance about four

14  years.  But in my most current position as an investigator for

15  seven months.

16  Q    What type of investigations do you do in this current

17  job?

18  A    Internal affairs.

19  Q    Prior to internal affairs, what was your position?

20  A    I was responsible for inmate telephone monitoring.

21  Q    And how long were you in that position?

22  A    Three and a half years.

23  Q    What were your duties in that role?

24  A    I was responsible for monitoring telephone calls placed

25  by inmates going outside of the facilities with personal phone

1   calls, not returning phone calls, which are privileged.

2       I would also, upon request of law enforcement, federal or

3   local prosecution teams, or the defense, would make

4   compilation of telephone records for their use.

5   Q   And when you say records, what type of records did you

6   keep?

7   A   Would be the physical telephone calls, recordings of the

8   telephone calls, as well as the digital information relating

9   to the date, time, telephone number, call was placed to,

10  things of that nature, relating to the telephones.

11  Q   Would you have considered yourself the custodian of

12  records for the jail calls and associated data?

13  A   Yes, sir.  I was considered the keeper of the records.

14  Q   Were all those records, the actual audio recordings and

15  the data, were those kept -- or I should say obtained and

16  maintained in the regular course of business?

17  A   They were, yes, sir.

18  Q   Can you describe the process by which phone calls are

19  made by inmates at the jail and how you retain them?

20  A   In order to place -- all phone calls from the jail are

21  collect telephone calls, so they would require a pin to be

22  used by that inmate to place that call.  The pin is a 10 digit

23  number.  The first six digits of that number is a specific

24  identifier to that inmate called a PID, a positive identifier.

25  Basically a fingerprint that is unique to that inmate alone.

1   The last four digits of the 10 digit pin typically consists of

2   the inmate's last four digits of their social security number.

3   So that comprises a unique number for that inmate to access

4   the call accounts to place telephone calls.

5        So in placing that telephone call, the inmate would

6   simply need to pick up the receiver, press one for English, if

7   that's the case, then dial the numbers as if it's a collect

8   call entering his pin, which would be used to identify him for

9   billing purposes.

10  Q    For all calls that are placed, when both sides of the

11  call are on the call, in the beginning, is there any sort of

12  warning regarding the recording of those calls?

13  A    Yes, sir.  There are three advisements that are

14  available, two are specifically for the inmate.  One being

15  within the inmate handbook that advises that all telephone

16  calls are monitored and recorded.  Another is a placard that

17  is physically placed on the telephone the inmate is using, and

18  in red announces that the calls are monitored and recorded.

19       And then finally, for both the inmate placing the

20  telephone call and the party that's receiving the call, there

21  is a verbal announcement that identifies that the telephone

22  call is originating from the Mecklenburg County Jail.  That it

23  is being placed by an inmate from that jail, and that the

24  calls are monitored and recorded.

25  Q    And that warning, is that played for both parties at the

1    beginning of all calls?

2    A    Yes, sir it is.

3    Q    Is there a reminder of the fact that it's being recorded

4    later on into a call, depending on how long that call is?

5    A    There are reminders randomly throughout the call that it

6    originates from the Mecklenburg County Jail.  But there is a

7    further advisement that it's being recorded, that just occurs

8    at the beginning of the call.

9    Q    Now, once you have captured the audio recording, once the

10   call has been placed in your system, is there any way to

11   modify or edit that audio file?

12   A    Once the calls have been recorded, they cannot be altered

13   in any way from their original form.

14   Q    The way that you've just described the creation and

15   maintaining of the jail phone calls, is that fair to say that

16   that applied throughout your tenure in that role to include

17   November of 2010, December of 2010, April of 2011, and at all

18   times?

19   A    Yes, sir.  It was consistent through my tenure.

20   Q    Did I at some point request that you create wave files of

21   four calls in this investigation.

22   A    Yes, sir you did.

23   Q    I would like to show you what have been marked and

24   provided in discovery to defense as Government's Exhibit 21,

25   53a, 53c and 53e for identification.

1    Do you recognize these four exhibits?

2   A    Yes, sir.  These are the original CD compilations that I

3   created per your request.  And I know these to be the

4   originals indicated in each by my initials.

5   Q    All right.  So these are authentic copies of the actual

6   recorded original phone calls?

7   A    Yes, sir, they are.

8        MR. KAUFMAN:  Your Honor, at this time we seek to

9   have Government's Exhibit 21, 53a, 53c, and 53e admitted to be

10  published at a later time.

11       MR. BUTLER:  Objection.

12       THE COURT:  Objection or no objection?

13       MR. BUTLER:  Objection, Your Honor.

14       THE COURT:  I'll admit them conditionally, subject

15  to linking them up at a later time.

16       MR. KAUFMAN:  Yes, Your Honor.

17       (Government's Exhibit No. 21, 53a, 53c and 53e were

18  received into evidence.)

19       MR. KAUFMAN:  We have no further questions.

20       THE COURT:  Any cross, Mr. Butler?

21       MR. BUTLER:  Yes, sir.  Thank you.

22                       CROSS EXAMINATION

23  BY MR. BUTLER:

24  Q    Good morning, Officer Clarkson.

25  A    Good morning.

1    Q    You indicated that you monitor inmates calls from the

2    jail; is that right?

3    A    I do, yes, sir.  Or at the time I did, yes, sir.

4    Q    I'm sorry.

5    A    At the time I did.  My responsibilities have changed as

6    of January.

7    Q    You're in internal affairs now?

8    A    Correct.

9    Q    I understand.  Do you monitor from Jail Central and Jail

10   North?

11   A    I monitor all facilities.  Because of the setup, I'm not

12   able to monitor all facilities simultaneously.  We need to

13   switch lines.  But yes, sir, I monitor all.

14   Q    So when you say you monitor the calls, are you listening

15   to the calls as calls are being made?

16   A    I am, yes, sir.

17   Q    How many calls are you listening to simultaneously?

18   A    Just one.

19   Q    Well, do you recall listening to any calls that -- strike

20   that.  Let me ask you this question.

21        Do you know Mr. Parker Coleman?

22   A    I do not.  No, sir.

23   Q    Okay.  So, I mean, you wouldn't have had any reason to

24   monitor his calls, would you?

25   A    Unless it came up as a random selection from the queue as

1  I would monitor, I would not.

2  Q    And now you indicated that you have kind of a unique set

3  up wherein, did you say a 10 digit number to make a call?

4  A    That's correct.  Yes, sir.

5  Q    And first six is PID number, that's positive

6  identification number?

7  A    Correct, the first six, yes.

8  Q    Then the last four is the social security?

9  A    Typically, the last four digits of their social security,

10  yes, sir.

11  Q    But now you're not telling the ladies and gentlemen of

12  the jury that an inmate can't use somebody else's PID number?

13  A    No, it can be -- they could use another inmate's pin, if

14  that inmate were to provide it.

15  Q    Yeah.  And that does happen?

16  A    It does, sir, yes.

17  Q    Now, of course you were actually monitoring these calls

18  through the use of some type of technical machinery devices;

19  is that right?

20  A    Yes, sir, it's a program.

21  Q    Okay.  And from time to time you have to provide some

22  type of preventive maintenance to make sure that this device

23  is going to work efficiently and properly; is that right?

24  A    I'm not involved in the preventive maintenance I simply

25  did the monitoring.  The vendor would take care of everything

1   related to the system.

2   Q    Okay.  But it's not a perfect machine, it's like any

3   other machine.  You have to maintain it, don't you?

4   A    I'm not clear on your question, I'm sorry.

5   Q    Well, my question is, is there a technical division or

6   support that you have in conjunction with your monitoring of

7   telephone calls from inmates?

8   A    One more time, I'm sorry.

9   Q    Is there a technical support division with the inmate

10  telephone monitoring system that you have?

11  A    Yes, sir, there is.

12  Q    Okay.  And do you know who works in that division?

13  A    That would be provided through our vendor.  I don't know

14  any of them personally.

15  Q    Who is your vendor?

16  A    That would be Global TeleLinks.

17  Q    Global Tell Links?

18  A    Correct.

19  Q    And wouldn't it be true that from time to time the whole

20  system shuts down?

21  A    It has occurred, yes, sir.

22  Q    In regards to calls -- now, you are not familiar with

23  every inmate or inmate's voice, are you?

24  A    No, sir I am not.

25  Q    So you're going on the 10 digit identification number

1  that you have that has to be used before you can make a call;

2  is that right, to identify the call?

3  A    The system identifies the caller based on that 10 digit,

4  and I would, typically as I monitor, not have a cause to be

5  concerned whose placing the call unless something security

6  related causes me to identify and pay further attention to it.

7  Q    And you are not there to determine who the receiver of

8  the call is?

9  A    No, sir.

10         MR. BUTLER:  If I may have a minute?

11         THE COURT:  You may.

12         MR. BUTLER:  Thank you.  No further questions.

13         THE COURT:  Any redirect?

14         MR. KAUFMAN:  No questions, Your Honor.

15         THE COURT:  You may step down, be excused.

16         Call your next witness.

17         MR. KAUFMAN:  Officer Carlos Lopez.

18         CARLOS LOPEZ, GOVERNMENT WITNESS, SWORN

19                  DIRECT EXAMINATION

20  BY MR. KAUFMAN:

21  Q    Good morning, sir.

22  A    Good morning.

23  Q    Can you please state your name for the record, spelling

24  your last name.

25  A    Carlos Lopez, Jr.  L-O-P-E-Z.

1    Q    Where do you work?

2    A    Charlotte-Mecklenburg Police Department.

3    Q    How long have you been there?

4    A    Just a little under 13 years.

5    Q    What is your current duty?

6    A    I'm a K-9 handler.

7    Q    How long have you been in a K-9 handler?

8    A    Just a little over two years.

9    Q    What's the name of your K-9?

10   A    Bolo.

11   Q    How long have you been working with Bolo?

12   A    My career with K-9.

13   Q    Did you go through any sort of certification or training

14   with Bolo?

15   A    Yes, we do.

16   Q    How often?

17   A    We have yearly certifications, and we have monthly

18   training that we do as a unit.

19   Q    With regard to the certifications, are there tests that

20   are performed during those certifications?

21   A    Yes.

22   Q    How have you performed during those certifications?

23   A    We certified -- we've only certified once.  We've only

24   taken the test once, so we certified one time.

25   Q    When was that?

1    A    Last year, last November.

2    Q    And what were the results?

3    A    We certified.

4    Q    Okay.  Can you describe what your routine training is

5    with Bolo, and when -- did that start as soon as -- well, let

6    me ask you, what was your initial training with Bolo?

7    A    My initial training with Bolo was to -- I went to a

8    school in Sanford, North Carolina, to where I basically

9    learned how to handle a K-9.  Not ever having the experience

10   of working a dog, I learned how to read my dog when he

11   indicates -- his different aspects of his work, from tracking,

12   to drug searches, to building searches.  I learned how to read

13   all his behaviors, when he's telling me basically what he's

14   been looking for.  What he's found or what he hasn't found.

15   Q    I would like to turn your attention to July 12th of 2010.

16   Were you and Bolo involved in a traffic stop involving a white

17   Porsche Cayenne SUV?

18   A    Yes, we were.

19   Q    Do you recall off the top of your head the driver of that

20   vehicle?

21   A    I'm not going to -- no, sir.

22   Q    Is there anything to refresh your recollection?

23   A    My notes.

24   Q    When you say your notes, do you mean like handwritten

25   notes or a report?

1    A    My report.

2    Q    I have what's been marked as Government's 64 for

3    identification purposes that's been provided previously to

4    defense in discovery.

5         Without reading directly from the report, can you tell me

6    first if you recognize what's in the two page 64 for

7    identification, just simply what the document is?

8    A    It's a K-9 incident report.

9    Q    Whose?

10   A    My K-9 incident report.

11   Q    Is it from the incident we just described in July 2010?

12   A    Yes, it is.

13   Q    Without reading from the document, can you review it to

14   see if it refreshes your recollection as to the name of the

15   person that you had stopped on that date?

16   A    Parker A. Coleman.

17   Q    Now, were you reading from that or does it refresh your

18   recollection?

19   A    Refreshes.

20   Q    Okay.  Can you tell us what happened?

21             MR. BUTLER:  Objection.

22             THE COURT:  Overruled.

23             THE WITNESS:  I was called to a traffic stop that

24   was conducted by North Carolina state troopers to conduct a

25   vehicle search of the vehicle.

1    Q    (Mr. Kaufman) Do you recall approximately what time it

2    was?

3    A    It was early in the morning.

4    Q    All right.  When you arrived, what happened?

5    A    When I arrived the trooper that was on scene had

6    advised -- the driver was already out of the vehicle, had

7    advised that there was some loose --

8              MR. BUTLER:  Objection.

9              THE COURT:  Members of the Jury, I'll sustain the

10   objection.

11   Q    Officer Lopez, without going into the details of what was

12   told to you --

13   A    Okay.

14   Q    -- but based on what you were told, what did you do as a

15   result of what you were told?

16   A    I deployed a K-9 Bolo, doing an exterior drug sniff of

17   the vehicle.

18   Q    And what happened?

19   A    Bolo alerted --

20             MR. BUTLER:  Objection.

21             THE WITNESS:  -- on the driver's side.

22             MR. BUTLER:  Objection.

23             THE COURT:  Overruled.  Overruled.

24             MR. BUTLER:  May I be heard, Your Honor, sidebar?

25             THE COURT:  Yes.

1          (Bench conference as follows:)

2          MR. BUTLER:  Your Honor, the basis of my objection

3   is K-9 Bolo was certified November 2011.  This happened 2010.

4   So my objection is, he's not qualified to give an objection on

5   the dog that's not certified.

6          THE COURT:  What says the government?

7          MR. KAUFMAN:  Well, Your Honor, the dog was -- we

8   went through proper training and ultimately the behavior of

9   the dog explains what Officer Lopez did next.

10          THE COURT:  If you want to voir dire any further

11   I'll give you that opportunity before I rule.

12          MR. BUTLER:  I would.

13          THE COURT:  Just on the qualifications.

14          MR. BUTLER:  Yes, sir.

15          (Bench conference was concluded.)

16          MR. KAUFMAN:  So Officer Lopez --

17          THE COURT:  I'm going to let Mr. Butler cross

18   examine on the training aspect of this.

19          MR. KAUFMAN:  Yes, Your Honor.

20          MR. BUTLER:  Thank you, Your Honor.

21                    VOIR DIRE EXAMINATION

22   BY MR. BUTLER:

23   Q    Good morning Officer Lopez.

24   A    Good morning, sir.

25   Q    Now Officer Lopez, you indicated that the first time that

1  Bolo qualified was November of last year; is that right?

2  A    Yes, sir.

3  Q    And so he was not certified on July 12 of 2010; is that

4  correct?

5  A    He was certified through the school that I had gone

6  through.

7  Q    What school is that?

8  A    Tar Heel K-9, sir.

9  Q    Is that the one that was in Sanford, North Carolina?

10  A    Yes, sir.

11  Q    And basically I thought you testified that that school

12  was basic familiarity school between you and the dog?

13  A    Correct.  But in order to graduate from that school, you

14  have to have a -- there's the test that you graduate from

15  there.

16  Q    Okay.  Well, do you have the certification?

17  A    I don't have them with me, no, sir.

18  Q    In regards to that certification, do you recall what

19  score Bolo received?

20  A    A passing score.

21  Q    Okay.  And what was that, do you remember?

22  A    No, sir.  It's a passing score.

23  Q    So you don't know if passing score is 70, 60 or 80?

24  A    I don't recall.  I don't recall it.  I know that it's a

25  passing score.

1   Q    Where was Bolo certified in November of 2011?

2   A    Here.

3   Q    At some --

4   A    Here in North Carolina through a certification.

5   Q    Do you recall prior to July the 12th of 2010, any false

6   alerts that Bolo had?

7   A    Not at this moment I don't recall.

8   Q    Okay.  But wouldn't it be fair to say he had some false

9   alerts?

10  A    Yes, sir.

11  Q    And during the training in Sanford, he had some false

12  alerts there, because he didn't score perfectly?

13  A    Correct, sir.

14  Q    Well now, you testified on direct that he became

15  certified for the first time, I thought you said last

16  November?

17  A    I did, sir.

18  Q    Okay.  Well, was he certified in Sanford or not?

19  A    Yes, he was.

20  Q    Did you forget that?

21  A    The certification in Sanford is in order for us to pass

22  and get out of the school.  After that we're on the road for a

23  year, and there is a certification that the department uses

24  nationally to basically hold the certification saying that the

25  dog is certified to perform certain tasks.  That's the

1  certification that I was speaking of.

2  Q    Okay.  Well what -- what kind of certification do you say

3  you received in Sanford?

4  A    That we were both capable of doing drug searches,

5  building searches, and tracking searches, and that he can pass

6  obedience.

7  Q    He can pass what?

8  A    Obedience.

9  Q    But you don't have the certification?

10  A    No, sir, I don't.

11  Q    Did you ever give the prosecutor that?

12  A    I'm sorry, sir?

13  Q    Did you ever give the prosecutor that?

14  A    I don't recall if I did or didn't.

15       MR. BUTLER:  That's all I have, Your Honor.  Thank

16  you.

17       THE COURT:  Very well.  Objection overruled.  You

18  may proceed.

19       MR. KAUFMAN:  Thank you, Your Honor.

20  Q    Officer Lopez, you discussed with the defense lawyer

21  about a false alert.  Are you familiar with the terms "blank"

22  and "fringing?"

23  A    Yes.

24  Q    Can you describe what that means to the jury?

25  A    Fringing is when -- if I was conducting a -- if I was

1    conducting a vehicle search on -- on any vehicle, fringing is

2    when the dog will catch odor of whatever item that we're

3    looking for, drugs.  If we're looking for drugs at this point,

4    he's going to catch odor of that.  If it's in a certain part

5    of the vehicle, depending on the air current, depending on

6    outside temperature, however the odor is escaping out of that

7    vehicle, the dog's going to catch that odor.

8         I can't tell -- I don't know 100 percent for sure how the

9    odor is going to go from, let's say one side of the trunk to

10   possibly the passenger door.  But odor's finding its way -- is

11   going to find its way out somehow, and Bolo will sometimes

12   fringe as to where the odor's at.  Not necessarily pinpoints

13   where the hide is at, where the drug is located, but he's

14   going to alert telling me that the odor is present.

15   Q    Can you describe for the jury the difference between when

16   Bolo is taking in odors --

17             THE COURT:  Let me interject here.

18             I allowed for Mr. Butler to voir dire at the point

19   in time where you were asking questions about the car stop in

20   July, driver being out of the vehicle and the exterior search.

21   So I overruled the objection and now I'm returning you back to

22   that point.

23             MR. KAUFMAN:  Thank you, Your Honor.

24   Q    Officer Lopez, you mentioned the alert.  What happened

25   after Bolo alerted to that portion of the SUV?

1  A    I opened -- I put Bolo inside the vehicle.

2  Q    And then what happened?

3  A    Bolo entered inside the vehicle, quickly jumped into the

4  back seat, alerted into the back seat.  And then between the

5  back seat and the trunk exterior of the Cayenne, he couldn't

6  get into the back part of it.  He wanted to.  He wanted to try

7  to get back there, but Bolo is anywhere between a 90, 95-pound

8  dog, and the space wouldn't allow him to jump into that back

9  compartment.

10    So I pulled him back out, opened the back of the Cayenne,

11  the Porsche, and put him into the back where he alerted on a

12  box that was back there.

13  Q    And do you remember what the box was for?

14  A    The box it was an -- it was a box that had for a money

15  counter.

16  Q    And did you in fact search the box?

17  A    I did.

18  Q    And what was your basis for allowing the dog into the

19  vehicle and then conducting your search?

20  A    Bolo alerted -- when Bolo alerted on the exterior of the

21  vehicle, it lead me to believe that there was something more

22  inside the vehicle that I could use my K-9 to locate.

23  Q    Are you familiar with the term "probable cause"?

24  A    Correct.

25  Q    Based on the alert, was it your understanding that you

1   had probable cause to do the search?

2   A    Yes.

3   Q    Did you look inside of the box that indicated that would

4   be for a money counter?

5   A    I did look inside the box.

6   Q    What did you find?

7   A    A large U.S. currency of cash.

8   Q    Did you find any evidence of -- well, let me actually

9   first show you what's been marked as Government's 23 for

10  identification.  Are you able to see that on the screen in

11  front of you?

12  A    I am.

13  Q    Do you recognize that photograph?

14  A    I do.

15  Q    And what is it?

16  A    It's a picture of the inside of that box with all the

17  money that was -- that Bolo had alerted on.

18  Q    And is it a fair and accurate representation of what you

19  saw on that date in July, 2010?

20  A    It is.

21            MR. KAUFMAN:  Your Honor, we seek to admit and

22  publish.

23            MR. BUTLER:  Objection.

24            THE COURT:  Overruled.  Let it be admitted.  You may

25  publish.

1    MR. KAUFMAN:  Thank you, Your Honor.

2         (Government's Exhibit No. 23 was received into

3    evidence and published.)

4    Q    And during your search did you find any other -- did you

5    find any indicia other than the money itself of drugs?

6    A    When Bolo alerted in the back seat, we actually removed

7    the back seat and found small amount of marijuana.

8         MR. BUTLER:  Objection to the conclusion.

9         THE COURT:  Overruled.

10   Q    (Mr. Kaufman) Is there a distinction between a narcotics

11   detection dog and a currency detection dog?

12   A    Yes.

13   Q    And what type of detection dog is Bolo?

14   A    He's a narcotics dog.

15   Q    Is he also a currency detection dog?

16        MR. BUTLER:  Objection.

17        THE WITNESS:  No, sir.  He's not.

18        THE COURT:  Overruled.

19        MR. KAUFMAN:  No further questions, Your Honor.

20        THE COURT:  Any cross?

21        MR. BUTLER:  Yes, Your Honor.

22                      CROSS EXAMINATION

23   BY MR. BUTLER:

24   Q    Now, Officer Lopez, did you charge Mr. Coleman with

25   marijuana?

1   A    I was not the charging officer.

2   Q    Okay.  Well, so you don't know if he was charged or not?

3   A    I don't know.

4   Q    Did you collect what you said was marijuana?

5   A    I was not the recovering officer of any of the evidence.

6   Q    Well, are you sure there was some evidence of marijuana?

7   A    Yes, I am sure.

8   Q    Okay.  Now, did you say Bolo was not a money detection

9   dog?

10  A    Correct.

11  Q    Well, did you see any drugs on the money?

12  A    No, sir.

13  Q    But I thought you said that the dog alerted to the box?

14  A    Correct, he did.

15  Q    And there were no drugs in the box?

16  A    No, sir.  Not that I'm aware of.

17  Q    Well, since the dog was a drug detection dog and not a

18  money detection dog, that would have been a false alert,

19  wouldn't it?

20  A    No, sir.

21  Q    Now, did you video record this investigation with your

22  dog?

23  A    No, sir.

24          MR. BUTLER:  If I could have a moment, please, Your

25  Honor?

1    THE COURT:  You may.

2    (Pause.)

3    MR. BUTLER:  If I could have a moment please Your

4  Honor.

5    THE COURT:  You may.

6    (Pause.)

7  Q    Now, you recall, do you not, Officer Lopez, that you say

8  that the dog alerted to some small amount of marijuana seeds?

9  A    Yes, sir.

10  Q    In the back seat?

11  A    Yes, sir.

12  Q    Under the back seat --

13  A    Yes, sir.

14  Q    -- is what you say?

15    Now you don't have personal knowledge of how much money

16  was in the exhibit that we just saw?

17  A    No, sir.

18  Q    You didn't count it?

19  A    No, sir.

20  Q    Do you recall when you completed this report?

21  A    Maybe a day afterwards, sir.

22  Q    You didn't see anybody counting money, did you?

23  A    No, sir.

24  Q    So you had to communicate with somebody about the amount?

25  A    Correct, sir.

1   Q    And do you know when you did that?

2   A    I'm pretty sure it would be the troopers.

3   Q    Okay.  But do you know when you did that?

4   A    No, sir I don't.  I don't recall that.

5   Q    Was it more than one trooper?

6   A    That was out there that night?

7   Q    Yes, sir.

8   A    Yes, sir.

9   Q    Do you recall which one you --

10  A    No, sir.  I don't recall that.  No, sir.

11  Q    And you don't know where that money is today?

12  A    No, sir, I don't.

13       MR. BUTLER:  Your Honor, please, at this time we

14  would move to strike his testimony about the amount of money.

15  He didn't count it.

16       THE COURT:  I don't know that he testified about the

17  amount of money.

18       MR. BUTLER:  If I could have a moment, please?

19       THE COURT:  You may.

20       (Pause.)

21  Q    Now, is Bolo an aggressive or passive dog in regards to

22  alerting?

23  A    He's passive most of the time, yes.

24  Q    Well, do you know whose money that was?

25  A    I'm sorry.  What was the question?

1    Q    Do you know whose money it was?

2    A    No, sir.

3    Q    Do you know who put it there?

4    A    No, sir.

5    Q    And you saw no marijuana in the vehicle any place?

6    A    Just what we found underneath the seat.

7    Q    So did you take the seat out of the car?

8    A    Removed it -- moved it so we could see what was there,

9    because Bolo's nose was wedged in there trying to get to it.

10   Q    This is the back seat?

11   A    Correct.

12        MR. BUTLER:  If I could have a moment, please?

13        THE COURT:  You may.

14        (Pause.)

15   Q    Well officer -- Officer Lopez, you had a chance to look

16   over your report to read it, correct?

17   A    I didn't read it.  I looked over it, yes, sir.

18   Q    Okay.  Well, do you recall -- strike that.

19        You know that nobody showed Mr. Coleman the money; isn't

20   that right?

21   A    I don't know that.

22   Q    Okay.  You didn't show it to him, did you?

23   A    No, sir, I did not.

24   Q    Okay.  And you saw it?

25   A    Correct.

1  Q    Okay.  Were you the first person to see it?  Did you open

2  the box?

3  A    Yes, sir I did.

4  Q    Okay.  And you didn't say well, Mr. Coleman, let me show

5  you what I found?

6  A    No, sir, I did not.

7  Q    Why not?

8  A    I wasn't the arresting officer, sir.

9  Q    Okay.  But you were involved in the investigation,

10 correct?

11 A    Correct.  I did my investigation part.

12 Q    Okay.  And once you found the money, your discussions

13 were with the troopers and not who you were told was the

14 driver of the car; is that right?

15 A    Correct.

16 Q    And now do you recall where Mr. Coleman was during the

17 search of the vehicle?

18 A    I believe he was in handcuffs in the car.

19 Q    And now he was actually in the vehicle -- in the

20 trooper's vehicle in front of the Porsche; is that right?  Do

21 you remember that?

22 A    I don't -- I don't know where.

23 Q    So you had no contact with Mr. Coleman; is that right?

24 A    That is correct.

25 Q    Now Bolo would alert on people, wouldn't he?  If -- if

1   there was a smell of narcotics?

2   A    We don't run our dogs on people.

3   Q    Okay.  But that's -- but if he was near a person, even if

4   you didn't run the dog.  I understand you don't run the dog.

5   But he would have alerted if he's certified, wouldn't he?

6              MR. KAUFMAN:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  I don't know that he would have.

9   Because at that point we have two different odors that we're

10  looking for.

11  Q    (Mr. Butler) You have --

12  A    At that point we have two odors that are involved, human

13  odor -- and when we train, when we work, I have never used my

14  dog to seek dope on a person.  It's always a building, a

15  vehicle or something like that.  If we're looking for human

16  odor, it's a completely different command.

17  Q    So, but you're not telling the ladies and gentlemen of

18  the jury that the dog can't distinguish between a human odor

19  and a controlled substance odor?

20  A    He can distinguish between the two, but we don't use our

21  dogs to find dope on people.

22  Q    Well, but my question is -- my question is this, if a --

23  well, let me ask this question.  Have you ever made a traffic

24  stop with your dog?

25  A    I'm not sure I understand that question.  I've made

1  traffic stop with my patrol vehicle while my dog is in the

2  back, yes.

3  Q   That's my question.

4  A   Okay.  Yes.

5  Q   You understood it.  I appreciate it.

6      And have you, during those types of traffic stops, ever

7  had the driver of the vehicle that you stop, come back and sit

8  in your vehicle?

9  A   No.

10 Q   Never done that?

11 A   Never.

12 Q   Okay.  But now, and you've never -- well, let me ask you

13 this question about the schooling.  In the schooling that you

14 went to in Sanford or here in Charlotte, those schools are not

15 just limited to Charlotte police officers, were they?  Highway

16 patrolmen there too?

17 A   At the schools that I went to?

18 Q   Yes, sir.

19 A   No, sir.

20 Q   It was just Charlotte police officers?

21 A   No, sir.  There were police officers from other agencies.

22 Q   Okay.  But you're not telling the ladies and gentlemen of

23 the jury that highway patrol don't have K-9s too?

24 A   I don't know if they have them or not.

25 Q   Okay.

1    MR. BUTLER:  If I could just have a moment.

2  Q   Wouldn't it be fair to say, Officer Lopez, that a strong

3  odor of marijuana would override or supercede a body odor,

4  wouldn't it?

5  A   If we're looking for marijuana?  Yes.

6  Q   I'm just asking a simple question.

7    MR. KAUFMAN:  Objection.

8    THE WITNESS:  I'm trying to give you a simple

9  answer, sir.

10    MR. BUTLER:  All right.  That's fine.  That's fine.

11    THE COURT:  Any redirect?

12    MR. KAUFMAN:  Yes, Your Honor.

13    MR. BUTLER:  Well, Judge, I don't know if he had

14  answered my question.

15    THE COURT:  Pardon me?

16    MR. BUTLER:  I don't think he had answered my

17  question.

18    THE COURT:  "Wouldn't it be fair to say, Officer

19  Lopez, that a strong odor of marijuana would override or

20  supercede a body odor, wouldn't it?

21    If we're looking for marijuana?  Yes."

22    MR. BUTLER:  Okay.  Thank you.  I didn't hear that

23  part.  Thank you very much.

24    THE COURT:  All right.

25    MR. KAUFMAN:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. KAUFMAN:

Q    Officer Lopez, do you recall being told how much money was in fact counted?

MR. BUTLER:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I do recall that, a rough estimate amount.

Q    (Mr. Kaufman) And did you put the specific dollar amount into your report?

MR. BUTLER:  Objection.

THE WITNESS:  I'm pretty sure I did.

THE COURT:  Overruled.

Q    (Mr. Kaufman) Did the trooper who counted the money, did he tell you that he had just counted the money when he told you the amount?

MR. BUTLER:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I don't know if he -- I don't know what, exactly how it was said.  But he said I counted the money and -- and that was the amount.

MR. BUTLER:  Objection.  Move to strike.

THE COURT:  Overruled.

Q    (Mr. Kaufman) What did the trooper tell you as to the amount?

1    THE COURT:  I'll sustain the objection as to that.

2  Q    Now you were -- how many officers were on scene during

3  this traffic stop, approximately?

4  A    Four, I believe.

5  Q    And you were asked about whether you had confronted the

6  defendant, Mr. Coleman with the seizure of the money.

7    Would it have been based on your training and experience

8  and your understanding, would it have been appropriate, based

9  on your role as a K-9 officer to do that?

10  A    It would not have been appropriate.

11  Q    Whose role would that be?

12  A    The arresting officer.

13  Q    Now with regard to the seizure of the money, are you

14  familiar with standard operating procedures as to whether that

15  money is retained in evidence or something else is done with

16  it?

17  A    It's retained in evidence.

18  Q    Are you familiar with whether certain dollar amounts,

19  thresholds are then made into a cashier's check?

20  A    I'm not familiar with that.

21  Q    You were asked about running Bolo on Mr. Coleman, and you

22  said that you didn't and wouldn't.  Why not?

23  A    We've never trained that.  It could lead to an accidental

24  bite.  So I -- we don't -- we don't do that.

25  Q    Are you familiar with the term, "search incident to

1  arrest"?

2  A    Correct.

3  Q    What's that mean?

4  A    Search incident to arrest would be that he's under arrest

5  and it give you the right to pat him down and search him.  So

6  the officers that arrested him would, the officers -- the

7  troopers that had him under arrest already had that right to

8  search him, pat him down, take anything that was on him.

9  Find -- if there were drugs, find the drugs that were on him.

10  Q    And while you're handling Bolo, would that be an

11  appropriate thing for you to conduct?

12  A    No.

13  Q    Who would be the appropriate person to conduct search

14  incident to arrest based on the circumstances?

15  A    The arresting officer.

16  Q    You were also asked whether Bolo's alerting to the money

17  was a false alert.  Do you remember the defense lawyer asking

18  you that?

19  A    Yes.

20  Q    And you said it was not.  Why not?

21  A    Because there isn't an actual -- because no marijuana was

22  found on the money.  It doesn't mean that the presence of odor

23  of marijuana wasn't in the money.  Money is a cloth material.

24  Therefore, it could absorb odor if that money was around

25  marijuana.  Then the odor would be on the money.

1          MR. KAUFMAN:  Thank you.  Nothing further, Your

2   Honor.

3          THE COURT:  Mr. Butler, any recross based on

4   redirect?

5          MR. BUTLER:  Yes, Your Honor.

6          THE COURT:  Something new?

7          MR. BUTLER:  Well, based on what the prosecutor --

8          THE COURT:  If it hasn't been asked before?

9          MR. BUTLER:  Yes, Your Honor.

10          THE COURT:  Yes.

11                    RECROSS EXAMINATION

12   BY MR. BUTLER:

13   Q    Did you see any of the troopers search Mr. Coleman?

14   A    I did not.

15   Q    You don't know if he was searched or not?

16   A    I don't know.

17   Q    And the -- so you didn't smell marijuana on the money,

18   did you?

19   A    I didn't smell the money.

20   Q    Okay.  Well, you opened up the box and saw the money?

21   A    Correct.

22   Q    Okay.  But you didn't detect an odor of marijuana, did

23   you?

24   A    No, sir, I did not.

25          MR. BUTLER:  Thank you very much.

1    THE COURT:  You may step down, be excused.

2    Call your next witness.

3    MR. KAUFMAN:  We call Gregory Sowers.

4    GREGORY SOWERS, GOVERNMENT WITNESS, SWORN

5    DIRECT EXAMINATION

6    BY MR. KAUFMAN:

7    Q    Good morning, sir.

8    A    Good morning.

9    Q    If you could please state your full name for the record,

10   spelling your last name.

11   A    Gregory Preston Sowers.  S-O-W-E-R-S.

12   Q    Where do you work?

13   A    Fintastic.

14   Q    And are you in fact the owner of Fintastic?

15   A    I am.

16   Q    What is Fintastic?

17   A    Fintastic is an aquatic store where we sell retail,

18   retail fish aquariums to the general public that would walk in

19   the store.  We also provide custom installation maintenance

20   services, where we actually go out to residences and

21   businesses to install aquariums, maintain aquariums, ponds

22   also.

23   Q    Let me ask you.  Do you recognize the man at the table

24   next to me in the blue shirt?

25   A    Yeah.

1    Q    Who is that?

2    A    Parker Coleman.

3    Q    How do you know Mr. Coleman?

4    A    He purchased an aquarium from me.

5    Q    And do you recall approximately when that was?

6    A    I guess -- I don't have the records with me -- two years

7    ago.  I'm guessing.

8    Q    If I could show you what's been marked as Exhibit 25.  We

9    do have a 902.11 certification of business record, Your Honor.

10   Been previously provided to defense in discovery.

11        If you could leaf through Exhibit 25 for identification,

12   please.

13   A    You want me to identify the pieces of it?

14   Q    Well, if you could just see if you are familiar with

15   these documents.

16   A    Yes.

17   Q    Okay.  Thank you.  And actually have you reviewed the

18   documents that are in Exhibit 25 prior to today?

19   A    Yes.

20   Q    What is exhibit -- what are in Exhibit 25 for ID?

21   A    It is a summary of invoices that would have the original

22   purchase, plus all the other sales that were made, either of

23   product and/or services to the aquarium.

24        The top of that Exhibit 25 is the actual maintenance

25   agreement contract that states what Fintastic will do in

1    servicing the aquarium.

2    Q    For all the documents in Exhibit 25, who is the customer?

3    A    Parker Coleman.

4         MR. KAUFMAN:  Your Honor, we seek to admit and

5    publish 25 for the jury.

6         MR. BUTLER:  Objection.

7         THE COURT:  Overruled.  Let it be admitted.

8         MR. KAUFMAN:  Thank you, Your Honor.

9         (Government's Exhibit No. 25 was received into

10   evidence and published.)

11   Q    Do you recall when Mr. Coleman first made his purchase

12   with Fintastic?

13   A    There will be a document that has the exact deposit date

14   when it was received.  But it was this document that I'm

15   looking at here.  I would say the first deposit was made in

16   September 2nd of '09.

17   Q    And that's on the page that's showing from Exhibit 25?

18   A    That is the master invoice for the entire aquarium

19   purchase.

20   Q    And with regard to this invoice, is this a standard

21   invoice form?

22   A    Yes, it is.  It's computer generated from my computer

23   system.

24   Q    And there are two addresses on this form and the other

25   forms that state, bill to and ship to?

1  A    Correct.

2  Q    What's the difference between those two addresses if

3  there ever is one?

4  A    The ship to will always be the aquarium location.  And

5  the bill to will be typically the aquarium location if it's in

6  a residential situation.  But like in Nordstrom, the ship to

7  is obviously South Park Mall, and the bill to is out in Salt

8  Lake City to the corporate offices.  So the ship to is the

9  corporate location.

10 Q    Do you remember -- well, first of all, were you involved

11 in the initial purchase by Mr. Coleman?

12 A    Hundred percent.

13 Q    Can you describe what happened?

14 A    I guess Parker and I we spent some time over -- I don't

15 know how much time, but talking about what he wanted, and

16 going through ideas and pictures.  And so an aquarium system

17 was put together within a budget that he felt comfortable

18 with.  And then there were various pieces of it that had to be

19 ordered to be able to fit the home, et cetera.  Specifically

20 the stand and canopy.  Then he gave -- once we agreed on the

21 price, then he gave me $8,500 deposit in cash.

22 Q    All right.  Now is that consistent with the portion of

23 the invoice that's highlighted on the screen now?

24 A    This portion here shows the previous credit of cash.  And

25 this is actually when the final payment was received on the --

1   to close the invoice out.

2   Q    Okay.

3   A    Of $4,210.

4   Q    So the $8,500 that was from November 2nd of 2010 -- or,

5   I'm sorry -- November 2nd, 2009?

6   A    Or September 2nd of '09.  It was either on that date --

7   the September 2nd, '09 date is the generation of that invoice,

8   does not mean that I received the deposit on that date.  But

9   that deposit was received after that date.

10  Q    Okay.

11  A    And then what is documented here is on February 25th,

12  2010, the $4,210 I received to close this ticket out to

13  complete the purchase.

14  Q    Okay.  So prior to the date of this ticket, you had

15  received the $8,500 in cash.  Can you describe your

16  interaction with Mr. Coleman and how that happened?

17  A    The $8,500.

18  Q    Yes, sir.

19  A    Parker came in the store and/or he had said -- he

20  probably called me and set time up and came in.  And he said

21  he had the paperwork to start the transaction and --

22  Q    Did that -- was there anything unusual about his -- did

23  he use the term paperwork?

24  A    Yeah, I thought that was unique.

25  Q    How come?

1  A    Because I've never heard cash referred to as paperwork

2  before.

3  Q    All right.

4  A    But anyway.

5  Q    What happened next?

6  A    Okay.  Well, so he said, I've got the paperwork in a

7  knapsack, and I finally figured out what he meant.  And we

8  went upstairs to one of our offices to count the cash.  And he

9  opened the backpack and pulled the cash out and put it on the

10 desk.  And then I proceeded to count it.

11 Q    And with regard to the subsequent payment of $4,210, how

12 did Mr. Coleman pay for that?

13 A    It was by cash again.  But I don't recall, I think that

14 was done at the register, the 4,200.  The $8,500 was done in

15 the offices.

16 Q    Why?

17 A    It was numerous bills.  Lots of 20s, lots of 50s, very

18 few 100s, and lots of stacks of bills all over the place.  I

19 didn't want to have that in eyesight of any other customers

20 from a security standpoint.

21 Q    Is it common in your business experience to have cash

22 payments like that?

23 A    I receive cash payments, but not in small bills like

24 that, typically.

25 Q    In several thousand dollar amounts?

1   A    This is definitely unusual.

2   Q    Now the address at the time and --

3   A    Kensington Place --

4   Q    Yes.

5   A    -- or Palace.

6   Q    In addition to being the owner of Fintastic and having

7   done this transaction, did you ever actually assist

8   Mr. Coleman with his tank on site?

9   A    I was actually part of the team to install the aquarium

10  at Kensington Palace.

11  Q    Subsequent to that, how many times, if any, did you

12  service the tank?

13  A    It was probably under 10, but definitely more than five

14  -- you know, five to 10 that I actually did the service.  But

15  I have a service team that also does that.  But I've been -- I

16  went to Kensington Place, probably five to 10 times.

17  Q    Showing you part of Exhibit 25, it states, "maintenance

18  service record" under the name Fintastic.  What is that?

19  A    That is a documentation of when we go visit an aquarium.

20  We fill out service record to document what we did do.

21  Various water quality parameters.  If anything was added.  If

22  anything -- if we found anything that were issues.  We also

23  identify items to be brought on the next visit, and then what

24  is to be billed for this specific visit.  And then in the

25  bottom is two pieces.  The left side is if we accept payment

1    on site, we will document the payment and what the form of the

2    payment was.  And then on the bottom right is a check off

3    sheet so that we can ensure that we've covered our bases and

4    the system is running correctly before we leave.

5    Q    And under "services" what was provided on that date?

6    A    In -- on June 15th it was the tank move.

7    Q    And -- well, actually let me go up a little bit.

8         Did there come a time when Fintastic moved the tank to

9    another address?

10   A    Yes.

11   Q    And do you recall where it was moved to?

12   A    It was moved to Closeburn Road, an apartment complex.

13   Q    And I'm highlighting a certain area in one of the

14   invoices here.  Is the address shown 5425 Closeburn Road

15   Apartment 115, is that where it was moved to?

16   A    Per our records, yes.

17   Q    And do you know what -- do you know the date of the move?

18   A    It would be the service record date that was previous to

19   this.  I think it said June 10th maybe, June 15th.

20   Q    June 15th of 2010?

21   A    Yes.

22   Q    Are you familiar with a fish known as a dragon eel?

23   A    Yes.

24   Q    Do you sell dragon eels at Fintastic?

25   A    We currently have one in stock right now.

1   Q     Only one in stock?  Is it considered a rare fish?

2   A     It's a very rare animal.

3   Q     I'm sorry.

4   A     Rare.  It's a very rare animal, hard to get.

5   Q     How about price on it?

6   A     Very expensive, low thousand dollar type thing.  We've

7   sold them up to $2,000 I guess.

8   Q     Increasing the size of a portion of Exhibit 25, do your

9   records indicate that you sold a dragon eel to Mr. Coleman?

10  A     Yes.

11  Q     What was the price?

12  A     $1,700.

13  Q     Like to show you what's been marked for identification

14  purposes as 24a, 24b, 24c.  Do you recognize what's in these

15  pictures?

16  A     It's a male dragon eel.

17  Q     How can you tell it's a male dragon eel?

18  A     The bright color.  The iridescent red is the markings of

19  a male.  The female looks very similar to that, but doesn't

20  have the bright red through the jaw line.

21  Q     Are you familiar with a person named Ryan Gruber?

22  A     Yes.

23  Q     Who is he?

24  A     He was my senior service technician.

25  Q     And has he moved out of the local area?

1   A    Yes.  His wife took a job in CMC Raleigh.  And he moved

2   sometime in the beginning of this year, in the spring.

3   Q    Have you been asked to review a couple of recordings and

4   transcripts of those recordings?

5   A    I have.

6   Q    I have what have previously been provided to defense in

7   discovery, and marked as Government's Exhibit 26a through d,

8   26a and c being audio recordings b and d being transcripts of

9   those recordings.

10       First of all, do you recognize the disk?

11  A    Yes.

12  Q    How do you recognize it?

13  A    I was asked to listen to it earlier today.

14  Q    Did you in fact initial it on the left side of the disk?

15  A    I did?

16  Q    Was that to indicate that it was a -- you recognized the

17  voice to be that of Ryan Gruber?

18  A    I heard two tracks off that disk, and those two tracks

19  were Ryan Gruber that I listened to.

20  Q    With regard to 26b and d, do you recognize those?

21  A    Yes.

22  Q    What are they?

23  A    Those are the words that I listened to on the tracks and

24  then I initialed that I've heard them.

25  Q    And did your initialing it also indicate that it seemed

1   to be an accurate transcript of the recordings?

2   A    Completely.

3             MR. KAUFMAN:  Your Honor, at this time we would seek

4   to admit and publish to the jury, Exhibits 26a and 26c, with

5   26b and d to be just demonstrative to assist the jury in

6   listening to those transcripts.

7             MR. BUTLER:  Objection.

8             THE COURT:  Basis?

9             MR. BUTLER:  Well, Your Honor, we would contend,

10  number one, it's irrelevant.  And number two, that the other

11  person, Mr. Gruber, is not subject to cross examination.

12            THE COURT:  I'll overrule the objection.  I'll admit

13  Government's Exhibits 26a through d.

14            But I do want to tell the jury that it appears to

15  the Court that the Government intends to play Government's

16  Exhibits a and c, certain recordings, and offer Government's

17  Exhibits 26b and e as transcripts of those recordings; is that

18  correct?

19            MR. KAUFMAN:  That's correct, Your Honor.

20            THE COURT:  And so what I want to tell you, members

21  of the jury, is that the evidence are the recordings.  Certain

22  transcripts may be presented to you that purport to be

23  accurate records of what was said and who said what.

24            You are specifically instructed that whether the

25  transcripts correctly or incorrectly reflect the content of

1   the conversation, or the identity of the speakers is entirely

2   for you to determine.  You should make that determination

3   without prejudice or bias, based on the testimony regarding

4   preparation of the transcripts, your own comparison of the

5   transcripts to which you have heard on the recording, and any

6   other relevant evidence or testimony.

7          Should you determine that the transcripts are

8   incorrect or inaccurate in any respect, you should disregard

9   it to that extent.  Remember that the recording is the

10  evidence.  The transcript is merely an aid to your listening

11  to that evidence.

12         MR. KAUFMAN:  Thank you, Your Honor.

13         (Government's Exhibits No. 26a, 26b, 26c & 26d were

14  received into evidence.)

15  Q   (Mr. Kaufman) Mr. Sowers, at some point in late 2010 or

16  early 2011, did Fintastic in fact move the fish tank from 5425

17  Closeburn Road?

18  A    Yes, we did.

19  Q    Where did you move it?

20  A    To his mother's home.

21  Q    Do you recall what her address was?

22  A    Do not.

23  Q    Do you remember speaking with his mother about the tank?

24  A    I had one conversation with them and then Ryan pretty

25  much handled it after that.

1    MR. KAUFMAN:  Thank you.

2    Nothing further, Your Honor.

3    THE COURT:  Any cross?

4    MR. BUTLER:  Yes, Your Honor.  Thank you.

5                    CROSS EXAMINATION

6    BY MR. BUTLER:

7    Q    Good morning, Mr. Sowers.

8    A    Good morning.

9    Q    Now, Mr. Sowers, you run this Fintastic business, which

10   is -- you're in the business of selling aquariums and fish

11   that go in them; is that right?

12   A    Correct.

13   Q    Among other things?  Sir?

14   A    Yes.

15   Q    Okay.  And you met Mr. Coleman in regards to your

16   business and his desire to have you sell him an aquarium and

17   this exotic fish; is that right?

18   A    That and other fish, build a complete system.

19   Q    I can't hear you.

20   A    Build a complete system.

21   Q    Okay.  Well, so, were there any other fish in the tank

22   that was explained to the ladies and gentlemen of the jury

23   this morning?

24   A    No.  The most expensive one was.

25   Q    Okay.

1  A    But there were numerous others --

2  Q    I'm sorry.

3  A    There were numerous others.

4  Q    Okay.  Now, you indicated that he -- he came in with I

5  believe you said $8,500; is that right?

6  A    Yes.

7  Q    Okay.  In cash?

8  A    Correct.

9  Q    You took that money?

10  A    Yes, I did.

11  Q    Okay.  And you counted it in your office; is that right?

12  A    I counted it in the service manager's office.

13  Q    And then he paid some more money in cash, that was at

14  which location?

15  A    At Fintastic.

16  Q    Okay.  At Fintastic?

17  A    Yes.

18  Q    What about the $4,210, was that Fintastic too?

19  A    Yeah, that's what I'm referring to, the $4,210.

20  Q    He gave you that at Fintastic too?

21  A    Yes.

22  Q    Now I believe you said that you made five to 10 service

23  calls; is that right?

24  A    Me personally, yes.

25  Q    Okay.  And when you were there, there wasn't a whole lot

1  of people coming in and out were there?

2  A    There was one time where there were probably five guys

3  laying on the couches when I got there on one visit.  And kind

4  of thought they may have been dead.  They didn't even move

5  when I was there the whole time.  I was will for about an

6  hour.

7  Q    Oh really?

8  A    Only one --

9  Q    Were they young guys?

10  A    Sir?

11  Q    Were they young guys?

12  A    Yeah.

13  Q    So they were asleep; is that right?

14  A    Passed out.

15  Q    Okay.  And what location was that?

16  A    I don't know the exact date.  I remember that one visit.

17  Q    Okay.

18  A    This particular -- outside of that, I probably only saw

19  one or two other people --

20  Q    Okay.

21  A    -- on my other visits, other than Parker.  Sometimes

22  Parker was there, sometimes he wasn't.

23  Q    So when he wasn't there, I mean, how did you get in?

24  A    One of the -- whoever was there would let me in.

25  Q    Okay.

1    A    And they were different people at times.

2    Q    Different people.  How many times would you estimate that

3    there were different people that let you in, Parker wasn't

4    there?

5    A    Probably two.

6    Q    Okay.

7    A    I remember one guy.  And then there was a female that let

8    me in the other time.

9    Q    And was the female, was she a black female, white female,

10   Asian female, do you remember?

11   A    I don't recall enough to be able to testify to that.  I'm

12   sorry.

13   Q    But it was a female?

14   A    It was definitely female.

15   Q    Okay.  Do you remember what location that was?

16   A    Kensington.

17        MR. BUTLER:  If I could have a moment, please.

18        THE COURT:  You may.

19        (Pause.)

20   Q    Well, Mr. Sowers, you've never -- when Mr. Coleman was

21   paying you the money, you never questioned him about the

22   money, did you?

23   A    Where it came from?

24   Q    Yes, sir.

25   A    Is that what you're referring to?

1    Q      Yes.

2    A      Nope.  That's his business not mine.

3             MR. BUTLER:  Okay.  Thank you very much.

4             THE COURT:  Any redirect?

5             MR. KAUFMAN:  Briefly, Your Honor.

6                      REDIRECT EXAMINATION

7    BY MR. KAUFMAN:

8    Q    You mentioned the incident at Kensington Palace where

9    there were several young folks in the apartment.  Did it

10   strike you as unusual in any way?

11   A    I just thought I was there for a whole hour and nobody

12   moved.

13   Q    All right.  Now did you ever go, personally, to the

14   Closeburn Road Unit 115 apartment?

15   A      No.

16            MR. KAUFMAN:  Nothing further, Your Honor.

17            THE COURT:  You may step down, be excused.

18            Call your next witness.

19            MR. KAUFMAN:  We next call Detective James beaver.

20         JAMES BEAVER, GOVERNMENT WITNESS, SWORN

21                      DIRECT EXAMINATION

22   BY MR. KAUFMAN:

23   Q    Good morning.

24   A    Good morning.

25   Q    If you could please introduce yourself to the jury.

1    A    My name is James Beaver.

2    Q    And where do you work?

3    A    I'm a detective with the Charlotte-Mecklenburg Police

4    Department.

5    Q    How long have you been in law enforcement?

6    A    Just over 23 years.

7    Q    How long have you been with CMPD?

8    A    The entire time, 23 years, approximately.

9    Q    Of those 23 years, approximately, how many of those have

10   involved the investigation of narcotics?

11   A    Just over 20 years.  I started narcotics investigations

12   in July of 1992.

13   Q    If you can quantify, about how many drug-related

14   investigations and arrests have you taken part in those over

15   20 years?

16   A    It would be in the hundreds.

17   Q    Are you also cross sworn as a task force officer with the

18   Homeland Security Investigations Smuggling Unit?

19   A    Yes, sir, I am.

20   Q    And are you the co-case agent on this Organized Crime

21   Drug Enforcement Task Force investigation along with Officer

22   MacDonald?

23   A    Yes, I am.

24   Q    Like to turn your attention to January 10th, 2009.  What

25   if anything happened on that date related to this

1    investigation?

2    A    A wooden crate was shipped from California to a trucking

3    company in Charlotte, Yellow Freight on Reames Road in

4    Charlotte in the northern part of the county.

5              MR. BUTLER:  Objection.

6              THE COURT:  Basis?

7              MR. BUTLER:  Well, Your Honor, lack of personal

8    knowledge without something to support it.

9              THE COURT:  Overruled.

10             THE WITNESS:  On January the 9th a wooden crate

11   arrived in Charlotte at Yellow Freight.  I was present.  I

12   verified the contents of the crate were marijuana.

13   Q    (Mr. Kaufman) What happened after that?

14   A    The shipment had arrived and was due for a customer dock

15   pickup, which meant it would sit on the property until

16   somebody came to pick it up.  So we had several law

17   enforcement officers in the area.  Once we verified the crate

18   did contain the marijuana, we established surveillance on the

19   crate, as well as the perimeter of the business waiting for

20   somebody to come pick it up.

21   Q    What happened next?

22   A    An individual showed up in a U-Haul truck.  Came up to

23   Yellow Freight, went inside, obtained the crate through a

24   forklift.  They obtained a -- picked it up on a forklift put

25   it on the back of the truck and he drove away.

1  Q    Do you know who that individual was?

2  A    Yes, sir.

3  Q    Who was it?

4  A    It was Gerren Ezekeil Darty.

5  Q    Like to show you what's been marked for identification

6  purposes as 22t.  Do you recognize that photograph?

7  A    Yes, sir I do.

8  Q    What is that?

9  A    That's Gerren Ezekeil Darty.

10         MR. KAUFMAN:  And I apologize if it's been

11  previously admitted, but we would seek to admit and publish

12  22t at this time.

13         THE COURT:  I think it's been admitted previously.

14         MR. KAUFMAN:  Okay.

15  Q    I would also like to show you what's been marked as 40a

16  for identification purposes, 40b for ID, and 40c for ID.

17         Do you recognize those photographs?

18  A    Yes, sir.

19  Q    Are they fair and accurate representations of what you

20  saw on January 9, 2009?

21  A    Yes, sir.

22         MR. KAUFMAN:  All right.  We seek to have 40a, b,

23  and c admitted and published.

24         THE COURT:  Any objection?

25         MR. BUTLER:  Objection.

1    THE COURT:  Overruled.  Let them be admitted.

2    (Government's Exhibits No. 40a, 40b and 40c were

3  received into evidence and published.)

4  Q    Detective Beaver, what's in 40a?

5  A    That's the U-Haul truck that Mr. Darty had picked up the

6  crate in containing the marijuana.  He'd actually driven away

7  from the trucking company, westbound on Harris and turned left

8  right there at North Lake Mall and went to an apartment

9  complex and parked the truck in the apartment complex.

10  Q    What's 40b showing?

11  A    That's a picture of Mr. Darty inside Yellow Freight near

12  the loading dock area.

13  Q    Did you in fact see Mr. Darty in that location?

14  A    Yes, sir.

15  Q    And 40c, what's that?

16  A    That's a picture of the vehicle that picked up Mr. Darty.

17  After he parked the U-Haul truck, this vehicle came into the

18  lot.  He got into the passenger seat and they drove away.

19  Q    And did you receive records that had been certified

20  regarding the rental of that vehicle?

21  A    Yes, sir I did.

22  Q    Like to show you what's been marked for identification

23  purposes as 54a.  Do you recognize this?

24  A    Yes, sir I do.

25  Q    And it's a multiple page document.

1   A     Yes, sir.  I recognize this.

2   Q     And 54b.  Do you recognize that?

3   A     Yes, sir.

4   Q     Are those the records you received from Enterprise the

5   rental agency?

6   A     Yes, sir.

7           MR. KAUFMAN:  We seek to admit and publish 54a and

8   b.

9           THE COURT:  Is that pursuant to the 902.11

10  affidavit?

11          MR. KAUFMAN:  Yes, Your Honor.

12          THE COURT:  Any objection?

13          MR. BUTLER:  No, Your Honor.

14          THE COURT:  Let them be admitted and published.

15          (Government's Exhibits No. 54a and 54b were received

16  into evidence and published.)

17  Q     So on 54a I've highlighted a portion of the page, and on

18  54b.  Did you obtain information from Enterprise as to any

19  references that the stated renter, Stephanie Peppers, provided

20  to Enterprise?

21  A     Yes, sir I did.

22  Q     Who were the references if you recall?

23  A     Enterprise Rental advised that the reference --

24          MR. BUTLER:  Objection.

25          THE COURT:  Sustained.

1      MR. KAUFMAN:  Your Honor, not for purposes of the

2  truth of the matter asserted, it goes to explain the following

3  steps.

4      THE COURT:  I'll admit for that limited purpose.

5      Members of the Jury, what Enterprise Rental may have

6  said to this witness is not offered for the truth of anything

7  they said, but for the limited purpose of explaining this

8  officer's next steps in the investigation, if it does.

9  Q   (Mr. Kaufman) Detective Beaver, what information did they

10  provide to you?

11  A   Three references were listed on the rental contract.  One

12  was Alex Bell, one was Parker Coleman, and one was Jarrett

13  Davis.

14  Q   And had you heard any of those names previous to

15  January 9 of 2009?

16  A   No, sir.

17  Q   Did you subsequently seek to locate those individuals and

18  then conduct surveillance of them?

19  A   At a later date, yes, sir.

20  Q   Did there come a time when you in fact had seized the

21  marijuana that was in the crate and review its contents?

22  A   Yes, sir.

23  Q   Can you describe that?

24  A   After the U-Haul truck was parked in the parking lot we

25  waited for several hours for somebody to come back to retrieve

1  the marijuana so we could effect an arrest.  We waited pretty

2  much to late in the evening on January 9th, nobody ever came

3  back.  So we went to the U-Haul truck, removed the marijuana

4  from the crate, and took it to CMPD, Charlotte-Mecklenburg

5  Police Department evidence vault.

6  Q    I'd like to show you what has been marked for

7  identification purposes as 38a, 38b, 38c, 38d, 38e, and 38f.

8       Do you recognize those photographs?

9  A    Yes, sir I do.

10 Q    What are they?

11 A    The initial photograph was the wooden crate.  And once --

12 I think it's the second photograph, showed the crate opened,

13 had two 55-gallon drums inside.  Those two drums contained

14 numerous bundles of marijuana vegetation which you've seen in

15 some of the subsequent photographs.  They were mixed in the

16 barrels along with compost or dirt.

17      And the last pictures are the actual bundles taken out of

18 the drums while we were at the Police Department.

19 Q    When you say dirt, was there any other material that it

20 was packed inside of?

21 A    It was the marijuana and the dirt or compost.

22 Q    Are these photographs in 38a through f, fair and accurate

23 representations of what you saw on or about January 9, 2009?

24 A    Yes, sir.

25            MR. KAUFMAN:  We seek to have 38a through f admitted

1   and published.

2               THE COURT:  Any objection?

3               MR. BUTLER:  Objection, Your Honor.

4               THE COURT:  Overruled.  Let them be admitted and

5   published.

6               (Government's Exhibits No. 38a, 38b, 38c, 38d, 38e

7   and 38f were received into evidence and published.)

8               MR. BUTLER:  Your Honor, may I state my reason for

9   the record?

10              THE COURT:  Sure.

11              MR. BUTLER:  If Your Honor please, at this time I

12  don't think they've shown a proper chain of custody for the

13  admission.

14              MR. KAUFMAN:  Your Honor, there's been a

15  stipulation --

16              THE COURT:  I've overruled the objection.

17  Q    Detective Beaver, 38a, what's that showing?

18  A    That's the wooden crate.

19  Q    38b.

20  A    It's the top removed from the wooden crate revealing the

21  two drums.

22  Q    38c.

23  A    One of the drums with the lid removed showing the

24  marijuana and the dirt or the compost.

25  Q    Based on your training and experience, is the dirt in

1   there relevant to you for any purpose?

2   A    It's just to help establish the weight on the barrel.  If

3   they were not to put the dirt, it would weigh a lot less.

4   Plus the fact that the marijuana bundles would rattle around

5   and make a lot of noise in transit.  So it kind of helps

6   solidify the shipment so it wouldn't shift.

7   Q    38d.

8   A    It's the long rectangular shape -- two shaped packages of

9   marijuana.  This was one of the type, the longer in length.

10  Q    So 38e, is that the second container?

11  A    Yes, sir.  That's the other barrel in the box, which had

12  the smaller thicker bundles.

13  Q    And 38f?

14  A    And that is the different shaped bundles, the smaller

15  shape.

16  Q    What was the approximate total weight of the marijuana?

17  A    Weighing at the police department on the scales, counting

18  the packing materials, meaning the plastic wrap, the black you

19  see, was approximately 338 pounds.

20  Q    And based on your review of the packing material, was

21  that a substantial portion of the 338 pounds?

22  A    No.  The substantial portion of the weight would have

23  been the marijuana itself.

24  Q    Speaking of pounds, are you familiar with conversion rate

25  from kilograms to pounds and back in either direction?

1   A    Yes, sir.

2   Q    How much is a kilogram?

3   A    One kilogram is 2.2 pounds.

4   Q    So how many pounds is 1,000 kilograms?

5   A    It be 2,200.

6   Q    I would like to show you a series of photographs, and if

7   you could let us know if you recognize them.  You don't have

8   to go into a description, other than just to describe whether

9   you are familiar with the photographs at this point.

10       Like to show you 22b for identification, 22c, 22d, 22e,

11  22f -- oh, I'm sorry.  Were you able to see any of those?

12  A    No, sir.

13  Q    I'm sorry.  Let me go back.  22b, 22c, 22d, 22e, 22f,

14  22h, 22i, 22j, 22k, 22l, 22m, 22o, 22p, 22q, 22r, and 22s.  Do

15  you recognize all of those photos?

16  A    Yes, sir I do.

17  Q    Are they fair and accurate photographs of the people you

18  know?

19  A    Yes, sir, they are.

20       MR. KAUFMAN:  Your Honor, at this time we seek to

21  have those listed exhibits admitted and published to the jury.

22       THE COURT:  Any objection?

23       MR. BUTLER:  If I could have a moment?

24       No objection.

25       THE COURT:  Let them be admitted.

1          (Government's Exhibits No. 22b-f, 22h-m and 22o-s

2     were received into evidence and published.)

3     Q     Going to 22b.  Who's that a photograph of?

4     A     Samantha Schmidlin.

5     Q     How did you meet her first?

6     A     She was arrested on or about November 18th, 2010, in

7     Charlotte.  She was brought to the Homeland Security office

8     when I interviewed her.

9     Q     Twenty-two-c, who is that?

10    A     Stephanie Peppers.

11    Q     Were you involved in her arrest?

12    A     Yes, sir I was.

13    Q     Twenty-two-d, who's that?

14    A     Harold Manigault.

15    Q     And did you meet him in the process of his arrest and

16    transport?

17    A     Yes, sir.

18    Q     Twenty-two-s, who is that?

19    A     That's Mark Hunt.

20    Q     And were you involved -- did you -- were you involved in

21    his arrest and transport?

22    A     Yes, sir.

23    Q     Twenty-two-f, have you met with -- well, who is this

24    individual?

25    A     William Pierce.

1    Q    And have you met with him?

2    A    Yes, sir.

3    Q    Twenty-two-h, who is that?

4    A    Shaunda McAdoo.

5    Q    And did you have a chance to encounter her during this

6    case?

7    A    Yes, sir.

8    Q    Twenty-two-i, did you have an opportunity to interview

9    him in this case?

10   A    Yes, sir.

11   Q    Were you involved in his arrest?

12   A    Yes, sir.

13   Q    Twenty-two-j, who is that?

14   A    That's Leah Davis.

15   Q    And 22-k.

16   A    Christopher McKneely.

17   Q    And do you know him by another nickname?

18   A    Yes.  He also goes by "Esco".

19   Q    Were you involved in his arrest or detention?

20   A    Yes, sir.

21   Q    Twenty-two-l, do you know who that is?

22   A    Yes, sir I do.

23   Q    Who is that?

24   A    Milton Adams.

25   Q    Does he have a nickname that he goes by?

1   A    Yeah, he goes by "Turtle".

2   Q    Were you involved in his arrest?

3   A    Yes, sir, I was.

4   Q    By the way, where did that arrest take place?

5   A    In the Los Angeles, California area.

6   Q    Twenty-two-m, who is that?

7   A    Glenn Carrera.

8   Q    Does he go by a nickname?

9   A    Yes, sir.  He goes by "Chucky".

10  Q    Did you have an opportunity to meet with him after his

11  arrest?

12  A    Yes, sir, I did.

13  Q    Twenty-two-m, who's that?

14  A    Mark Dorsey.

15  Q    Twenty-two-o, who's is that?

16  A    Leon Robertson.

17  Q    Did you have a chance to conduct a pre-arrest interview

18  with Mr. Robertson?

19  A    Yes, I did.

20  Q    Twenty-two-p, who is that?

21  A    Nastasha Rodriguez.

22  Q    Twenty-two-q, who is that?

23  A    Rico Grier.

24  Q    Twenty-two-r, who's that?

25  A    Kevin Stanfield.

1   Q    And 22-s?

2   A    Megan Baehr.

3   Q    Were you involved in her arrest?

4   A    Yes, sir, I was.

5   Q    I would like to turn your attention to October 21st of

6   2010.  Did you conduct surveillance relevant to this

7   investigation on that date?

8   A    Yes, sir, I did.

9   Q    Could you describe what you did?

10  A    We were on surveillance in the area of Park and Fairview.

11  I think it's called the South Gate Condominium Complex.  It's

12  not far from South Park Mall.  We were conducting surveillance

13  of that location.

14  Q    And what if anything happened?

15  A    On that day I observed a white Porsche Cayenne parked in

16  the parking lot, took a photograph of it.

17  Q    Did you have an opportunity to see if it was being driven

18  by anybody?

19  A    When I saw it was parked, it was not occupied.

20  Q    I would like to show you what's been marked for

21  identification purposes as Exhibit 48a -- I'm sorry, as 48.

22  Do you recognize that?

23  A    Yes, sir I do.

24  Q    What is it?

25  A    It's the photograph of the Porsche Cayenne in the parking

1    lot.

2    Q    And the parking lot of what?

3    A    I believe it's called the South Gate Condominium Complex.

4    It's the corner of Park and Fairview.  The street address is

5    Closeburn.

6    Q    And is that 5425 Closeburn?

7    A    Yes, sir.

8    Q    Is this a fair and accurate photograph of what you saw on

9    October 21st, 2010?

10   A    Yes, sir.

11              MR. KAUFMAN:  Your Honor, we seek to have 48

12   admitted and published.

13              THE COURT:  Any objection?

14              MR. BUTLER:  No objection.

15              THE COURT:  Let it be admitted and published.

16              (Government's Exhibit No. 48 was received into

17   evidence and published.)

18   Q    Detective Beaver, did you have an opportunity to go

19   through evidence that was seized on November 2nd, 2010 at 5425

20   Closeburn Road, Unit 115?

21   A    Yes, sir, I had.

22   Q    I'm showing you what's already been admitted as

23   Government's Exhibit 14h.  If you could take the contents out.

24        Have you reviewed the contents of this and other

25   envelopes that were -- of evidence that were seized from the

1    search?

2    A    Yes, sir, I have.

3    Q    And I'll ask you about a few items.  For this envelope,

4    is there a photograph in that group?

5    A    Yes, sir, there is.

6    Q    And who is that a photograph of?

7    A    Three individuals.  One of which I don't know on the far

8    left.  The middle individual is Mr. Parker Coleman.

9    Individual on the right is Harold Manigault.

10             MR. KAUFMAN:  And Your Honor, this is part of the

11   evidence already seized.  I'll now be publishing portions.

12             THE COURT:  I think ELMO might be a little more

13   efficient.

14             MR. KAUFMAN:  Yes, Your Honor.

15   Q    Are there any -- did you find any receipts relevant to

16   anything that was viewed in the apartment?

17   A    Yes, sir.

18   Q    And maybe I can ask you this.  Are you familiar with the

19   name Fintastic?

20   A    Yes, sir, I am.

21   Q    In that envelope, are there any receipts from Fintastic?

22   A    Give me one second to continue looking.  Yes, sir, there

23   are.

24   Q    And can you tell us whose receipts those are?

25   A    In the client name portion it says "Parker Coleman".

1    Q    And does it indicate the address?

2    A    Not on these pieces of paper.  Let me continue looking.

3    Q    And as you're going through those documents, are there

4    any other materials that we may not be discussing yet that

5    also have Mr. Coleman's name on them?

6    A    Yes, sir, there are.

7    Q    If you could place the items back into envelope two --

8    into envelope one, that's 14h, I'll be showing you next

9    envelope two which is admitted already as 14i.

10         And can you tell us what's significant about the contents

11   of 14i?

12   A    May I remove the contents to do it?

13   Q    Absolutely.

14   A    Additional paperwork and documents were found inside 5425

15   Closeburn, Unit 115 on 11/2/2010.  Majority of the contents or

16   some of the contents were wrappers for money bands.  There's a

17   deposit slip for Bank of America deposit in the amount of

18   $8,500, several rubber bands, additional money bands.

19   Q    Can you tell us the denominations of those money bands?

20   A    Yellow bands are for $1,000 stacks.  Purple are for

21   $2,000.  I guess that's an olive color for $10,000 stacks.  I

22   think that's all the ones.

23   Q    If you could put the contents back into 14i.  Like to now

24   show you what's been admitted as 14l.

25         Inside 14l, did you find any documentation related to a

1    Porsche Cayenne SUV?

2    A    Yes, sir.

3    Q    And what information does it have about the insured for

4    that vehicle?

5    A    It's in the name of Parker Coleman, 5425 Closeburn Road,

6    Apartment 115 in Charlotte.

7    Q    If I may borrow that for a second to put that on the

8    ELMO.  And this the document that you testified about just

9    now?

10   A    Yes, sir.

11   Q    And is this for the same Porsche Cayenne you saw on

12   October 21st, 2010?

13   A    Yes, sir.

14   Q    All right.  If you could put the contents back in 141.

15   And have you also gone through several other envelopes that

16   have been admitted already in this trial?

17   A    Yes, sir I have.

18   Q    Were there other documents or materials related to Parker

19   Coleman in those?

20   A    Yes, sir, there were.

21   Q    Did you have -- did law enforcement obtain certification

22   from Brinks for various funds that were seized during this

23   investigation?

24   A    Yes, sir, we did.

25   Q    And is that for funds that were seized from November 2nd

1   of 2010?

2   A    Yes, sir, it was.

3           MR. KAUFMAN:  Your Honor, at this time we would seek

4   to admit and publish what have been previously marked for

5   identification as Exhibits 3, 4, 8 and 13.

6           THE COURT:  Subject to 902.11 certification?

7   Q   (Mr. Kaufman) And Detective Beaver, did you in fact

8   receive a 902.11 certification for all four of those seizures?

9           THE WITNESS:  Yes, sir, we did.

10          THE COURT:  Over objection?

11          MR. BUTLER:  If I could just have a moment, Your

12  Honor.

13          THE COURT:  Sure.

14          MR. BUTLER:  Objection, Your Honor.

15          THE COURT:  Overruled.  I'll admit 3, 4, 8 and 13 at

16  this time.

17          MR. KAUFMAN:  Thank you, Your Honor.

18          (Government's Exhibits No. 3, 4, 8 & 13 were

19  received into evidence.)

20  Q   (Mr. Kaufman) Three, this is 4, next is 8, and finally 13.

21      Now, have what have been admitted as Government's 15, 16

22  audio recordings, and 15a and 16a, transcripts of those

23  recordings.  Do you recognize the disk with 15 and 16?

24  A    Yes, sir, I recognize.

25  Q    And what is that disk?

1   A    It's a disk containing two audio tracks, phone calls.

2   Q    From when?

3   A    November 2nd, 2010.

4   Q    And how do you recognize this?

5   A    This is the disk that was obtained by Agent Bryant.  This

6   is Agent Bryant's initials 1/22/2012.

7   Q    Have you listened to the audio for these two calls?

8   A    Yes, sir I have.

9   Q    I'm showing you 15a and 16a.  Are these transcripts of

10  those calls?

11  A    Yes, sir, they are.

12  Q    And are they accurate transcripts of those calls?

13  A    Yes, sir, they are.

14  Q    When you listened to those calls, were you able to

15  identify the voices?

16  A    Yes, sir, I could.

17  Q    With regard to the first one, were there -- the one with

18  the two male voices, as opposed to the one with the male and

19  female voice.  With two male voices, were you able to

20  recognize those two voices?

21  A    Yes, sir.

22  Q    Who did they belong to?

23  A    Jerry Davis and Parker Coleman.

24  Q    And does the transcript accurately reflect which one is

25  speaking at different times?

1   A    Yes, it does.

2   Q    With regard to the second call with the female, does --

3   and I'm sorry, let me marry them up.  So that's now transcript

4   15a.  The one for 15 with the female voice on it, do you

5   recognize the male and female voice on that one?

6   A    Yes, sir, I do.

7   Q    Who are those two voices?

8   A    It's Shaunda McAdoo and Jerry Davis.

9        MR. KAUFMAN:  Your Honor, at this time we would seek

10  to publish Exhibit 16 with the transcript and then 15.

11       MR. BUTLER:  Objection, Your Honor.

12       THE COURT:  Overruled.

13       (The exhibits were published to the jury.)

14  Q    (Mr. Kaufman) And so when you indicated that was Shaunda

15  McAdoo's voice, I would like to show you what's been admitted

16  as 7a.

17       Is that in fact Shaunda McAdoo, whose voice you

18  recognized from that last transcript, that last call?

19  A    Yes, it is.

20  Q    Like to talk to you about phones at this point.  Did you

21  have an opportunity to seize a phone on November 16, 2010 from

22  Stephanie Peppers?

23  A    Yes, sir.

24  Q    And did you review that phone for various types of data?

25  A    Yes, sir.

1  Q    Like to show you what's been marked for identification

2  purposes as 18d.  Do you recognize that?

3  A    Yes, sir.

4  Q    What is it?

5  A    It's a photograph of Stephanie Peppers.

6  Q    And in fact, is the photograph contained on something

7  else?  That is, is it a photograph itself or is the image on

8  another device?

9  A    It's a photograph on the phone.

10  Q    Who took that photograph?

11  A    I don't know.

12  Q    But did you actually review Ms. Pepper's phone and see

13  that photograph on her phone?

14  A    Yes.

15  Q    And it's a fair and accurate representation what you saw

16  on the physical phone?

17  A    Yes, sir.

18        MR. KAUFMAN:  Your Honor, we'd seek to have

19  Government's 18d admitted and published.

20        THE COURT:  Any objection?

21        MR. BUTLER:  No objection.

22        THE COURT:  Let it be admitted, published.

23        (Government's Exhibit No. 18d was received into

24  evidence and published.)

25  Q    Did you find other photographs of interest on this phone

1   that you seized from Ms. Peppers?

2   A    Yes, sir.

3   Q    Like to show you what's been marked as 18a for

4   identification purposes, and 18b for identification purposes,

5   and 18c for ID.

6        Do you recognize all these from that same phone?

7   A    Yes, sir.

8        MR. KAUFMAN:  Seek to have 18a through c admitted

9   and published.

10       THE COURT:  Any objection?

11       MR. BUTLER:  No objection.

12       THE COURT:  Let them be admitted.

13       (Government's Exhibit No. 18a-c were received into

14   evidence and published.)

15  Q    What's 18a?

16  A    That's a picture of Mr. Coleman standing in front of the

17  Porsche Cayenne holding two wads of paper currency.

18  Q    Do you recognize the residence behind it?

19  A    I notice it's an apartment complex.

20  Q    Going to 18b, is that Mr. Coleman?

21  A    Yes, sir.

22  Q    And again, this came from Ms. Pepper's phone?

23  A    Yes, sir.

24  Q    And 18c, is this a screen shot from Ms. Pepper's phone?

25  A    Yes, sir.

1    Q    And have you determined what this content is?

2    A    Yes, sir.

3    Q    What is it?

4    A    PC, which is initials for Parker Coleman.  That phone

5    number was one of the numbers for Mr. Coleman.

6    Q    And in fact, did you seize the phone with that same

7    mobile phone number?

8    A    Yes, sir.

9    Q    Who is it seized from?

10   A    Mr. Coleman.

11   Q    At some point did you try to gain access into

12   Mr. Coleman's phone?

13   A    Yes, sir.

14   Q    And by the way, had you obtained a search warrant from

15   federal court to go into the phone?

16   A    Yes, sir, I did.

17   Q    At first were you able to get into it?

18   A    No, sir.  It was locked and I couldn't get in.

19   Q    How did you eventually get into it?

20   A    I was able to get the key or the password to unlock the

21   phone from Ms. McAdoo.

22   Q    So she told you what the password was and you were able

23   to unlock it from her information?

24   A    Yes, sir.

25   Q    How many tries did it take?

1   A    If I recall, the first time that I tried the number she

2   gave me it worked.

3              MR. BUTLER:  Objection.  Move to strike.

4              THE COURT:  Overruled.

5   Q    Now, did you do a very thorough -- well, let me ask this.

6   Did you review various aspects of the data on Mr. Coleman's

7   phone?

8   A    Yes, sir.

9   Q    What types of data did you review?

10  A    There were contact numbers and names and phone numbers,

11  text messages.  And there were also voice mail messages on the

12  phone.

13  Q    Did you create a report to document your findings?

14  A    Yes, sir, I did.  Let me interject.  There were also

15  photographs on the phone as well.

16  Q    In terms of the contacts, were there contacts that you

17  found in Mr. Coleman's phone relevant to this investigation?

18  A    Yes, sir.

19  Q    Do you recall the names of those contacts?

20  A    Wubs, W-U-B-S was one of the names and phone numbers in

21  there.  Wubs is an alias name for Stephanie Peppers.

22             MR. BUTLER:  I can't understand you.

23             THE WITNESS:  Wubs, W-U-B-S was a name that

24  Stephanie Peppers was known as.  There was a number for a

25  Leon.  Turned out to be a phone number for Leon Robertson.  A

1   phone number Boogie, alias name for Jerry Davis.  There was a

2   phone number for an SM, which is Shaunda McAdoo, that was her

3   phone number.  There was several, some of which I don't

4   remember.  I did generate a report.

5   Q    Was there an entry for an Esco?

6   A    I believe so.

7   Q    Or a Boo?

8          MR. BUTLER:  Objection to form.

9          THE COURT:  Overruled.

10         THE WITNESS:  Yes, sir.  I believe so.

11  Q    And were you able to determine in the investigation if

12  that was an alias for anybody?

13  A    Boo was an individual, his real name was Wendle Robinson.

14  Q    Were you involved in his arrest or transport?

15  A    Yes, sir.

16  Q    Was there a contact for Poppa?

17  A    Yes, sir.

18  Q    Did you determine in your investigation for whom that's

19  an alias for?

20  A    That would be Davon Harris.

21         MR. KAUFMAN:  Like to show you what's been admitted

22  as 7b.

23         THE COURT:  Mr. Kaufman, before you go any further,

24  how much longer do you anticipate your direct of this witness

25  to be?

1      MR. KAUFMAN:  Your Honor, I do have maybe 20 to 30

2  minutes remaining.

3      THE COURT:  Members of the Jury, I think we're going

4  to take our morning break at this time.  We pushed it a little

5  bit with you.  You've been sitting there for a while.  So

6  we'll take our morning break.  I'll ask you during the break

7  not to talk about the case, keep an open mind, and we'll see

8  you in 15 minutes.

9      (The jury was escorted from the courtroom at

10 11:43 a.m.)

11     (Recess at 11:43 until 12:00.)

12     THE COURT:  Are we ready for the jury?

13     MR. KAUFMAN:  We are, Your Honor.

14     MR. BUTLER:  Yes, Your Honor.

15     (The jury was returned to the courtroom.)

16     THE COURT:  Mr. Kaufman, you may proceed.

17     MR. KAUFMAN:  Thank you, Your Honor.

18 Q    Detective Beaver, just before the break you had indicated

19 that one of the contacts on Mr. Coleman's phone was that of

20 Poppa.  And did you identify his true name?

21 A    Yes, sir, I did.  It was Davon Harris.

22 Q    And I would like show you what's been admitted as

23 Government's 7b.  Do you recognize that person?

24 A    Yes, sir.  That is Davon Harris.

25 Q    You indicated that you had generated a report of your

1  review of Mr. Coleman's iPhone?

2  A    Yes, sir.

3  Q    When you created that report, were you in fact at that

4  time reviewing the physical phone while putting the details

5  into your report?

6  A    Yes, sir.

7  Q    Showing what's been marked as Government's Exhibit -- and

8  let me ask you this, are you able to recall all the details of

9  the information that you were writing down when generating

10 that report from the phone?

11 A    No, sir.  I can't remember everything in the report.

12 Q    But what you put in at the time was your present sense

13 impression of what you were reviewing in the phone?

14 A    Yes, sir.

15 Q    Showing what's been marked as Government's 65 for

16 identification which has been provided to the defendant in

17 discovery.

18      Do you recognize Government's 65 for identification?

19 A    Yes, sir.

20 Q    And what is it?

21 A    It's a review I conducted on September 2nd, 2011 of the

22 iPhone of Mr. Coleman, several pages, as well as another phone

23 seized from Mr. Coleman.

24 Q    And when you say another phone, did you follow the same

25 procedure in terms of generating this report for the other

1   phone as well?

2   A    Yes, sir.

3   Q    And would you be able to recall the facts that you

4   transferred from the phone into this report, independent of

5   reviewing the report?

6   A    Not all.  I couldn't remember every single thing on this

7   report.  No, sir.

8          MR. KAUFMAN:  Your Honor, we'd seek to have

9   Government's 65 admitted and published to the jury.

10         MR. BUTLER:  Objection.

11         THE COURT:  Basis?

12         MR. BUTLER:  Well, Your Honor.

13         THE COURT:  Let me see the attorneys at sidebar.

14         (Bench conference as follows:)

15         THE COURT:  Mr. Butler, what's your objection?  Is

16  it a hearsay objection?

17         MR. BUTLER:  Well, it's an objection.  It's hearsay,

18  and it's also the fact that how do we know, Judge, how will

19  the jury know this is actually what was in the phone?  It's a

20  report he did.

21         THE COURT:  That's what cross-examination is all

22  about.

23         MR. BUTLER:  Well, I understand that, Your Honor.

24  But for him to say this is what I wrote down, you know.

25         THE COURT:  So on the basis of the objection is

1    hearsay, what's your response?

2           MR. KAUFMAN:  There's a few.  First of all, Your

3    Honor, it's not hearsay.  These are actually statements of the

4    defendant himself.  Even if it was to be considered hearsay,

5    after that it would be admissible under two other exceptions,

6    which are present sense impression and past recollection

7    recorded.

8           THE COURT:  Past recollection recorded would allow

9    you to read into evidence the past recollection, but not

10   introduce it as a substantive exhibit.

11          Present sense impression is interesting if he lays a

12   foundation that he perceives something and immediately or

13   while perceiving it, or immediately thereafter he recorded it.

14   It seems to meet the requirements of that exception.

15          What are you trying to get out of that?

16          MR. KAUFMAN:  Well, there's additional information.

17   There are text messages that Mr. Coleman sent and received.

18   Additional contact information.  And instead of essentially

19   pressing Detective Beaver on the stand about what he had

20   already viewed, it's in the report.  So there are numerous

21   contacts.

22          THE COURT:  I'm going to overrule your objection.

23   I'm going to allow the government to introduce this subject to

24   your cross-examination.  I do think it's -- it meets the

25   requirements of present sense impression to the extent that

1   any of the data -- well, I'll admit it for that purpose.

2           MR. BUTLER:  Well, Your Honor, we would contend that

3   it contains evidence irrelevant to this trial.

4           THE COURT:  Well, you can -- you can --

5           MR. BUTLER:  And we would contend --

6           THE COURT:  Let's do it this way, Mr. Kaufman.  Why

7   don't you -- I'm going to allow him to have that in front of

8   him while he testifies.  And then whatever you want to bring

9   out of that testimony, you don't have to go through the

10  refreshed recollection.

11          And then I'll take under advisement whether I'm

12  going to admit that document itself as substantive evidence.

13          And so, are there certain things that you want to

14  get out like text messages and that type of thing?

15          MR. KAUFMAN:  Actually, Your Honor, the text

16  messages, they're just the fact of showing that there was back

17  and forth.  Showing the contact to Jay, for example.  But not

18  necessarily the content of them.  I wasn't --

19          THE COURT:  So it seems like you could examine on

20  that.  And I'll let you do that.  And I'm not going to make

21  you go up every time you refresh recollection, because I think

22  there is a basis for present sense impression.

23          The relevancy objection is a difficult one for me to

24  do just standing here.  And so rather than deal with that, I

25  think the best way to handle it is for you to examine on the

1  areas that you think are relevant, and I'll take objections as

2  we go.

3        MR. BUTLER:  And Your Honor, I also I thought

4  Detective Beaver said that he had the code from McAdoo.  So if

5  he had the call from McAdoo, that means she had access to it.

6        THE COURT:  That's a great cross-examination

7  question.  I don't think it goes to weight.  I think it -- I

8  don't think it goes to admissibility, I think it goes to

9  weight.  All right.

10        MR. BUTLER:  Thank you.

11        THE COURT:  Mr. Butler, before you go, I'm trying to

12  balance things here, and so what I'm asking you, do you think

13  you can get what you need proceeding that way?

14        MR. KAUFMAN:  I think so.  Based on subsequent

15  testimony, there might have been other things that we would

16  want to pull from this for closing, but I guess --

17        THE COURT:  That's why I'm holding off till later on

18  a final decision on admitting this or not.  Let's see how far

19  we go with just examining that in front of the witness, but

20  not admitted into the record.

21        MR. KAUFMAN:  And may I, at counsel's table, ask,

22  because there were some additional contacts he couldn't recall

23  off top of his head what I intended to say.

24        THE COURT:  Yeah.  Go through the refreshed

25  recollection on that.

1              MR. KAUFMAN:  Yes, sir.

2              THE COURT:  Would it refresh your recollection to

3    look at your report directing him to page and line.  See if we

4    can do it that way.

5              MR. KAUFMAN:  Yes, sir.

6              (The bench conference was concluded.)

7              MR. KAUFMAN:  May I, Your Honor?

8              THE COURT:  You may.

9              MR. KAUFMAN:  Thank you.

10   Q    Detective Beaver, you've listed several contacts that

11   were included in Mr. Coleman's iPhone.  In addition, do you

12   recall whether there was a contact for somebody listed as

13   Mark?

14   A    Yes, sir.

15   Q    And did you in fact during your investigation seize a

16   phone with the same phone number belonging to the contact

17   listed as Mark in Mr. Coleman's phone?

18   A    Yes, sir, we did.  It was actually Mark Hunt.

19   Q    Same question for a contact in Mr. Coleman's phone Nole.

20   N-O-L-E.  Did you in fact determine whose phone number that

21   was?

22   A    Determined that number from Nolan Robertson.

23   Q    Did the name BJ come up, as well, relevant to your

24   investigation?

25   A    Yes, sir, it did.

1  Q    And when you reviewed Mr. Coleman's phone, was there an

2  entry for a contact with that name?

3  A    Yes, sir.

4  Q    If you recall?

5  A    Yes, sir.  I believe there was.

6  Q    Were you involved in a traffic stop related to this

7  investigation -- were you involved, during this investigation,

8  with the traffic stop of a white Audi with California tags?

9  A    Yes, sir.

10  Q    And who was the driver of that vehicle?

11  A    The day that I was involved with the traffic stop of the

12  Audi was Ashley Coleman.

13  Q    Do you know who that is?

14          MR. BUTLER:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  The sister of Parker Coleman.

17  Q    (Mr. Kaufman) In Mr. Coleman's iPhone, was there a listing

18  for what purports to be Audi?

19  A    Yes, sir, I believe there was.

20  Q    Was there a contact number for a Ryan in Mr. Coleman's

21  phone?

22  A    Yes, sir, I believe there was.

23  Q    Did you confirm whether that phone number was in fact for

24  Fintastic?

25  A    Yes, it was.

1    Q    In addition to the iPhone, did you also seize an LG phone

2    that belonged to Mr. Coleman?

3    A    Yes, sir.

4    Q    And in that phone do you recall if there were contacts

5    that are relevant to this investigation?

6    A    Yes, sir, I believe there were.  But without reviewing my

7    report to refresh my memory, I can't recall.

8    Q    Like to direct your attention to page 6 of what's been

9    marked for identification purposes as Government's 65.

10         Was there, if I may retrieve that now.  Was there a

11   contact in Mr. Coleman's LG firm for a Leah?

12   A    Yes, sir.

13   Q    Was there one for a Pop?

14   A    Yes, sir.

15   Q    Are you familiar with the 818 area code?

16   A    Yes, sir I am.

17   Q    Where is that?

18   A    Southern California.

19   Q    And let's see.  In terms of the LG phone, and then was

20   there another phone seized from Mr. Coleman, a Verizon Samsung

21   phone?

22   A    Yes, sir.

23   Q    And were there numerous -- as opposed to the other

24   phones, were there numerous text messages, over 70 on that

25   phone?

1   A    Yes, sir, I believe there were.

2   Q    And among those text messages, were there numerous with

3   somebody who's identified as Jay?

4   A    I would have to review the report to refresh my memory.

5   Q    Okay.  I would like to show you what's, again, from 65

6   for ID, page 10.  So is "Jay" a known nickname for Jerry

7   Davis?

8   A    Yes, sir, it is.

9   Q    And are there numerous contacts between Mr. Coleman's

10  phone and Jay?

11  A    Yes, sir.  There's several text messages between the two.

12  Q    And in those text messages, is there communications

13  regarding Bank of America bank accounts with --

14          MR. BUTLER:  Objection.

15  Q   (Mr. Kaufman) -- names?

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes, sir there are.

18  Q    And is there also discussion with another contact about

19  communication from a Mark, quote, "Mark said Dude --"

20          MR. BUTLER:  Objection.  May I state my reason, Your

21  Honor?

22          THE COURT:  Yes.

23          MR. BUTLER:  We would object on the grounds of the

24  best evidence rule, Your Honor.

25          THE COURT:  Overruled.

1   Q   (Mr. Kaufman) "Mark said, Dude, be there at 10:50."

2   A   Yes, sir, there was a text stating that.

3   Q   Was it just above that text where there are texts with

4   Jay listing Bank of America account numbers and the name of

5   Tonya or Tonya Vazquez?

6                   MR. BUTLER:  Objection.

7                   THE COURT:  Overruled.

8                   THE WITNESS:  Yes, sir.

9   Q   (Mr. Kaufman) Now, did you review Mr. Coleman's iPhone for

10  voice mail messages?

11  A   Yes, sir.

12  Q   And did you find any that were relevant to this

13  investigation?

14  A   Yes, sir.

15  Q   Was there one that was from Ryan?

16  A   Yes, sir.

17  Q   Did you also find any that were left by Nolan Robertson?

18  A   Yes, sir.

19  Q   Did you find that were left by Mark Hunt?

20  A   Yes, sir.

21  Q   And through your investigation, have you had an

22  opportunity to become familiar with both of those men's

23  voices?

24  A   Yes, sir I have.

25  Q   With regard to Mr. Hunt's voice mail, do you recall off

1  the top of your head the date and time, or even just the date

2  of the phone call?

3  A    I would have to go to the transcript.  It was completed

4  for the voice mail to recall the exact date and time.

5  Q    I would like to show you what's been marked and provided

6  previously to defense in discovery 26g, 26h.

7      First of all, if I could ask you if you recognize both of

8  these, 26g and h?

9  A    Yes, sir, I do.

10  Q    How do you recognize them?

11  A    The CD is a disk containing the voice mail message with

12  Mr. Hunt -- from Mr. Hunt.  The 26h is the transcript of the

13  voice mail.

14  Q    And in reviewing the transcript, does it refresh your

15  recollection as to the time that the voice mail Mr. Hunt left

16  was -- date and time that Mr. Hunt left the voice mail on

17  Mr. Coleman's, iPhone?

18  A    Yes, sir it does.

19  Q    What was that date of time?

20  A    November 2nd.  I need to look at the report again for the

21  time, because I didn't memorize it just now.

22          MR. BUTLER:  Your Honor, I can't hear.

23          THE COURT:  He has to look at the report to see the

24  time.  He didn't memorize it.

25          THE WITNESS:  I'm sorry.  It was, like I said,

1   November 2nd, 2010, it was 4:52 p.m.

2   Q   (Mr. Kaufman) And did you make that notation on the

3   transcript having reviewed it just at that same general time

4   from the iPhone itself?

5   A    Yes, sir.  I reviewed the audio from the phone, as well

6   as the transcript for accuracy.

7            MR. KAUFMAN:  Your Honor, at this time we seek to

8   publish g and h to assist with the review of g.

9            THE COURT:  Any objection?

10           MR. BUTLER:  Yes, sir.

11           THE COURT:  Same objection noted?

12           MR. BUTLER:  Yes, sir.

13           THE COURT:  All right.  Overruled.  You may admit

14  and publish.

15           MR. KAUFMAN:  Thank you, Your Honor.

16           (Government's Exhibits No. 26g & h were received

17  into evidence.)

18  Q   (Mr. Kaufman) And that's Mr. Hunt's call, the voice mail

19  to Mr. Coleman on November 2nd, 2010?

20  A    Yes, sir.

21  Q    I would like to next show you what have been marked for

22  identification purposes as 26e and 26f, previously provided to

23  defense in discovery.  Do you recognize these?

24  A    Yes, sir, I do.

25  Q    How do you recognize them?

1    A    26e is a CD containing the message from Nole, which is

2    Nolan Robertson, on Mr. Coleman's iPhone.  Twenty-six-f is a

3    transcript of the message that was left.  And the date was

4    October 18, 2010 at 2:46 p.m.

5             MR. KAUFMAN:  Your Honor, we would seek to admit and

6    publish 26e and f.

7             MR. BUTLER:  Objection.

8             THE COURT:  Overruled.  Let them be admitted.  You

9    may publish.

10            MR. KAUFMAN:  Thank you, Your Honor.

11            (Government's Exhibit No. 26e & f were received into

12   evidence and published.)

13   Q    Now Detective Beaver, if I can take you to travel

14   records.  Did you send subpoenas to various airlines and

15   ticketing agencies?

16   A    Yes, sir, we did.

17   Q    Did you obtain data from one of those to include Orbitz

18   also operating as Cheaptickets.com?

19   A    Yes, sir, we did.

20   Q    Did you receive a 902.11 certificate of authenticity

21   regarding those records?

22   A    Yes, sir, we did.

23   Q    Can you give an approximation as to how many records you

24   had received from Cheap Tickets slash Orbitz?

25   A    As far as a number, I would hate to guess.  But if I

1  recall, the stack of paperwork I received back from Orbitz,

2  which is also known as Cheap Tickets, was approximately

3  3 inches thick, a big stack of paper.

4  Q    What type of data was included in those records?

5  A    Gave information on dates of travel, passengers

6  traveling, cities traveled from and to, with layovers, if

7  layovers applied.  Individuals that were paying for those

8  flight records.  In other words, the person that traveled, it

9  would show the person that paid for the travel.  And it would

10 indicate a name on the credit card or debit card that paid for

11 the travel.

12 Q    Would you consider that the sum of all that data to be

13 voluminous?

14 A    Yes, sir.

15 Q    Now, did you at some point early in this investigation

16 when you received that data, did you transfer the data into a

17 smaller spreadsheet?

18 A    Yes, sir.  I was somewhat familiar with Microsoft Excel.

19 So I made a spreadsheet so I could go through the data, the

20 three or so inches thick paperwork, and obtain the records

21 directly off each piece of paper and put it into the

22 spreadsheet that I made.

23 Q    So when you created the spreadsheet, were you, at that

24 very same moment, looking at the records that you had obtained

25 back from Orbitz/Cheap Tickets?

1   A   Yes, sir. I was looking at one piece of paper and

2   transferring the data that I had received on to the

3   spreadsheet that I made.

4   Q   Did you ever check that -- the entry of that data into

5   that spreadsheet?

6   A   Yes, sir. I checked to make sure it was accurate.

7   Q   How many times would you say you checked it?

8   A   Probably three or four times.

9   Q   And in fact, did you, subsequently, during meetings with

10   targets of the investigation, review that data again in order

11   to ensure it's accuracy?

12   A   Yes, sir.

13   Q   In terms of the information in that spreadsheet, is it

14   solely data from -- sorry. Is it -- the entries in that

15   spreadsheet, is it solely from the data that was in the

16   Orbitz/Cheap Tickets records?

17   A   Yes, sir, it is.

18   Q   Did you add any other editorializing or any other

19   information other than what came directly from those records?

20   A   No, sir, I didn't.

21   Q   And again, if I didn't already ask. Did you receive a

22   certification of authenticity for the original of the records?

23   A   Yes, sir, I did.

24         MR. KAUFMAN: Your Honor, under Rule 1006 we would

25   like to show the witness Exhibit 29.

1  Q    And showing you page 1 of Exhibit 29, page 2, page 3,

2  page 4, page 5, page 6.  Do you recognize what's in

3  Government's Exhibit 29?

4  A    Yes, sir, I do.

5  Q    What is it?

6  A    It's the spreadsheet that I made from the information

7  obtained from Orbitz.

8            MR. KAUFMAN:  Your Honor, at this time we'd seek to

9  admit Government's 29 and publish to the jury.

10            MR. BUTLER:  Objection.

11            THE COURT:  Basis.

12            MR. BUTLER:  Well, Your Honor, we would object if

13  it's being submitted to prove the truth therein.

14            THE COURT:  Very well.  Has the underlying data been

15  made available to defense counsel in discovery?

16            MR. KAUFMAN:  It has been made available and

17  provided on disk to defense many months ago.

18            THE COURT:  I think it meets the requirements of

19  1006.  I'll overrule the objection, and allow admission of

20  Government's 29.

21            MR. KAUFMAN:  Thank you, Your Honor.

22            (Government's Exhibit No. 29 was received into

23  evidence and published.)

24  Q    (Mr. Kaufman) Showing page 1.  And without going through

25  every single one, do you recognize on this page several

1   individuals who have been arrested in relation to this case,

2   many of which you already discussed when viewing photographs?

3   A    Yes, sir, I do.

4   Q    Page 2, does the same apply?

5   A    Yes, sir, it does.

6   Q    Page 3.

7   A    Yes, sir.

8   Q    Page 4.

9   A    Yes.

10  Q    On the next page.

11  A    Yes, sir.

12  Q    And on the final page.

13  A    Yes, sir.

14  Q    Now, I would like to ask you, you stated that exhibits e

15  and f from Nole, Nolan Robertson was from October 18, 2010.

16  Is that consistent with the data you received from Cheap

17  Tickets/Orbitz?

18  A    Yes, sir.  The voice mail we played from Nolan Robertson

19  on Mr. Coleman's iPhone, indicated that he was to layover in

20  Memphis.  That message was received on the same date that the

21  records provided from Orbitz indicated that Mr. Robertson

22  traveled from -- L-A-X is Los Angeles.  Memphis is the layover

23  spot.  M-E-M is Memphis.  And then continued on to Charlotte

24  on Delta Airlines.

25  Q    And in reviewing this document Exhibit 29, and the source

1  data itself, did you find any co-conspirators for whom

2  Mr. Coleman purchased tickets?

3  A    Yes, sir.

4  Q    And do you recall off the top of your head some of those

5  names?

6          MR. BUTLER:  Objection to the form of the question.

7          THE COURT:  I'll object (sic) as to the form.

8  Q    (Mr. Kaufman) Do you recall the names of people who you

9  had investigated in this case listed as recipients of tickets

10  purchased by Mr. Coleman?

11          MR. BUTLER:  Objection.

12          THE COURT:  Overruled.

13          THE WITNESS:  Specifically paid for by Mr. Coleman,

14  I remember, I believe Stephanie Peppers was one of them.

15  Mr. Coleman, I believe, was a payee on one of his tickets, if

16  I remember correctly.  I'd have to review the entire docket --

17          MR. BUTLER:  Objection, Your Honor, to what he

18  believed.

19          THE COURT:  Overruled.

20          THE WITNESS:  I would have to review the entire

21  document to tell you exactly every name.

22  Q    (Mr. Kaufman) How about Kevin Stanfield?

23          MR. BUTLER:  Objection.

24          THE COURT:  Overruled.

25  Q    Do you recall if Mr. Coleman had purchased any tickets

1   for Mr. Stanfield?

2         MR. BUTLER:  Objection.

3         THE COURT:  I'll sustain it as to form.  If you

4   would direct it to -- your question to the payee listing.

5         MR. KAUFMAN:  Yes, Your Honor.

6   Q    On page 1, I'm highlighting a travel for September 12th,

7   2009.  Can you indicate who the traveler was and who paid for

8   that travel between Charlotte and LAX?

9   A    Megan Baehr was the traveler, and the payment was made by

10  Parker Coleman with the Visa card.

11  Q    What's the entry highlighted?

12  A    October 31st -- I'm sorry.

13  Q    No, please.

14  A    On October 31st, 2009, Mr. Gerren Darty had traveled

15  United Airlines from Charlotte to Burbank through Denver.  And

16  the payment was made by Visa card in the name of Parker

17  Coleman.

18        MR. BUTLER:  Objection.

19        THE COURT:  Overruled.

20  Q    And where is Burbank located?

21  A    Southern California.

22  Q    Is that -- how close is that to LA?

23  A    I have no idea.

24  Q    I believe you indicated that Mr. Coleman purchased

25  tickets for himself, as well?

1    A    Yes, sir.

2    Q    And what's the highlighted portion indicate?

3    A    On November 15th, 2009, Mr. Coleman was a traveler on

4    Continental Airlines from LAX to Charlotte, stopped in

5    Cleveland.  Visa card had paid for that travel in the name of

6    Parker Antron Coleman.

7    Q    From October 28, 2009, what's that indicating?

8    A    Stephanie Peppers traveled from LAX, which is Los

9    Angeles, to Charlotte on Delta Airlines.  That payment was

10   made on a Visa card in the name of Stephanie Peppers.

11   Q    How about this entry from November 19th, 2009?

12   A    Glenn Carrera was a passenger on American Airlines Los

13   Angeles LAX to Charlotte with a layover in Dallas, Fort Worth.

14   Paid for by Visa card in the name of Parker Coleman.

15            MR. BUTLER:  Objection.

16            THE COURT:  Overruled.

17   Q    How about November 22nd, 2009?

18   A    On that date both Christopher McKneely and William Pierce

19   traveled.  Mr. McKneely traveled from LA to Charlotte on Delta

20   Airlines with a stop in Atlanta.  That payment was by a Visa

21   card in the name of Parker Coleman.

22        Mr. Pierce traveled the same date from Charlotte to

23   Burbank with a stop in Dallas/Fort Worth on American Airlines,

24   and that payment was made by Mr. Coleman's Visa, the very same

25   Visa card the last four numbers were identical.

1  Q    Actually, I've got three entries.  If you could look at

2  the second and third entries for December 6, 2009.

3  A    Okay.  The second one, Nastasha Rodriguez, traveled on

4  American Airlines from Charlotte and -- I'm trying to remember

5  SNA, I honestly can't remember what city that is.  Travel

6  American Airlines from Charlotte, layover in Dallas/Fort Worth

7  on a Visa card in the name of Parker Antron Coleman.

8       The last one, Mr. William Pierce, traveled LAX to

9  Charlotte.  CVG, I believe, is Cincinnati, Ohio, but I'm not

10  100 percent sure.  Delta Airlines, same Visa card, Mr. Parker

11  Antron Coleman's name, same last four card numbers.

12  Q    December 7, 2009?

13  A    William Pierce traveled from Charlotte through Los

14  Angeles with a layover in Atlanta on Delta Airlines.  The

15  flight was paid for by Parker Antron Coleman with a Visa.

16  Q    December 12, 2009?

17  A    Samantha Schmidlin traveled via Delta Airlines from Los

18  Angeles to Charlotte, with a layover in Atlanta.  Payment was

19  made by Visa card in the name of Parker Antron Coleman.

20  Q    August 11, 2010?

21  A    Leon Robertson traveled on Delta Airlines from Charlotte

22  to Los Angeles with a layover in Memphis.  Visa card paid for

23  the payment, name of Parker Coleman.

24  Q    Now Detective Beaver, did you also -- I believe you

25  mentioned that you had seized Nolan Robertson's phone; is that

1    correct?

2    A    Yes, sir.  A phone was seized from Nolan Robertson.

3    Q    I would like to show you a few photographs.  First for

4    identification purposes, 11a, 11b, 11c, 11d -- actually,

5    let's -- I'm not going to ask you about 11c, 11d -- my

6    apologies.

7         Let's just limit it to 11a and 11b for now.  Do you

8    recognize those two images?

9    A    Yes, sir.

10   Q    What are they?

11   A    The first photograph is a photograph upon seizure of

12   Nolan Robertson.  The second photograph which is on the screen

13   now, is a photograph of Nolan Robertson seated on the

14   aircraft.

15            MR. KAUFMAN:  We move to admit and publish 11a and

16   11b.

17            THE COURT:  Any objection?

18            MR. BUTLER:  No, Your Honor.

19            THE COURT:  Let them be admitted and published.

20            (Government's Exhibits No. 11a & 11b were received

21   into evidence and published.)

22   Q    (Mr. Kaufman) I believe you said this was Mr. Nolan

23   Robertson's phone?

24   A    Yes, sir.

25   Q    And 11b?

1   A    It was a photograph of Mr. Robertson that was found on

2   the phone, and it's a photograph of him on an airplane.

3   Q    Now on his phone, did you review a text message with an

4   identification of a "new num?"

5   A    Yes, sir, I did.

6   Q    I'd like to show you what's been -- the "new num" --

7   sorry.  When you reviewed the "new num," were you able to

8   determine whose phone that was?

9   A    Yes, sir.  I recognized the number.

10  Q    Whose number did that belong to?

11            MR. BUTLER:  Objection.

12            THE COURT:  Overruled.

13            THE WITNESS:  Parker Coleman.

14  Q    (Mr. Kaufman) Do you recall which phone number?

15  A    (704)421-4963, which is the number of the iPhone which

16  was seized from Mr. Coleman.

17  Q    I'm showing you what's been marked for identification as

18  11d.  Do you recognize that?

19  A    Yes, sir.  It's the text message on Mr. Nolan Robertson's

20  phone.

21  Q    Is this what you just testified about?

22  A    Yes, sir.

23            MR. KAUFMAN:  Move to admit and publish.

24            THE COURT:  Any objection?

25            MR. BUTLER:  Objection.

1     THE COURT:  Let it be admitted.

2          (Government's Exhibit No. 11d was received into

3     evidence and published.)

4     Q    (Mr. Kaufman) Did you, in reviewing Mr. Nolan Robertson's

5     phone, find several text messages on October 15th and

6     October 16th, 2010, between Mr. Robertson's phone and this

7     (704)421-4963 phone number?

8     A    I recall seeing several text messages on Mr. Nolan

9     Robertson's phone.  I'd have to refresh my memory by looking

10    at the report to tell you exactly which number.

11    Q    Sorry.  I'll show you what have been marked for

12    identification as 11e, 11f, 11g, 11h, 11i, 11j, 11k, 11l, 11m,

13    11n, 11o, 11p, 11q, 11r, 11s, 11t, and 11u.  Do you recall

14    those images?

15    A    Yes, sir, I do.

16    Q    And in fact, did you take those photographs?

17    A    Yes, sir, I did.

18    Q    What are they?

19    A    They're photographs of the text messages on Mr. Nolan

20    Robertson's phone to and from the number (704)421-4963 which

21    is the phone number for Mr. Coleman's iPhone.

22    Q    Was that consistent with the travel that you indicated on

23    November 18th, 2010 -- sorry on October 15th -- let me start

24    that over.

25         These text messages are from October 15th and 16th, is

1  that accurate?

2  A     Yes, sir, they are.

3  Q     And does it appear from the text messages that they are

4  related to the other end of the travel that resulted in the

5  October 18th, 2010 travel by Nolan Robertson that you've

6  described from Exhibit 29?

7  A     Yes, sir.

8         MR. KAUFMAN:  Your Honor, at this time we seek to

9  admit and publish at a later time, 11e through 11u.

10        MR. BUTLER:  Objection.

11        THE COURT:  Overruled.  Let them be admitted.

12        (Government's Exhibit No. 11e-11u were received into

13  evidence and published.)

14  Q     Now Detective Beaver, did you also -- you mentioned that

15  you were involved with the arrest of -- and detention of

16  Shaunda McAdoo.  On November 2nd, did you seize any phones

17  from her?

18  A     Yes, sir, I did.

19  Q     And have you reviewed her phones?

20  A     Yes, sir.  Her phone.

21  Q     I'm sorry.

22  A     Actually, yes.  Let me correct that.  I seized a phone

23  from her on November 2nd.  She was not arrested that date.

24  Subsequently she was arrested around midnight on

25  November 16th, into November 17th, and a phone was seized from

1    her.  I did review both phones.

2    Q    All right.  By the way, when you were interacting with

3    Ms. McAdoo on November 2nd, 2010, at what point in the day in

4    relation to other activities was that?

5    A    It was in the evening hours.  It would have been after

6    5:30 p.m.  It was after she had already been stopped in the

7    Infiniti with two other individuals.

8    Q    While you were actually with her, was there any activity

9    taking place on her phone?

10   A    Yes, sir.

11   Q    Can you describe what happened?

12   A    As I was speaking with Ms. McAdoo, I had the phone that

13   she had on the back of the police car.  The phone received an

14   incoming call, and I glanced at the phone and saw that it was

15   an incoming call from Turtle.

16       I didn't note the number on my notepad at the time

17   because the name meant something to me, as far as a marijuana

18   source out in California.  But I didn't want Ms. McAdoo to

19   know I was interested in that.  Didn't want her to know I knew

20   anything about it.

21       So I mistakenly thought later that evening I'd be able to

22   search the phone.  But the phone locked, so I couldn't get the

23   number.

24   Q    Now also on that date were you able to actually obtain

25   some data related to Mr. Coleman?

1  A    On that date, on November 2nd, or on subsequent time?

2  Q    I would like to show you what's been marked as 27g for

3  identification.  Do you recognize that?

4  A    Yes, sir, I do.

5  Q    What is that?

6  A    It's the phone seized from Ms. McAdoo.

7  Q    And did you in fact take the photograph here in 27g?

8  A    Yes, sir.

9         MR. KAUFMAN:  Your Honor, we seek to admit and

10  publish 27g.

11        MR. BUTLER:  Objection.

12        THE COURT:  Overruled.  Let it be admitted.  You may

13  publish.

14        MR. KAUFMAN:  Thank you.

15        (Government's Exhibit No. 27g was received into

16  evidence and published.)

17  Q    Detective Beaver, what is the entry on this phone?  What

18  is it indicating?

19  A    It shows a missed call from Parker on November the 2nd,

20  2010.

21  Q    Also from this phone did you review other information

22  that's relevant to this investigation?

23  A    Yes, sir.  Like I said, I reviewed two phones that were

24  seized from Ms. McAdoo.  I generated a report regarding the

25  search of both phones.  I would have to look at each report to

1  show which information came off of which phone.

2  Q    I would like to show you what's been marked for

3  identification purposes as 27b, 27c, 27d, 27e, 27f.

4       Do you recognize all these images?

5  A    Yes, sir.

6  Q    And where are they from?

7  A    They were photographs on the phone of Ms. McAdoo.

8            MR. KAUFMAN:  Your Honor, we seek to publish 27b

9  through f.

10           THE COURT:  Any objection?

11           MR. BUTLER:  We would object, Your Honor.  And we

12  would object to 27f as being duplicitous.

13           THE COURT:  Overruled.  Let them be admitted.

14           MR. KAUFMAN:  Thank you, Your Honor.

15           (Government's Exhibits No. 27b-f were received into

16  evidence and published.)

17  Q    What's in 27b, Detective Beaver?

18  A    That's a photograph of someone holding a bud of marijuana

19  with a lot of other marijuana in the background.

20  Q    And based on your training and experience, how would you

21  characterize this type of marijuana?

22           MR. BUTLER:  Objection.

23           THE COURT:  Overruled.

24           THE WITNESS:  Mid grade to high grade.  A decent

25  quality of marijuana.

1  Q  (Mr. Kaufman) Twenty-seven-c.  This again came from Ms.

2  McAdoo's phone.  Do you recognize the person in the photo?

3  A   Yes, sir.

4  Q   Who is it?

5  A   It's Parker Coleman.

6  Q   Twenty-seven-d.  What is this depicting?

7  A   This is showing a Nolan Robertson was a passenger on U.S.

8  Airways.  Indicates the e-mail address was SMcAdoo@Ymail.com

9  and gave a phone number.

10 Q   Twenty-seven-e.  Now is this also an image from her

11 phone?

12 A   Yes, sir.  There was an image of her driver's license in

13 her phone -- or -- ID card, excuse me.

14 Q   And 27f.  Do you recognize various aspects of this

15 photograph?

16 A   Yes, sir.  This is the photograph of the white Porsche

17 Cayenne.

18 Q   And can you tell the location?

19 A   Yes, sir.  It's the parking lot of the South Gate

20 Condominiums at Park and Fairview.

21 Q   Is that located 5425 Closeburn Road?

22 A   Yes, sir, it is.

23 Q   Detective Beaver, you stated that you had seized phones

24 from Ms. McAdoo's arrest.  I believe you said it was on or

25 about November 16th or 17th, 2010?

1   A    Yes, sir.

2   Q    I would like to show you what's been marked for

3   identification purposes as 28b.  Do you recognize this?  Do

4   you recognize the phone first of all?

5   A    Yes, sir.

6   Q    And whose phone is that?

7   A    It's the phone of Ms. McAdoo.

8   Q    And is this -- did you actually take this photograph?

9   A    Yes, sir.

10  Q    Is it a fair and accurate representation of what you saw

11  on Ms. McAdoo's phone seized on November 16th or 17th, 2010?

12  A    Yes, sir.

13          MR. KAUFMAN:  We move to admit and publish, Your

14  Honor.

15          MR. BUTLER:  Objection.

16          THE COURT:  Overruled.  Let it be admitted and

17  published.

18          MR. KAUFMAN:  Thank you.

19          (Government's Exhibit No. 28b was received into

20  evidence and published.)

21  Q    And Detective Beaver, is this the same phone number

22  you've previously testified was in Mr. Coleman's iPhone?

23  A    Yes, sir, it is.

24  Q    And it states "Parker --"

25  A    Yes, sir, it does.

1   Q    -- as the contact.

2        Now did you also seize the phone belonging to Davon

3   Harris who I believe you said was known as Poppa?

4   A    Yes, sir.  We seized actually two phones.  A Blackberry

5   and I believe it was a Metro PCS phone from the Infiniti on

6   which he was an occupant on November 2nd, 2010.

7   Q    I'd like to show you what's been marked as 43a for

8   identification.  Do you recognize this image?

9   A    Yes, sir, I do.

10  Q    And was that an image taken off of one of those two

11  phones?

12  A    Yes, sir it is.  It's a photograph that was on one of the

13  phones.  That is a picture of Mr. Harris himself.

14  Q    And 43b, was this also an image taken from that very same

15  phone?

16  A    Yes, sir it was.

17       MR. KAUFMAN:  Your Honor, we would move to admit and

18  publish 43a and 43b.

19       THE COURT:  Any objection?

20       MR. BUTLER:  No objection.

21       THE COURT:  Let them be admitted and published.

22       (Government's Exhibit No. 43a & 43b were received

23  into evidence and published.)

24  Q    Detective Beaver, is it accurate that you were testifying

25  that this image is of Davon Harris, also known as Poppa?

1    A    Yes, sir, it is.

2    Q    Now 43b.  What is that an image of?

3    A    It's the white Porsche Cayenne.

4    Q    Did you obtain business records that were certified under

5    902.11 from Hendrick Porsche regarding the SUV, the Porsche

6    Cayenne SUV?

7    A    Yes, sir, we do.

8    Q    Like to show you what's been marked for identification

9    purposes as Exhibit 61, it's a multi-page document.  1 --

10   sorry.  Page 1, 2, 3, 4, 5, 6, 7, 8; eight pages.  Do you

11   recognize this document?

12   A    Yes, sir.

13   Q    What is it?

14   A    It's the records we received from Hendrick Porsche

15   involving the 2008 Porsche Cayenne.

16             MR. KAUFMAN:  All right.  Your Honor, we'd move to

17   admit and publish 61.

18             THE COURT:  Any objection?

19             MR. BUTLER:  No objection.

20             THE COURT:  Let them be admitted.

21             (Government's Exhibit No. 61 was received into

22   evidence and published.)

23   Q    And Detective Beaver, with regard to the Porsche Cayenne

24   from Hendrick Porsche's records, who is listed as the owner?

25   A    Parker Coleman.

1    Q    Page 2, same thing?

2    A    Yes, sir.

3    Q    And by the way, is this a different phone number than the

4    phone numbers that you've been testifying about so far?

5    A    Yes, sir, it is.

6    Q    Approximately how -- may I just take a side note question

7    for -- Detective Beaver, can you give a rough number as to how

8    many different phone numbers you found during your

9    investigation associated with Mr. Coleman?

10   A    It would have been in excess of five.

11   Q    Based on your training and experience, what's that

12   indicative of?

13            MR. BUTLER:   Objection.

14            THE COURT:   Sustained.

15   Q    Let's go on to, this is page 3.   Listed owner is?

16   A    Parker Coleman.

17   Q    Page 4, same thing?

18   A    Yes, sir.

19   Q    Five, six, for pages 5 and 6, same thing?

20   A    Yes, sir.   It lists Parker Coleman on five and six.

21   Q    Now page 7, these are records from you obtained -- these

22   are all Hendrick's records responsive to a subpoena, correct?

23   A    Yes, sir.

24   Q    And for this document that you received, is there a name

25   that you recognize on the documentation?

1    A    Yes, sir.  The name of Shaunda McAdoo.

2    Q    And then for the final page, again, the registered owner

3    was listed as?

4    A    Parker Coleman.

5              MR. KAUFMAN:  Your Honor, at this time I would like

6    to read the second stipulation.

7              THE COURT:  You may.

8              MR. KAUFMAN:  "Now comes the United States of

9    America, by and through the United States Attorney for the

10   Western District of North Carolina as represented by Assistant

11   United States Attorney Steven R. Kaufman, and Norman Butler,

12   Esquire, counsel for Defendant Parker Coleman, and advise the

13   Court that they have entered into a stipulation that:

14             Defendant Parker Coleman has been previously

15   convicted of a crime punishable by imprisonment for a term

16   exceeding one year.  At the time of the offense charged in the

17   above-captioned pending case, the defendant's felony

18   conviction had not been expunged or set aside, and he had not

19   been pardoned nor had his civil rights restored."

20             Based on -- did you in fact conduct a records review

21   for Mr. Coleman's prior felony conviction?

22   A    Yes, sir.

23   Q    And did you send for information for certified records

24   from the State of Mississippi for that prior conviction?

25   A    Yes, sir.

1    Q    Like to show you what's been marked as Government's

2    Exhibit 12 for identification.  Page 1, page 2, 3, 4, 5, 6, 7,

3    8, 9, 10, 11, 12, 13, 14, 15, 16, 17; 17 pages in total.

4         Do you recognize what this document is?

5    A    Yes, sir.  It's a record of receipt from Mississippi

6    regarding that charge.

7              MR. KAUFMAN:  And going back up to page 10 -- well,

8    first of all, Your Honor we would move to admit and publish

9    Exhibit 12.

10             MR. BUTLER:  We would object.  May we have sidebar,

11   Your Honor?

12             THE COURT:  Yes.

13             (Bench conference as follows:)

14             THE COURT:  You're way over your 20 or 30 minute

15   estimate.  Where are we?

16             MR. KAUFMAN:  This is it, Your Honor, after I submit

17   this I'm done.

18             THE COURT:  All right.  Mr. Butler.

19             MR. BUTLER:  When did you provide that to me?  I

20   can't -- I don't remember seeing that.

21             MR. KAUFMAN:  It was in discovery.  I can show you.

22             THE COURT:  All right.  So assuming you got it, we

23   can talk about that later.

24             MR. BUTLER:  Okay.

25             THE COURT:  What's --

1          MR. BUTLER:  That was my point.

2          THE COURT:  Oh --

3          MR. BUTLER:  Cause, I mean, for a while you weren't

4    going to introduce --

5          MR. KAUFMAN:  Well, we were trying to work out a

6    stipulation.

7          THE COURT:  You stipulated to a felony conviction.

8    Do you have a judgment and conviction, just a judgment like we

9    have here from Mississippi?

10         MR. KAUFMAN:  Well, I mean, that's the certified

11   records we receive --

12         THE COURT:  I know you have certified records.  I'm

13   saying, within the package of stuff, do you have a piece of

14   paper that says --

15         MR. KAUFMAN:  Yes, Your Honor.  In fact, page 10 was

16   what I was about to show the jury, and that's the cover sheet

17   for the judgment and that's also the sheet --

18         THE COURT:  Does it list the conviction?

19         MR. KAUFMAN:  I believe it does, Your Honor.  And

20   that's also the same document that we found in the apartment

21   on November 2nd.

22         THE COURT:  So let's -- I'm going to limit you to

23   showing the jury that page of the certified records.

24         MR. KAUFMAN:  Yes, Your Honor.

25         THE COURT:  All right.  Does that --

1    MR. BUTLER:  That's fine.

2    MR. KAUFMAN:  I guess, logistically, I don't know

3  how to work this out, just in case the jury had any question

4  as to whether that was his --

5    THE COURT:  No, I don't think they would, given the

6  stipulation.  If he opens the door on cross, we'll take a

7  second look at it.  Right now that's it.

8    MR. KAUFMAN:  I'll ask him if one of those pages

9  does show the correct picture.

10    THE COURT:  That's fine.

11    (The bench conference was concluded.)

12  Q   (Mr. Kaufman) Detective Beaver, in what's Government's 12

13  for identification purposes, I'm now showing you one of those

14  pages.  Do you see that in front of you?

15  A    Yes, sir.

16  Q    And it is tilted to the side.  Just tried to rotate it,

17  but usual technological issue.  Are you able to see the face?

18  A    Yes, sir, I am.

19  Q    Whose face is that?

20  A    Mr. Parker Coleman.

21  Q    When you say Mr. Parker Coleman, you're talking about the

22  defendant who's in the blue shirt to my right?

23  A    Yes, sir, I am.

24  Q    And how confident are you that's the same Parker Antron

25  Coleman?

1   A    One hundred percent.

2   Q    Like to show you what's been marked as Government's

3   Exhibit -- there we go.  Okay.  It's now turned.  Is it still

4   your testimony that you can see it in the proper orientation?

5   A    Yes, sir.

6   Q    Now I'm going to show you what's been marked for

7   identification purposes as 12b.  I've got one page currently

8   showing on the record from 12.  If there is a way that we can

9   maybe capture this one page so that that will be the

10  Exhibit 12 admitted.

11           THE COURT:  You have this listed as 12b.

12           MR. KAUFMAN:  Well, 12b is actually a photographic

13  image that is part of Agent MacDonald's testimony.  So it's

14  not the same as this particular image.  If we could capture

15  this --

16           THE COURT:  Give it a --

17           MR. KAUFMAN:  -- as 12c.

18           THE COURT:  All right.  Let's label it 12c.

19           MR. KAUFMAN:  Thank you, Your Honor.

20  Q    So from the certified records, Detective Beaver, can you

21  tell us, again, the name listed Parker Antron Coleman, is

22  this, now 12c, an accurate page from the records received back

23  from Mississippi?

24  A    Yes, sir.

25           MR. KAUFMAN:  Your Honor, at this time we would seek

1   to admit and publish this page now 12c.

2            THE COURT:  Over previously tendered objection I'll

3   admit 12c.

4            MR. BUTLER:  Very well, Your Honor.

5            THE COURT:  And you may publish it to the jury.

6            (Government's Exhibit No. 12c was received into

7   evidence and published.)

8   Q    And Detective Beaver, Mr. Coleman pled guilty to what

9   charge?  What felony charge did he plead guilty to?

10  A    Possession of marijuana.

11  Q    And does the conviction indicate that it was

12  7.7-kilograms?

13  A    Six point seven.

14  Q    I'm sorry, if I misspoke --

15  A    Six point seven.

16  Q    And roughly, if I could ask you to do a little math, how

17  many pounds of that?

18  A    I'll round it off, around 14 pounds.

19           THE COURT:  Members of the Jury, let me just give

20  you an instruction with respect to this evidence.

21           You've heard evidence that the defendant was

22  convicted in Mississippi of possession of marijuana,

23  6.7-kilograms, which is contained in Government's Exhibit 12c.

24  That evidence is offered for the limited purpose, although it

25  may be similar to the possession -- the conspiracy and

1  possession with intent to distribute charges in the instant

2  indictment, you are not to consider this evidence in 12c in

3  any way in determining whether the defendant conspired to

4  possess with intent to distribute marijuana in this case.

5         You may consider it for other purposes, such as

6  whether the defendant was a convicted felon at the time of the

7  instant offense, and for purposes related to the testimony of

8  other witnesses in the case.  But you are not to consider it

9  in determining whether the defendant conspired or possessed

10 with intent to distribute marijuana in the instant case.

11        MR. KAUFMAN:  And, Your Honor, may we request an

12 additional 404(b) instruction at this time?

13        THE COURT:  Yes.

14        If you find beyond a reasonable doubt from other

15 evidence in the case that the defendant did commit the acts

16 charged in the indictment with respect to conspiracy to

17 possess with intent to distribute, and distribution of

18 marijuana, then you may consider evidence of this other -- of

19 similar acts committed on a different occasion to determine

20 whether the defendant had the state of mind or intent

21 necessary to commit that offense, whether he had the motive or

22 opportunity, plan or preparation to commit the instant

23 offense.  These are the limited purposes for which the

24 evidence of other similar acts may be considered.

25        You should remember that the defendant is only on

1  trial for the crimes charged in the instant indictment.  And

2  you may consider the evidence of other acts only for the

3  limited purpose for which I have stated.

4  MR. KAUFMAN:  Thank you, Your Honor.  We have no

5  further questions at this time.

6  THE COURT:  Mr. Butler, I think we'll take a lunch

7  break before you begin your cross-examination.

8  MR. BUTLER:  That's fine, Your Honor.  Thank you.

9  THE COURT:  Members of the Jury, we'll take our

10  lunch break at this time.  Ask you not to talk about the case.

11  Keep an open mind, and we will see you at 2:15 after lunch.

12  (Lunch recess at 1:09 until 2:22.)

13  THE COURT:  Are we ready for the jury?

14  MR. KAUFMAN:  We are, Your Honor.  I've spoken to

15  Mr. Butler.  There was just a question or two I wanted to ask

16  Detective Beaver before he starts his cross.  And Mr. Butler

17  indicated that he did not have a problem with that.

18  THE COURT:  Well, I guess if Mr. Butler doesn't have

19  a problem with it.

20  All right.  Agent Beaver, if you would take the

21  stand and we'll be ready to go.

22  Call the jury.

23  (The jury was returned to the courtroom.)

24  THE COURT:  Mr. Kaufman.

25  MR. KAUFMAN:  Thank you, Your Honor.

1    Q    Detective Beaver, I had just a couple of quick questions.

2    You had earlier said that Milton Adams went by the nickname

3    Turtle.  Have you heard him referenced as "T"?

4    A    Yes, sir I have.

5    Q    You also testified about having reviewed Mr. Coleman's

6    iPhone.  And I believe there was discussion about some images

7    that were found on that phone.  Among them were there any,

8    shall we say, animals, that you found photographed on his

9    iPhone?

10   A    Yes, sir, there was.

11   Q    I would like to show you what have been previously

12   identified in earlier testimony today, Government Exhibit's

13   24a -- 24a, 24b and 24c.

14        Do you recognize these images?

15   A    Yes, sir I do.

16   Q    How do you recognize them?

17   A    It's photographs that were on the phone, on the iPhone of

18   Mr. Coleman.  They're photographs of a dragon eel.

19        MR. KAUFMAN:  Your Honor, we would seek to admit and

20   publish 24a through c.

21        THE COURT:  Any objection?

22        MR. BUTLER:  No objection.

23        THE COURT:  Let them be admitted and published.

24        MR. KAUFMAN:  Thank you, Your Honor.

25        (Government's Exhibit No. 24a-c were received into

1   evidence and published.)

2              MR. KAUFMAN:  No further questions, Your Honor.

3              THE COURT:  Mr. Butler, any cross?

4              MR. BUTLER:  Yes, Your Honor.

5                        CROSS EXAMINATION

6   BY MR. BUTLER:

7   Q    Good afternoon, Detective Beaver.

8   A    Good afternoon, Mr. Butler.  How are you doing?

9   Q    I'm fine.  I hope you're doing well.

10  A    Good.  Good.

11  Q    Now, Detective Beaver, you and Agent MacDonald are the

12  lead investigators or detectives in this case; is that right?

13  A    Yes, sir, we are.

14  Q    And Milton Adams was a person who was a source of

15  marijuana out in LA?

16  A    Yes, sir, he was.

17  Q    Did you all have an occasion to go out to LA?

18  A    Yes, sir, we did.

19  Q    Can you describe to the ladies and gentlemen of the jury

20  the big house that Mr. Adams lived in?  Was it Tarzana,

21  California?

22  A    It was on Aladdin Court.  I remember the street.  I think

23  it was Tarzana.  It was a two-story large stucco exterior

24  house.  It was on, like, a private driveway off the main road.

25  It was three houses on the street, or down the private drive.

1   Then there was a swimming pool in the backyard under

2   construction.

3   Q    And what type of vehicles did you know Mr. Adams to

4   drive?

5   A    We had information on several sports cars, Cadillac

6   Escalade SUV.  Trying to remember -- recall what we saw the

7   day we were there.  I think it was a BMW.

8   Q    What about a S550 Mercedes?

9   A    That's correct.  That's correct.

10  Q    Did he have a Ferrari there too?

11  A    I never saw a Ferrari.  We had information that he had a

12  Ferrari at times.

13  Q    What about the Lamborghini?

14  A    I never saw it, but I heard about a Lamborghini as well.

15  Q    Now would it be fair to say that Mr. Adams, Turtle, is a

16  fugitive now, isn't he?

17  A    Yes, sir.

18  Q    So you all don't know his whereabouts; is that right?

19  A    That's right.

20  Q    He's on the run?

21  A    That's correct.

22  Q    Now let me just talk to you a little bit about these --

23  the Orbitz records that you made -- that were introduced into

24  evidence in this case.

25       Now, as you made this report or chart, there were other

1   people that you have under the category of "paid for by" in

2   other words, they used a credit card in their name; is that

3   right?

4   A    That's right.

5   Q    Now are all these credit card transactions?

6   A    I believe most of them are credit cards.

7   Q    And Stephanie Peppers, she's listed as having paid for

8   several tickets; is that correct?

9   A    Yes, sir, I believe so.

10  Q    Used a credit card in her name?

11  A    Yes, sir, I believe so.

12  Q    Now you don't know from those records or otherwise, who

13  actually made the transactions in purchasing the tickets,

14  correct?

15  A    That's correct.

16  Q    All you know is that there was a credit card used, in the

17  person's name; is that right?

18  A    Yes, sir.

19  Q    And did you take a tally of how many times Stephanie

20  Pepper's credit card was used?

21  A    No.  I could look at it and tell you, sir.

22  Q    You don't have a copy with you?

23  A    No, sir, I don't.

24       MR. BUTLER:  Would you show it to him?  Thank you.

25  Q    Let me know when you're finished with that page.

1   A    I'm finished with this page.

2            THE COURT:  What's the question before this witness?

3   Q   (Mr. Butler) The question is, how many times Stephanie

4   Pepper's credit card was used.

5            THE COURT:  Do you have a tally?

6   Q   (Mr. Butler) Would 28 be a fair tally?  That's what I

7   counted up.

8   A    There was 10 on the first page.

9   Q    I counted 28.

10  A    And 10 on the second page, that's 20.

11  Q    All right.

12  A    I see seven on this page, which would be 27.

13  Q    You get more than me.

14  A    Maybe it's switched places on me.  Yeah, I see five on

15  this page.

16           MR. KAUFMAN:  For the record, this is page --

17           THE COURT:  I don't want you testifying, Mr.

18  Kaufman.  Let's put a question to the witness and see if we

19  can get an answer.

20           MR. BUTLER:  Thank you, Your Honor.

21  Q    Now Jerry Davis also had a credit card in his name that

22  was used; is that right?

23  A    Yes, sir.

24  Q    His name was over on this list?

25  A    Yes, sir it was.

1   Q    And I counted 22 times, okay?

2   A    Okay.

3   Q    Also other people that were -- whose names you wrote

4   down.  Mark Dorsey, correct?

5   A    Yes, sir.

6   Q    William Pierce; is that right?

7   A    Yes, sir.

8   Q    Phyliss Branch.  Do you know a Phyliss branch?

9   A    I never met a Phyliss Branch, but I know of the name.

10  Q    Okay.  Harold Manigault, his name's on here; isn't that

11  correct?

12  A    It's not on the page I'm looking at, but I believe it's

13  on the record.

14  Q    All right.  Dwight Pierce?

15  A    That sounds familiar.  Not on the page I'm looking at.

16  Q    Alonna M. Carrera?

17  A    Yes, sir.

18  Q    You know that person?

19  A    I don't know them, I know the name.

20  Q    Samantha Schmidlin, her name's on here, correct?

21  A    Not on the page I'm looking at, but it probably is.

22  Q    Jason Lee Banks, you remember seeing his name?

23  A    I don't recall if it was on the payee, but it could have

24  been.

25  Q    Vincent Talbert.

1      Would it be fair to say, Detective Beaver, that there are
2 a lot of peoples name on this report, correct?
3 A    Yes, sir, it is.
4 Q    And you don't know if a person whose names appear --
5 whose name appear on this document under the column of "paid
6 for by," actually had knowledge that their card was being
7 used; isn't that correct?
8 A    No, sir.
9 Q    Sir?
10 A    No, sir.
11 Q    Okay.  So you don't know who used the card, is my
12 question?
13 A    Not in each and every case, no, sir.
14 Q    Okay.  Let me just go back.
15      During direct examination, I believe, Mr. Kaufman showed
16 you Exhibit 22a, you identify that picture as Samantha
17 Schmidlin; isn't that correct?
18 A    I would have to see that photograph again.  But I did
19 identify a photograph of Samantha Schmidlin.
20 Q    Okay.  And you are aware that Ms. Schmidlin was -- is
21 that her on the screen there?
22 A    It is, but that's 22b.
23 Q    Okay, 22b.  Now, but you are aware that Ms. Schmidlin got
24 caught out in Arizona with some money?
25 A    Yes, I am.

1   Q    That was in February of what; 2010?

2   A    I believe so.

3   Q    And she was -- she's a part of this conspiracy; is that

4   right?

5   A    Yes, sir, she is.

6   Q    Now the -- the testimony that you gave concerning the

7   U-Haul, I believe you said it was 380 pounds of marijuana?

8   A    Approximately 338.

9   Q    How much was it?

10  A    338 pounds.

11  Q    338 pounds?

12  A    Yes, sir.  That was counting the packaging on the

13  bundles.

14  Q    And now you indicated that Ms. Peppers was the lessee of

15  the trick -- of the truck; is that right?

16  A    It was a Dodge Caliber.  She was the person that leased

17  the vehicle that was used to pick up Mr. Darty that day.

18  Q    All right.  And she was listed, did you say Alex Bell as

19  a reference.

20  A    Alex Bell, being her son, was one of the people she gave

21  as reference.

22  Q    Her son?

23  A    Yes, sir.

24  Q    Do you know how old her son was in '09?

25  A    He was approximately 17 in '10, so he'd been about 16.

1   Q      I'm sorry?

2   A      He would have been about 16 years old.

3   Q      Okay.  And Jarrett Davis was listed as a reference; is

4   that right?

5   A      Jarrett J-A-R-R-E-T-T Davis, was.

6   Q      Okay.  You know him?

7   A      No -- well, I know -- there's a phone number listed with

8   name of Jarrett Davis.  Obtained a subpoena for that phone

9   number and I do know whose phone that was.

10  Q      Okay.  In regards to this 338 pounds of marijuana back in

11  '09 that you indicated that you all went out and took the

12  truck and seized it, now you didn't see Mr. Coleman there, did

13  you?

14  A      No, I never did.

15  Q      And so you don't know -- strike that.

16         Wouldn't it be fair to say, Mr. Coleman, as far as you

17  know, didn't have anything to do with it?

18  A      Based on the results of my investigation that day, the

19  vehicle that was used to pick up Mr. Darty, there was a link

20  to Mr. Coleman, but I did not see Mr. Coleman that day.

21  Q      Okay.  Well, but he wasn't at the location where the, you

22  said Yellow Freight?

23  A      Yes, sir.

24  Q      Wasn't there?

25  A      Reames Road in Charlotte.

1   Q    Right.  He wasn't there.

2   A    No, sir, I didn't see him.

3   Q    And he wasn't in the car that picked up Mr. Darty once

4   Mr. Darty left the truck at the parking lot at the apartment

5   complex, correct?

6   A    That's correct.

7   Q    And you all were following the U-Haul truck; is that

8   right?

9   A    Yes, sir.

10  Q    Actually you have video of it, don't you?

11  A    I think we have -- I don't think we have video following

12  it.  I think we may have video of it in the parking lot after

13  it was parked, but I can't recall.

14  Q    Okay.  Now on the day in question, November 2nd, of 2010,

15  did you have an occasion to be at the Closeburn Road address?

16  A    Yes, sir.

17  Q    And were you with Agent MacDonald conducting

18  surveillance?

19  A    Earlier that morning I was, then I had to leave about

20  noontime, and then I ended up coming back later that evening.

21  Q    You had indicated that that you opened an exhibit and

22  displayed an insurance receipt for the Porsche Cayenne; is

23  that right?  I think that was 14 --

24  A    It was paperwork.

25  Q    -- 14l.  Do you have that?

1        Now you didn't find any registration cards at the

2   Closeburn address, did you, for that Porsche Cayenne?

3   A    Not that I recall.

4   Q    Does the name Habeed; does that sound familiar to you?

5   A    Habeed Rabeed?

6   Q    Yes.

7   A    Yes, sir.  I'm familiar with that name.

8   Q    He has a connection with that vehicle, didn't he?

9   A    I remember seeing that name on some paperwork associated

10  with that vehicle.

11  Q    Did you try to locate him and ask him some questions

12  about the vehicle?

13  A    I actually spoke to Mr. Rabeed on the phone.  He lives in

14  Virginia, if I remember correctly.

15  Q    Okay.  Based on your investigation, you knew that the

16  Porsche was shipped from California to Charlotte?

17  A    Yes, sir.

18  Q    Isn't that right?

19  A    Yes, sir.

20  Q    Are you aware there was an outstanding lien on the

21  vehicle, it wasn't paid for?

22  A    I remember hearing that.  I didn't do any follow up

23  background.  I think Agent MacDonald dealt with that.

24  Q    Now you had contact with Jerry Davis in this case, did

25  you not?

1    A    Yes, I did.

2    Q    How many times did you interview him?

3    A    Probably between five and 10 times.

4    Q    Okay.  And do you recall were you a part of the team that

5    went to Mr. Davis' apartment on November the 2nd of 2010?

6    A    No, sir.

7    Q    But you recall asking him about a safe that was in that

8    apartment?

9    A    I remember conversation about a safe, but I don't recall

10    if it was the one in that apartment.  I do recall a

11    conversation about a safe.

12    Q    Okay.  And didn't you -- do you recall asking about how

13    much money was in the safe?

14    A    I'm sure that question came up.  I don't recall that.

15    Q    If I could have a moment please, Your Honor.

16        Now during this investigation, do you remember

17    interviewing Harold Manigault?

18    A    Yes, sir.

19    Q    Now in regards to Ms. Stephanie Peppers, were you present

20    when she was arrested?

21    A    Yes, sir I was.

22    Q    And there was a weapon in the house; is that correct?

23    A    Yes, sir.  I believe it was a .25 semi-automatic, yes.

24    Q    And was that weapon seized?

25    A    Yes, sir.

1   Q     Do you know if you did a trace on that?

2   A     Yes, sir, I did.

3   Q     You were present during the search over at Closeburn; is

4   that right?

5   A     That's correct.

6   Q     There was a search warrant that was obtained by Detective

7   Spears.  Wouldn't it be fair to say that you were aware that

8   according to information in the application for the search

9   warrant, there was supposed to be a large quantity of

10  marijuana in that apartment, correct?

11  A     That's correct.

12  Q     But that wasn't true; isn't that right?

13  A     When we executed the search warrant, we just found

14  residue.

15  Q     I'm sorry?

16  A     We found residue when we executed the search warrant.

17  Q     All right.  And is it your understanding that once Jerry

18  Davis supposed to have left the location of the condo at

19  Closeburn, Agent MacDonald was still there or some law

20  enforcement officers were there surveilling that location; is

21  that right?

22  A     That's correct.  I wasn't there during that period of

23  time.  That's my understanding.

24  Q     Okay.  You had indicated that you seized some phones.

25  Did you seize one phone or two phones for Ms. Shaunda McAdoo?

1    A     Seized one on November the 2nd.

2    Q     I'm sorry?

3    A     On November the 2nd we seized one phone from her.  And

4    then another phone when she was arrested on it, was the 16th

5    or 17th, it was right around midnight.

6    Q     And you turned both of those phones in; is that right, in

7    property control?

8    A     The one on the 2nd that was seized on Closeburn, I turned

9    in at property control.  The other one I believe was secured

10   at the ICE office, Homeland Security Office on a different

11   date.

12   Q     Of course, now, Detective Beaver, based on your training

13   and experience, there are a variety of investigative

14   techniques that you all use in investigating drug trafficking,

15   correct?

16   A     That's correct.

17   Q     And one of those techniques, wouldn't it be true, that

18   you would send either a undercover officer, who is in plain

19   clothes and acting as a drug purchaser, to a drug dealer to

20   buy drugs, correct?

21   A      If it's a location where we can accurately protect the

22   undercover officer, we can actually see the entrances and

23   exits, we can make sure their safety, and we know for sure who

24   he's dealing with.  In some cases we do that.

25   Q     And usually what you try to do is actually meet in a

1   parking lot or somewhere like you said that you all can set up

2   a perimeter and have surveillance, correct?

3   A    A public place is a better place.

4   Q    Yes.  And isn't it also true that from time to time you

5   get information that somebody's transporting drugs and you do

6   a traffic stop; isn't that correct?

7   A    That's correct.

8   Q    And you know in this case that Jerry Davis, he recruited

9   a lot of the couriers, people that were going out to

10  California taking money and coming back with drugs; is that

11  right?

12  A    I know Mr. Davis did recruit some people to do that.

13              MR. BUTLER:  Now if I could have a moment, please

14  Your Honor.

15  Q    And you are aware, are you not, that Mr. Davis had an

16  address of 2112 Heather Lake Drive in Mint Hill?

17  A    That sounds correct.  I think that's where his parents

18  live.

19  Q    Heath Lake.  I'm sorry.  Heath Lake?

20  A    That sounds, correct.

21  Q    That's a big house, too.  Have you seen it?

22  A    I've been to that house.

23  Q    Sir?

24  A    Yes, sir, I've been there.

25  Q    Two story?

1  A    It's a regular two-story house.  I don't consider it big

2  for a two-story house, but it's a two story.

3  Q    You don't consider it big?

4  A    I don't consider it extravagant or --

5  Q    It wasn't like Turtle's?

6  A    Didn't look like Turtle's.

7  Q    Now, you had indicated that Ms. McAdoo had the code to

8  what you contend was Mr. Coleman's phone?

9  A    That's correct.

10  Q    So you don't know how often she used that phone, correct?

11  A    That's correct.

12  Q    Where did you get the phone that you contend were

13  Mr. Coleman's phone?

14  A    The iPhone, the LG phone, there was a Verizon phone, I

15  believe, were all seized on the 2nd, November the 2nd during

16  the search warrant.  I believe they were in the condo.

17  Q    Okay.  But you didn't see them.  Somebody gave them to

18  you?

19  A    Detective Spears was in charge of collecting the evidence

20  at the scene.  I assisted later when he packaged the evidence

21  at the police department.

22  Q    Okay.  Well, now, simply because Detective Spears was in

23  charge of it, doesn't mean that he collected everything that

24  was collected, correct?

25  A    That's correct.

1   Q    He was, like, the inventory clerk; is that right?

2   A    I guess you could call him that.

3   Q    Okay.  So you were assuming that those phones were

4   Mr. Coleman's phones, because they were located in the

5   dwelling where he was; is that right?

6   A    Yes, sir.  That, plus the fact that the other paperwork

7   in the house had his name and indicated that, there was at

8   least some paperwork indicated that was his place.  And he was

9   the only one there when we went.

10  Q    Okay.  But did you find any paperwork related to the

11  phone?

12  A    I don't believe so.

13  Q    Okay.  Now in the recording that was played, I believe it

14  was 26g and 26h, you indicated that was Mark Hunt; is that

15  right?

16  A    I recall listening to one -- some of the recordings this

17  morning that was Mr. Hunt, but I don't remember the exhibit

18  number.

19  Q    Okay.  That's fine.  The one that we listened to that you

20  indicated was Mark Hunt, now you are aware that Mr. Hunt was,

21  among other things, was a handyman.  He did painting and home

22  repairs.

23  A    Yes, sir.

24  Q    And he mentioned Jerry Davis in that conversation, I

25  believe.

1    MR. KAUFMAN:  Objection.

2    THE COURT:  Overruled.

3    THE WITNESS:  I can't remember, but I'd have to look

4  at it again.

5  Q   (Mr. Butler) Well, Jerry Davis goes by Boogie, doesn't he?

6  A   Yes, that's one of his nicknames, correct.

7  Q   And Jay?

8  A   Correct.

9  Q   And Jay Boogie?

10  A   Yes, sir.

11  Q   Now did you ever talk to Nastasha Rodriguez?

12  A   Yes, sir, we did.

13  Q   She's not charged in this case; is that right?

14  A   That's correct.

15  Q   And were you present during the interview with her lawyer

16  and her?

17  A   Yeah, that was done over the telephone, I believe.

18  Q   I'm sorry.

19  A   Yes, sir.  She wasn't actually with us, I don't believe.

20  I believe that's a telephonic or video conferenced interview.

21  But yes, I was present.

22  Q   Okay.  Now, Detective Beaver, wouldn't it be fair to say

23  that you never saw Mr. Coleman with any marijuana, have you?

24  A   No, sir.

25  Q   Never saw him in possession of any firearms, have you?

1    A    No, sir.

2    Q    And you are aware of the TSA agent out in LAX who is

3    supposed to have been the person who was letting the alleged

4    suitcase full of marijuana through the airport?

5    A    Yes, sir.

6    Q    And the only way you all knew about that person was

7    somebody involved in this investigation told you, correct?

8    A    We did receive information about the TSA agent in the

9    California area being involved.

10   Q    You were never able to locate that person?

11        MR. KAUFMAN:  Objection, Your Honor.

12        THE COURT:  Overruled.

13        MR. KAUFMAN:  May we have a sidebar on this issue?

14        THE COURT:  No.  I'll allow the question.

15        THE WITNESS:  Yes, sir, we were.

16   Q    (Mr. Butler) Well, is that person part of this conspiracy,

17   this indictment?

18        MR. KAUFMAN:  Objection, Your Honor.  Law

19   enforcement sensitive.

20        THE COURT:  I'll sustain as to the legal conclusion.

21   Q    (Mr. Butler) Has that person been charged?

22   A    Not to my knowledge.

23        MR. BUTLER:  If I could have a moment, please, Your

24   Honor.

25        THE COURT:  You may.

1          (Pause.)

2   Q     Now Detective Beaver, on November the 2nd of 2010, you

3   were aware that Mr. Davis, Jerry Davis became a cooperating

4   person in this case?

5   A     Yes, sir.

6   Q     And he started cooperating that day; is that right?

7   A     Yes, sir.

8   Q     And I think you identified a consensual recorded

9   telephone call that the ladies and gentlemen of the jury

10  heard.

11  A     Yes, sir.

12  Q     Is that right?

13  A     That's correct.

14  Q     Okay.  And at that point it was law enforcement's

15  intention for people that could possibly be involved in the

16  marijuana trafficking trade, be unaware that Mr. Davis was

17  cooperating; is that correct?

18  A     We made efforts to conceal the fact he was cooperating,

19  initially.

20  Q     Okay.

21  A     Otherwise people wouldn't talk to him, wouldn't deal with

22  him.

23  Q     So, of course you could have, if -- you could have sent

24  him over to Closeburn with some marijuana, sent him back over

25  to try to buy some marijuana, couldn't you?

1    A    I guess that could have been done.  That's one option.

2    Like I said, I wasn't there when that happened.  I'd left

3    around noon and got back about 1730, about 5:30 p.m.  And all

4    that transpired while I was gone away from the area.

5    Q    But that was a possibility?

6    A    That could be a possibility.

7    Q    But that wasn't done, correct?

8    A    That's correct.

9    Q    And wouldn't it be fair to say that some of those five to

10   10 interviews or debriefings with Mr. Davis was to correct

11   things that were said previously?

12   A    I just remember we met him on numerous occasions because

13   he was a wealth of information.  And there was probably a

14   couple occasions where information had been corrected from

15   prior -- either a misunderstanding or something that was

16   remembered differently.  Something had been corrected, maybe,

17   in a previous statement or report.

18   Q    Okay.  And so you think it was a misunderstanding?

19   A    Well, I know sometimes I have a hard time remembering

20   what I ate for lunch yesterday.  Sometimes people remember

21   things, then they realize a day later that, okay, that wasn't

22   exactly right.  This is really what happened.  So sometimes, I

23   mean, that's not uncommon for people to remember things.

24   Q    But now when you cooperate in a case like this, people

25   cooperate to get the time cut; isn't that right?

1    A    Well, part of it is cooperating with the government in

2    hopes of maybe getting some kind of break later on.

3    Q    Right.

4    A    There's nothing promised.

5    Q    And, so basically, wouldn't it be fair to say that a

6    cooperator is gonna, you know, try to make you all happy?

7              MR. KAUFMAN:  Objection.

8              THE COURT:  Sustained.

9    Q    Well, isn't a cooperator going to try to give you as much

10   information that is helpful then?

11   A    I know cooperators, the main purpose is to tell us the

12   truth.  Because we want the facts.  If a cooperator makes an

13   admittedly false statement and they meant to make that false

14   statement, instead of maybe remembering something different.

15   If they boldface lie to us, then they're no good to us as a

16   witness because their credibility is shot.  So they have to

17   tell the truth.  They don't have to give us certain amount of

18   information that we want to hear, we just want to hear what

19   the truth is.  We don't tell them up front what we want them

20   to say, other than tell us the truth.

21   Q    But you do tell them certain things that you want to

22   know; isn't that right?

23   A    We'll ask them questions during the interview.

24   Q    And, but, now, if it -- if it's that simple then why did

25   it take so many times regarding Mr. Davis, five to 10 times?

1   A    I'd have to look at the reports.  But a lot of times the

2   interview is -- the sole subject of that interview was maybe

3   one person, or a couple people.  And as you've seen in this

4   case, there's a lot of different individuals involved.  You

5   can't just knock that out in a couple hours.

6        Plus, this case is not the only case we've worked in the

7   last three and a half years.  We have other commitments, other

8   conflicts.  So we would meet with, maybe in Mr. Davis' case or

9   other people, to fully get a picture of all the information

10  they had.

11  Q    Okay.  Isn't it true though, Detective Beaver, that you

12  all have, at the law enforcement center, police station, the

13  capability of recording and videotaping interviews --

14  A    Yes, sir, we do.

15  Q    -- witnesses?

16  A    Yes, sir.

17  Q    And with cooperators?

18  A    Yes, sir.  We do have that ability.

19  Q    And did you do that in this case?

20  A    No.  The interviews were conducted either out in the

21  field or at the ICE office, which does not have capability.

22  Q    Okay.  But they could have been recorded and then ladies

23  and gentlemen of the jury could see exactly how it was done?

24  A    If we had taken him to the police department we could

25  have recorded it, but it's not required.

1    Q    So, basically, whatever happened in interview was only

2    privileged to those that were there present, correct?

3    A    Well, the results of the interview were documented on a

4    report by either myself or Agent MacDonald.  But as far as

5    video, no, we have no video.

6    Q    But your report is not verbatim, is it?

7    A    No, it's not verbatim.

8    Q    But it could have been verbatim, correct?

9    A    Yeah, it could have been.

10   Q    And certainly you all have the capability of wiretapping

11   and using cameras and audio on cooperators?

12   A    We have those methods we can use.  We have to go through

13   the proper legal justification to use them, yes, sir.

14   Q    You come down here to federal court and ask the judge to

15   give you one?

16   A    It's a little bit more than that.

17   Q    Well, Article III application --

18   A    Yes, sir.

19   Q    -- for a wiretap --

20   A    That's correct.

21   Q    -- isn't that right?  Okay.  But you didn't do that in

22   this case?

23   A    We had a consensual wiretap in this case.

24   Q    Okay.  And so the consensual wiretap that you had in this

25   case, would it be fair to say that the ladies and gentlemen of

1    the jury have heard it?

2    A    No, it didn't involve calls to Mr. Coleman.

3    Q    Oh, okay.

4              MR. BUTLER:  If I could have a moment please, Your

5    Honor.

6              THE COURT:  You may.

7    Q    Now you were aware, are you not, that Ms. Peppers and

8    Mr. Coleman had a relationship as probation officer and

9    probationer?

10   A    Yes, sir, I am.

11   Q    You also aware that they subsequently had a romantic

12   relationship?

13   A    Yes, sir.

14   Q    And you were aware, were you not, that Mr. Coleman had a

15   romantic relationship with Ms. McAdoo?

16   A    Yes, sir.

17   Q    And you were aware that Mr. Coleman had a relationship

18   with Ms. Rodriguez?

19   A    Yes, sir.

20   Q    Mr. Coleman had relationship with a lot of women; is that

21   right?

22   A    At least those three.

23   Q    Okay.  And, of course, now, in your interview with

24   Ms. Peppers you -- didn't you all discuss his other

25   relationship with women?

1          MR. KAUFMAN:  Objection, Your Honor.

2          THE COURT:  Sustained.

3    Q    Well, did you talk to him about -- did you talk to

4    Ms. Peppers about Ms. McAdoo?

5          MR. KAUFMAN:  Objection.

6          THE COURT:  Sustained.

7    Q    Now let me just ask you this, would it be fair to say

8    that you know the whereabouts of Ms. Stephanie Peppers,

9    correct?

10   A    Yes, sir.  I could find her in 15 minutes.

11   Q    Okay.  And you know the whereabouts of Mr. Harold

12   Manigault, correct?

13   A    Yes, sir.

14   Q    And you know the whereabouts of Mr. Mark Hunt, correct?

15   A    Yes.

16   Q    Sir?

17   A    Yes, sir.  I'm sorry.

18   Q    And you know the whereabouts of Mr. William Pierce?

19   A    Yes, sir.

20   Q    You know the whereabouts of Ms. Shaunda McAdoo?

21   A    Yes, sir.

22   Q    You know the whereabouts of Mr. Jason Banks?

23   A    Yes, sir.

24   Q    You know the whereabouts of Ms. Leah Davis.

25   A    Yes, sir.

1   Q    You know the whereabouts of Mr. Christopher McKneely?

2   A    Yes, sir.

3   Q    You know --

4         MR. KAUFMAN:  Objection.  Relevance.

5         THE COURT:  Sustained.

6   Q   Well, the cooperators in this case are potential

7 witnesses in this case, aren't they?

8         MR. KAUFMAN:  Objection.

9         THE COURT:  Sustained.

10  Q   Well, how did you use the information they gave you, the

11 cooperators?

12  A   How did we use the information we obtained from the

13 cooperators?

14  Q   Yes, sir.

15  A   We generate reports, attempted to corroborate information

16 that was given to us by them through other interviews or

17 through records we had received, phone records, or travel

18 records, or any other information we received.  Presented that

19 information to the U.S. Attorney's Office.

20  Q   You don't decide who will be witnesses in the case; is

21 that right?

22  A   That's not my decision.

23  Q   That's up to the prosecutor?

24  A   Yes, sir.

25  Q   But Glen Carrera, Mark Dorsey, Leon Robinson, Nastasha

1   Rodriguez, Kevin Stanfield, Megan Baehr, and Rico Grier, you

2   all identified -- you identified all these people by their

3   photograph earlier this morning.  Do you remember that?

4   A    Yes, sir.

5   Q    Okay.

6           MR. BUTLER:  Thank you, sir.  I have no further

7   questions.

8           THE COURT:  Redirect?

9           MR. KAUFMAN:  Yes, sir.

10                  REDIRECT EXAMINATION

11  BY MR. KAUFMAN:

12  Q    You mentioned cooperation with cooperators.  How

13  important is corroboration?

14  A    Corroboration is key, because we don't just go on one

15  person's word against somebody else's.  We want to be able to

16  take an interview, somebody tells us something happened.  We

17  can find a record that backs it up that we verify somebody is

18  telling the truth.

19  Q    You consider somebody a successful cooperator if you

20  cannot cooperate what they've said?

21          MR. BUTLER:  Objection.

22          THE COURT:  Sustained.

23  Q    You were asked about Jerry Davis and information that he

24  provided.  Were you able to corroborate his information?

25  A    Yes, we were.

1   Q    In how many ways?

2   A    Through other witnesses.

3            MR. BUTLER:  Objection.

4            THE COURT:  Overruled.

5            THE WITNESS:  Through other witness statements and

6   documents.

7   Q    Did you obtain business records, bank records, phone

8   records in this case?

9   A    Yes, we did.

10  Q    And did that information corroborate or fail to

11  corroborate what Jerry Davis had told you during those several

12  debriefings?

13  A    It corroborated it.

14  Q    You were asked a few times about what things Jerry Davis

15  could have done on November 2nd.  For example, trying to use

16  him to make a controlled purchase of drugs from Mr. Coleman,

17  things of that nature.  Based on your understanding of what

18  had transpired that day, would that have made any sense in

19  your investigation?

20  A    What I know now or what I knew that day?

21  Q    What you knew then?

22  A    No.  Because he had already obtained the drugs.  If we

23  had went, took him back to buy more drugs from Mr. Coleman or

24  whoever, we would have to have the money to buy the drugs.

25       Marijuana -- that grade of marijuana is very expensive

1   and we just don't have that kind of money sitting in our back

2   pocket to go buy the drugs when we already had them in the

3   first place.

4   Q    And do you just take a cooperator and immediately send

5   them into controlled purchase environment?

6   A    No.

7   Q    Why not?

8   A    Well, first you got to investigate what they tell you and

9   corroborate it.  The best thing to do is what we did in that

10  case, or what was done when I wasn't there was, make the phone

11  calls to corroborate what he's telling you.  The people on the

12  other end of the phone, whether they call him or he calls

13  them.  They make statements that makes sense what you were

14  told, plus what you observed earlier in the day, and it all

15  corroborates itself and makes sense.

16  Q    Now, in the call that you just mentioned, Mr. Coleman

17  asks Mr. Davis, do you still have "the".

18           THE COURT:  That's been asked and answered.

19  Redirect is for something new.

20           MR. KAUFMAN:  Yes, Your Honor.

21           THE COURT:  It's already been played to the jury.

22  Q    With regard to, you were asked some questions about

23  individuals who are in Exhibit 29b.  The summary of travel

24  data that you had received.  You were asked about several

25  names, just for example, Alona Carrera.  Is that name, do you

1   believe connected to the investigation somehow?

2   A    Yes.  I believe it's a relative of Mr. Glen Carrera, or

3   Chucky.

4   Q    And there are numerous names on Exhibit 29.  How many

5   people have been charged and arrested just in this indictment?

6   A    In this indictment, I would have to look at the tape.

7   It's seven or eight, if I had to guess.  But overall I can

8   tell you exactly.

9   Q    When you say seven or eight, are you saying all the

10  people or specific types of people?

11  A    I'm just talking about in this conspiracy indictment

12  involving Mr. Coleman.

13          THE COURT:  I'll sustain the objection as to who has

14  been charged and not charged in this case.

15  Q    Now, you were asked about interviews and how many

16  interviews with Mr. Davis.  Is it uncommon for you to do

17  multiple interviews with a witness?

18  A    No.

19  Q    In fact, in this overall investigation, can you give an

20  approximation to how many interviews you conducted over the

21  last three and a half years?

22  A    Probably over 75 interviews.

23  Q    You were asked about the three references on the -- that

24  Ms. Peppers had provided to include Mr. Coleman.  One of the

25  other names the defense lawyer asked you about, Jarrett Davis.

1   And you were going to explain that the phone number you were

2   able to tie back to a natural individual.  Who was that

3   person?

4   A    The phone number that was listed for Jarrett Davis, when

5   we subpoenaed the phone company we got the records back.  The

6   subscriber to that phone was Gerren Darty.

7   Q    You testified on cross-examination about a .25 caliber

8   handgun that was found in Ms. Peppers' residence.  Are you

9   aware of whether she was legally permitted to possess a

10  firearm?

11  A    It's my understanding that she was legally in possession

12  of a firearm.

13  Q    You were asked about whether you found marijuana in

14  Mr. Coleman's apartment as it relates to the search warrant

15  affidavit.  Did your investigation reveal that he did in fact

16  have marijuana in the apartment at the time that the warrant

17  was applied for?

18  A    Yes, it did.

19           MR. BUTLER:  Objection.

20           THE COURT:  Overruled.

21  Q    Defense lawyer asked you if Jerry Davis had recruited

22  couriers based on the investigation that you had conducted and

23  you answered that he had.  That same investigation, who did it

24  reveal he had recruited those couriers on behalf of?

25  A    Mr. Coleman.

1  Q    You were asked if Mr. -- if you saw Mr. Coleman in

2  possession of any marijuana or firearms.  When you say

3  possession, are you talking about physically possessing in his

4  hand or on his person, or are you talking about constructive

5  possession?

6           MR. BUTLER:  Objection.

7           THE COURT:  I'll sustain it as to the compound

8  nature of the question.  You can ask it --

9           MR. KAUFMAN:  Yes, Your Honor.

10  Q    When you answered in the negative, regarding having seen

11  Mr. Coleman in possession of marijuana or a firearm, were you

12  specifically addressing personal contact with the gun either

13  in his hand or on his person somewhere?

14  A    Yes, sir, I was.

15  Q    Were you --

16           THE COURT:  All right.  That's as far as you go with

17  that question.

18           MR. KAUFMAN:  Yes, Your Honor.

19  Q    Now, when Mr. Davis cooperated on November 2nd, was that

20  the only information leading to the search warrant of

21  Mr. Coleman's residence on Closeburn?

22  A    No, sir.

23  Q    Was there other information that had been corroborated

24  that was contained in that search warrant?

25  A    Yes, sir, there was.

1   Q   You were asked about -- well, let me ask you this: The

2   search warrant, after it was executed and the return took

3   place, was it placed under seal?

4   A   I don't believe so.

5   Q   So was it a public document at that point available for

6   anybody to review?

7   A   Yes, sir.

8   Q   And in fact, based on your investigation, did you

9   discover that the search warrant was being distributed among

10   co-conspirators almost immediately after November 2nd?

11         MR. BUTLER: Objection.

12         THE COURT: Sustained.

13   Q   You were asked about the method that you asked questions

14   of a cooperating witness. When you asked questions of a

15   cooperating witness, do you provide facts or do you ask

16   open-ended questions?

17   A   I don't provide them with any facts. It's open ended to

18   where they can tell us exactly what they know. We don't want

19   to provide them with any information that might feed them

20   information. We want to hear it from them. The questions we

21   ask are to clarify statements that they made.

22   Q   Is that a very important aspect of doing a proper

23   debriefing with a witness?

24   A   Yes, it is.

25   Q   You were asked about wiretaps and body wires, and you

1    mentioned that there was a consensual wiretap.  Whose phone

2    was the consensual wiretap conducted on?

3    A    Stephanie Peppers.

4    Q    And whose -- who was captured on that consensual wire?

5    A    Milton Adams, also known as Turtle or T, Tracy Coleman,

6    the mother of Parker Coleman.  May have been others, that's

7    the two I recall.

8    Q    You were asked about the recording of interviews with

9    witnesses.  I believe you stated that there were in excess of

10   75 interviews in this case?

11   A    That's my estimation, at least 75 or more.

12   Q    Did you record any of those interviews?

13   A    I don't recall recording any of them.

14   Q    Are unrecorded interviews the norm?

15   A    Yes.  I've been a police officer for over 23 years, and

16   hardly -- the recording of an interview just came about in the

17   last few years with advanced technology.  It's mainly used for

18   homicide or murder cases.  It's not required in our cases.

19   Where these interviews were conducted, the equipment was not

20   present.

21   Q    And --

22   A    But even if I interview somebody at the police

23   department, that's not a normal procedure for me.

24   Q    What are -- you are both CMPD detective and also a task

25   force officer with Homeland Security.  What are the standard

 1  operating procedures for both organizations with regard to

 2  offsite interviews with witnesses, or interviews anywhere but

 3  the LEC?

 4  A    There's no requirement for us to conduct recorded

 5  interviews.

 6         MR. KAUFMAN:  Nothing further.

 7         THE COURT:  Any recross on something new in

 8  redirect?

 9         MR. BUTLER:  Just a couple questions, Your Honor.

10                      RECROSS EXAMINATION

11  BY MR. BUTLER:

12  Q    So Detective Beaver, just because a person has a legal

13  right to possess a firearm, that doesn't mean that they can't

14  be charged with a crime in regards to drugs and guns; isn't

15  that right?

16  A    That's correct.

17  Q    And basically when you interview cooperators, you are

18  listening to what they say.  You don't know who they've talked

19  to, prior to talking to you, do you?

20  A    No, sir.

21  Q    You don't know how many people that are involved in it

22  saying that they've talked to.

23  A    No, I have no idea who they've spoken to unless I was

24  present.

25         MR. BUTLER:  Thank you.  I have no further

1  questions.

2          THE COURT:  You may step down and be excused.

3          Call your next witness.

4          MR. KAUFMAN:  Samantha Jo Schmidlin.

5      SAMANTHA JO SCHMIDLIN, GOVERNMENT WITNESS, SWORN

6                  DIRECT EXAMINATION

7  BY MR. KAUFMAN:

8  Q    Good afternoon.  Can you please state your full name

9  spelling your last name for the record?

10 A    Samantha Jo Schmidlin.  S-C-H-M-I-D-L-I-N.

11 Q    All right.  And in a loud clear voice, if you could tell

12 us where you're from?

13 A    New York.

14 Q    Now, have you pleaded guilty to a conspiracy to possess

15 with intent to distribute and to distribute marijuana and to

16 launder the proceeds of that same conspiracy?

17 A    Yeah.

18 Q    Prior to this case have you had any trouble with the law

19 other than minor traffic offenses?

20 A    No.

21 Q    Do you see any of your co-conspirators from the

22 conspiracy you just described, do you see any of them in the

23 courtroom today?

24 A    Yes.

25 Q    Who do you see?

1   A    Parker Coleman.

2   Q    Can you identify him by where he is and what he's

3   wearing?

4   A    To the left, blue shirt, glasses.

5   Q    I'm sorry.  Can you say that in a louder voice, please?

6   A    To the left, in a blue shirt and glasses.

7           MR. KAUFMAN:  Your Honor, may the record reflect an

8   in-court identification of the defendant?

9           THE COURT:  It will.  Let me also tell the jury

10  that, Members of the Jury, the fact that a witness has pled

11  guilty to a crime that may involve the defendant, is no

12  evidence in and of itself of the defendant's guilt.  You may

13  assess the fact that this witness or any witness pled guilty

14  to a crime in determining the credibility, if any, to attach

15  to that testimony.

16  Q    Ms. Schmidlin, how did you get involved in the

17  conspiracy?

18  A    Through Jay Davis.

19  Q    And describe what happened?

20  A    I met him at a club and he asked me to make a trip.  I

21  refused at first, and then I agreed to do it and I started

22  going to California.

23  Q    Now when you say he, who's he?  Are you talking about

24  Mr. Davis or Mr. Coleman?

25  A    Davis.

1   Q   All right.  So when you did agree to do it, how did it

2   happen?  How did it take place?

3   A   I would go to Parker Coleman's house and get money put in

4   my bag, and I would go to California and then come back from

5   California with marijuana in suitcases in an airplane.

6   Q   All right.  So when you went to Mr. Coleman's house, was

7   it just one of his -- one house of his?

8   A   Two.

9   Q   Do you remember the addresses or the streets?

10  A   I know one was off Johnson Road, but I don't know the

11  address of the other one.

12  Q   What was the general area of the other one?

13  A   Like, the South Park area.

14  Q   Can you describe the kind of place it was?

15  A   Nice.

16  Q   Well, was it a house or an apartment?

17  A   Like a townhome.

18  Q   And let me take a step back.  The first place you

19  mentioned, what type of residence was that?

20  A   Same, like a townhome.

21  Q   I'm sorry.  I can't understand.

22          THE COURT:  "The first place you mentioned, what

23  type of residence was that?"  What was your answer?

24          THE WITNESS:  A townhome.

25  Q   (Mr. Kaufman) And then the second place, what type of

1  place was that?

2  A    A townhome.

3  Q    Did you ever go to one of his residences in, like, an

4  apartment or condo unit?

5  A    No.

6  Q    Now, when you went to Mr. Coleman's residence, how did

7  you know it was his?

8  A    Through Jerry Davis.

9  Q    Jerry told you that it was Mr. Coleman's.

10 A    Yes.  I met Parker through Jerry.

11 Q    So you met him through Jerry?  When you went to the

12 location that belonged to Mr. Coleman was he there?

13 A    On a couple occasions, yes.

14 Q    What was he doing?

15 A    I'm not too sure.  Sometimes he put money in my bag

16 sometimes he didn't, only twice.

17 Q    How do you know that -- did you see Mr. Coleman putting

18 the money in the bag?

19 A    Yes, once, when I was there.

20 Q    What did it look like when he put it in the bag?

21 A    The money?

22 Q    Yes.  Was it loose bills?  What did it look like?

23 A    Wrapped in rubber bands.

24 Q    So do you recall when your first trip was?

25 A    November, late November/December.

1    Q    Of what year?

2    A    2009.

3    Q    All right.  So, and on that occasion did you see

4    Mr. Coleman at his residence before you went to the airport?

5    A    Usually not.  Usually Jerry Davis would go into the house

6    and get the money in the bag.  I've only went in myself twice.

7    And had him -- he did it, then I've done it.

8    Q    How many trips in total did you do?

9    A    Five.  But the fifth one I got caught.  I did four

10   successfully.

11   Q    Okay.  Actually, with regard to that fifth trip, like to

12   show you what have been marked as Exhibits 46a and b for

13   identification.  First 46a and 46b.  Do you recognize those

14   photographs?

15   A    Yeah.

16   Q    What are they?

17   A    When I got caught at the airport.

18   Q    Okay.  And do you remember what that date was?

19   A    February 21st, 2010.

20   Q    Where were you at the time you got stopped?

21   A    Originally I got stopped in Charlotte, but they let me go

22   through.  And then they stopped me in Phoenix.

23            MR. KAUFMAN:  We move to admit and publish Exhibits

24   46a and b.

25            THE COURT:  Any objection?

1          MR. BUTLER:  No objection.

2          THE COURT:  Let them be admitted, published.

3          (Government's Exhibit No. 46a-b was received into

4   evidence and published.)

5   Q   (Mr. Kaufman) Who is that in 46a?

6   A   Me.

7   Q   And what's in 46b?

8   A   Money.

9   Q   And that's the money that you were carrying?

10  A   Yes.

11  Q   Did you know how much money you were carrying?

12  A   No.

13  Q   On any of the trips?

14  A   No.

15  Q   Were you told how much?

16  A   No.

17  Q   When you got to California -- I'm sorry if you already

18  testified about this, did you bring anything back from

19  California?

20  A   Yes.

21  Q   What was it?

22  A   Marijuana.

23  Q   Did you see the marijuana?

24  A   Yes.

25  Q   Tell us the circumstances around your seeing the

1  marijuana.

2  A    I was at T's house and one of the back rooms, I guess, is

3  where one of the other guys was using to seal it, to put it in

4  the bags.

5  Q    And when you say T's house, do you know who T was?

6  A    Turtle.

7  Q    And do you know what Turtle's real name is?

8  A    Milton something.

9  Q    I'm sorry?

10  A    Milton something.  I'm not sure -- I don't remember what

11  his last name is.

12  Q    Like to show you what's already been admitted as

13  Government Exhibit 221.  Do you recognize that person?

14  A    Yes.

15  Q    Who is that?

16  A    T.

17  Q    You mention that there were other people at the house.

18  Who else was at the house?

19  A    Poo, Mark and Chucky.

20  Q    And were they all involved in the conspiracy as well?

21  A    Yes.

22  Q    What were their roles, if you know?

23  A    Poo would pick me up from the airport and drop me off

24  along with Mark and Chucky had put -- was the one putting the,

25  like sealing up the marijuana in the bags, putting them in the

1    suitcase.

2    Q    All right.  I would like to show you photographs already

3    admitted into evidence.  Twenty-two-f, do you recognize that

4    person?

5    A    Yes.

6    Q    Who is it?

7    A    Poo.

8    Q    Do you know what his real name is?

9    A    No, I don't remember his real name.

10   Q    Twenty-two-n do you recognize that person?

11   A    Yes.

12   Q    Who is that?

13   A    Mark.

14   Q    Do you know what Mark's last name is?

15   A    Dorsey.

16   Q    And 22-m, you recognize that person?

17   A    Yes.

18   Q    Who is it?

19   A    Chucky.

20   Q    Do you know Chucky's real name is?

21   A    No.

22   Q    Now when you went to California, did you ever see anybody

23   from Charlotte there?

24   A    Yes.

25   Q    Who?

1   A    Parker Coleman.

2   Q    Okay.  And please make sure that you speak in a loud

3   enough voice.

4        So you saw Mr. Coleman there when?

5   A    My first trip.

6   Q    What happened when he was there?

7   A    He was with, I believe, T, and we had went out to eat,

8   and then everybody went back to T's house and nothing really.

9   I ended up leaving and he was still there.

10  Q    When you took your four trips back from California to

11  Charlotte, you said that you were carrying marijuana.  How

12  were you carrying it?

13  A    It was put in a suitcase, roll-on suitcase.

14  Q    And was it just one suitcase?

15  A    Two.

16  Q    All four times?

17  A    No, except the once.  One time I brought back one.

18  Q    When you got to the airport, were the suitcases weighed?

19  A    Yes.

20  Q    How much did they weigh?

21  A    Anywhere from 50 to maybe 70 pounds.

22  Q    And is that per suitcase?

23  A    Yes.

24  Q    How much were you getting paid?

25  A    For each trip, $1,000, except for the time I went and

1   brought back one suitcase, it was 500.

2   Q    So were you getting paid at a per suitcase rate?

3   A    Yes.

4   Q    Are you familiar with a white Porsche Cayenne SUV?

5   A    Yes.

6   Q    What information do you have about that vehicle?

7   A    That it belonged to Parker Coleman.

8   Q    Do you know how he came into possession of it?

9        MR. BUTLER:  Objection.  Move to strike.

10       THE COURT:  Overruled.

11  Q    Do you know how he came into possession of the Porsche?

12  A    No.

13  Q    Do you know where the Porsche came from?

14  A    Yes.

15  Q    Where?

16  A    California.

17  Q    How do you know that?

18  A    Cause the first trip that I went, he was there getting

19  the truck.

20  Q    When you say he?

21  A    Parker.

22  Q    When you were -- you were stopped on February 21st, 2010,

23  was it a later date that you were actually arrested on the

24  federal charges?

25  A    I was stopped at the airport on that date, but I didn't

1   get arrested until November 17th.

2   Q    And on November 17th who arrested you?

3   A    I don't remember the agents' names, but they came to my

4   job and got me.

5   Q    And when you were arrested, did you provide a full

6   confession?

7   A    Yes.

8   Q    Did you agree to cooperate?

9   A    Yes.

10           MR. KAUFMAN:  No further questions, Your Honor.

11           THE COURT:  Any cross?

12           MR. BUTLER:  Yes, Your Honor.

13                      CROSS EXAMINATION

14  BY MR. BUTLER:

15  Q    Good afternoon, Ms. Schmidlin.

16  A    How you doing?

17  Q    Ms. Schmidlin, you initially had a relationship with

18  Mr. Jerry Davis; is that right?

19  A    Yes.

20  Q    You all dated, correct?

21  A    Not literally, but we were together in a way.

22  Q    Okay.  So you all were together.  You all had a romantic

23  relationship?

24  A    Yes.

25  Q    And he's the one that got you to take money out to

1   California bring back marijuana; is that right?

2   A    Yes.

3   Q    And now you got stopped in Arizona, correct?

4   A    Yes.

5   Q    And you lied to the authorities about the money --

6   A    Yes.

7   Q    -- is that right?

8        Okay.  And you told them -- do you remember what you told

9   them?

10  A    Yes.

11  Q    What did you tell them?

12  A    That I bet on a basketball college game.

13  Q    I'm sorry?

14  A    That I had bet on a basketball college game and that's

15  where the money had came from.

16  Q    But you told them you were going to California?

17  A    Yes.

18  Q    Going shopping?

19  A    Yes.

20  Q    And taking some of that money out for somebody that also

21  had -- was part of the bet?

22  A    I'm sorry?

23  Q    That you were taking some of that money out there as part

24  of the bet to somebody out in California?

25  A    I said I was taking the money to go out there to shop and

1   buy a car.

2   Q    Oh, buy a car.  Now you indicated that when you went to

3   take money out to California, Jerry Davis gave you the bulk of

4   the money; isn't that correct?

5   A    He put it in my bag, yes.

6   Q    Okay.  He put it in your bag, and you didn't see where he

7   got it from did you?

8   A    I know he came out of Parker's apartment with it.  He

9   didn't go in with it.

10  Q    But my question, ma'am, you don't know where he got it

11  from?

12  A    Okay.  Yes.

13  Q    Okay.  You weren't with him --

14  A    No.

15  Q    Is that right?

16            MR. BUTLER:  Now, if Your Honor please, may we have

17  a sidebar?

18            THE COURT:  Yes.

19            (Bench conference as follows:)

20            MR. BUTLER:  Your Honor, Ms. Schmidlin is one of the

21  witnesses that I filed a motion that was granted in regards to

22  drug treatment, is my recollection that Judge Cayer granted.

23  And I don't know if he has reports or not.  Maybe Mr. Haycock

24  knows.

25            THE COURT:  Well, so what's your -- I mean, what's

1   your question?

2            MR. BUTLER:  Well, I wanted to know if we have the

3   information, if there was information that was relevant for

4   impeachment purposes on cross-examination that was ordered by

5   Judge Cayer to be provided to the court in-camera for

6   in-camera review.

7            THE COURT:  Well, if you have reason to ask her

8   questions about drug usage, go ahead and do it now, and if I

9   discover that there's impeachable material at a later point in

10  this trial, I'll give you the opportunity to call her back.

11           MR. BUTLER:  Very well.

12           MR. KAUFMAN:  And just I would note that I have

13  provided *Giglio* information about these witnesses, which I

14  think generated Mr. Coleman.

15           THE COURT:  Go ahead.  Ask the question now.  If

16  there's other information your entitled to, we'll take it up

17  at a later time.

18           (Bench conference was concluded.)

19  Q   (Mr. Butler) Now Ms. Schmidlin, you -- have you ever

20  received any drug treatment?

21  A    No.

22  Q    Ever received any counseling?

23  A    Yes.

24  Q    Where did you receive counseling?

25  A    New Beginnings in Charlotte.

1    Q    And what was that for?

2    A    After I got arrested I needed to go talk to somebody

3    about my charges and everything that was going on.

4    Q    You told them about your charges; is that right?

5    A    Yes.

6    Q    Now, of course, you knew what you were doing; is that

7    right?

8    A    Yes.

9    Q    When you flew out to California with money?

10   A    Yes.

11   Q    Is that right?  And you never looked at the money?  You

12   just carried it out there?

13   A    What was in my bag was none of my business.  I brought it

14   to California and that was it.

15   Q    And that was it?  And then you brought back marijuana?

16   A    Yes.

17   Q    And now, did I understand your testimony correctly

18   earlier on direct examination that you saw them packaging up

19   that marijuana; is that right?

20   A    Yes.

21   Q    Okay.  But do you remember in one of your interviews

22   telling the officers that you knew the suitcases contained

23   weed or marijuana, but you couldn't remember if you knew it

24   because Jerry Davis had told you or T had told you?

25   A    That was the first or second time I went.  I didn't see

1    them do that until the third or fourth time I went.

2    Q    The third and fourth time.

3         Well, so once you got stopped in Arizona, how many more

4    trips did you make out there?

5    A    None.

6    Q    And you remember getting a gun from Jerry Davis, don't

7    you?

8    A    Yes.

9    Q    What type of gun was it?

10   A    I'm not sure.

11   Q    And when did you get that gun from Jerry Davis?

12   A    Sometime after I got caught at the airport, so it was

13   after February --

14   Q    I'm sorry.

15   A    After I got caught at the airport, so it was after

16   February of 2010.

17   Q    Now after you got caught at the airport, that was

18   February of '09 -- I mean February of 2010, right?

19   A    Yes.

20   Q    And how soon after you got caught at the airport in

21   February 2010 did you get the gun from Mr. Davis?

22   A    Around the summertime.

23   Q    Around what?

24   A    The summertime.

25   Q    So June or July?

1    A    July/August.

2    Q    July/August.  All right.  But it was before Mr. Davis got

3    arrested, if he got arrested November 2nd, 2010?

4    A    Yes, it was before he got arrested.

5    Q    What did you do with the gun?

6    A    I sold it.

7    Q    You were told to get rid of it; is that right?

8    A    Yes.

9    Q    Is that what Mr. Davis told you?

10   A    Yeah.

11   Q    How many times did you see Mr. Davis with the gun?

12   A    Actually I didn't see him with the gun.  I didn't know he

13   had it until he told me to get rid of it.

14   Q    Okay.  Now, so you disclaim any rights to the money out

15   in Arizona, correct?

16   A    Yes.

17   Q    And the story that you told them wasn't true; isn't that

18   correct?

19   A    Correct.

20   Q    You didn't tell them you were going out -- that you were

21   a drug courier going to purchase marijuana?

22   A    No.

23   Q    Or pay for marijuana, whatever it was?

24        Now you -- you've entered a plea of guilty; is that

25   correct?

1   A     Yes.

2   Q     And you're testifying in hopes of getting a lighter

3   sentence, aren't you?

4   A     Yes.

5   Q     Ma'am?

6   A     Yes.

7   Q     How many times would you say you've talked to either --

8   how many times have you talked to law enforcement, either

9   Agent MacDonald or Detective Beaver?

10  A     The first time I got interrogated and two times after

11  that.

12  Q     I'm sorry?

13  A     Two times after that.

14  Q     So a total of three times?

15  A     Yes.

16  Q     And Mr. Davis, he would carry you to the airport, would

17  he not?

18  A     Yes.

19  Q     And would pick you up when you came back from LA to

20  Charlotte?

21  A     Except for once, yes.

22  Q     Ma'am?

23  A     Except for once, yes.

24  Q     Okay.

25  A     I'm sorry.  I got to correct that, except for twice.

1  Q    I'm sorry.

2  A    Twice.

3  Q    Okay.

4       MR. BUTLER:  If I could just have a moment, please.

5       THE COURT:  You may.

6       (Pause.)

7  Q    So Ms. Schmidlin, you pled guilty to the conspiracy; is

8  that right?

9  A    Yes.

10 Q    And to money laundering; is that correct?

11 A    Yes.

12 Q    And you don't have a copy of your plea agreement in front

13 of you, do you?

14 A    No.

15      MR. BUTLER:  May I approach the witness, Your Honor.

16      THE COURT:  Well, you can ask her something if she

17 has trouble remembering you can approach.

18      MR. BUTLER:  All right.

19 Q    Well, in your plea agreement, the sentence, the statutory

20 minimum and maximum sentence for Count One is five years or 40

21 years imprisonment, a $2 million fine; is that correct?

22 A    It's a minimum of five years and up to 40 years.

23 Q    Okay.

24 A    Not 20 years or 40.

25 Q    I'm sorry?

1    A    You said 40 or 20?

2    Q    Forty.

3    A    Up to 40, yes.

4    Q    Not more than 40 years?

5    A    Not more, no.

6    Q    Okay.  But you want to get less than five, don't you?

7    A    I am getting less than five.

8    Q    How much you gonna get?

9    A    Right now my PSI says three years and 10 months.

10   Q    How much?

11   A    Three years and 10 months.

12   Q    Three years and 10 months?  But you're hoping to get less

13   than that; isn't that right?

14   A    Yeah.

15   Q    Have you been told how much you're gonna get?

16   A    No.

17   Q    And the drug amount involved, do you recall how much that

18   was?

19   A    On the original indictment was 1,000 plus kilograms, I

20   believe.  But on my plea -- or my PSR, I'm not sure which one,

21   it's no less than 100 and no more than 400.

22   Q    Kilograms?

23   A    Yes.

24   Q    And as a part of your agreement, you are to assist the

25   government if you were requested to do so by the government;

1   is that right?

2   A    Yes.

3   Q    And you've been so requested because you're here today?

4   A    Yes.

5   Q    Is that fair to say?

6          MR. BUTLER:  If Your Honor please, I would like for

7   her to identify this for my case in chief.

8          MR. KAUFMAN:  Objection.

9          THE COURT:  You may have her identify it, sure.

10         MR. BUTLER:  May I approach?

11         THE COURT:  You may.

12         MR. BUTLER:  Thank you.

13  Q    Ms. Schmidlin, you have in front of you what I'm going to

14  mark as Defendant's Exhibit 1.

15         MR. KAUFMAN:  Objection.

16         THE COURT:  Overruled.

17  Q    Will, you please look at Defendant's 1.  You recognize

18  that document?

19  A    Yes.

20  Q    And how do you recognize it?

21  A    It's the -- my plea.

22  Q    And is it United States versus Samantha Jo Schmidlin?

23  A    Yes.

24  Q    And did you sign it?

25  A    Yes.

1   Q   And what page did you sign it on?

2   A   The eighth.

3   Q   Okay.  And what date did you sign your signature on?

4   A   On January 14, 2011.

5   Q   And is it signed by your lawyer and Mr. Kaufman?

6   A   Yes.

7   Q   What date did they sign it?

8   A   My lawyer signed it on the 14th along with mine, and Mr.

9   Kaufman signed it on the 19th.

10  Q   All right.  Thank you, ma'am.

11      If I may retrieve my document?

12          THE COURT:  You may.

13  Q   Now Ms. Schmidlin, you know that Kevin Stanfield, do you

14  not?

15  A   Yes.

16  Q   That was Jerry Davis' nephew; is that right?

17  A   Yes.

18  Q   And do you recall the two or three occasions when you

19  were with Mr. Davis, Jerry Davis, and you all picked up

20  Mr. Stanfield, Kevin Stanfield and took him to the airport?

21  A    I was with Mr. Davis two or three times, yes, when we

22  rode to the airport.

23  Q   I'm sorry.  I can't understand you.

24  A   Yes, two or three times.

25  Q   Okay.  And that Stanfield was taking money to

1   California --

2   A    Yes.

3   Q    -- to get marijuana; is that right?

4   A    Um-hmm.

5   Q    Now, well, how many other people do you remember riding

6   with Mr. Jerry Davis to the airport to go to California to

7   take money or bring back marijuana?

8   A    I brought Leon to the airport myself.

9   Q    Leon Robertson?

10  A    Yes.

11  Q    Well, how much were you paid for that?

12  A    $150.

13  Q    $150?

14  A    Yes.

15  Q    Almost as much as you got from coming back from

16  California, wasn't it?

17  A    No, that was not half as much as I was bringing back from

18  California.

19  Q    Okay.  If you brought one suitcase it was 500?

20  A    Um-hmm.

21  Q    You brought two, it was 1,000?

22  A    Yes.

23  Q    If you carried somebody to the airport to -- Charlotte

24  Douglas?

25  A    Yes.

1    Q    It was 150?

2    A    Yes.

3    Q    Okay.  And now, would you stay at Turtle's house or T's

4    house out in California?

5    A    Yes.

6    Q    Did you ever go to hotel or a motel?

7    A    No.

8    Q    So Turtle provided everything for you while you were

9    there?

10   A    Yes.

11   Q    I mean T, you called him T?

12        Now the receipt for the money that was seized from you

13   out in Phoenix, Arizona, February 21st of 2010, you kept that

14   receipt; is that right?

15   A    Yes.

16   Q    And you subsequently gave it to the agents, was that

17   after your arrest?

18   A    Yes.

19   Q    So you had it for what eight, nine months?

20   A    Yes.

21   Q    So did you ever travel out there with anybody else?

22   A    No.

23   Q    And while you were out in California, you saw in T's

24   garage a Lamborghini and a Ferrari?

25   A    Either or.  I'm not sure which one it was.

1    Q    An Audi; is that right?

2    A    A white one, yes.

3    Q    Now did you -- when you were leaving California, you went

4    to LAX, did you go to a particular person at the baggage

5    counter to give the bags to?

6    A    No.  I would be on the phone with whoever dropped me off

7    at the airport.

8    Q    I'm sorry.

9    A    I would be on the phone with whoever dropped me off at

10   the airport.

11   Q    Okay.

12   A    And they would be on the phone with somebody who worked

13   in the airport.

14   Q    Okay.  And would they direct you to who to give it to?

15   A    No.  I would go up to a counter, and whoever was working

16   in the back would take my bags.

17   Q    Okay.  Would you ever see the person who took your bag?

18   A    No.

19   Q    So you would just leave them at the counter and you would

20   just go over to board the plane?

21   A    Yes.

22   Q    Okay.

23        MR. BUTLER:  If I could have a moment please, Your

24   Honor?

25        THE COURT:  You may.

1    Q    Do you recall seeing a photo lineup earlier this year of

2    some people from California?

3    A    Yes.

4    Q    Do you remember that you couldn't identify all of them?

5    A    Yes.

6    Q    And one of them that you couldn't identify was Poo,

7    William Pierce?

8    A    I did identify him.

9    Q    And well who -- did you ever learn who you couldn't

10   identify?

11   A    I couldn't identify T.

12   Q    Who?

13   A    Turtle.  T.

14   Q    Turtle.  Okay.

15   A    And there was other pictures that I was shown, but I

16   didn't know who they were.

17   Q    Okay.  But now Turtle was the person that you had the

18   most contact with out there?  You lived at his house?

19   A    I would stay at his house, but he wasn't there all the

20   time.

21   Q    Okay.  Well how often was he there when you were there?

22   A    I was there four times out of the five.  And he was there

23   maybe the first two times.  He would be there other times, but

24   that doesn't mean that we would come into contact with each

25   other all the time.  I haven't seen anybody in California in

1    two years.

2    Q     It was a big house?

3    A     Yes.

4    Q     Gated community?

5    A     It wasn't a community.

6    Q     Okay.  Three houses on that street?

7    A     No.  It was a block, and you had to go and punch in a

8    number and get into the driveway and there was two houses

9    there.

10   Q     Two houses?

11   A     Yes.

12   Q     Okay.  Was the swimming pool under construction then?

13   A     There was no swimming pool.

14   Q     Okay.  But now you're hoping to get as little prison time

15   as possible, aren't you?

16              MR. KAUFMAN:  Objection.  Asked and answered.

17              THE COURT:  Sustained.

18              THE WITNESS:  I'm sorry.

19              THE COURT:  Ask your next question.

20              MR. BUTLER:  I don't have any further questions.

21              THE COURT:  Any redirect?

22              MR. KAUFMAN:  Yes, Your Honor.

23                       REDIRECT EXAMINATION

24   BY MR. KAUFMAN:

25   Q     Ms. Schmidlin, the defense lawyer asked you a few

1  questions about the receipt that you -- the form you received

2  when the money was taken from you.  I would like to show you

3  what's been marked as Government's Exhibit 45 for

4  identification.  Do you recognize this?  Do you recognize

5  this?

6  A    Yes.

7  Q    What is it?

8  A    The receipt that they gave me from Phoenix.

9        MR. KAUFMAN:  Your Honor, we move to admit and

10 publish.

11       THE COURT:  Any objection?

12       MR. BUTLER:  No, Your Honor.

13       THE COURT:  Let it be admitted and published.

14       (Government's Exhibit No. 45 was received into

15 evidence and published.)

16 Q    And is this the form that you also provided to Detective

17 Beaver upon your arrest?

18 A    Yes.

19 Q    And the money that was seized from you on that date, is

20 it the same amount of money, based on your perception of it,

21 as you had carried in the past?

22 A    Yes.

23 Q    So it felt like the same weight?

24 A    Yes.

25 Q    Now you were asked several questions about what Jerry

1  Davis was doing. Did you ever see Jerry Davis bring marijuana

2  to Mr. Coleman's house?

3  A    When he would pick me up, we would take it from whatever

4  vehicle we were in and leave it at his house or at Davis'

5  house.

6  Q    And you know if Mr. Coleman was home at any of those

7  times that Mr. Davis brought the marijuana into Mr. Coleman's

8  residence?

9  A    I know once he was, cause I went in with them and it was

10  brought into the garage.

11  Q    It was brought to the garage of Mr. Coleman's house?

12  A    Yes.

13  Q    Who brought it into the garage?

14  A    Davis was carrying it and he was going into the garage

15  with him.

16  Q    With Mr. Coleman?

17  A    Yes.

18  Q    Did you see, let me ask this, you were asked how you were

19  transported to the airport and from the airport. You

20  mentioned Jerry Davis. Did Mr. Coleman ever drop you off or

21  pick you up from the airport?

22  A    I was picked up from the airport by him once.

23  Q    What was Mr. Coleman driving?

24  A    A Porsche truck.

25  Q    What kind of?

1    A    A Porsche.

2    Q    What kind of Porsche?

3    A    A truck.

4    Q    When you say a truck, do you mean like a flatbed truck or

5    are you using that term for like a sport utility vehicle?

6    A    Yeah, I call everything a truck, so.

7    Q    What color was the Porsche?

8    A    White.

9    Q    (Indicating?)

10   A    White.

11   Q    White.  And in that time, did you go anywhere else with

12   Mr. Coleman?

13   A    We went to a bank once.

14   Q    And what did you do at the bank?

15   A    I didn't go in.

16   Q    Did Mr. Coleman go in?

17   A    Yeah.  I believe he went in and I think somebody else

18   might have -- yeah he went in.  Somebody else stayed in the

19   car with me.

20   Q    Did Mr. Coleman ever pay you any money?

21   A    Yes.

22   Q    When?

23   A    On, I believe one trip that I had made, he gave me money

24   directly.

25   Q    And how much money was it?

1    A    $1,000.

2    Q    So it was for two suitcases?

3    A    Yes.

4    Q    Now when you were stopped on February 21st, you gave a

5    cover story about shopping, you testified about that.  Did

6    anybody tell you what to say?

7              MR. BUTLER:  Well, objection to the form of that

8    question.

9              THE COURT:  I'll sustain as to "cover story".  But

10   the question is, did anybody tell you what to say?

11             THE WITNESS:  Yes.

12   Q    (Mr. Kaufman) Who?

13   A    P and T.

14   Q    And --

15             MR. BUTLER:  Objection.

16             THE COURT:  Overruled.

17   Q    Now you also mentioned that you saw at Mr. -- at Turtle's

18   house in California a white Audi.  Do you have any knowledge

19   as to whether it ever came to Charlotte?

20   A    Yes.

21   Q    Tell us about your knowledge about what happened?

22   A    That it belonged to P.

23   Q    To -- can you say the -- say again?

24   A    Parker.

25   Q    Ma'am?

1    A    I'm sorry.

2    Q    I'm afraid your answering my question when I'm not quite

3    finished with my question.  Can you tell us who ended up

4    having the white Audi?

5    A    P did.

6    Q    And you're talking about the defendant here in court?

7    A    Yes.

8    Q    Do you know if he gave that white Audi to somebody else?

9              MR. BUTLER:  Objection.

10             THE WITNESS:  I don't know.

11             THE COURT:  Overruled.

12   Q    (Mr. Kaufman) You mentioned that you're looking at less

13   than the five year mandatory minimum of three years and 10

14   months.  Does that have anything to do with your testifying

15   against Mr. Coleman?

16   A    No.

17   Q    The defense showed you a document.  I'd like to show you

18   the government's version so that the jury can see it as well.

19   For now, without the jury being able to see it just yet,

20   what's been marked as Government's 36b.  Can you see that

21   document?

22   A    Yes.

23   Q    And is this in fact your plea agreement?

24   A    Yes.

25   Q    And are you familiar with the terms of the agreement?

1    A    Yes.

2              MR. KAUFMAN:  Your Honor, we seek to admit and

3    publish Exhibit 36b.

4              THE COURT:  Let me see the attorneys at sidebar.

5              (Bench conference as follows:)

6              THE COURT:  Apparently you both want to put in the

7    same exhibit, but you want to give different numbers to it.

8    I'm not sure I understand that.  I'm not sure you have a basis

9    for getting it into evidence, but we can talk about that later

10   on.

11             What's your basis for -- you've already asked her

12   about what her understanding of the plea is.  What is your

13   basis for seeking its admission at this time?

14             MR. KAUFMAN:  Well, she's been impeached with the

15   plea agreement itself, so I'm now bringing into evidence as

16   substantive evidence now that she's being impeached.

17             THE COURT:  How is she impeached?  Seemed like her

18   testimony is consistent with the terms of the plea agreement.

19   I'm not so sure --

20             MR. KAUFMAN:  Well, he was impeaching her with the

21   statutory provisions to show bias.  And so now I'm hoping to

22   use the same agreement to now rehabilitate her.

23             THE COURT:  I'm confused.  I mean, you got in the

24   terms of the plea agreement in the direct, as I recall.

25             MR. BUTLER:  Right.

1    THE COURT:  And you went into it on cross.  Now you

2 want to go back into direct.  She seems to have said the same

3 thing every time.  I mean, you -- I think you would be

4 permitted to introduce it if there's been a change of undue

5 motive or recent fabrication under the -- as I understand the

6 hearsay rules on prior consistent statements.  But I'm not

7 sure -- I'm not sure that she's been impeached in any way that

8 would allow you to get it in.  I mean, you brought it out in

9 direct.

10    MR. KAUFMAN:  I didn't bring out the provisions of

11 the plea.  I did state she pled guilty to the conspiracy.  I

12 didn't go into the terms of the agreement, Your Honor.

13    THE COURT:  But you did on cross.

14    MR. KAUFMAN:  The defense did on cross, Your Honor.

15    THE COURT:  Right.  And then your redirecting on --

16 I mean, you want it admitted anyway.  So I guess this is just

17 a theoretical concern of the Court's.

18    MR. BUTLER:  Yeah, I want it in.  I'm not objecting.

19    THE COURT:  I don't -- don't want to get bogged down

20 into the details of the plea agreement.  I think what's

21 important is her understanding of it.  I'll let you admit it,

22 but I'm not going to let you go into the weeds on the eight

23 pages worth of stuff.  Be on notice I'll let you admit it, but

24 we're not going --

25    MR. KAUFMAN:  I don't plan to spend much time.

1    THE COURT:  The key thing for the jury is, what is

2  her understanding.  So that's where we're going to stay in

3  terms of the questioning in the plea agreement.

4    MR. KAUFMAN:  I can ask the question without the

5  document coming in, Your Honor.

6    THE COURT:  No, I'll let you admit it.  I'm saying

7  we're not going to go very deep into it.  I'm going to cut it

8  off.

9    MR. KAUFMAN:  Yes, Your Honor.

10    (Bench conference was concluded.)

11  Q   (Mr. Kaufman) So Ms. Schmidlin, 36b for identification, is

12  this in fact your plea agreement?

13  A    Yes.

14    MR. KAUFMAN:  Your Honor, we move to admit and

15  publish.

16    THE COURT:  Let it be admitted.

17    (Government's Exhibit No. 36b was received into

18  evidence and published.)

19  Q    Going to page 6 of the plea agreement, "Assistance to the

20  United States."  What's your understanding as to the one key

21  requirement of your cooperation, your testimony, and every

22  aspect of your assistance to the United States?

23  A    Telling the truth.

24  Q    In fact, is that part of the written agreement as well?

25  A    Yes.

1     MR. KAUFMAN:  We have nothing further, Your Honor.

2     THE COURT:  Any recross on something new?

3     MR. BUTLER:  Yes, Your Honor.

4                    RECROSS EXAMINATION

5  BY MR. BUTLER:

6  Q    Ms. Schmidlin, you never told the agents that you had

7  gone to a bank with Mr. Coleman, did you?

8  A    I believe I did.  It's actually in my PSR.

9  Q    Okay.  Well I'm asking you, did you -- do you remember

10 you telling them that?

11 A    Yes.

12 Q    Well, when did you tell them?

13 A    I don't remember.

14     MR. BUTLER:  That's all the questions I have, Your

15 Honor.

16     MR. KAUFMAN:  Your Honor, just very briefly.

17     THE COURT:  No, I don't -- I heard one question.  It

18 was about something on redirect.  And I'm not -- this is where

19 we stop.

20     You may step down.

21     Call your next witness.

22     MR. KAUFMAN:  We call Nastasha Rodriguez.

23     NASTASHA RODRIGUEZ, GOVERNMENT WITNESS, SWORN

24                    DIRECT EXAMINATION

25 BY MR. KAUFMAN:

1  Q    Good afternoon.

2  A    Hi, how are you?

3  Q    Good.  Can you please state your full name and also spell

4  it for the record.

5  A    Nastasha Rodriguez.  N-A-S-T-A-S-H-A.  Rodriguez.

6  R-O-D-R-I-G-U-E-Z.

7  Q    Other than Agent MacDonald and myself, do you know

8  anybody in the courtroom here today?

9  A    Yes.

10  Q    Who do you know?

11  A    Parker Coleman.

12  Q    And just for the record, can you identify him by where

13  he's sitting and what he's wearing?

14  A    Yes.  He's sitting to my left, your right, with the blue

15  shirt on.

16           MR. KAUFMAN:  Your Honor, may the record reflect an

17  in-court identification of the defendant?

18           THE COURT:  It will.

19           MR. KAUFMAN:  Thank you.

20  Q    Ms. Rodriguez, how do you know Mr. Coleman?

21  A    Him and I dated for a minute in 2009.

22  Q    I'm sorry.  You dated for --

23  A    For a couple of months.  I met him in 2009.

24  Q    And how did you meet?

25  A    I was working at a store in South Park Mall called Pure

1    Denim and he was a customer in there.  We began to hang out

2    from meeting him in there.

3    Q    When he came in to meet -- when he met you, was he alone?

4    A    No.

5    Q    Who was he with?

6    A    He was with a heavyset guy by the name of Poo.

7    Q    I would like to show you what's been admitted as

8    Government Exhibit 22f.  You should be able to see it on the

9    screen.  You may have to tilt it up to view it.

10        Do you recognize this photograph?

11   A    Yes.

12   Q    Who is that?

13   A    It's Poo.

14   Q    Did you ever meet an individual that you came to know as

15   Turtle?

16   A    Yes.

17   Q    Do you know what his real name is?

18   A    No.

19   Q    Like to show you what's been admitted as Government's

20   221.  Do you recognize this person?

21   A    Yes.

22   Q    Who is that?

23   A    Turtle.

24   Q    What were the circumstances under which you met

25   Mr. Adams?

1  A    Me and an old girlfriend of mine went to California, and

2  I met him on a vacation there.

3  Q    Why were you in California?

4  A    I went to go see Mr. Coleman.

5  Q    Was there any particular reason?  Was anything happening

6  special that time?

7  A    No.  He was gone for a minute.  And like I said, you

8  know, him and I were dating, and I wanted to see him and vice

9  versa.

10  Q    Was it a special day or an event for either of you?

11  A    No.

12  Q    So when you went out to California, you got to the

13  airport.  Who picked you up?

14  A    From the airport in California?

15  Q    Yes, ma'am.

16  A    Parker and Turtle.

17  Q    What were they in?

18  A    A white Porsche Cayenne.

19  Q    Who was driving?

20  A    I do believe Turtle was driving at the time.  I'm not

21  quite sure.

22  Q    Did you ever see that Cayenne back in Charlotte?

23  A    Yes.

24  Q    Who had it?

25  A    Parker.

1    Q    Did you ever see anybody but Parker have it?

2    A    No.

3    Q    Going back to California, who are some of the folks that

4    you met in California?

5    A    I met Chucky, in California, Mark, Turtle, and that's

6    about it.  Because the other guy who was already there, I had

7    met him here.

8    Q    And who was the guy you had met her previously?

9    A    Harold.

10   Q    All right.  Let's see.  I'll show you a few photographs

11   and see if you recognize any of them.  Twenty-two-d, you

12   recognize twenty-two-d?

13   A    Yes.

14   Q    Who is that?

15   A    Harold.

16   Q    Do you know what his last name is?

17   A    No.

18   Q    Twenty-two-n, do you know who that is?

19   A    Yes, that's Mark.

20   Q    Twenty-two-m, do you know who that is?

21   A    That's Chucky.

22   Q    Was there anything distinctive that you remember about

23   meeting Chucky, anything about him?

24   A    No.  He kept bragging about how he was dating Whoopee

25   Goldberg's niece or daughter or something --

 1            MR. BUTLER:  Objection.  Motion to strike.

 2            THE COURT:  I'll sustain the last statement of the

 3   witness, ask the jury to disregard it.

 4   Q   (Mr. Kaufman) Let's see.  Now you said that you saw

 5   Harold -- you had met him in Charlotte, but then you saw him

 6   at Turtle's house; is that right?

 7   A    Correct.

 8   Q    Was there any conversation that you had with

 9   Mr. Manigault that is of note for you?

10   A    Who is Mr. Manigault?

11   Q    I'm sorry.  Let me show you a photograph.  Okay.  Now

12   this individual 22-d, I think you said was Harold?

13   A    Yes.

14   Q    When you were in California, did you have a conversation

15   with Mr. Manigault that Mr. Coleman was present for?

16   A    I don't know if he was there, but him and I had a

17   conversation.  I was asking how long he was staying.  And he

18   said he was leaving right back out that day.

19            MR. BUTLER:  Objection.

20            THE COURT:  Hang on a second.  When you say "him,"

21   who are you referring to?

22            THE WITNESS:  Oh, I'm sorry.  Mr. Coleman.

23            THE COURT:  And --

24            THE WITNESS:  And Harold.

25            THE COURT:  And so -- so, go ahead and ask your

1   question.

2   Q   (Mr. Kaufman) So when you asked that question, was that

3   question of Harold --

4          THE COURT:  When you asked what question.  Go ahead

5   and -- I'm not sure I understand what question --

6          MR. KAUFMAN:  Okay.

7   Q   What question did you ask when you were in California?

8   A   Oh, okay.  I asked Harold how long was he gonna be

9   staying in California, and I'm not sure.

10         THE COURT:  All right.  And then ask your next

11  question.

12         MR. KAUFMAN:  Okay.

13  Q   Now, was Mr. Coleman present when he gave you the answer?

14  A   I'm not sure.  I don't remember that.

15  Q   Do you remember being part of a conversation with

16  somebody in California and Mr. Coleman told you to leave the

17  room?

18  A   Yes.

19  Q   Can you tell us what happened leading up to Mr. Coleman

20  telling you to leave the room?

21  A   That was around the time -- yeah, that was around the

22  time when I asked him, like, how long was he staying.  And

23  then --

24         THE COURT:  When you asked --

25         THE WITNESS:  I'm sorry.  When I asked Harold how

1   long he was staying.

2   Q   (Mr. Kaufman) And what happened?

3   A   And Harold and Parker --

4             MR. BUTLER:  Objection.

5             THE WITNESS:  I'm sorry.

6             THE COURT:  At this point, overruled.

7             Harold and Parker what?

8             THE WITNESS:  Harold and Parker began to talk --

9             THE COURT:  All right.

10            THE WITNESS:  -- and he -- Parker told me to leave

11  the room.

12  Q   (Mr. Kaufman) I'd like to show you another photograph

13  that's been admitted as 43a.  Do you recognize the person in

14  this photograph?

15  A   Yes.

16  Q   And how do you know this person?

17  A   I met him through Parker.

18  Q   When and where?

19  A   I met him in Charlotte, but I don't remember around the

20  time it was.

21  Q   And by the way, Ms. Rodriguez, you're not under any kind

22  of charges in this case, are you?

23  A   No.

24  Q   Now has there been any promises by anybody on behalf of

25  the United States saying that you will or not be charged with

1   any kind of crime?

2   A     No.

3   Q     Did you ever meet Mr. Coleman's sister?

4   A     Yes.

5   Q     What's her name?

6   A     Ashley Coleman.

7   Q     Do you know what kind of vehicle she drove?

8   A     Well, he got her an Audi for her graduation gift.  It was

9   a black Audi.  And then she was driving -- Ashley was driving

10  the white Audi.

11  Q     Have you ever been to a residence on Kensington Palace?

12  A     Where is that by?

13  Q     Well, let me ask you, were you ever to Mr. Coleman's

14  residences?

15  A     Yes.

16  Q     How many?

17  A     The townhouse and the one by South Park, the condo.

18  Q     Okay.  With regard to -- let me ask you this, did you

19  ever see any indication that Mr. Coleman was or was not

20  involved in marijuana trafficking?

21  A     Yes.

22  Q     What information do you have?

23              MR. BUTLER:  Objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  When I was at Mr. Coleman's house at

1  the townhouse, yeah, it was the townhouse.  Mr. Coleman was in

2  the garage and I had just finished making him something to eat

3  and I went to let him know that food was ready, and I went in

4  the garage and I saw the drugs.

5  Q   (Mr. Kaufman) Can you describe what you saw?

6  A   It was big packages of marijuana, and I also saw scales.

7  Q   What did the substance look like?

8  A   It was a box -- it looked like a box, but it was green

9  and it was like, kind of, stuffed.

10 Q   A box?

11 A   Yeah, it was in like a box form.

12 Q   Oh, okay, the shape of it?

13 A   Yes.

14 Q   Was it -- was it in a packaging material of any kind?

15 A   It looked like he had already -- I'm sorry.  It looked

16 like Parker had already ripped it off.

17         MR. BUTLER:  Objection.  Move to strike.

18         THE COURT:  Overruled.

19 Q   (Mr. Kaufman) So it was just the raw material itself?

20 A   Correct.

21 Q   Were you able to smell anything?

22 A   It was strong.  I smelled something.  I knew it wasn't

23 anything like a regular potpourri smell.

24 Q   What did he say when you came in?

25 A   He told me to close the door.

1          MR. BUTLER:  I would object, Your Honor.  Move to

2  strike his testimony --

3          THE COURT:  Overruled.

4  Q   (Mr. Kaufman) What was he doing with the marijuana?

5          MR. BUTLER:  Objection.

6          THE COURT:  Overruled.

7          MR. BUTLER:  To the form of marijuana.

8          THE COURT:  Overruled.

9          THE WITNESS:  Mr. Coleman was breaking the marijuana

10  down and putting it on the scale.

11  Q   (Mr. Kaufman) Do you know a woman by the name of Shaunda

12  McAdoo?

13  A   I don't know her.  I know of her.

14  Q   Would you be able to identify a photograph of her?

15  A   Yes.

16  Q   Do you recognize the person in 22h?

17  A   Yes.

18  Q   Who is it?

19  A   It's Shaunda.

20  Q   And do you know Shaunda's -- do you know if Shaunda was

21  in a long-term relationship?

22  A   The one that I knew of, yes.

23  Q   And what's the name of the person with whom she was in a

24  relationship?

25          MR. BUTLER:  Objection.

1          THE COURT:  Overruled.

2          THE WITNESS:  All I know her by -- I know her by Moe

3   or Corona.

4   Q   (Mr. Kaufman) Did you ever see Mr. Coleman in possession

5   of large amounts of money?

6   A   Yes.

7   Q   Can you tell us about those circumstances?

8   A   Just when we would go out, or just like on a random day,

9   to have the money, he would spend it going out having a good

10  time.

11  Q   When you went out, what kind of vehicles did you go out

12  in?

13  A   Either the -- before he gave the Audi to his sister, we

14  would go out in that one, or we would go out in the Porsche.

15  Q   So after he gave the Audi to his sister, was it always

16  the white Porsche?

17  A   Yes.

18  Q   Was there anything unusual you saw him do in that porch?

19  A   Yes.

20  Q   What did he do?

21  A   He had a secret compartment for his money.

22  Q   Where was that?

23  A   It was on the driver's side.  It was on the driver's side

24  on the back of the front seat.

25  Q   Are you sure?  So when you say the driver's side, the

1    seat where Mr. Coleman was sitting?

2    A    Correct.

3    Q    Okay.  Did you ever see him retrieve anything from that

4    compartment?

5    A    Yes.

6    Q    How did he do it?

7    A    I was sitting in the front passenger seat, and I think

8    his name was Randy was sitting in the driver's seat.  And

9    he -- Randy pulled under the driver's seat and clicked

10   something and it came off.  But I'm not sure if it's the

11   driver side or the passenger's side, because it's been so

12   long.  But I know it was a secret compartment because I saw

13   it.

14   Q    All right.  Have you ever seen Mr. Coleman in possession

15   of any firearms?

16   A    Yes.

17   Q    Can you tell us about that?

18   A    Yes.  I was in the house one day watching TV and I made a

19   comment about uzi or something like that, of that nature.  And

20   I said I wanted to go to a shooting range.  And Mr. Coleman

21   goes in the closet, puts the glove on, and pulls out a gun.

22   And I was like, please get away from me, OJ.  I'm not, you

23   know, feeling the whole gun around me thing.

24   Q    Was that the only firearm you saw in possession?

25   A    And I saw, it looked like a regular handgun that was by

1   the bed one time.

2   Q    Do you remember what kind of handgun it was?

3   A    I don't know the name of guns.  But I just know it was,

4   like, black, and it had a regular handle to it.  It was a

5   smaller gun.

6   Q    All right.  Do you know what the difference is between a

7   revolver and semi-automatic handgun?

8   A    No.

9   Q    Were you still in contact with -- do you recall when your

10  relationship with Mr. Coleman ended?

11  A    Last time I heard from him was in December of 2010.

12  Q    Were you aware of Mr. Coleman at some point being

13  arrested in November of 2010?

14  A    Yes.

15  Q    So what was the nature of your discussion with

16  Mr. Coleman in that time period after November 2010?

17  A    He asked me to help him get some paperwork together from

18  one of my -- from my aunt's wedding to help account for some

19  money, to say that his company catered her wedding.

20  Q    To your knowledge, did Mr. Coleman actually have a

21  catering company?

22  A    To my knowledge, I believed everything he said.  So to my

23  knowledge, yes, from what he told me.

24  Q    You still believe everything he said?

25  A    No.

1        MR. BUTLER:  Well, objection.

2        THE COURT:  Overruled.

3   Q   (Mr. Kaufman) Why not?

4   A    Because dealing with this situation, and a lot of

5   different things coming out, like, I don't -- I don't know who

6   this Parker is that everybody is talking about.  The Parker --

7        MR. BUTLER:  Objection.

8        THE WITNESS:  -- that I knew --

9        THE COURT:  I'll sustain the objection to that.

10  Q   (Mr. Kaufman) I'd like to show you what have been marked

11  for identification purposes and previously provided to defense

12  in discovery is 53a through f, 53a, c and e are audio

13  recordings and 53b, d and f are transcripts of those

14  recordings.

15       Going to take out each of the particular disks and ask if

16  you recognize each of these disks?

17  A    Yes.

18  Q    How do you recognize them?

19  A    I listened to the audio not too long ago, and I initialed

20  my name to let you know that it was my voice and Mr. Coleman's

21  voice.

22  Q    Were they accurate recordings of your conversations with

23  Mr. Coleman?

24  A    Yes.

25  Q    And then with regard to 53b, d and f, do you recognize

1   these?

2   A    Yes.

3   Q    What are they?

4   A    The transcripts from the CD audio that I listened to.

5   Q    And were these transcripts accurate?

6   A    Yes.

7            MR. KAUFMAN:  Your Honor, at this time we'd seek to

8   admit and publish Government's Exhibit 53a and b, 53c and d,

9   and 53e and f.

10           MR. BUTLER:  Objection.

11           THE COURT:  Overruled.  They will be admitted.  You

12  may publish.

13           MR. KAUFMAN:  Thank you, Your Honor.

14           THE COURT:  Before you do that, Mr. Kaufman, it's

15  4:30.  I think we'll take our afternoon break at this time.

16           MR. KAUFMAN:  Yes, Your Honor.

17           THE COURT:  Members of the jury, we'll take our

18  afternoon break for 15 minutes.  We'll see you at 4:45 p.m.

19           (Recess at 4:30 until 4:45.)

20           THE COURT:  Mr. Kaufman, can you get your witness

21  back in?

22           MR. KAUFMAN:  Yes, Your Honor.  But before I do I

23  wanted to bring to the Court's attention.

24           THE COURT:  Go ahead and have a seat.

25           MR. KAUFMAN:  Thank you.

1          THE COURT:  No, you can stand up.

2          MR. KAUFMAN:  Your Honor, as Ms. Rodriguez was

3    walking out from the witness stand.  I was right in front of

4    her and I could see that Ms. Tracy Coleman and Ms. Ashley

5    Coleman who have been watching the trial throughout, were what

6    I call staring daggers at her.  I also spoke to somebody who

7    has been watching the trial who overheard Ms. Ashley Coleman

8    saying something to the effect of, I'm gonna punch her in the

9    face.  I spoke to Deputy Yates.  She noticed some activity

10   with regard to a gentleman who's been watching the trial, and

11   the family, that raised -- caught her attention, as well.

12   Just wanted to bring that to the Court's attention.

13          THE COURT:  Very well.  Of course the Court will not

14   tolerate any witness intimidation in any form.  I do not have

15   enough -- I don't have information in front of me to suggest

16   that that's going on, but I do have the authority to make sure

17   it doesn't happen.  And so, I wouldn't hesitate to use that

18   authority.  And so, I am just mentioning not to any specific

19   people, but in general, that there will not be any toleration

20   of any -- any form of witness intimidation or any obstruction

21   of this Court's proceedings.  Having said that, anybody who's

22   in the courtroom is on notice of that, and should conduct

23   themselves accordingly.

24          And I might suggest that each side talk to whatever

25   folks are associated with each side to make sure that that

1    message is heard clearly.

2         MR. BUTLER:  If Your Honor please, during the break

3    I did talk to Mr. Coleman's family.  They assured me that they

4    didn't do anything out of the ordinary --

5         THE COURT:  I'm not saying that they did.

6         MR. BUTLER:  Yes.

7         THE COURT:  But I'm saying that the Court is on

8    notice from this point forward for each side, if there was any

9    attempt at any influence or intimidation --

10        MR. BUTLER:  Well --

11        THE COURT:  -- won't hesitate to deal with that.

12        As a matter of fact, from this point forward, any

13   time the court starts up after a break, no one is allowed to

14   leave the courtroom until the next break.

15        There has been, as I have sat here presiding over

16   the trial, there has been fairly frequent in and out type of

17   activity, I think it's distracting to the jury.  And so the

18   rule going forward in this case is that if you're in here when

19   the jury comes back in here, you're in here till the next

20   break.  And so if all spectators wherever they're sitting

21   would be aware of that.

22        So if you need to -- if you think you're gonna need

23   to take a break before -- we take a break every two hours.

24   And if anybody thinks they need a break before that, they

25   better leave before the testimony starts because you will not

1   be allowed to leave until the next break.

2              MR. KAUFMAN:  Your Honor, occasionally Agent

3   MacDonald may need to coordinate witnesses to ensure the --

4              THE COURT:  Yeah.  The exception would be the

5   attorneys or their staff or anybody working with them and

6   bringing witnesses in and out of the courtroom.

7              MR. KAUFMAN:  Thank you, Your Honor.

8              THE COURT:  All right.  We ready for the jury?

9              Let's get the witness in here and on the stand.

10             (Witness Rodriguez resumes the stand.)

11             THE COURT:  All right.  Call the jury.

12             (The jury was returned to the courtroom.)

13             THE COURT:  Mr. Kaufman, you may proceed.

14             MR. KAUFMAN:  Thank you, Your Honor.

15             We will now be publishing Government's Exhibit 53a.

16             (The exhibit was published to the jury.)

17  Q   (Mr. Kaufman) Ms. Rodriguez, what was that phone call all

18  about?

19             MR. BUTLER:  Objection.

20             THE COURT:  Overruled.

21             THE WITNESS:  I don't remember exactly what the

22  phone call was about, because it was so long ago.  I don't

23  remember who Collard Green was.  But Pinky, he was referring

24  to someone white, because I call them a pink toe.  Sorry, not

25  trying to offend anyone.  But I don't remember what the

1   conversation was about because it was, like, two years ago.

2   Q    But you previously testified about his request to get

3   receipts through you?

4               MR. BUTLER:  Objection.

5               THE COURT:  Sustained.

6   Q    (Mr. Kaufman) Let's see.  Now, there was a reference in

7   the beginning of that conversation to having been at someone's

8   house.  Do you remember who that person was?

9   A    No.

10  Q    And excuse my language, it's from the recording itself.

11  The term "bull dike", who is that a reference to?

12  A    I do believe it was in reference to Moe.

13  Q    And when there was a reference to "old girl?"

14  A    I don't remember.

15  Q    And there was a reference to -- there was a question

16  asked, "What is Jackie?"  What was that a reference to?

17  A    Because he was trying to explain somebody white, and my

18  best friend at the time was white.  But he -- he was calling

19  her "Pinky," so I didn't get it until he said "Pink Toe," then

20  I understood he was talking about a white girl.

21  Q    Do you know why he just didn't come out say the person's

22  name?

23              MR. BUTLER:  Objection.

24              THE COURT:  Sustained.

25  Q    Were you trying to speak in code?

1    A    Yes.

2    Q    Why?

3    A    Because he was speaking in code.

4    Q    How do you know he was?

5    A    Because he was saying "Collard Green" and "Pinky" and

6    "Pink Toe," he never said any names.

7    Q    And there was a reference to a "Little Dwarf," who was

8    that?

9    A    I don't remember his name.  But he was a short guy.  He

10   was a little guy.  I think he was from New Orleans, and he was

11   really funny, and he joked around a lot.

12   Q    And I'd like to show you what's been already admitted as

13   Government's 22o.  Do you recognize that person?

14   A    Yes.

15   Q    Who is that person?

16   A    I don't remember his name, but he's the little guy.

17   Q    When the reference was to "Little Dwarf," is 22o, is that

18   that person that was being referred to?

19   A    Yes.

20   Q    Next I would like to publish 53c.

21        (The exhibit was published to the jury.)

22   Q    What was your understanding as to what that conversation

23   was about?

24   A    That conversation was about getting the documents saying

25   that he catered my aunt's wedding that past September.

1  Q    And did he in fact cater it?

2  A    No.

3  Q    What was he asking you to do?

4           MR. BUTLER:  Objection.

5           THE COURT:  Overruled.

6           THE WITNESS:  To write out the receipts to his

7  company saying that they catered -- the -- catered the

8  wedding.  And also just like little events from my Granny's

9  church and things like that.

10 Q    Did he, in fact, have any business involvement in any of

11 those events?

12 A    No.

13 Q    And what did he tell you was the reason why he needed

14 that?

15          MR. BUTLER:  Well, objection.

16          THE WITNESS:  He --

17          THE COURT:  Overruled.

18          THE WITNESS:  He never told me a specific reason of

19 why he needed it.

20 Q    Did you have an understanding as to why he needed it?

21          MR. BUTLER:  Objection.

22          THE WITNESS:  I kind of had an understanding.

23 Q    (Mr. Kaufman) Based on what?

24          THE COURT:  Overruled.

25          THE WITNESS:  From when he got arrested the first

1   time and they took money from him.

2   Q   (Mr. Kaufman) And what's your understanding as to how

3   that's relevant to what he was asking to you do?

4              MR. BUTLER:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS:  So that he can be accounted for his

7   money that was taken so that he can get that money back.

8   Q   (Mr. Kaufman) Did you have an understanding of what the

9   source was for that money?

10  A   No.

11  Q   Next I'll be publishing 53e with transcript.

12             (The exhibit was published to the jury.)

13  Q   (Mr. Kaufman) What was that call about?

14  A   I do believe that that was about finishing up the papers

15  to send, saying that he catered my aunt's wedding and

16  everything.

17             MR. KAUFMAN:  Nothing further, Your Honor.

18             THE COURT:  Any cross?

19             MR. BUTLER:  Yes, Your Honor.

20                      CROSS EXAMINATION

21  BY MR. BUTLER:

22  Q   Good afternoon, Ms. Rodriguez.

23  A   Good afternoon.

24  Q   Now, Ms. Rodriguez, you were not charged in this case; is

25  that right?

1    A     Right.

2    Q     And agents came out and talked to you, I think it was

3    Agent MacDonald and Agent Beaver on the first occasion, and

4    you told them that you would talk to them, but you wanted to

5    get a lawyer?

6    A     Correct.

7    Q     Okay.  And you obtained a lawyer; is that right?

8    A     Right.

9    Q     And you signed a -- an agreement, an agreement requiring

10   truthful disclosure; is that correct?

11   A     Right.

12   Q     And in the agreement you were required to give them all

13   of the information you knew about certain activities; is that

14   right?

15   A     Yes.

16   Q     Now you haven't been charged?

17   A     Right.

18   Q     But now you did some things in this case; isn't that

19   right?  You went to California.

20   A     Yes.

21   Q     Okay.  And when you went to California, you took a --

22   some pants, some rolled up pants from Jerry Davis, didn't you?

23   A     Yes.

24   Q     Okay.  And you put it in your bag?

25   A     He put it in the bag.

1    Q    He put it in the bag?

2    A    Yes.

3    Q    Okay.  And you never looked in the bag in the pants?

4    A    Correct.

5    Q    So you don't know what was in the pants or that you

6    put -- that he put in the bag and you carried to California?

7    A    Right.

8    Q    Now, how did you get to the airport on that occasion?

9    A    Me and my friend drove.

10   Q    And --

11   A    Cause it was my friend and I, and we parked the car at

12   the terminal.

13   Q    And what was your friend's name?

14   A    DeMarius Tretoo (phonetic).

15   Q    Now -- well, you -- you talked to the agents back on

16   August 18 of 2011; is that right?

17   A    I don't remember exactly what month it was, but I did

18   talk to them last year.

19   Q    And you know that Mr. Coleman was arrested on or about

20   November the 2nd of 2010, November 16th, 2010; is that right?

21   A    Yes.

22   Q    In fact, you came to a detention hearing down in federal

23   court, didn't you?

24   A    Yes.

25   Q    There were some other young ladies present too, correct?

1   A    When?

2   Q    At the bond hearing, the detention hearing?

3   A    They didn't come with me, but, yes.

4   Q    Okay.  Joanna was present.  Do you remember Joanna?

5   A    I remember that name, but I don't remember her.

6   Q    Now, when you went out to California, you went to

7   Turtle's house; is that correct?

8   A    Correct.

9   Q    And you know Jerry Davis; isn't that right?

10  A    Who?  Does he have --

11  Q    Jerry Davis, Jay or Boogie?

12  A    Yes.

13  Q    You know him as Reginald, too?

14  A    No.  I just knew him as Boogie.

15  Q    Okay.  And did you know Poppa, Davon Harris?

16  A    I didn't know him, but I met him through Parker.

17  Q    And you knew Poo?

18  A    Met him through Parker.

19  Q    Did you know Esco?

20  A    I don't remember a name Esco.

21  Q    Now you used to be a bartender at Onyx; is that right?

22  A    I waitressed there.

23  Q    Now you actually talked to Agent MacDonald and Mr.

24  Kaufman, the prosecutor, in the presence of your lawyer back

25  on September 15th, 2011; does that sound right?

1   A    Yes, it sounds about right.

2   Q    Now your mother is named Melanie Rodriguez; is that

3   right?

4   A    Correct.

5   Q    And she knows Mr. Coleman?

6   A    Correct.

7   Q    Do you remember Turtle telling you that he was in real

8   estate?

9   A    He never told me what he did.  I never asked.

10  Q    Okay.  Well you don't remember telling the officers that?

11  A    No, I don't.

12       MR. BUTLER:  If I could have a moment, please, Your

13  Honor.

14       THE COURT:  You may.

15  Q    Now, how long did you stay out in California?

16  A    Just for a few days.

17  Q    And back then you were romantically involved with

18  Mr. Coleman?

19  A    Yes.

20  Q    And did you know he was seeing other women?

21  A    No, I did not.

22  Q    Did you ever find that out?

23  A    Yes.

24  Q    Okay.  How did you find that out?

25  A    After he got arrested and I spoke with the detectives.

1    Q    Oh, they told you?

2    A    Well, I'm sorry.  Actually I heard it on the streets,

3    like people talk.  And I heard it, and it was just confirmed.

4    Q    And who confirmed it?

5    A    The detectives.

6    Q    Okay.  And you really don't have anything to gain or

7    anything to lose as a result of your testimony; is that right?

8    A    No.

9    Q    But when you learned about these other women, that upset

10   you, didn't it?

11   A    It did.

12   Q    And the telephone conversation about the collard greens,

13   you don't remember what that was about, do you?

14   A    No.

15   Q    And you know Mr. Coleman was in partnership with a cafe

16   called Peps Cafe?

17   A    Right.  That's what he told me.

18   Q    Did you ever go down there?

19   A    No.

20   Q    Did you know where it was on South Tryon Street?

21   A    I just knew it was downtown.

22   Q    Did you ever receive any written documentation or

23   discovery in this case?

24   A    My lawyer has that information, I do believe.

25   Q    I'm sorry?

1   A    I said my lawyer has information, I do believe.  I never

2   received any documents myself.

3   Q    Okay.  But your lawyer discussed the documents with you?

4   A    Correct.

5   Q    That she got about the case?

6   A    Correct.

7   Q    Even though you're not charged?

8   A    In the beginning when they were talking to me, they were

9   talking about charging me.

10  Q    Okay.  They were talking about charging you?

11  A    Correct.

12  Q    Okay.  Do you know what they were talking about charging

13  you with?

14  A    No.

15  Q    And as a result of them talking about charging you, your

16  lawyer was able to get some of the discovery in this case?

17  A    I do believe so.

18  Q    Okay.  And that's pretty much what you've told them in

19  your interview, that you knew some things because your lawyer

20  told you that she had gotten in discovery?

21  A    No, I never said that.

22  Q    You said something to that effect -- let me see if I can

23  find it here.

24          MR. KAUFMAN:  Objection.

25          THE COURT:  Overruled.

1    Q    Well, do you remember telling the agents that you

2    remember making two currency deposits after seeing Kamia

3    Saulsberry's name on some case documents you thought sound

4    familiar?

5    A    Yes.

6    Q    Okay.  So you were shown some documents?

7    A    Correct.

8    Q    And do you remember who -- is that the situation with

9    your lawyer?

10   A    Right.

11   Q    Okay.  So your lawyer showed you those documents?

12   A    Actually Mr. Kaufman showed them to me when I went and

13   spoke with him.

14   Q    Okay.

15   A    With my attorney.

16   Q    Okay.  So he showed you those documents?

17   A    Yes.

18   Q    And of course, now, when you were told that they were

19   thinking about charging you, that -- that didn't make you

20   happy, did it?

21   A    No.

22   Q    It upset you, didn't it?

23   A    Yes.

24   Q    Very much so.

25   A    Yes.

1    Q    So you did make some bank deposits?

2    A    Yes.

3    Q    And you put them in Kamia Saulsberry's name?

4    A    I don't remember.

5    Q    Did you put them in your name?

6    A    I didn't put them in my name.  I have to see it to know

7    that's what I did, because it was so long ago.

8    Q    Okay.  But you made some bank deposit in somebody else's

9    name?

10   A    Right.

11        MR. BUTLER:  Thank you, ma'am.  I have no further

12   questions.

13        THE COURT:  Redirect?

14        MR. KAUFMAN:  Yes.

15                    REDIRECT EXAMINATION

16   BY MR. KAUFMAN:

17   Q    Who asked you to make deposits?

18   A    Parker Coleman.

19   Q    And when he asked you to, what information did he provide

20   to you?

21   A    The names and the account number.

22   Q    Did he tell you anything about those deposits?

23   A    No.  I just assumed they were for his business.

24   Q    Now with regard to the business, you were asked if

25   Mr. Coleman told you whether he had a partnership interest in

1  Peps Cafe.  Do you have any corroboration from anything you

2  saw or heard other than Mr. Coleman's say so that corroborates

3  that he had any interest?

4  A    No.

5  Q    You know who Pep is?

6  A    No.  Heard of her.  Never -- I've heard of her, but I've

7  never met her.

8  Q    Like to show you what's been admitted as Government's

9  Exhibit 22c.  Can you see the person on the screen?

10 A    Yes.

11 Q    Do you recognize that person?

12 A    No.  I've never seen her before.  I mean, I saw her when

13 you showed me the picture before, but I don't -- I never met

14 her.

15 Q    And so that was when you were being asked to identify

16 whether you knew people or not?

17 A    Correct.

18 Q    And with regard to the money rolled up in pants from

19 Jerry Davis that you took on the airplane, do you remember

20 testifying about that?

21 A    When I talked to you?

22 Q    No, I mean in your testimony today, you were asked by the

23 defense lawyer about that?

24 A    Yeah.

25 Q    Who asked you to do that?

1  A    Parker.

2  Q    And finally you were asked whether Turtle was involved in

3  real estate, and you indicated that he wasn't.  Did you ever

4  meet Kamia Saulsberry?

5  A    No.

6  Q    Did you ever hear from anybody involved in this

7  conspiracy that in fact it was Kamia Saulsberry who was the

8  one involved in real estate?

9  A    I heard that she sold houses.

10        MR. BUTLER:  Objection.

11        THE COURT:  Overruled.

12        THE WITNESS:  I heard that she sold houses, but I

13  didn't know for sure, for sure, because I never got into a

14  conversation about what she did.

15  Q    And did you hear about what connection, if any, she had

16  to a person known as Milton Adams, also with the nickname

17  Turtle?

18  A    Yes.

19        MR. BUTLER:  Objection.

20        MR. KAUFMAN:  From whom did you hear about the

21  connection?

22        THE COURT:  Overruled.

23        THE WITNESS:  Parker.

24  Q    (Mr. Kaufman) What did he say the connection was?

25  A    That was his baby's mother.

1          MR. KAUFMAN:  Nothing further, Your Honor.

2          THE COURT:  Any recross?

3          MR. BUTLER:  Yes, Your Honor.

4                    RECROSS EXAMINATION

5  BY MR. BUTLER:

6  Q    Well, did you know that your mother went out to

7  California met Kamia Saulsberry too?

8          MR. KAUFMAN:  Objection.  Scope.

9          THE COURT:  Overruled.

10         THE WITNESS:  No, I don't know that she went out

11 there and met her.

12 Q    (Mr. Butler) But you know your mother knows Milton Adams,

13 too?

14 A    Yes.

15 Q    And she stayed at his house, too.  You know that, don't

16 you?

17 A    I don't know what my mother does when my mother isn't

18 around me.  I don't know.

19 Q    Okay.  But, so you're saying you don't know if she went

20 to California to see Mr. Adams?

21 A    I don't -- she probably did go to California, but I don't

22 know where she stayed.  Cause her -- we all went to California

23 on a trip one time, and she stayed with me in a hotel.

24 Q    Okay.  But -- and you don't -- you don't recall her

25 telling you that she went to California to see Mr. Adams?

1   A    She went to California, but she didn't tell me who she

2   was going to see.

3         MR. BUTLER:  Okay.  That's fine.  I don't have any

4   further questions.

5         THE COURT:  You may step down, be excused.  Call

6   your next witness.

7         MR. KAUFMAN:  Harold Manigault, Your Honor.

8         HAROLD MANIGAULT, GOVERNMENT WITNESS, SWORN

9                     DIRECT EXAMINATION

10  BY MR. KAUFMAN:

11  Q    Good afternoon, sir.

12  A    Hey.

13  Q    Can you please state your full name and spell your last

14  name for the record?

15  A    Harold Manigault.  M-A-N-I-G-A-U-L-T.

16  Q    Are you here having plead guilty to a conspiracy to

17  possess with intent to distribute and to distribute marijuana

18  and also conspiracy to launder the proceeds of that same

19  conspiracy?

20  A    Yeah.

21  Q    Prior to this case, did you have any prior convictions

22  other than minor traffic offenses?

23  A    That's all.

24  Q    Do you see any of the people in the courtroom today who

25  were part of your conspiracy to launder proceeds of drug

1  trafficking and drug trafficking itself?

2  A    Yes, sir.

3  Q    Who do you see?

4  A    Mr. Parker Coleman.

5  Q    Can you identify him by where he is, what he's wearing?

6  A    Blue shirt, tie and glasses.

7            MR. KAUFMAN:  Your Honor, may the record reflect the

8  in-court identification of the defendant?

9            THE COURT:  Would you point to the person that

10  you're identifying?

11            THE WITNESS:  (Complies.)

12            THE COURT:  It will so reflect.

13            MR. KAUFMAN:  Thank you, Your Honor.

14  Q    How long have you known Mr. Coleman?

15  A    Since he was about 13.

16  Q    Where did you meet him?

17  A    We went to Kingdom Hall Jehovah's Witnesses.

18  Q    Where was that?

19  A    That's in Charleston, South Carolina.  Well, I met him

20  through his cousin.

21  Q    Who's his cousin?

22  A    His name is Nicholas Cave (phonetic).

23  Q    And did you become friends with Mr. Coleman?

24  A    Yeah.

25  Q    When you were kids?

1   A    Yeah.

2   Q    Did you stay friends with him?

3   A    Yeah.

4   Q    Sir, do you feel like you're still friends with him?

5   A    Maybe.  I don't know.  We haven't talked since -- since

6   this incident happened, so.

7   Q    You're talking about the arrests for the drugs?

8   A    Right.  Yeah.

9   Q    Sir, how do you feel about testifying against Mr. Coleman

10  here?

11          MR. BUTLER:  Objection.

12          THE COURT:  Overruled.

13          THE WITNESS:  I mean, part of me feels bad, but I

14  have no choice since I signed for my plea agreement.

15  Q    (Mr. Kaufman) And what does your plea agreement require

16  you to do?

17  A    The government needs me to testify, then that's what I

18  have to do.

19  Q    And what's the key component about your testimony?

20  A    It's truthful and honest.

21  Q    When did you first get involved in the drug trafficking

22  and money laundering conspiracy?

23  A    This was labor day weekend of -- not the weekend, it was

24  2009, after the weekend of labor day he needed somebody to

25  take a trip.  And we was up here, just me and a couple friends

1    was up here visiting him.  So he asked me if I wanted to go,

2    so I said yeah.

3    Q    And sir, I apologize, but if you can take the microphone

4    just a little bit away from your mouth, it's a little too

5    close.  Not too far away.  The court reporter won't be happy

6    with me.

7         Now sir, can you tell us -- when you say take a trip, can

8    you describe what happened?

9    A    Well, he informed me that I was supposed to take some

10   money to California, and somebody would meet me or pick me up

11   at the airport.  And then I would stay out there a couple of

12   days, and I would receive two large suitcases with 50 pounds

13   in each bag and fly back here to Charlotte and somebody would

14   pick me back up.

15   Q    What was in it for you?

16   A    $1,000.

17   Q    Who was gonna pay you?

18   A    He was supposed to.

19   Q    And when you say he, that's Mr. Coleman?

20   A    Yeah.

21   Q    So let me ask you, did you do only one trip?

22   A    I did up to 10 trips.

23   Q    And did each of the trips happen in the same way?

24   A    Primarily.  There was some trips where I didn't -- they

25   couldn't find somebody to -- to buy it -- to buy the weed

1    from, so I came back with nothing.  I just took money out

2    there.

3    Q    Okay.  Who were some of the people that you met when you

4    went out to California?

5    A    Mr. Milton Adams, Mark Dorsey, Poo, I don't know his real

6    name.  Esco, McKneely, Christopher McKneely.  Chucky.

7    Q    Do you know Chucky's real name?

8    A    I think it's Glenn, Glenn Carrera.

9    Q    When you were in California, did you see any vehicles

10   being used by the co-conspirators?

11              MR. BUTLER:  Objection.

12              THE COURT:  Overruled.

13              THE WITNESS:  Couple of cars.

14   Q    (Mr. Kaufman) What kind of cars?

15   A    Mr. Adams had a -- I know one time he had a Ferrari and a

16   Lambo.  Then they had like, a small Chrysler, SUV.  I don't

17   know what kind, what model or type.

18   Q    Did you ever see a white Porsche Cayenne SUV?

19   A    Yeah.

20   Q    When did you first see it?

21   A    Probably on my third or fourth trip.

22   Q    Who was using it?

23   A    Milton.

24   Q    When you were in California, did you ever see Mr. Coleman

25   there?

1    A    No.  He only -- it was only one time he came out there.

2    Q    When was that?  And when I say -- when you say there was

3    only one time he went out there, is that the only time you saw

4    him there, or that's the only time you're aware he went out

5    there at all, with you or without you?

6    A    That was the only time I was aware.

7    Q    What were the circumstances?

8    A    He came out there, I think it was for a party.  I'm not

9    sure.  But I know he was out there.  Cause I was out there at

10   the same time.  Oh, I think it was Turtle's birthday party.

11   Milton's party.

12   Q    It was his birthday party?

13   A    Yeah.

14   Q    Did you ever see that same Porsche Cayenne back in

15   Charlotte?

16   A    Yeah.

17   Q    How often?

18   A    They shipped it -- they shipped it back up here.  It

19   was -- Turtle bought it for him.  And he was to take --

20   Q    When you say bought it for him --

21             MR. BUTLER:  Objection.

22             THE WITNESS:  Mr. Coleman.

23             THE COURT:  Overruled.

24   Q    (Mr. Kaufman) And so, did you ever see -- how frequently

25   did Mr. Coleman use the Porsche?

1   A    Used it is all the time.

2   Q    Did you ever see -- well, let me ask you this, where were

3   you living during the course of the conspiracy?

4   A    I lived with him for -- up until April of 2010.

5   Q    Where were you living?  When you were living with him, is

6   it one place or did it change?

7   A    It was one place, Kensington Palace Lane.

8   Q    After April 2010 where did you live?

9   A    It's in the Ballantyne area, but I don't know the exact

10  street.

11  Q    Where you moved to was in Ballantyne?

12  A    Yeah, it was in the same area, about five minutes away

13  from his house.

14  Q    How long did you live with him at Kensington Palace?

15  A    From September 2009 after Labor Day, to April of 2010.

16  Q    Oh, and so, does your moving in with him coincide with

17  when you got involved in the drug conspiracy?

18  A    Yeah.

19  Q    Was that part of your payback, your involvement to

20  have --

21           MR. BUTLER:  Objection.

22           MR. KAUFMAN:  -- to stay with him.

23           THE COURT:  Sustained as to form.

24  Q    (Mr. Kaufman) Why did you move in with Mr. Coleman?

25  A    Well, at the time, I recently got laid off and I was

1   going through job troubles, so -- originally I was supposed to

2   just stay with him for a little while till I got on my feet.

3   But that's -- that's just how it happened.

4   Q    Did you ever see anybody other than Mr. Coleman driving

5   the Porsche or taking the keys and leaving with the Porsche?

6   A    Yeah, I drove it sometimes, Pepper, Stephanie Peppers

7   drove.  That's about all.  That's about it, I can remember.

8   Q    Did you ever see Mr. Coleman with any kind of firearms or

9   guns?

10  A    I knew he kept one upstairs in his room.

11  Q    How do you know that?

12  A    It was on the window sill.

13  Q    Did you personally see it?

14  A    Yeah.

15  Q    Was it there on one occasion or was it there more often?

16  A    It was there all the time.

17  Q    What kind of gun was it?

18  A    Small handgun.

19  Q    Do you know the difference between a semi-automatic and a

20  revolver?

21  A    No.  Well, revolver's thick, right?  It's got the thick

22  barrel or whatever?

23  Q    Well, the weapon that you saw was it basically --

24  A    I know it was a clip.  You had to put -- use the clip.  I

25  know that.

1   Q   Okay.  What color was it?

2   A   It was black.

3   Q   Did you see anybody else involved in the conspiracy at

4 any point with any kind of firearms or weapons?

5   A   Turtle, Milton Adams.

6   Q   And what were those circumstances?

7   A   Same thing.  Usually he had two of them.  He kept one in

8 his room, and he kept one downstairs.

9   Q   Like to show you what's already been admitted as

10 government's 22e.  Do you recognize this photo?

11   A   Yeah, that's Mark Hunt.

12   Q   And how do you know Mark, Mr. Hunt?

13   A   He would come to the house and do work from time to time.

14   Q   As a painter?

15   A   Yeah.

16   Q   Were you aware of whether he was involved in the

17 conspiracy?

18   A   I knew he took a couple of trips.

19   Q   Did you ever see Mr. Hunt with any kind of firearms?

20   A   Yeah.

21   Q   Tell us about that.

22   A   I know he had -- he came with a -- I don't know what type

23 of gun it is, but it had a banana clip.

24   Q   And was it a handgun?

25   A   It was a bigger gun, I guess.  I don't know, like, I say,

1   I don't know the type of gun.  I mean, I don't know the name

2   of the gun.

3   Q    And when you say he came, he came where?

4   A    He came to the house where we were staying at.

5   Q    That was Kensington Palace with Mr. Coleman?

6   A    Yeah.

7   Q    Was Mr. Coleman present?

8   A    Yeah.

9   Q    Tell us what happened when Mr. Hunt came over with the

10  firearm you're describing?

11  A    I know that he showed him the gun.  I know he didn't buy

12  it.  But I know he showed it to him to buy it, but he didn't

13  buy it.  I think he wanted something smaller.

14  Q    So when you say he didn't buy it, was there a

15  conversation between Mr. Coleman and Mr. Hunt?

16  A    Yeah.

17  Q    Can you tell us -- describe what that conversation was?

18  If you can remember any details or anything like that.

19           MR. BUTLER:  Objection.

20           THE COURT:  Overruled.

21           THE WITNESS:  I know he was looking at the gun, he

22  was saying nah, it's a little bit too big.

23  Q    (Mr. Kaufman) And Mr. Coleman said that?

24  A    Yeah.

25  Q    Okay.  If you could -- instead of saying he, if you could

1   use Mr. Hunt and Mr. Coleman, please.

2   A    Okay.  Sorry.  Yeah, Mr. Hunt -- Mr. Coleman was saying

3   the gun was a little bit too big.  And he told Mr. Hunt that

4   he wanted something, you know, a little bit smaller.

5   Q    And what did Mr. Hunt say to Mr. Coleman?

6            MR. BUTLER:  Object.

7            THE WITNESS:  He said that he would try to see what

8   he could get him.

9   Q    (Mr. Kaufman) Did Mr. Coleman respond to Mr. Hunt?

10  A    He said, that's fine.

11  Q    And Mr. Manigault, were you arrested on April 27th, 2011

12  in this federal investigation?

13  A    Yeah.

14  Q    And upon your arrest, did you provide a complete

15  confession to law enforcement?

16  A    Yeah.

17           MR. KAUFMAN:  No further questions.

18           THE COURT:  Any cross?

19           MR. BUTLER:  Yes, Your Honor.

20                    CROSS EXAMINATION

21  BY MR. BUTLER:

22  Q    Good afternoon, Mr. Manigault.

23  A    Good afternoon.

24  Q    Now Mr. Manigault, you indicated that you're testifying

25  because it's part of your plea agreement; is that right?

1   A     Yeah.

2   Q     Okay.  But now, it's not only part of your plea

3   agreement, but you, you gonna get -- you want to get a

4   benefit, don't you?

5   A     I mean, that's --

6   Q     I can't hear you.

7   A     Yeah.

8   Q     Okay.  And you want to get a time cut; isn't that right?

9   A     Yeah.  But I also -- I've been advised by my lawyer that

10  I applied for a safety valve.  I get under my mandatory

11  minimum.

12  Q     Okay.  But so -- so you don't care if you don't get a

13  time cut, is that what you're telling the jury?

14  A     I'm not saying that.

15  Q     Okay.  Cause you want a time cut, too, and the safety

16  valve; isn't that right?

17  A     If that's what I get, that's what I get.

18  Q     Well, you understand that you could possibly get that?

19  A     If I get it, I get it.

20  Q     Okay.  Now, how old are you, Mr. Manigault?

21  A     33.

22  Q     Now you made 10 trips; is that right?

23  A     Yes, sir.

24  Q     And so how much time would you say you spent with Milton

25  Adams?

1  A    It would depend on how quick they would get the weed.

2  Like, there was one incident when I stayed out there for,

3  like, two weeks.

4  Q    Was that the longest you stayed out there, two weeks?

5  A    A month.

6  Q    A month?

7  A    (Nodding head.)

8  Q    What month did you stay out there?

9  A    It was from December -- November to December or -- yeah,

10 November to December.  I know it was wintertime up here.

11 Q    And where did you stay for the month?  Where did you

12 live?

13 A    I stayed with Mr. Adams.

14 Q    And what were you doing for him out there?

15 A    When they -- when they would get the weed, they had a

16 room, and you would have to wrap it up and seal it in a -- put

17 it in a bag, in the suitcases.

18 Q    So for that month you weren't coming back to Charlotte.

19 You were just hanging out there with Mr. Adams?

20 A    That, yeah, until -- until they shipped me back.

21 Q    So you were out in California packing up marijuana for

22 Mr. Adams?

23 A    I wasn't the only one.

24 Q    Okay.  But you -- that's what you were doing?

25 A    Yeah.

1  Q    And you were doing it every day?

2  A    No, not every day.

3  Q    Okay.  Well, how often were you doing it?

4  A    It would depend.  When they would send a person down

5  there, when they would send one back.  So they would send --

6  they started off sending one person a week, and then changed

7  it to two.

8  Q    So it would have been as many as four people or eight

9  people; is that right?

10 A    Yeah.  Yeah.

11 Q    Now you know Jason Banks, don't you?

12 A    Yeah, I know Jason Banks.

13 Q    Okay.  Well, how long have you known him?

14 A    I met him probably about a year.  I would say a year.

15 Q    And you flew out with Banks from time to time; is that

16 right?

17 A    I did that one time.

18 Q    One time?

19      But now you had indicated to the agents that Mr. Banks

20 wasn't a part of this conspiracy at one point, didn't you?

21 A    I don't recall that.  I said I flew out with him.  And he

22 I was supposed to, you know, help him go along with it.  I

23 mean, you know, guide him through it.  And I didn't know

24 whether or not he came back with nothing.  I know he took

25 money out there.  But as far as the bringing something back, I

1   don't know nothing about that.

2   Q    Now, well, did you see Jason Banks drive the Porsche

3   before?

4   A    Yeah.

5   Q    I'm sorry.

6   A    Yeah.

7   Q    And Jerry Davis, he drove it too, didn't he?

8   A    I never saw him drove it.  He had his own car.

9   Q    What about Shaunda McAdoo, did you know her?

10  A    Yeah, I know her.  I never saw her drive the Porsche.

11  Q    So the only people that you knew that drove it, other

12  than Mr. Coleman, was Stephanie Peppers, Jason Banks and you?

13  A    Yes, sir.

14  Q    And now did you go to -- when you were out in California

15  with Turtle, did you live in the big house or did you live in

16  the house in Carson City?

17  A    I stayed at both residences.  At first I was at a hotel.

18  They wouldn't let you come to his house.  Until, I guess, he

19  got comfortable with knowing you.

20  Q    So you started out in a hotel?  Then you went to the big

21  mansion-type house?

22  A    Yeah.

23  Q    And then you went to the second house in Carson City?

24  A    Yeah, that's when I stayed out there for like two weeks.

25  When they was trying to find, I guess whoever they were

1   supposed to buy the weed from.  I guess they weren't ready or

2   whatever, so.  That's when they took me out the hotel and put

3   me in the house.

4   Q    Did you know that Turtle was buying the weed from a

5   Mexican?

6   A    Yes, sir.

7   Q    Did you meet his source, the Mexican?

8   A    I saw him.

9   Q    Okay.  Where were you when you saw him?

10  A    I was with Mr. Adams in California.

11  Q    Were you at his house or at some other location?

12  A    No, I think it was at his -- it wouldn't always be the

13  same place.  Sometimes it be at his daddy's house.  Sometimes

14  they would meet someplace else.

15  Q    Now, how well did you know Jerry Davis?

16  A    I didn't know him that well at all.  That's Mr. Coleman's

17  friend.

18  Q    And did you know Nastasha Rodriguez?

19  A    I knew of her, that was his friend.

20  Q    How many times did you see her out in California?

21  A    I saw her once.

22  Q    And you knew Ms. Stephanie Peppers; is that right?

23  A    Yes.

24  Q    How many times did you see her in California?

25  A    One time.

1    Q    And did you ever go to Ms. Peppers' house here in

2    Charlotte?

3    A    Yes.

4    Q    She had two houses too, didn't she?

5    A    Yes.

6    Q    Did you go to both her houses?

7    A    I was staying at the house.

8    Q    You were staying at her house?

9    A    Yeah.  Kensington Palace Lane was in her name.

10   Q    You went to the house over on Nantucket?

11   A    Yeah, yes, sir.

12            MR. BUTLER:  If I can have a moment, Your Honor.

13            THE COURT:  You may.

14   Q    So you indicated earlier to the ladies and gentlemen of

15   the jury that you moved from Kensington Palace to another

16   house or apartment in Ballantyne; is that right?

17   A    Yes, sir.

18   Q    And did Ms. Peppers rent -- lease that house for you?

19   A    Yes, sir.

20   Q    Now when you were in California you, you essentially

21   worked for Turtle, weren't you?

22   A    I was working for both of them.  They work together.

23   Q    Okay.  But you -- but now you were in California --

24   A    Yeah.

25   Q    -- right?

1      And Mr. Coleman wasn't in California, was he?

2   A   No.

3   Q   I thought you said you saw him one time at this party?

4   A   Yeah.  He was there during that time, yeah.

5   Q   Now this party was a big party, wasn't it?

6   A   It was a what?

7   Q   A big, a large party?

8   A   Yes, sir.

9   Q   About a couple thousand people?

10  A   No, not a thousand people.

11  Q   How many were there, approximately?

12  A   It was at a small venue.  Probably was over-capacitated

13  probably was about 200 -- 300 people.

14  Q   Okay.  Now, while you were out there, I mean, was Turtle

15  giving you money?

16  A   No.

17  Q   So he was just feeding you and letting you sleep there --

18  A   Yeah.

19  Q   -- is that what you're telling the jury?

20  A   Yes, sir.

21  Q   So when things dried up, so to speak, there was no

22  marijuana, you just stayed and just did nothing until the

23  drought was over?

24  A   Well, when they find it, they sent me back out here.

25  Q   So did you ever go over to Jerry Davis' house?

1    A    One time.

2    Q    Why did you go over there?

3    A    I was with Mr. Coleman.

4    Q    Okay.  Where did Mr. Davis live, do you remember?

5    A    Well, I know he stayed -- he stayed at two places.  I

6    know he had an apartment.  And then I think the other place

7    was his mama's house.

8    Q    So he had two houses, too?

9    A    I don't know he owned the other one.  But I know he had

10   an apartment that was in his name.

11   Q    Okay.  And which did you go to, the apartment or the

12   house where his mother lived?

13   A    Well, actually, we went to both.

14   Q    Okay.  Mother's house a big house, wasn't it?

15   A    Yeah.

16   Q    In Mint Hill?

17   A    I believe.  I just know it's a big house.

18   Q    Okay.  So when you met the Mexican source of marijuana,

19   that was at Turtle and you; is that right?

20   A    Me and Turtle, sometimes -- I don't know his real name, I

21   know his name is Poo.

22   Q    Poo?

23   A    Yeah.

24   Q    Big guy?

25   A    Yeah.

1  Q    Now you sold marijuana yourself, didn't you?

2  A    No, sir.

3  Q    I'm sorry?

4  A    I mean, how do you mean by sold it?

5  Q    What do I mean by --

6  A    Yeah.

7  Q    -- selling it?  I mean, you know, sell ounces or half

8  ounce or quarter?

9  A    I mean, I knew some people who needed some and they came

10  up to buy.

11  Q    Okay.  And you sold it to them --

12  A    Yeah.

13  Q    -- right?

14  A    Yeah.

15  Q    Sir?

16  A    Yeah.

17  Q    Okay.  So you were selling it here to people that you

18  knew; is that right?

19  A    No, sir.  They was from Charleston.

20  Q    I'm sorry?

21  A    They were from Charleston.

22  Q    Charleston?

23  A    Yeah.

24  Q    Charleston, South Carolina?

25  A    Yeah.

1   Q    Did you go down there to take it to them or would they

2   come up here to get it?

3   A    Two occasions they came up here.  And one time I went out

4   there.

5   Q    Okay.  How much were you selling it for?

6   A    It was 675 I think.

7   Q    For how much?

8   A    For a pound.

9   Q    Oh, so you sold a pound?

10  A    Yeah.

11  Q    Okay.

12       MR. BUTLER:  Thank you, sir.  I have no further

13  questions.

14       THE COURT:  Any redirect?

15       MR. KAUFMAN:  Yes, Your Honor.

16                    REDIRECT EXAMINATION

17  BY MR. KAUFMAN:

18  Q    Mr. Manigault, the marijuana that you just described

19  selling, where did you get it?

20  A    I got it from Mr. Coleman.

21  Q    And were you buying it from Mr. Coleman?  Describe the

22  business transaction how it worked?

23  A    Well, at first, when, you know, I was trying -- when

24  things weren't going that well, I let him know that I knew

25  some people in Charleston that, you know, might want to buy

 1   some from him.  So he said that -- I asked him, well, how much

 2   would it be if I arranged a deal.  And he said, I would get

 3   $2,000 out of it.  So that was the first instance.  And then

 4   there was some other people that I knew about.  And they kept

 5   on coming up, they would buy 25 and 10 pounds.

 6   Q    Sir, are you familiar with the terms "brokering" and

 7   "fronting"?

 8   A    Yeah.

 9   Q    What does the term "brokering" mean?

10   A    Well, I'm familiar with the term "fronting".  I don't

11   know "broker".

12   Q    Okay.  Well, what does "fronting" mean?

13   A    "Fronting" means when somebody gives you something on

14   face value or for free, and you pay them back later.

15   Q    And so does that describe your relationship between

16   Mr. Coleman and then the people in South Carolina?

17   A    Yeah, at first, yeah.  Yes, sir.

18   Q    Okay.  So at first.

19   A    Yeah.

20   Q    So basically he was essentially selling you, but giving

21   you the drugs up front before payment, and then you were

22   selling to your own customers in South Carolina; is that

23   accurate?

24   A    Well, at first they weren't my customers.  See, they were

25   there was arrangement where it was about -- it was me, Mark

1   Dorsey, Poo, and Christopher McKneely, and the arrangement

2   was -- cause, I guess they got tired of us complaining that

3   they would give us 2 pounds each, and then that would help us

4   start out to get money.

5   Q    Now --

6   A    So that's how --

7   Q    Sorry.

8   A    Go ahead.

9   Q    Do you know who Mr. Coleman's redistributors were?

10  A    I know, just Turtle.  Milton, Milton Adams.

11  Q    I'm sorry.  Not his source of supply.  But the people

12  then redistributing the drugs that Mr. Coleman received from

13  California?

14  A    Jerry Davis.  I mean there's another person, but I don't

15  know his name.  And Rico, Rico Grier.

16  Q    Do you recognize 22q?

17  A    Yeah.  That's Rico Grier.

18  Q    Are you familiar with the name or nickname BJ?

19  A    Yeah.

20  Q    Who is BJ?

21  A    That's somebody used to go to when somebody came here

22  from California -- I mean, California to North Carolina.  I

23  don't know what part of Charlotte it is, but it was some house

24  apartments we would go to and he would sell it to him or

25  whoever.

1   Q    He would sell it to him?  Who would sell it to whom?

2   A    Mr. Coleman or Ms. Peppers would drop it off.

3   Q    Now you mentioned earlier that Kensington Palace was in

4   Ms. Peppers' name.  Did she actually ever live there?

5   A    No.

6   Q    And you also mentioned Nantucket.  Did she ever live

7   there?

8   A    Yes.

9   Q    So was that her real house?

10  A    Yeah, that's where she stayed at.

11  Q    Now, when you were -- you discussed with the defense

12  lawyer about how you were working in California under Turtle's

13  supervision.  When you were in Charlotte, who were you working

14  for?

15  A    Mr. Coleman.

16  Q    And there been some questions about Mr. Coleman and

17  Turtle.  What was, to your understanding, what was their

18  relative business relationship?

19  A    He was basically number one, and he was number two.

20  Mr. Adams was number one and he was number two, Mr. Coleman

21  was.

22  Q    Where did Jerry Davis and Stephanie Peppers fall within

23  the relationship?

24  A    Mr. Davis was his best friend, and Ms. Peppers was the

25  one he was messing with.  I know he told me -- he told me she

1    helped him get on.

2    Q    I believe -- and correct me if I'm wrong, but you used

3    the term that Ms. Peppers helped Mr. Coleman get on?

4    A    Yeah, she helped him initially get his first, I guess,

5    package, if you want to call it.

6    Q    How did she help him?

7              MR. BUTLER:  Objection.

8              THE COURT:  Only if you know.

9              THE WITNESS:  She gave -- well, I don't know the

10   specific amount of money --

11             MR. BUTLER:  Objection.

12             THE WITNESS:  -- but I know --

13             THE COURT:  Overruled.

14             THE WITNESS:  -- I know she gave him money.

15   Q    (Mr. Kaufman) How do you know that?

16   A    He told me that.

17   Q    When you say "he," who told you?

18   A    Mr. Coleman.

19             MR. BUTLER:  Objection.  Move to strike, Your Honor.

20             THE COURT:  Overruled.

21   Q    (Mr. Kaufman) Mr. Manigault, you said that after April of

22   2010 you moved out of Kensington Palace into another location

23   that was in Ms. Peppers' name; is that correct?

24   A    Yeah.

25   Q    Did she ever live there?

1    A    No.

2    Q    Do you know why she put that residence in her name and

3    you lived there?

4    A    That was supposed to be another spot for the packages to

5    come in at so the people -- they could pick it up and take it

6    to wherever it needed to go.

7    Q    Did you ever talk to Mr. Coleman about that new

8    residence?

9    A    Yeah.  We agreed -- we agreed that I was supposed to live

10   there.

11   Q    So it was Mr. Coleman who organized that to happen?

12            MR. BUTLER:  Objection.

13            THE COURT:  Sustained as to leading.

14            THE WITNESS:  Yes.

15            THE COURT:  No.  The jury should disregard that

16   answer.

17   Q    (Mr. Kaufman) Who was it that organized that whole setup

18   in the residence after April 2010?

19            MR. BUTLER:  Objection.

20            THE COURT:  Overruled.

21            THE WITNESS:  Mr. Coleman talked to me and he said

22   that he wanted me to move there.  And I said I didn't have no

23   problem with it.

24            MR. KAUFMAN:  No further questions, Your Honor.

25            THE COURT:  Any recross?

1       MR. BUTLER:  Just briefly, Your Honor.

2                   RECROSS EXAMINATION

3   BY MR. BUTLER:

4   Q    Mr. Manigault, you didn't -- this situation about you

5   saying that Ms. Peppers helped Mr. Coleman get on was not in

6   your interviews with the government, is it?

7   A    I don't -- I don't recall.

8   Q    Okay.  And this -- about your place being a spot, that's

9   not in the interview either, is it?

10  A    I don't think so.

11  Q    And now you indicated that you were getting 2 pounds.  It

12  was you, Dorsey, Poo and Christopher McKneely --

13  A    Yeah.

14  Q    -- the guy from California; is that right?

15  A    Yeah.

16  Q    All right.  And how much were you getting it for?

17  A    The price that they was getting it for, Mr. Coleman and

18  Mr. Adams, was $300.

19  Q    I'm talking about you?

20  A    Me?

21  Q    How much were you getting it for?

22  A    How much was I getting it for?

23  Q    Yes.

24  A    Well, they fronted us the first.

25  Q    I can't hear you.

1   A    They fronted us the first couple -- couple of pounds.

2   Q    Well, do you know how much Dorsey, Poo and McKneely were

3   getting it for?

4   A    I know -- oh, okay.  The money, when I said about that

5   transaction, I put $2,000 towards that, and the rest they

6   covered.  Whatever we put -- we each put half the money and

7   they covered the rest.

8   Q    So you're saying that Poo, McKneely and Dorsey covered

9   the rest?

10  A    No, Mr. Adams and Mr. Coleman.

11  Q    But I thought you just said that you were getting pounds

12  for 350 to $400?

13  A    That's what they was getting it for.  We didn't buy -- I

14  mean, we wasn't buying from the Mexican.  They gave it -- they

15  gave it to us.  They fronted us.  That's what they was getting

16  it for.

17  Q    Well, but -- and you were -- and you were paying $2,000

18  for it?

19  A    Think back.  Yes, sir.

20          MR. BUTLER:  No further questions.

21          MR. KAUFMAN:  Just two quick areas, Your Honor.

22          THE COURT:  Very brief.

23          MR. KAUFMAN:  Thank you, Your Honor.

24                  FURTHER REDIRECT EXAMINATION

25  BY MR. KAUFMAN:

1  Q    Mr. Manigault, you were asked about whether you told law

2  enforcement about Ms. Peppers providing money to Mr. Coleman

3  start his business.  Would it refresh your recollection if you

4  saw a report of interview --

5  A    Yeah.

6  Q    -- that you had?

7  A    Yeah.

8  Q    I have what has been marked as Government's Exhibit 66

9  for identification.  It's been previously provided to defense

10 in discovery.

11        THE COURT:  He didn't say he didn't remember.  He

12 didn't say he didn't know.  I'm not going to let you go there.

13 Q    And Mr. Manigault, when you earlier testified about

14 $2,000, were you talking about how much you were selling per

15 pound, or were you talking about how much you were making for

16 brokering the deal?

17 A    Brokering the deal.

18        MR. KAUFMAN:  Nothing further, Your Honor.

19        THE COURT:  All right.  You may step down.

20        Members of the Jury, we're going to break for the

21 evening.  Again, don't talk about the case.  You've heard a

22 lot of evidence but you haven't heard all the evidence.

23 Haven't heard the instructions of the Court.  So keep an open

24 mind until the end of the case.  Don't talk about the case in

25 any way.  Don't do any research, and we will see you at 9:30

1    in the morning.  We'll start promptly at 9:30.

2              (The jury was escorted from the courtroom at 6:06

3    p.m.)

4              THE COURT:  Mr. Kaufman, can you give me a forecast

5    where you're at and where you anticipate going?

6              MR. KAUFMAN:  I believe we have three or four

7    cooperating witnesses.  All but Ms. Peppers should be

8    relatively brief, at least from the government's side.  Should

9    be very brief.  Even Ms. Peppers shouldn't be overly lengthy,

10   but I imagine the defense might have quite a bit of cross.

11   And then after that it's just Agent MacDonald for certain bank

12   records and other kind of final pieces of evidence.

13             THE COURT:  All right.  I think what we're going to

14   do is, I'm going to pass out proposed instructions tonight to

15   the attorneys and schedule a charge conference in the morning

16   at 8:30.

17             MR. BUTLER:  If Your Honor, please.

18             THE COURT:  Yes.

19             MR. BUTLER:  I have a situation with my daughter.  I

20   have to take her to -- she goes to a special center, and I

21   need to get her there -- I can't get her there until about

22   8:45.

23             THE COURT:  All right.  Well then we'll meet at

24   9:00.

25             MR. BUTLER:  That be fine.  Thank you, so much.

1     THE COURT:  Meet at 9:00.  I'm thinking probably

2  grand jury room, if that's not available then we'll meet here

3  in the courtroom.  So review the proposed instructions

4  tonight.  We'll have a charge conference in the morning at

5  9:00 and then we'll see where we're at.

6     MR. KAUFMAN:  Yes, Your Honor.  Thank you.

7     THE COURT:  All right.  We'll break for the evening

8  and I'll see the attorneys at 9:00 tomorrow morning.

9     (The Court was in recess for the day at 6:08 p.m.)

10               *  *  *  *  *  *