1                    UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                        CHARLOTTE DIVISION

3
UNITED STATES OF AMERICA,      )  DOCKET NO. 3:10-cr-238
4                              )
            Plaintiff,         )
5                              )
            vs.                )  VOLUME III of IV
6                              )
PARKER ANTRON COLEMAN,         )
7                              )
            Defendant.         )
8  _____)

9
                TRANSCRIPT OF TRIAL PROCEEDINGS
10          BEFORE THE HONORABLE ROBERT J. CONRAD, JR
              UNITED STATES DISTRICT COURT JUDGE
11                     AUGUST 15, 2012

12

13

14  APPEARANCES:

15  On Behalf of the Government:

16          STEVEN R. KAUFMAN, ESQ.,
            Assistant United States Attorney
17          227 West Trade Street, Suite 1700
            Charlotte, North Carolina 28202
18

19
    On Behalf of the Defendant:
20
            NORMAN BUTLER, ESQ.,
21          725 E. Trade Street
            Suite 115 Court Arcade Building
22          Charlotte, North Carolina 28202

23

24              LAURA ANDERSEN, RMR
              Official Court Reporter
25          United States District Court
              Charlotte, North Carolina

1

<u>I N D E X</u>

2

AUGUST 15, 2012; VOLUME III of IV

3

GOVERNMENT WITNESSES:                              <u>PAGE</u>

4

STEPHANIE PEPPERS
   Direct Examination By Mr. Kaufman          475
5   Cross Examination By Mr. Butler            533
   Redirect Examination By Mr. Kaufman        559

6

MARK HUNT
7   Direct Examination By Mr. Kaufman          566
   Cross Examination By Mr. Butler            578
8   Redirect Examination By Mr. Kaufman        586

9

WILLIAM PIERCE
   Direct Examination By Mr. Kaufman          590
10  Cross Examination By Mr. Butler            599
   Redirect Examination By Mr. Kaufman        605

11

GLEN MacDONALD
12  Direct Examination By Mr. Kaufman          606
   Cross Examination By Mr. Butler            649
13  Redirect Examination By Mr. Kaufman        669

14                    *  *  *  *  *  *

Charge conference                                 460
15 Government rests                                 677
Defendant rests                                   683
16 Defendant Rule 29 Motion                        680

17                    *  *  *  *  *  *

18

19

20

21

22

23

24

25

1                          E X H I B I T S

GOVERNMENT EXHIBITS:

2    NUMBER                                                    ADMITTED
     9b..............................................611
3    9w ............................................611
     12b ...........................................612
4    21 ............................................649
     21a ...........................................649
5    30a ...........................................621
     30b ...........................................628
6    30c ...........................................627
     30f ...........................................619
7    31a ...........................................622
     31b ...........................................623
8    34 ............................................615
     35 ............................................630
9    39 ............................................569
     44 ............................................517
10   47 ............................................614
     49a ...........................................631
11   49b ...........................................634
     49c ...........................................632
12   50b ...........................................635
     58a ...........................................637
13   58b ...........................................637
     58c ...........................................637
14   59 ............................................640

15                      *   *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

3              (Defendant Parker Antron Coleman is not present.)

4              THE COURT:  You reminded me it's been five years

5    since we tried a case together.

6              MR. BUTLER:  Been a long time.

7              THE COURT:  I haven't changed, in terms of the

8    approach to instructions.  I like to give the general

9    instructions before you argue, and then the offense specific

10   instructions afterwards.  And so they're broken up in the

11   proposed instructions.

12             I don't know that we need all of the general

13   instructions.  Some of it I've given before, punishment, use

14   of notes, questions not evidence, duty to object, I've given

15   that all before.  And so if you were in agreement that I don't

16   have to give it again, I wouldn't.  But if either one of you

17   wanted those instructions, 28, I guess, through 31, I'd give

18   them again.

19             MR. BUTLER:  Well, Your Honor, in a case like this,

20   and a client like I have, I think it probably be in his best

21   interest or my best interest.

22             THE COURT:  To give it all?

23             MR. BUTLER:  Yes, sir.

24             THE COURT:  Anything in the first 31 pages that

25   ought to come out or changed in any way?

1      Steve, I think you had sent some things.

2           MR. KAUFMAN:  Yes, Your Honor.  I'll address the

3      things I sent already.  On page 15, confession statement

4      voluntary.

5           THE COURT:  Take that out.

6           MR. KAUFMAN:  Yes, Your Honor.  Page 20.

7           THE COURT:  You agree, Norman?

8           MR. BUTLER:  Yes, Your Honor.

9           MR. KAUFMAN:  Page 20, credibility of witness, prior

10     conviction.  I don't believe any of the witnesses so far have

11     prior felonies.  I don't believe any that are going to be

12     called.

13          THE COURT:  Okay.

14          MR. KAUFMAN:  At least to my understanding.  So

15     assuming that's the case for upcoming witnesses, we would ask

16     that credibility of witness prior conviction on page 20 be

17     removed.

18          THE COURT:  Okay.

19          MR. KAUFMAN:  On the next page 21, there's a bit of

20     redundancy, if you will, and it seems to me that starting from

21     the second sentence, an accomplice did not become, through the

22     end of that paragraph, and maybe even a touch more

23     amplification in the second paragraph.

24          So if we went from the first sentence, paragraph

25     one, then started in the second paragraph, capitalizing

1   alleged accomplices, we would ask that to be the instruction.

2          THE COURT:  I've looked at that.  That makes sense.

3   Do you have any objection to that?

4          MR. BUTLER:  I'm not sure if I'm following you.

5          THE COURT:  Taking out the second -- leaving in the

6   first sentence of the first paragraph, but taking everything

7   out and then starting -- going from the first sentence first

8   paragraph to the second paragraph.

9          So just the first sentence and then -- and then the

10   second paragraph.

11          MR. BUTLER:  Well, Your Honor, I kind of like the

12   last sentence.  The jury should, however, keep in mind such

13   testimony to be received with caution and considered with

14   great care.

15          THE COURT:  In the second paragraph, however, the

16   jury should keep in mind such testimony is to be received with

17   caution and weighed with great care.  So I don't need to say

18   it twice.

19          MR. BUTLER:  All right.  I don't have an objection

20   to that.

21          THE COURT:  I think it's helpful.  I'll take that

22   second part of the first paragraph out.

23          Now 27, plural, becomes singular.

24          MR. KAUFMAN:  Yes, Your Honor.  It appears on the

25   first line between convicted of, and then certain, should be

1    an a, line two, felonies should be felony.  "These convictions

2    have", should become "this conviction".

3            THE COURT:  Right.  We'll take the plural and make

4    it singular.

5            MR. BUTLER:  What page are we?

6            THE COURT:  Twenty-seven talks about felonies and --

7            MR. BUTLER:  All right.

8            THE COURT:  The only felony in evidence is the

9    Mississippi conviction.

10           MR. BUTLER:  Right.

11           THE COURT:  So --

12           MR. KAUFMAN:  The only other thing I was noticing

13   when I was looking through -- and first of all I think it's

14   helpful for the government, but in fairness to the defense,

15   I'm just not sure if this is accurate under case law.  I'm

16   just going by the language of 404(b) on page 7.

17           THE COURT:  That's one of the things I was gonna

18   suggest or mention to you.  I'm taking out the last or

19   provision of 404(b) and I'm going to insert -- we're on page 6

20   and 7.  I'm going to insert the things that the jury can

21   consider, the Mississippi conviction for, I'm going to insert,

22   whether the defendant was a convicted felon at the time of the

23   acts charged in the indictment.  And then the state of mind

24   kind of things.  But excluding participant on page 7.

25           MR. KAUFMAN:  Actually, Your Honor, I don't know if

1  the inclusion is necessary in light of the stipulation by the

2  defense.   The *Old Chief* which states that at the time of the

3  offense he was a convicted felon not having had his

4  conviction --

5           THE COURT:  So you don't want it in?

6           MR. KAUFMAN:  May I hear what the language was one

7  more time?

8           THE COURT:  Whether the defendant was a convicted

9  felon at the time of the acts charged in the indictment.

10           MR. KAUFMAN:  I would ask that it be taken out in

11  light of the stipulation.

12           THE COURT:  All right.

13           MR. BUTLER:  That's on page what now?

14           THE COURT:  Six and seven.  It was something I was

15  going to add to, not there at the moment.  But I'm going to

16  take out this provision on page 7 that says, whether the

17  defendant was a participant in a conspiracy to distribute or

18  possess with intent to distribute marijuana.

19           MR. KAUFMAN:  In addition to thinking about that

20  this morning on page 7, there was one other issue that had

21  come up during the trial.  There were several times in

22  cross-examination that Mr. Butler seemed to impugn the

23  probable cause for the search warrant and for various searches

24  that law enforcement took.  I would ask for -- and I haven't

25  typed out specific language, and I can certainly do that in

1  the break between now and start of trial.  But I would ask

2  that the Court instruct that the evidence that's been admitted

3  is lawfully before them.

4        My concern is that without that, and I've had this

5  issue come up in trials before, the concern is that they may

6  come to the conclusion, based on the cross-examination by the

7  defense, that the search was improper and it was illegally

8  seized.

9        THE COURT:  I don't think there's been sufficient

10  questioning to warrant that instruction so I'll decline to do

11  that.

12        Anything else on the general instructions?

13        MR. KAUFMAN:  That's all I have for all of it, Your

14  Honor.

15        THE COURT:  All right.  The specific instructions,

16  the only thing I had in mind from my end in rereading them

17  this morning, was on page 26 when we're talking about money

18  laundering and defining specified unlawful activity.  I define

19  it to include manufacture, importation, sale or distribution

20  of a controlled substance.  I'm deliberating on adding

21  possession with intent to distribute or conspiracy to possess

22  with intent to distribute a controlled substance.  Any

23  objection to that?

24        MR. KAUFMAN:  No, Your Honor.

25        MR. BUTLER:  You're on the substantive instructions,

1  right?

2          THE COURT:  Yes.

3          MR. BUTLER:  This is page what?

4          THE COURT:  Twenty-six of the substantive

5  instructions.

6          MR. KAUFMAN:  And Your Honor, I'm wondering when it

7  says, manufacture, importation, sale, possession with intent

8  to distribute or distribution comma, or conspiracy to do any

9  of those acts.  So the conspiracy can encompass all of those.

10          THE COURT:  All right.

11          MR. KAUFMAN:  Thank you, Your Honor.

12          THE COURT:  Any objection, Norman?

13          So we're just defining specified unlawful activity

14  to include manufacture, importation, sale, distribution, or

15  possession, those that were mentioned before, or conspiracy

16  to -- distribution, or possession with intent to distribute a

17  controlled substance, or conspiracy to perform any of those

18  acts in violation of federal law.

19          MR. BUTLER:  Well, Your Honor, yeah.  I would object

20  to that.  Cause I think it talks about the conspiracy down in

21  the last paragraph.

22          THE COURT:  Right.  But the definitional section is,

23  I mean, I think that defines legally specified unlawful

24  activity, and so notwithstanding the objection, I think I'll

25  include that language.

1          Are there any other recommendations for changes,

2   additions, deletions in the substantive instructions?

3          MR. BUTLER:  Well, Your Honor, I have a concern

4   about -- the jury don't get a copy of the instructions, right?

5          THE COURT:  Just the substantive ones, yes.

6          MR. BUTLER:  All right.  Well on page 27 it says

7   Parker, kind of a typo in his name.  And also known as KP.

8          THE COURT:  You want me to take the also knowns out?

9          MR. BUTLER:  Yes, Your Honor.

10          THE COURT:  I'll do that.  Anywhere also known

11   appears, I'll delete that.

12          MR. BUTLER:  Thank you.

13          MR. KAUFMAN:  Will that apply to the indictment?

14          THE COURT:  I think so.  There's actually been

15   testimony that P, and PC.  I don't know that I've heard any

16   KP.

17          MR. KAUFMAN:  I have no objection to modification,

18   Your Honor.

19          THE COURT:  I think PNC too, or maybe it was P and

20   C, I'm not sure.  Any other suggested changes?

21          MR. BUTLER:  Well, Your Honor, on page 10 with

22   intent to distribute, third paragraph talks about, in

23   determining a person's intent to distribute.  It talks about

24   the purity of the controlled substance.  We would object to

25   that.

1        THE COURT: As not being supported by the evidence?

2        MR. BUTLER: Yes, Your Honor.

3        THE COURT: Was there any -- well, I guess there is

4 testimony between the grades, right.

5        MR. KAUFMAN: Yes, Your Honor. So, I mean, if there

6 were to be a modification, it could be the grade of the

7 controlled substance. Although, actually --

8        THE COURT: You know, I don't think there was any

9 evidence of purity. I don't think there was any differential

10 evidence between the grades. In other words, they weren't

11 smoking one type of grade and selling the other.

12        MR. KAUFMAN: No, Your Honor. The only thing I

13 could think of, I can't remember if it was Officer Newman

14 or -- I think it was Officer Newman who was talking about the

15 smell. How the high-grade marijuana had even more pungent

16 smell. You can't avoid smelling that over the regular grade.

17        THE COURT: I'm going to take -- so you're objecting

18 just to that phrase, "the purity of the controlled substance"?

19        MR. BUTLER: Yes, Your Honor.

20        THE COURT: I'm going to take it out. Anything else

21 from either side?

22        MR. KAUFMAN: No, Your Honor.

23        MR. BUTLER: No, Your Honor. But we would be asking

24 for an instruction on single and multiple conspiracies.

25 Because I think the evidence shows there are a lot of people

involved and Manigault testified about him and Esco, Davon
Harris and Poo getting their own and doing their own thing.
That's when the $2,000 issue came up.

THE COURT:  I'll give a single versus multiple
conspiracy instruction.  I think there's enough evidence in
terms of numbers of people participating at different times
that it's warranted.  So the government objects?

MR. KAUFMAN:  I do, Your Honor.  I believe that it's
been clear that, so far -- and will be only strengthened that
Parker Coleman has been part of this ongoing conspiracy with
the single source of supply being Milton Adams out in
California.  All these couriers follow the same pattern of
practice, and were involved with the same co-conspirators in
terms of people who were dropping them off at the airport in
Charlotte, who was picking them up and dropping them off in
California.

THE COURT:  I think that's a good jury argument for
finding a single conspiracy, but I'm going to give the
instruction.

MR. BUTLER:  Thank you.

THE COURT:  All right.  How much time do you all
need to argue?

MR. BUTLER:  With a case like this?

THE COURT:  Half hour.

MR. BUTLER:  I don't think there's enough time.

1        No, seriously, Your Honor.  Half hour, Judge?  At

2   least an hour, Your Honor.

3        THE COURT:  An hour.  I can't give you an hour.  Do

4   you need a half hour?

5        MR. KAUFMAN:  I'll do whatever time Mr. Butler

6   needs.  But I think that an hour is certainly more than is

7   necessary.

8        THE COURT:  I'm got giving an hour.  I'm probably

9   not going to give more than a half hour.

10       MR. BUTLER:  But, Your Honor, my client's going to

11  get all this time, I need to be able to tell the jury a few

12  things.

13       THE COURT:  Sure.

14       MR. BUTLER:  A lot of things.

15       THE COURT:  Why would you need more than a half

16  hour?

17       MR. BUTLER:  Because I can't -- I can't explain the

18  situation in a half.

19       THE COURT:  I'm going to give each side a half hour.

20       MR. BUTLER:  I'll object, Your Honor.

21       THE COURT:  Sure.

22       MR. KAUFMAN:  Your Honor, I don't know exactly how

23  long my opening -- the initial closing will take -- I'll just

24  ask whatever I haven't used, the remainder be reserved.

25       THE COURT:  Sure.  Do either one of you want any

1  time warning when you're running out of time?

2         MR. KAUFMAN:  If I could have a five-minute warning,

3  Your Honor.

4         MR. BUTLER:  I'd like a 10-minute warning, Your

5  Honor.

6         THE COURT:  After 20?

7         MR. BUTLER:  Yes.

8         THE COURT:  All right.  All righty.  So anything

9  else about the charge that would -- we looked at the verdict

10  form.  Is there any objection to it?

11         MR. KAUFMAN:  It looks fine.  I don't know if just

12  for consistency we wanted Mr. Coleman's middle name in there.

13  It's a minor.

14         MR. BUTLER:  I don't have an objection to that.  It

15  doesn't matter to me.

16         THE COURT:  All right.  All right.  Then the only

17  thing we need to do before we start up, as close to 9:30 as

18  possible, is, I want you to go into court and run through what

19  we have as admitted into evidence at this point to make sure

20  that we're on the same page that you all and the court have

21  the same understanding of what's in, what's not in.  If

22  there's any issues with that, we'll take it up before the jury

23  comes.

24         MR. BUTLER:  And, Your Honor, I would ask, I know

25  that Mr. Kaufman has used the electronic device to show a lot

1    of the evidence that has been admitted, but I'd like to be

2    able to use it -- some of the evidence, if not all of it in my

3    closing.  So I don't know if you have paper copies or not.

4            MR. KAUFMAN:  I provided you with discovery in

5    general and also a disk with the specific exhibits the same.

6            THE COURT:  But are there some recordings and stuff?

7            MR. BUTLER:  No, I'm not interested in the

8    recordings.  I mean the -- I'm interested in things like those

9    Orbitz records, photographs, those types of things.

10           MR. KAUFMAN:  Well, I have the physical documents

11   obviously.  I'm not going to be able to run the computer

12   during your --

13           THE COURT:  Why don't you do this, come up with a

14   list of what you think you need, maybe your agent can be

15   compiling the hard copies of those things while things are

16   going on?

17           MR. KAUFMAN:  Yes, Your Honor.

18           MR. BUTLER:  All right.

19           THE COURT:  There is a forfeiture provision in the

20   indictment, and procedurally the rules require -- I hate to do

21   this because before the jury renders a liability verdict, I

22   need to know whether the defendant -- if there is a guilty

23   verdict, wants to proceed with the forfeiture trial before the

24   jury or whether he waives it and will deal with that at

25   sentencing.  He needs to tell me that before the jury begins

1   its deliberations according to Rule 32.

2              MR. BUTLER:  You talking about the money that --

3              THE COURT:  Yeah.  That's a -- yeah.

4              MR. KAUFMAN:  Money, firearms, the cars.

5              THE COURT:  And, you know, we can -- if the jury

6   comes back with a guilty verdict, that triggers forfeiture.

7   We can have a jury trial on that right then, or if he's

8   willing to waive it, it can become a sentencing matter that

9   the Court deals with.  He just needs to tell me that.

10             MR. BUTLER:  Okay.  I'll talk to him.

11             THE COURT:  Before the jury deliberates, if you all

12  would remind me of that.

13             MR. KAUFMAN:  Your Honor, checking with my

14  forfeiture attorney with Bill Brafford and Glen MacDonald,

15  there's a question whether there's been an administrative

16  forfeiture completed or whether it's some or all of the items.

17  I know some of them have been, so I'm trying to track down the

18  final issue on that.  Mr. Brafford was under the impression

19  that it was everything.  But I'd be surprised if for example

20  the firearms had been.

21             THE COURT:  So we need to resolve all that before

22  the jury begins deliberation.

23             MR. KAUFMAN:  Yes.  Yes.

24             MR. BUTLER:  I don't think he's claimed any of it,

25  quite frankly.  But I'll talk to him.

1          THE COURT:  All right.  And then I'd also at some

2     point after they rest, would want to know on the record

3     whether he elects to testify or not.  I would like to have

4     inquiry of him on the record.

5          MR. BUTLER:  Yes, sir.  That's fine.

6          THE COURT:  All right.  You know, at this point

7     whether you intend to put on any evidence?

8          MR. BUTLER:  We may put on some.

9          THE COURT:  All right.

10         Well, let's go in and take care of the exhibits,

11    make sure we're on the same page there.  Do that as quickly as

12    possible, and then call the jury and go from there.  9:25 a.m.

13    concluded charge conference.

14    AUGUST 15, 2012, COURT CALLED TO ORDER AT 9:53 A.M.:

15              (Defendant Parker Antron Coleman is present.)

16         THE COURT:  Are we ready for the jury?

17         MR. BUTLER:  Yes, Your Honor.

18         MR. KAUFMAN:  Yes, Your Honor.

19         THE COURT:  Call the jury.

20              (The jury was returned to the courtroom.)

21         THE COURT:  Good morning, Members of the Jury.

22         THE JURY:  Good morning.

23         THE COURT:  Thank you for being on time.  I

24    apologize for starting late, that's the Court's fault, and I

25    apologize.  When I say we would start promptly at 9:30, I

1   meant it at the time and then we're starting late, and I'm to

2   blame.  You should know that the attorneys were here a half

3   hour early ready to go.  It was the Court's fault for not

4   starting promptly at 9:30 and we'll try to do better in the

5   future.

6             Mr. Kaufman, are you ready to proceed?

7             MR. KAUFMAN:  Yes, Your Honor.

8             We call Stephanie Peppers.

9         STEPHANIE PEPPERS, GOVERNMENT WITNESS, SWORN

10                      DIRECT EXAMINATION

11  BY MR. KAUFMAN:

12  Q    Good morning.

13  A    Good morning.

14  Q    Can you please state your full name and spell your last

15  name for the record?

16  A    Stephanie Peppers.  P-E-P-P-E-R-S.

17  Q    What's your highest level of education?

18  A    Bachelors.

19  Q    Where did you obtain that from?

20  A    UNCC.

21  Q    Can you also tell us since graduating just where have you

22  been employed up until the end of 2010?

23  A    I worked for an attorney named David Lange.  I worked at

24  the clerk's office, and I was a probation officer.

25  Q    And in what court were you a clerk?

1   A    The district -- district court in the State courthouse.

2   Q    Mecklenburg County?

3   A    Yes.

4   Q    And you mentioned that you were a probation officer.  For

5   what level were you a probation officer?

6   A    It was intermediate, which is a level II probation.

7   Q    Is that for North Carolina State?

8   A    Yes.

9   Q    Have you ever owned a business after that?

10  A    Yes.

11  Q    What's the name of that business?

12  A    Pep's Cafe.

13  Q    Where is it located?

14  A    It was 320 South Tryon in Charlotte.

15  Q    When did you cease operating that business?

16  A    March of 2011.

17  Q    Now, have you pleaded guilty to a marijuana trafficking

18  conspiracy, and a conspiracy to launder proceeds of that drug

19  trafficking offense?

20  A    Yes.

21  Q    How much marijuana was involved and reasonably

22  foreseeable to you in that conspiracy?

23  A    I pled guilty to over 1,000 kilos.

24  Q    And when you say kilos, you're talking about 1,000

25  kilograms of marijuana?

1   A     Yes.  Yes.

2   Q     Okay.  Do you see any of your co-conspirators in the

3   courtroom today?

4   A     (Nodding head.)  Yes.

5   Q     Who do you see?

6   A     Parker Coleman.

7   Q     And can you identify him by where he's sitting and what

8   he's wearing?

9   A     Sitting by Norman Butler with a blue shirt and glasses.

10            MR. KAUFMAN:  Your Honor, may the record reflect a

11  correct in-court identification of the defendant?

12            THE COURT:  It will.

13            MR. KAUFMAN:  Thank you.

14  Q     Other than speeding tickets, had you ever been in any

15  trouble with the law prior to the crime for which you pled

16  guilty?

17  A     No.

18  Q     Ms. Peppers, can you start in a chronological fashion and

19  tell us how you got involved in the conspiracy?

20  A     In February or March of 2009, Parker asked me for money

21  to start the conspiracy when I got my tax refund back.

22            MR. BUTLER:  Objection.  Move to strike.

23            THE COURT:  Overruled.

24  Q     Now Ms. Peppers, if I can actually take a step back.  I

25  apologize for this.  I take it from your testimony that you

1    already knew Mr. Coleman?

2    A    Yes.

3    Q    When did you first meet him?

4    A    In 2007.

5    Q    Do you remember approximately what time of year it was?

6    A    It was about the summer of 2007.

7    Q    How did you meet him?

8    A    I was his probation officer.

9    Q    And what were you supervising him for as a probation

10   officer?

11              MR. BUTLER:  Objection.

12              THE COURT:  Overruled.

13              THE WITNESS:  Trafficking marijuana.

14   Q    What was involved in your being his probation officer?

15   What were your responsibilities?  What did you do?

16   A    The requirements were one office visit per month, and one

17   home visit per month, and that's what I did.  I don't recall

18   specifics, but.

19   Q    How long were you his probation officer?

20   A    From that summer until February of 2008.

21   Q    All right.  Now in relation to February of 2008, you

22   mentioned that Mr. Coleman asked you for your income tax

23   refund; is that correct?

24   A    It was the next year, 2009.

25   Q    Okay.  So if you could go back to the progression.  While

1  you were supervising Mr. Coleman in 2007, can you tell us

2  about your business and any other kind of relationship that

3  you had with Mr. Coleman from that point on?

4  A    I was his probation officer and, you know, he came to

5  visit me, and -- just each month, you know, I would see him in

6  the office and he may ask little things about my personal

7  life.  I didn't really think anything of it.  Then in January

8  of 2009 -- I'm sorry -- January of 2008, it went from business

9  to personal and then that's when I resigned after that in

10 February.

11 Q    And at whose initiation did it become a personal

12 relationship?

13 A    It was at his just constant, you know, flirting.  And I

14 finally -- he was just really charming, and I just fell for

15 it.

16 Q    Did you in fact have a sexual relationship with him?

17 A    Yes.

18 Q    And when did that aspect of the relationship start?

19 A    January.

20 Q    Of 2008?

21 A    Yes.

22 Q    I believe you said you ceased being a probation officer

23 the next month in February of 2008; is that correct?

24 A    Yes.

25 Q    Why?

1   A     I just knew that I had to quit.

2   Q     So did you resign your position?

3   A     Yes.

4   Q     Were you asked to leave by anybody?

5   A     No.

6   Q     In fact, were you aware of whether anybody else in the

7   probation office or related to your work knew about your

8   personal relationship with Parker?

9   A     No.

10  Q     So why did you in fact resign then?

11  A     It was just, you know, what I did was just wrong, so I

12  just quit.

13  Q     What happened after that?

14  A     So we had kept, you know, we kept in touch.  And then

15  March or April he ended up telling me he had a fight with his

16  mom, and he didn't have anywhere to go.  She had put him out,

17  and I offered for him to live with me.

18  Q     At the time where were you living?

19  A     Matthews.

20  Q     So did he in fact come to live with you at that point?

21  A     Yes.

22  Q     How long did that last?

23  A     It lasted until 2009.

24  Q     All right.  We'll get back to 2009 in a little bit.

25        So what happened after Mr. Coleman moved in with you in

1   Matthews?

2   A    That was 2008.   That year just, you know, passed by.   And

3   then at the end of the year he introduced me to a friend name

4   "Champ".

5   Q    Do you know what Champ's real name is?

6   A    Gerren Darty.

7   Q    Showing you what's been previously admitted as 22t.   Do

8   you recognize this photo?

9   A    Yes.

10  Q    And are you able to see the screen from your position

11  right now?

12  A    Yes.

13  Q    Okay.   Who is the person in 22t?

14  A    That's Gerren Darty.

15  Q    Now what happened when you met Gerren Darty?

16  A    Well, the first time I met him, Parker just brought him

17  over to the house and just introduced me to him as a friend,

18  you know, just as a friend of his.   We just sat out on the

19  front porch and just talked for a few minutes, and that was

20  it.

21  Q    Prior to your meeting Gerren Darty through Mr. Coleman,

22  was there anything going on with Mr. Coleman relevant to the

23  drug trafficking conspiracy?

24  A    During 2008, he -- he just was determined to get

25  something -- some type of drug business going.   He just went

1   out --

2           MR. BUTLER:  Objection.

3           THE COURT:  Overruled.

4           THE WITNESS:  Every night, telling me he just needed

5   to network and meet people and, you know, get -- just to get

6   something going, but not related to this drug conspiracy.

7   Q    Well, what was it related to?

8           MR. BUTLER:  Objection.  Move to strike.

9           THE COURT:  Overruled.

10  Q    What was it related to?

11  A    He was trying to get a drug -- a drug business going,

12  but, you know, it was prior to this one.  I mean -- that I

13  knew of.

14  Q    All right.  Now when he was going out, do you know

15  whether he in fact made any connections, any -- I think you

16  used the term "network?"

17          MR. BUTLER:  Well, objection.

18          THE COURT:  Overruled.

19          THE WITNESS:  I don't really know who he met during

20  that time.  But he had already known Jay, and during that time

21  Jay introduced him to Champ.

22  Q    And when you say "Jay," who are you talking about?

23  A    Jerry Davis.

24  Q    Showing you what's been admitted as 22g.  Who is that, if

25  you know?

1    A    Jerry Davis.

2    Q    How often did Mr. Coleman, in 2008, discuss with you his

3    attempts to network?

4    A    I mean, it could have been, you know, several times a

5    week.  Because he was going out just about every night, you

6    know.  And, I mean, I would just ask him why did he have to

7    keep going out every single night.  He just said it was to

8    network, to meet people, just to try to get someone to front

9    him something so that he could get started.

10   Q    And when you say "front him something," what does that

11   mean?

12   A    Like, give him something, and then you sell it and give

13   the money back.

14   Q    And when you say "something", what specifically are you

15   referring to?

16   A    Like, marijuana.

17   Q    Let me ask you, at any time that you knew Mr. Coleman,

18   was he lawfully employed at any time?

19   A    When I was his probation officer he worked at the

20   Marriott.

21   Q    And do you know how much he was making when he was there?

22   A    No.

23   Q    Did you -- did he ever have any involvement with your

24   business, Pep's Cafe?

25   A    He gave me the money to buy it, and -- he didn't work

1   there.

2   Q    Did he have any business connection other than giving you

3   the start-up money?

4   A    I mean, I listed him on the paperwork as part owner of

5   it.

6   Q    Why is that?

7   A    Just to make it seem like we had a business and could

8   show where money was coming from.

9   Q    Why did you want to do that?

10  A    Because it was getting to a point where, you know, there

11  was large amounts of money that were unaccounted for.

12  Q    When you say unaccounted for, where was that money coming

13  from?

14  A    Marijuana.

15  Q    So is -- is that activity of the money going through

16  Pep's Cafe your understanding -- is it your understanding as

17  to that's why you pled guilty to the money laundering charge,

18  in part?

19  A    Yes.

20            MR. BUTLER:  Objection.

21            THE COURT:  Overruled.

22  Q    How much money did Mr. Coleman give to you to start up

23  Pep's Cafe?

24  A    Nine thousand dollars.

25  Q    And was that after the actual conspiracy had started

1  underway, and there were marijuana transactions taking place?

2  A    Yes.

3  Q    All right.  After you met Gerren Darty that first time,

4  what happened after that?

5  A    He asked me to rent a car for Gerren.  Because he said he

6  was in town and he didn't have a way to get around town, so I

7  rented the car.

8  Q    If I can stop you there for a second.  I would like to

9  show you what's been admitted as 54b.  And for a moment I'm

10 going to highlight a portion in the middle of the document.

11 Do you recognize that signature?

12 A    Yes.

13 Q    Whose signature is that?

14 A    Mine.

15 Q    And do you recall if you were asked to list references --

16 well, let me move on.

17     Ms. Peppers, can you describe what your feelings were for

18 Mr. Coleman?

19         MR. BUTLER:  Objection.

20         THE COURT:  Overruled.

21         THE WITNESS:  Over time I just -- I loved him very

22 much.  I would have just done anything for him.  He was my

23 best friend.

24 Q    How do you feel now?

25 A    I mean, I don't hate him.  I guess he'll always have a

1   place in my heart.

2   Q    Ms. Peppers, after you rented the vehicle for Mr. Darty,

3   what happened after that?

4   A    So then it was 2009 and I filed my income taxes, and

5   that's when, you know, he said when I get my taxes back to

6   give him some money because Champ had connections in

7   California that could get, you know, the marijuana here.  And

8   he knew people to sell it to.  And that he would give me my

9   money back, just to lend him some money.  In that he would

10  give me my money back as soon as, you know, he sold it.  And

11  so, I just -- I knew he would give me my money back and --

12  Q    Why did you know that?

13  A    Well, I mean, he had the other conviction for it, and

14  just by talking --

15            MR. BUTLER:  Objection.

16            THE COURT:  Overruled.

17            THE WITNESS:  -- by talking to him, you know, he was

18  determined to do it.  He -- you know, he knew a lot of people,

19  and they had the way to get it here.  He said it was safe and

20  I just knew that -- I knew he would give me my money back.

21  Q    Did he in fact give it back to you at some point?

22  A    Yes.

23  Q    Did you come to find out who the connection that he had

24  was, the source of supply?

25  A    Yes.

1  Q    Who was that?

2  A    It was Turtle.

3  Q    Did you also know what Turtle's real name was?

4  A    Yes.

5  Q    What was it?

6  A    Milton Adams.

7  Q    Showing you what's been admitted as 221.  Do you

8  recognize this photograph?

9  A    Yes.

10 Q    Who is it?

11 A    That's Turtle.

12 Q    After you provided Mr. Coleman -- by the way, you said

13 that you provided him with your refund.  How much was that

14 approximately?

15 A    I gave him $5,000.

16 Q    What happened next?

17 A    So I gave him the money, and within like a week or two,

18 him and Champ made a trip to California cause he had to meet

19 the people out there.

20        MR. BUTLER:  Well, objection.  Move to strike.

21 Personal knowledge.

22        THE COURT:  Overruled.

23 Q    And then what?  What happened during that trip that

24 you're aware of?

25 A    Well, I know when he got back, he did have some

1    marijuana, and he just said it was safe, you know.  And was --

2    I didn't know at the time how it got here or anything.

3    Q    All right.  What happened after that first trip?

4    A    So then it just -- it just started.  Girls started coming

5    here from California, and they would bring the marijuana, and

6    then they would sell it, and then the girl would take the

7    money back.

8    Q    And when you say "they would sell it," are you referring

9    to the girls or to somebody else?  Who sold the marijuana that

10   was brought here?

11   A    Parker.

12   Q    And at that point in time, at the beginning of the

13   conspiracy, who was he selling the marijuana to?

14   A    I know -- I don't know everybody, but I know Jay was one

15   of them.  I had seen Shondo a couple times, and that was all

16   that I knew.

17   Q    And did -- was Mr. Coleman directly selling it to Shondo

18   and to Jay, or did he have any intermediaries at that point?

19   A    Directly to them.

20   Q    At that point in time were you planning to be more

21   involved in the drug trafficking conspiracy?

22              MR. BUTLER:  Objection to the form.

23              THE COURT:  Overruled.

24              THE WITNESS:  Not at that time.

25   Q    Did you get more involved?

1    A    Yes.

2    Q    How did that happen?

3    A    At some point later that summer instead of the girls

4    coming here from California, people from Charlotte started

5    taking the money to California and they'd come back with the

6    marijuana, and then I did that.

7    Q    All right.  Now, well, in general, with the couriers

8    going first from the Charlotte area to California, how did

9    that come about?

10   A    It was just the decision was made.

11   Q    By whom?

12   A    Parker.

13   Q    How did you come to start making those trips?

14   A    He would just tell me, you're leaving on a certain day

15   and, you know, either someone would either buy my ticket or he

16   would give me money to buy my own ticket.  And he would just

17   tell me a day or, you know, two, in advance.

18   Q    How were the tickets paid for, what method of payment?

19   A    Credit card.

20   Q    Was it ever paid in cash?

21   A    Not that I'm aware of.

22   Q    I believe you earlier used the term "fronting" in terms

23   of the payment method to the source of supply.  You mentioned

24   when -- initially, the females came from California with the

25   marijuana to Charlotte, Mr. Coleman sold the marijuana and

1  then the proceeds were then returned by those same females;

2  was that accurate?

3  A    Yes.

4  Q    What was the payment method after this changed when the

5  couriers were coming from Charlotte to go to California?  And

6  if it changed over time, let us know.

7  A    They took cash out there and gave it to Turtle.

8  Q    How much cash did the couriers carry?

9          MR. BUTLER:  Well, objection.  Move to strike.

10          THE COURT:  Overruled.

11          THE WITNESS:  It was varying amounts.  On average

12  each person could take $50,000.

13  Q    (Mr. Kaufman) And so they brought that to California.

14  What did they return with?

15  A    Two suitcases, each suit case had 50 pounds.

16  Q    Of marijuana?

17  A    Yes.

18  Q    Now, when you personally made the trips -- well, let me

19  ask this, when the couriers were bringing the money from

20  Charlotte to North Carolina, were they paying for prior

21  transactions, or were they paying for the marijuana that was

22  to be received from California; and did it vary over time?

23  A    He was buying the marijuana.  When we took the money it

24  was to buy the next batch of marijuana.

25  Q    Now when you went and made your trips, were you there

1  when the money was collected to be brought to California?

2  A    Yes.

3  Q    Who did what?

4  A    Well, there had already been a previous trip from a

5  couple days before.  So Parker would tell me, like, Jay's

6  gonna bring you this amount of money.  BJ's gonna bring you

7  this amount of money.  Rico's going to bring you this amount

8  of money.  I had to count it make sure it was right.  And

9  then --

10 Q    What was the appearance of the money?

11 A    Usually it was rubber banded in thousand dollar bundles.

12 Q    Was it always in rubber bands?

13 A    Yes.

14 Q    Have you ever seen the use of paper bands, like the kind

15 one would get from a bank?

16 A    Yes.

17 Q    And what was the use of those paper bands?

18 A    I didn't really see them that much.  Not -- I mean, I've

19 seen them before.  But I didn't really ever see them on the

20 money.

21 Q    Did you ever speak to Parker Coleman about the paper

22 bands?

23 A    No.

24 Q    Were you present for -- are you aware of Mr. Coleman

25 conducting any kind of cash transactions with other

 1  co-conspirators outside of your presence?

 2          MR. BUTLER:  Well, objection.

 3          THE COURT:  Overruled.

 4          THE WITNESS:  A cash transaction with another

 5  person?

 6  Q    Yes.  For example, other people who were assisting in the

 7  conspiracy in one way or another, whether distributors,

 8  couriers, other types of facilitators.

 9          MR. BUTLER:  Objection.

10          THE COURT:  Overruled.

11          THE WITNESS:  I mean, I know if they didn't bring me

12  the money, they might bring Parker the money.

13          MR. BUTLER:  Objection.

14          THE COURT:  Overruled.

15          MR. BUTLER:  May we have a sidebar?

16          THE COURT:  Sure.

17          (Bench conference as follows:)

18          MR. BUTLER:  If, Your Honor please, I'm a little bit

19  confused in that the government's attorney is asking her

20  questions about what she knows or her understanding when she

21  wasn't present.  I don't know how she, I mean --

22          THE COURT:  Well, she -- there's co-conspirator

23  liability for acts and declarations of other co-conspirators.

24  That seems to be the framework of these questions.  And I

25  think they could be more artfully done in terms of her

1   personal knowledge, but any -- but in terms of relevance,

2   certainly any acts or declarations of co-conspirators would be

3   relevant to --

4                MR. BUTLER:  But, Your Honor, she -- she wasn't

5   present.

6                THE COURT:  Right.

7                MR. BUTLER:  She doesn't know where he was.

8                THE COURT:  Well, what she -- I'll require a

9   foundation in terms of the source of her knowledge.  And, so,

10  if you ask her if she knows about something else, also ask her

11  the basis for her knowledge.  And then if you still have an

12  objection at that point, I'll hear from you on that.

13               MR. BUTLER:  Very well.

14               THE COURT:  But in general terms I'm going to let

15  anything in that deals with acts or declarations of

16  co-conspirators during -- in what a jury might reasonably

17  infer is furtherance of a conspiracy.

18               MR. BUTLER:  And I understand that, Your Honor.

19  But -- most of her answers in my opinion is guesswork.

20               THE COURT:  No, I don't think so.  I think she

21  testified about what Parker Coleman told her and what she

22  observed.  But be careful on that and lay a foundation for

23  that on future questions.

24               (The bench conference was concluded.)

25  Q    (Mr. Kaufman) Ms. Peppers, you mentioned an individual by

1   the name of BJ.  Who is BJ?

2   A    I don't know BJ's name.

3   Q    What was his role?

4   A    He was someone that would sell marijuana.

5   Q    For whom?

6   A    Parker.

7   Q    And you mentioned Rico.  Who's Rico?

8   A    He's someone that would sell the marijuana for Parker.

9   Q    Showing you what's been admitted as 22q.  Do you

10  recognize that picture?

11  A    Yes.

12  Q    Who is that?

13  A    That's Rico.

14  Q    Who were -- based on your observations and conversations

15  with Mr. Coleman, who were Mr. Coleman's primary

16  redistributors of marijuana?

17  A    Jay, BJ and Rico.

18  Q    Those three?

19  A    Yes.

20  Q    Was that consistent throughout the conspiracy?

21  A    Yes.

22  Q    Now you were starting to describe the trips that you

23  personally made.  After you received the money, how did you

24  get to the airport?

25  A    Well, at first Parker would take me.

1   Q   How would he take you?

2   A   I'm sorry?

3   Q   How would he take you?

4   A   In a car.

5   Q   What kind of car or cars?

6   A   He's taken me in the Porsche.

7   Q   What kind of Porsche?

8   A   A Cayenne.

9   Q   What color?

10  A   White.

11  Q   What other vehicles, if any?

12  A   He's taken me in the Nissan Sentra, and the white Audi.

13  Q   Did you own a silver Lexus?

14  A   An Infiniti.

15  Q   Oh, my mistake.  You said an Infiniti?

16  A   Yes.

17  Q   Did he ever drive that car?

18  A   Yes.  He -- ever since I bought it, I only had it about a

19  week and then he drove it the rest of the time.

20  Q   Why is that?

21  A   I don't know.

22  Q   Are you aware from your conversations with Mr. Coleman of

23  him having any vehicles in his own name?

24  A   No.

25  Q   All right.  So was it always Mr. Coleman who drove you to

1    the airport?

2    A    I drove myself many times.

3    Q    And when you say many times, can I ask you approximately

4    how many trips did you personally make to bring money to

5    California and/or marijuana back to Charlotte?

6    A    I think it was about 20 times.

7    Q    When you got to California, what happened?

8    A    Someone would pick me up at the airport, and then I would

9    go to Turtle's house, and they would count the money and make

10   sure it was right.  And then I would either just sleep there

11   or they would take me to a hotel.

12   Q    When you say there, where is there?

13   A    At Turtle's house.

14   Q    Do you recall where Turtle's house was?

15   A    He had a couple houses.  The first one was in Carson.

16   The second one was in Tarzana.  Those are the only two I know

17   of.

18   Q    Was he using both houses at the same time or were they in

19   sequence?

20   A    The Carson house was first and then the Tarzana house was

21   later.

22   Q    Are you aware of whether he had the Carson house while he

23   also had the Tarzana house?

24   A    They had told me that a girl was staying in the Carson

25   house.

1          MR. BUTLER:  Objection.

2     Q    Who's they?

3     A    Other people from California that I had met along the

4     way.  Just one day they were joking about how dirty the house

5     was, and that the girl kept the house really dirty.  And that

6     she was -- there was a girl living there and it was just,

7     like, filthy.

8     Q    These statements to you, were they made by

9     co-conspirators?

10    A    Yes.

11    Q    Who was it who picked you up at the airport, or did you

12    take cabs from the airport to Turtle's house?

13    A    It was different people that picked me up.  Mark Dorsey

14    William Pierce, Glenn Carrera, Turtle, and I've taken a cab.

15    Q    Were you present when people were counting the money in

16    California?

17    A    Yes.

18    Q    Who did that?

19    A    I saw William Pierce, Mark Dorsey, Glenn Carrera and

20    Turtle all count the money.

21    Q    When you made your trip to California, was Mr. Coleman

22    ever there at the same time as you?

23    A    One time.

24    Q    Can you describe that time?

25    A    I don't remember when it was.  He had gone for an

1    extended period of time, two weeks or more.  And while he was

2    out there, one time I came out there, stayed for a day or two

3    and then came back and he was still out there.

4    Q    Did he tell you what --

5    A    Or -- I'm sorry.  He came back with me.

6    Q    Did he tell you what his purpose was out there?  Or did

7    you see what he was doing out there?

8    A    No.  I stayed in the hotel.  I rode around in a car.  We

9    went to a car wash and things like that, and I went back to

10   the hotel.

11   Q    After you received the marijuana in California, did the

12   same people bring you back to the airport that had picked you

13   up?

14   A    Not necessarily the same person who had picked me up that

15   time.  But it was the same group of people either picked me up

16   or took me back.

17   Q    What happened at the airport?

18   A    When we first started -- at first we would go in to the

19   airport with the suitcases, and the way they had the bag

20   check-in was different at the beginning.  So there was someone

21   from TSA who worked at the bag check-in and they would tell me

22   which one to go to.  They were numbered, like, one, two and

23   three.  And so they would say, for instance, go to number two,

24   so --

25   Q    Who's they, the person that dropped you off?

1   A    Yes.  So I would walk in and I had seen this person

2   previously, so I knew who it was.  So --

3   Q    When you say you've seen them previously, where -- what

4   were the context of that meeting or seeing that person

5   previously?

6   A    Well, I had seen him at the airport before, but also one

7   time he came to Turtle's house to check to see what color

8   suitcases I was bringing, so that they would know what he was

9   looking for.

10       But -- so, at first I would walk in and I would see them,

11  but I would just put my bags -- he would grab the bag and put

12  it like he was putting it over by the scanner, and that was

13  it.  Then I would go to the front desk and get my ticket.

14  Q    And I take it from your testimony that that procedure

15  changed at some point?

16  A    Um-hmm.

17  Q    Is that a yes?

18  A    Yes.

19  Q    How did it change?

20  A    So, sometime into it they didn't have the TSA people out

21  in the lobby anymore.  You had to go to the counter and check

22  your bags, and then they went down the conveyor belt, and the

23  TSA people were back behind a wall.  And you would get your

24  ticket and check your bag and then it would go down.

25  Q    Now you mentioned that you had seen a TSA employee that

1   was a co-conspirator at Mr. Adams' house.  Did you become

2   aware at any point of there being any more than one TSA

3   insider?  Based on conversations with Mr. Coleman or any other

4   co-conspirator or anything you may have personally seen?

5   A    For a short period there was a girl that worked for TSA

6   in another airline area.  I only flew that way every time the

7   ticket was purchased with Delta, because that's where she

8   worked for TSA.  For a short period I think I only flew one

9   time through American, where another girl TSA worker worked

10  for a short period of time and then she didn't work there

11  anymore.

12        When I was in jail, I talked to another conspirator and

13  she told me --

14        THE COURT:  All right.  I'll stop you there.  Ask

15  your next question.

16        MR. KAUFMAN:  Yes, Your Honor.

17  Q    When you were in California, did you hear anything

18  personally related to Turtle's source of supply?

19  A    The only thing I know is one time when I went there and

20  some Hispanic men came over to get the money and they were

21  yelling and --

22  Q    At whom?

23  A    -- just Turtle saying like --

24        MR. BUTLER:  Objection.

25        THE COURT:  Overruled.

1  THE WITNESS:  This money's short.  Like I had taken

2  some of the money, and just, you know, then finally I guess it

3  all added up in the end and --

4  MR. BUTLER:  Objection to her guess.

5  THE COURT:  Overruled.

6  Q    Before that was resolved -- well, I guess -- were you --

7  were you physically present while the yelling or shouting was

8  taking place?

9  A    I was upstairs.  I could hear it.

10  Q    Do you have personal knowledge as to what if anything

11  Mr. Adams may have done, if he had contacted anybody or

12  anything like that?

13  A    I called Parker.  While they were yelling downstairs I

14  called Parker when I was upstairs and I said, they're down

15  there yelling and cussing saying that I've taken some money

16  and I didn't take any money.

17  Q    With regard to couriers, based on your personal

18  observations and conversations with co-conspirators, do you

19  recall some of the names of the couriers -- the Charlotte

20  based conspirators -- I'm sorry, the Charlotte-based couriers?

21  A    Ryan Louis, Samantha Schmidlin, Harold Manigault, Megan

22  Baehr.  I can't recall anymore.

23  Q    Like to show you some photographs that have been

24  admitted.  Do you recognize the person in government's 22a?

25  A    That's Nolan.

1    Q    Do you know his last name?

2    A    Robertson.

3    Q    Was he involved in this conspiracy?

4    A    He was a courier.

5    Q    Showing you what's been admitted as 22e.  Do you

6    recognize this photograph?

7    A    That's Mark.

8    Q    Do you know his last name?

9    A    Hunt.

10   Q    Was he involved in the conspiracy?

11   A    Yes.

12   Q    How so?

13   A    I know he was a courier one time.  And Parker told me

14   that he sold him guns.

15   Q    This might be a good time to go into that.  What

16   specifically did Parker tell you about guns he received from

17   Mr. Hunt?

18   A    He didn't really tell me anything specific about the

19   guns -- or just -- I mean, I had seen the guns and I asked him

20   where he got them and he said from Mark.

21   Q    What types of guns did Mr. Coleman show you?

22   A    They looked like handguns.

23   Q    What types?  And how many?

24   A    I don't know the types.  I mean, little, you know,

25   regular size pistol type guns, and I saw about four.

1    Q    And all four were just handguns?

2    A    He brought another gun to my house that wasn't a handgun.

3    Q    When was that?

4              MR. BUTLER:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS:  In the fall of 2010.

7    Q    Was it after the November seizures in this case or

8    before?

9    A    It was before.

10   Q    Do you recall how much before?

11   A    Maybe about a month or two.

12   Q    Tell us what happened.

13   A    He came over to my house and had a black bag.  And I

14   looked in the bag and he said, keep this at your house.  And I

15   looked in there and it was like a handgun and another type of

16   gun, like a -- assault type weapon.

17   Q    And when you say an assault type weapon, can you describe

18   it in any more detail?  And if you know what type of assault

19   gun it was, can you tell us?

20   A    It was rectangle, like this (indicating).  And then it

21   had, like, a handle on the bottom.

22   Q    Were you able to tell what kind of ammunition it held or

23   what container for ammunition it had, if any?

24   A    It was, like -- it was, like, hollow on the bottom where

25   you hold it, and then you push it in there.

1    Q    Are you familiar with the term "magazine"?

2    A    Yes.

3    Q    Or sometimes people call it a "clip"?

4    A    Yes.

5    Q    Were you able to see if it had the magazine?

6    A    I just -- I can't recall.  I didn't take it out and

7    examine it.

8    Q    Have you ever seen Mr. Coleman in possession of any

9    firearms, personally?

10   A    I've seen him, yes.

11   Q    Can you describe that occasion or those occasions?

12   A    I've seen them under his bed.  And I've seen him sit on

13   the floor, pull them out from under the bed.

14   Q    And did you see him physically handle the guns?

15   A    Yes.

16   Q    How did he handle them?

17   A    He would grab a T-shirt and pick the gun up with the

18   T-shirt.  And I've also seen him have a pair of black gloves,

19   similar to weightlifting gloves, and put those on before he'd

20   pick it up.

21   Q    Did he tell you why?

22   A    No.

23   Q    Did you ever see Mr. Coleman with firearms in any of his

24   vehicles?

25   A    I had seen one -- I had seen one in the Porsche before.

1    Q    How often?

2    A    Well, I had only seen it one time when I looked into the

3    compartment where it was.

4    Q    Now when you say the compartment, what are you talking

5    about?

6    A    On the Porsche behind the driver's seat there was a

7    compartment that needed like a combination to get it open.

8    Q    I'm sorry, behind which seat?

9         MR. BUTLER:  Objection.

10         THE COURT:  Overruled.

11         THE WITNESS:  I mean, I'm sorry.  Behind the

12    passenger's seat.

13    Q    And when you say a combination, what do you mean by that?

14    A    There was this combination or thing that you do with the

15    mirror switch, it was like push it, you know, a certain way,

16    certain number of times, and it would open it.

17    Q    Did you see Mr. Coleman operating that combination?

18    A    Yes.

19    Q    How often?

20    A    He kept money in there, so whenever he needed to get

21    money out.

22    Q    Now you mentioned you did see him once with a gun in that

23    same compartment.  Do you remember the context of how you came

24    to see the gun there?

25    A    He had asked me to pay a bill and told me that there was

1   money in there, and to get the money out.  And so when I

2   opened it up to get the money out, there was a handgun in

3   there.

4   Q    Do you know who had the -- based on your conversations

5   with anybody involved in the case or your personal

6   observations, do you know who had that compartment installed?

7   A    It was installed before the car was shipped here.  It was

8   installed in California.

9   Q    And do you have personal knowledge as to who directed

10  that it be done?

11  A    Well, Parker and Turtle had scheduled it.

12  Q    How do you know that?

13  A    Well, he told me that the car was ready but they were

14  still putting the compartment in.

15  Q    Who told you that?

16  A    Parker.

17  Q    With regard to firearms, did you ever provide any

18  firearms to Mr. Coleman?

19  A    Yes.

20  Q    Describe that, please.

21  A    In 2009 he gave me money and told me to go buy him a

22  Glock 17.

23  Q    And were you aware at the time as to whether he was

24  lawfully permitted to possess a firearm?

25  A    Yes, I knew he wasn't.

1   Q    And is that because you were his probation officer for a

2  felony?

3   A    Yes.

4   Q    What did you do after he asked you to do that?

5   A    What did I do?

6   Q    Yes.

7   A    He gave me the money and I went to Fire Power and bought

8  a Glock 17.

9   Q    Fire Power is the name of the store?

10  A    Yes.

11  Q    I'd like to show you what's been admitted as Government's

12  9o.  Do you recognize that?

13  A    Yes.

14  Q    What is it?

15  A    Glock.

16  Q    At least, what does it appear to be?

17  A    It appears to be a Glock 17 similar to the one I

18  purchased.

19  Q    Now do you know if this is the particular one that you

20  purchased?

21  A    I don't know, because I bought two of them, and so I

22  don't know.

23  Q    And when you were -- at some point during the

24  investigation was a firearm taken from you, as well from your

25  home?

1   A    It was taken from the car.  There was one taken from the

2   car, not from my house.

3   Q    Okay.  What kind of gun was that?

4   A    A Glock 17.

5   Q    Was there a -- was there a .25 caliber firearm that was

6   taken from your home?

7              MR. BUTLER:  Objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  There was one taken by the police that

10  arrested me.

11  Q    All right.  Now based on all these firearms you've been

12  testifying about, are you being held responsible for those

13  firearms?

14  A    Yes.

15  Q    You mentioned that after Mr. Coleman's mother put him out

16  and he moved in with you in Matthews, at some point did you

17  stop living together there?

18  A    Yes.

19  Q    At what point?

20  A    In June 2009 he asked me to rent him a place, and I

21  rented a place in Ballantyne for him.

22  Q    What was the street name?

23  A    Kensington Palace.

24  Q    Did you ever live there?

25  A    No.

1    Q    Who did?

2    A    Parker.

3    Q    And you say you rented it from June 2009, is that when

4    Mr. Parker moved in there?

5    A    He really didn't move there until after I moved from

6    Matthews, and that was September of 2009.

7    Q    So in those three months was the Kensington Palace being

8    used?

9    A    Basically as a house where they stored marijuana.

10   Q    Did you see marijuana there on any occasions?

11   A    Yes.

12   Q    How long did Mr. Coleman -- or until when did Mr. Coleman

13   live at Kensington Palace?

14   A    In June 2010 -- well, a month or two before June 2010 he

15   asked me to find him another place.  He wanted to move.  So

16   his lease was up in June 2010.  And a month or so prior to

17   that I started looking for another place.  And so I found

18   another place and so he moved in June 2010.

19   Q    Where to?

20   A    Over by South Park.  On the corner of Park Road and

21   Tyvola.

22   Q    Do you remember the address?

23   A    I believe it was 5425 Closeburn Road, Apartment 115.

24   Q    Did you ever personally live there?

25   A    No.

1    Q    Did you ever keep any personal items there?

2    A    No.

3    Q    Did you ever stay overnight there?

4    A    No.

5    Q    Have you ever been inside of it?

6    A    Yes.

7    Q    How often?

8    A    Once or twice a month.

9    Q    For what purpose?

10   A    I would do his grocery shopping and bring his groceries

11   back, put them away.  I had dropped a couple couriers off

12   there, and a couple times to visit with him.

13   Q    Now you mentioned that you had seen a handgun under

14   Mr. Coleman's bed.  Are you referring just to Kensington

15   Palace or did that also include Closeburn Road?

16   A    I only saw it at Closeburn Road.

17   Q    Only at Closeburn Road?

18   A    Yes.

19   Q    And it was under the bed, you're saying?

20   A    Yes.

21   Q    I'd like to show you what's been admitted as Government's

22   91.  Do you recognize this, what's being shown in this

23   photograph?

24   A    Yes.

25   Q    What is it?

1   A    His closet.

2   Q    When you rented Closeburn, did you do a walk through of

3   the entire apartment?

4   A    Yes.

5   Q    I'd like to draw your attention to the middle of 91.  Do

6   you see the thing in the middle that's in the corner of that

7   closet?

8   A    Yes.

9   Q    What is that?

10  A    A safe.

11  Q    Was that originally there when you leased the property?

12  A    No.

13  Q    How did it come to be there?

14  A    Someone came and put it in.

15  Q    At whose request, if you know?

16  A    I can't remember -- I remember seeing the guy there doing

17  it, but I don't remember how, you know, he got chosen to do

18  that.

19  Q    Well, was it after Mr. Coleman moved in?

20  A    Yes.

21  Q    Did you know the combination to the safe?

22  A    Yes.  I've opened it.  I can't recall it right now.  It

23  was something easy, like, maybe 1111, or -- it was something

24  easy.  I can't recall what it was right now, but I have opened

25  it before.

1   Q    Did you have it written down anywhere?

2   A    No.

3   Q    Do you know if it was written down anywhere?

4   A    No.

5   Q    Who gave you the combination?

6   A    Parker.

7   Q    Do you know why he gave it to you?  Did he tell you?

8   A    Well, sometimes I had to go in there to put money in

9   there or to get money out.

10  Q    Speaking of residences, I would like to show you what's

11  been admitted as Government's 18a.  First of all, do you

12  recognize who's in the photograph?

13  A    Yes.

14  Q    Who is that?

15  A    That's Parker.

16  Q    I'd like to highlight the background.  Do you recognize

17  the building behind the Porsche and Mr. Coleman?

18  A    Yes.

19  Q    What is that?

20  A    That was my apartment building.

21  Q    Where?

22  A    At Providence Court Apartments.

23  Q    When you say your apartment at Providence Courts, you

24  mentioned already that you lived in Matthews?

25  A    Yes.

1  Q    And I apologize.  I don't remember the address in

2  Matthews.  Is this the same residence or this is a subsequent

3  residence or different residence?

4  A    In September 2009 I moved from Matthews to Providence

5  Court Apartments, and then I lived there until November 2010.

6  Q    I'd like to ask you a few questions about Pep's Cafe.

7       Up until November of 2010, what were the hours of

8  operation and days of operation of the cafe?

9  A    It was Monday through Friday, 11:00 a.m. to 2:00 p.m.

10 Q    So it was just for lunch?

11 A    Yes.

12 Q    Ever open on weekends?

13 A    No.

14 Q    And up until November of 2010, were you doing any kind of

15 catering business?

16 A    No.

17 Q    Let me ask you, was the cafe making any actual legitimate

18 money?

19 A    No.

20 Q    What was its purpose?

21 A    Well, I had hoped it would make money, eventually.  But

22 it just wasn't making money at that time.

23 Q    Were you ever asked to generate receipts for the

24 business?  And when I say "to generate receipts," that is for

25 business that wasn't actually conducted?

1   A    I'm trying to think back to -- there was talk of doing

2   catering.  And I'm just trying to think back to when it was

3   about, you know, to make these catering contracts and things

4   like that.

5   Q    When was that?

6   A    I think it was -- well, I remember it was, you know,

7   during 2010 there was a lot of talk of trying to get catering

8   going and trying to have this business and --

9   Q    And you're talking about attempting to have legitimate

10  catering business?

11  A    Right.

12  Q    And these conversations were with whom?

13  A    Parker and Jason.

14  Q    Who's Jason?

15  A    Jason is another person, co-conspirator.

16  Q    What was his last name?

17  A    Banks.  I didn't know Jason when he was part of the

18  conspiracy.  When I met him, he had had a falling out with

19  Parker.  And Parker made him come work with me at the cafe.

20            MR. BUTLER:  Objection.

21            THE COURT:  Overruled.

22  Q    Did there come a time you were ever asked to make false

23  records of any business associated with Pep's Cafe?

24  A    I'm just trying to think.  There may have been a time

25  where -- I'm just trying to think, cause I know we had talked

1    about it a lot.  If a contract had actually been made up, I

2    can't remember if we had made a contract, or if one had been

3    signed by somebody.

4         Actually, there was a time.

5    Q    Can you describe that?

6    A    Yes.  In July 2010 Parker got pulled over for a DWI and

7    they seized some money out of the car.

8    Q    And Parker told you about this?

9    A    Yes.  And then --

10   Q    Did he tell you how much money was seized from the

11   vehicle?

12   A    I think like $40,000.  And then in order to get the

13   seized money back, you have to, like, petition somebody and

14   have a hearing and prove that the money was yours.  And so

15   after that money was taken, he asked me to -- that I had to

16   get that money back.  And that I had to go to a hearing and

17   get that money, say that it was mine and --

18   Q    Did he tell you everything to say at that hearing?

19   A    He told me just to tell them, you know, do what I had to

20   do to just get the money back.

21   Q    Did you in fact go to the hearing?

22   A    No.

23   Q    Why not?

24   A    Well, I was saying to him, there's no way I can claim

25   $40,000 cash, you know.  I don't have enough receipts and

1  stuff to show that I had that much cash, and --

2  Q    That's because Pep's business wasn't doing anywhere near

3  that?

4  A    No.  Then, you know, then he got arrested in November and

5  we just never, you know, got to have a hearing to get the

6  money back.

7  Q    So to your knowledge he never got the money back?

8  A    No.

9  Q    Or, I guess I should ask, do you know whether he got the

10 money back?

11 A    Not to my knowledge.

12 Q    Did you ever make bank deposits in relation to this case?

13 A    Yes.

14 Q    Can you describe those?

15 A    During the summer of 2010 there were sometimes where

16 Parker would text me the name of somebody and their account

17 number and the bank branch to go to, and the amount to

18 deposit, and then I did it.

19 Q    Do you remember off the top of your head any of the names

20 or addresses or any of the information about those deposits?

21 A    I remember making one into Turtle's account and one into

22 his girlfriend's account.

23 Q    Do you remember what his girlfriend's name is?

24 A    Kamia.

25 Q    Do you remember what her last name is?

1    A     Saulsberry.

2    Q     Did you ever meet Ms. Saulsberry?

3    A     Yes.

4    Q     When?

5    A     One time when I went to California she was pregnant and

6    we were at the house together.

7    Q     Like to show you what's been marked as Government's

8    Exhibit 44 for identification purposes.  It's a multi-page

9    document.  Showing you page 1, page 2, page 3, page 4.  I'm

10   going back to page 3 for a moment.

11         Do you recognize any of the handwriting on this?

12   A     I recognize the handwriting on the name and the address.

13   Q     How about the date, do you recognize that handwriting?

14   A     I recognize that also.

15   Q     And whose handwriting are those different items?

16   A     That's mine.

17   Q     Going up to page 1, do you recognize any of the

18   handwriting on page 1?

19   A     The name and the date is mine.

20         MR. KAUFMAN:  Your Honor, we'd seek to admit and

21   publish Government's Exhibit 44.

22         MR. BUTLER:  Objection.

23         THE COURT:  Overruled.  Let it be admitted.

24         (Government's Exhibit No. 44 was received into

25   evidence and published.)

1   Q    Now, I believe you testified that Ms. Saulsberry's first

2   name was Kamia.  It's not Kimberly, is it?

3   A    No.

4   Q    Do you know why it says Kimberly on page 1 of Exhibit 44?

5   A    I don't know -- you know, all I know is, I would receive

6   a text message from Parker with a name, an account number, a

7   bank, and an amount.  And I would, you know, go deposit that.

8   So, you know, that name must have been what came on the text

9   message.

10  Q    Where did you get the money for the deposit?  Where did

11  you get it from, if you recall?

12  A    It was out of money that I already had at my house from

13  money that people had brought me already.  Instead of sending

14  it back over the airplane, you know, he said, take the money

15  out of that and put it in the bank.

16  Q    How much money were you storing at your residence and did

17  it vary over time?

18  A    It varied.

19  Q    What was the most that you had at your residence at any

20  time?

21  A    About $100,000.

22  Q    Whose money was that?

23  A    Parker's.

24  Q    Would you have been free to spend all that money

25  yourself?

1   A    No.

2   Q    Why not?

3   A    It was his money and I didn't take any of it.  I --

4   Q    Was there any accounting of it?

5   A    No, not that I know of.  The only accounting we did was

6   just -- he knew how much people owed, and he would tell me how

7   much they were supposed to bring.  And then I would count it

8   and make sure it was matched.  And then they just -- as long

9   as they paid what they owed, then that was okay.

10  Q    I'm going to page 3 of Government's Exhibit 44.  And I

11  believe your testimony was that you recognized your

12  handwriting for the name, address, city, state, zip and date;

13  is that correct?

14  A    Yes.

15  Q    And what's the amount on this deposit?

16  A    $8,500.

17  Q    I'm going to page 1 again.  How much is that?

18  A    $6,400.

19  Q    Do you recall what the range of amounts of the deposits

20  you made were?

21  A    I think they were about $5,500 to $9,000.

22  Q    Were they ever over $9,000?

23  A    No.

24  Q    All right.  In speaking to Mr. Coleman, do you know why

25  not?

1    A    He never said why not.

2    Q    Did you ever make more than one multiple thousand dollar

3    deposit in a given day?

4    A    Yes.

5    Q    Could you describe that instance or those instances?

6    A    On one particular day I went to Bank of America and made

7    a deposit in Ballantyne, and then went to Wachovia and made a

8    deposit on another account in the same day.

9    Q    Do you remember who the beneficiaries of those accounts

10   were?

11   A    One was Turtle and one was Kamia.

12   Q    Did you have an understanding as to why you were doing

13   the two separate deposits from speaking to Mr. Coleman?

14   A    I didn't ask.

15   Q    So the instructions for those deposits and the ones that

16   are on Exhibit 44, is that consistent with your testimony that

17   you just received a text from Mr. Coleman with the

18   information?

19   A    And I just did it.

20   Q    I apologize if I've asked you already.  Do you know what

21   the relationship, if any, was between Turtle and

22   Ms. Saulsberry?

23   A    It was my understanding she was his girlfriend and she

24   ended up having a child by him.

25   Q    Like to ask you about the events on and after November

1   2nd of 2010.

2       Do you have personal information about any marijuana that

3   was in 5425 Closeburn Road, Unit 115, on or about November 2nd

4   that law enforcement didn't seize?

5   A    Yes.

6   Q    Tell us about that.

7   A    November 3rd Parker got out of jail and the landlord had

8   changed the locks on the door.  So when he got out of jail he

9   couldn't get in.  And so he called me.  And the police officer

10  was there.  And the police officer said just to bring a copy

11  of the lease and he would let me in the house.

12      So I rode a cab over there and brought the lease with me.

13  And he let us -- he let me, Parker and Shaunda in the house.

14  She was there.  And the house had been raided and everything

15  was still a mess.  The door was -- well, they had put a new

16  door on, but there was -- inside the door area was, like,

17  where the door had been kicked in, and everything was a mess.

18      And we started talking about the day before and how he

19  had gotten arrested.  And Parker and Shaunda were there and

20  they told me that on the 2nd there were some other people at

21  the house from California.  And they had seen strange cars in

22  the parking area, parking lot with really dark tinted windows,

23  Chrysler 300, just different cars that they had never seen in

24  the area.  And they got suspicious and thought that it was the

25  police.  And someone who was at the house put marijuana in the

1   Porsche Cayenne that was down in the parking garage.

2   Q    And based on your conversations with Mr. Coleman or any

3   of the other co-conspirators about what happened, do you know

4   what the timing was of that movement of the marijuana in

5   relation to the execution of the search warrant?

6   A    I don't know.  It was before they came to the house.

7             MR. BUTLER:  Objection.

8             THE COURT:  I'll sustain the objection as to form,

9   as to the source of the knowledge.

10  Q    Who told you about the movement of the marijuana from the

11  house to the Cayenne?

12  A    Parker and Shaunda were both telling me about it.

13  Q    And did -- did Mr. Coleman tell you at what point it was

14  moved downstairs -- down to the Cayenne?

15  A    After they had seen these cars in the area, they moved it

16  down there.  And then that was before Shaunda took some of the

17  other people -- she was taking them to the airport, and she

18  went to the bank first.  And when she left, then the police

19  came and the marijuana was already in the Cayenne.

20  Q    Did Mr. Coleman -- at the point in time when you were at

21  the apartment with Ms. McAdoo and Mr. Coleman, do you know

22  where the marijuana was at that point?

23  A    It was in the Cayenne.

24  Q    So what happened next?

25  A    So that day Parker told me and Shaunda that we were to

1    get Jason to help us and some other people get some -- have

2    him get some other people and get the marijuana out of there.

3    Q    Did you do that?

4    A    Yes.

5    Q    Tell us what happened?

6    A    Within the next couple days -- well, so I exchanged phone

7    numbers with her and --

8    Q    Had you met Ms. McAdoo prior to that date?

9    A    No.

10   Q    Did you know if she had any kind of relationship with

11   Mr. Coleman, in terms of, like, an intimate relationship with

12   Mr. Coleman at that point in time?

13   A    I had asked him because I had seen a bunch of, like,

14   weave hair in the bathroom, in the shower, and in the sink.

15   So I had asked him about her, because she was over there a

16   lot.

17   Q    What did Mr. Coleman tell you?

18   A    He was like, she's gay.  No.  You know, she's gay.  And I

19   was like, you know, so I just believed him.

20   Q    Did there come a point when you learned about Mr. Coleman

21   having intimate relations with any other women?

22   A    I had seen -- I mean, over the few years I had seen

23   several text of girls asking him to come over, seeing when he

24   was on his way, talking about, you know, him previously have

25   been there, you know, like seeing him that night, sending

1   naked pictures of themselves.

2   Q     The women sent naked pictures of themselves?

3   A     Yeah.  But, you know, I mean, actually I didn't actually

4   know of him having sex with anybody, but, I mean --

5   Q     Did you confront Mr. Coleman after you saw the texts and

6   the pictures?

7   A     Um-hmm, yes.

8   Q     What happened?

9   A     I mean, I always asked him.

10  Q     Did your relationship -- your intimate relationship with

11  him continue after that?

12  A     Yes.

13  Q     Why?

14  A     I mean, we just always had sex until November of 2010.

15  Q     All right.  Turning back your attention to Mr. Coleman's

16  instructions to you about the marijuana and the Cayenne.

17        If you could tell us from where you left off, what

18  happened next?

19  A     So Parker told me and Shaunda to get Jason and get him to

20  get some other people to help us get the marijuana out of the

21  Cayenne.  So I exchanged numbers with her.  And, like, within

22  a day or two called her, made arrangements -- well, I saw

23  Jason and I asked him -- I explained what had happened, and I

24  needed him to help me.  And got back in touch with her and

25  made arrangements to -- to get it out.

1   Q    Were you present when it was actually taken out?

2   A    Yes.

3   Q    How did -- how did you all get it out of the Cayenne?

4   A    Well, they had lost the key so we didn't have the key to

5   get into the door.  And -- so there was a pickup truck that

6   was parked behind the Cayenne, and Jason had a hammer, and he

7   hit the window with the hammer, and the alarm started going

8   off.  And then I reached in through the broken window and

9   opened up the door and went into the back seat and looked

10  behind the seat into the back trunk area, and there was two

11  duffel bags.  And I just got one duffel bag and gave it to

12  Jason, and the other duffel bag and gave it to Jason, and he

13  put it in the pickup truck and then they drove off.

14  Q    Were you in a position throughout that whole interaction

15  to see whether anybody accessed the compartment that you had

16  referenced earlier?

17  A    I don't think so, because -- I don't know because I was

18  outside on the driver's side outside, and that compartment was

19  on the passenger side.  I don't know what happened during that

20  time, it was -- the alarm was going off.  I was nervous.

21  Q    The alarm was going off.  How long were you all there at

22  the vehicle?

23  A    Like a minute.

24  Q    Do you know what happened to the vehicle after you all

25  had left there?

1    A    Well, the vehicle stayed there for a day or two with the

2    broken window.

3    Q    And then what?

4    A    And then we tried to get it -- people -- you know,

5    Shaunda had called a tow truck, and for some reason the way

6    the parking garage was under the ground, the tow truck

7    couldn't get in there.  You had to have a special kind of tow

8    truck.  So one night a tow truck came, couldn't get it out.

9    So, like the next day I called a different tow company and

10   explained the situation where the parking deck was and how the

11   vehicle was.  And they said it required a special kind of

12   pickup truck, so --

13   Q    So ultimately it was --

14   A    It got towed.

15   Q    -- able to be extracted; is that correct?

16   A    Yes.

17   Q    Where was it brought?

18   A    To my apartment for a day -- for like two days and then

19   it was taken to the Porsche dealership.

20   Q    Is that Hendrick?

21   A    Yes.

22        MR. KAUFMAN:  Your Honor, may we have a brief

23   sidebar?

24        THE COURT:  Yes.

25        (Bench conference as follows:)

1      MR. KAUFMAN:  One last brief area I would like to go

2  into just a little bit.  I had not intended, even though Your

3  Honor ruled I could go into the wiretaps and present the

4  recordings, and I say it was not our intention in our case in

5  chief to go into that.  But in light of some of the defense

6  cross-examination about the use of wiretaps and things of that

7  nature, I would like to briefly ask her about the consensual

8  wiretap.  I believe there was already testimony about it in a

9  general term, asking about who she talked to, and if there was

10 any discussion with co-conspirators about Mr. Coleman.

11      THE COURT:  Are you planning on playing --

12      MR. KAUFMAN:  I'm not, Your Honor.  I just wanted to

13 do a very brief -- then I'll be done with her testimony.

14      MR. BUTLER:  Judge, I would object.

15      THE COURT:  Basis.

16      MR. BUTLER:  Well, Your Honor, I mean, they really

17 don't need it.  I don't think I've ever had a case with so

18 much evidence.  I mean, to tell you the truth, I think it's

19 duplicitous not necessary.  She's an eyewitness.  She's laid

20 it out.  I don't know if you can get it laid out any better.

21      THE COURT:  And there's a lot of reasons it's

22 relevant.  Whether it's necessary or not, the jury will tell

23 us later on.  Brief examination in this area --

24      MR. KAUFMAN:  I will, Your Honor.

25      THE COURT:  -- is permitted.  Thank you.

1    (Bench conference was concluded.)

2    Q   (Mr. Kaufman) Ms. Peppers, at some point in time did law

3    enforcement, the case agents, Detective Beaver, Special Agent

4    MacDonald, ask you to agree to a consensual wiretap of a phone

5    that you were using?

6    A    Yes.

7    Q    Can you tell us how you came into possession of that

8    phone?

9    A    That was a phone that I purchased after I got out of

10   jail.

11   Q    And was that your -- was it your sole idea to get the

12   phone and phone number that you had?

13   A    Well, I didn't have a phone at the time.  And when I was

14   at the cafe, Parker's mom came in there and Turtle was on her

15   phone and --

16   Q    How do you know that?

17          MR. BUTLER:  Well, objection.

18          THE COURT:  Sustained.

19          The question was, "Was it your sole idea to get the

20   phone and phone number that you had?"

21          That's the question you should answer.

22          THE WITNESS:  No.

23   Q   (Mr. Kaufman) Whose idea was it?

24          MR. BUTLER:  Objection.

25          THE COURT:  Overruled.

1                THE WITNESS:  Turtle's.

2      Q    How do you know that?

3      A    When I was working at the cafe, Parker's mom came in

4      and --

5                MR. BUTLER:  Objection.

6                THE COURT:  Overruled.

7                THE WITNESS:  She had on -- she had a phone, and

8      said that someone was on there and wanted to talk to me.  And

9      when I got on the phone it was Turtle and --

10     Q    (Mr. Kaufman) Did you recognize his voice from previous

11     encounters?

12     A    Yes.

13     Q    If I could also ask as a background question, how often

14     had you met Mr. Coleman's mother in the past, prior to that

15     date?

16     A    I don't know how many times prior to that date.  But I

17     first met her when I got out of jail.  So I don't really

18     recall exactly how many times before that.

19     Q    Do you happen to recall when -- by the way, what's

20     Mr. Coleman's mother's name?

21     A    Tracy.

22     Q    Now at the time that she came to the cafe and said that

23     Turtle wanted to speak to you, at that point had you agreed to

24     cooperate with law enforcement's investigation?

25     A    No.

1    Q     How soon thereafter did you agree?

2    A     Well, I don't know how long it had been.  How long it was

3    after that.  It was, you know, I had told my attorney that it

4    happened and, you know, I was --

5    Q     Without -- we don't want to go into your communications

6    with your lawyer.

7          So, did you in fact talk to Turtle --

8    A     Yes.

9    Q     -- and when Tracy Coleman came to Pep's Cafe that time?

10   What did he say?

11                MR. BUTLER:  Objection.

12                THE COURT:  Overruled.

13                THE WITNESS:  Basically, he was telling me I needed

14   to get a new phone.  Because I didn't have a phone.  And just

15   wanting to know what had happened.  If they know his name.

16   Q     (Mr. Kaufman) They wanted to know -- Mr. Adams wanted to

17   know if law enforcement knew Mr. Adams' name?

18   A     Yes.  And really just to find out what was going on

19   what -- you know, what I was doing.  What everyone was doing.

20   Q     Now, you stated that you had agreed to a consensual wire.

21   Was it, in fact, the phone that you obtained, based in part on

22   this conversation?

23   A     Yes.

24   Q     Who did you speak with on that particular phone?

25   A     Turtle and Tracy.

1    Q     Anybody else?

2    A     No.

3    Q     Was that the only phone that you had?

4    A     I ended up getting a personal one and I got that one.

5    Q     When you say that one, what kind of phone was that?

6    A     A prepaid phone.

7    Q     Do you recall -- well, in your conversations with Tracy

8    and Tracy Coleman and with Milton Adams, let me start with

9    Ms. Coleman.  Did she discuss with you facts related to the

10   conspiracy?

11             MR. BUTLER:  Objection.

12             THE COURT:  Sustained.

13   Q     With Mr. Adams, in your conversations with him, did you

14   discuss any facts related to Mr. Coleman?

15             MR. BUTLER:  Objection.

16             THE COURT:  Overruled.

17             THE WITNESS:  Any facts related to Mr. Coleman?

18   Q     Well, what if anything did Mr. Adams say to you about

19   Mr. Coleman?

20   A     Just he -- he was just wanting to know what Parker was

21   doing.

22   Q     May I ask, do you recall about how many conversations --

23   how many phone calls you had with Mr. Adams about Mr. Coleman?

24   A     About Mr. Coleman or in general?

25   Q     Well, let's start with in general.

1   A    I mean, in general I talked to him several times.  Like

2   every other day, briefly, just to see what was, you know, what

3   was going on.  Just checking in.

4   Q    How frequently was the -- did any of these phone calls

5   relate to Mr. Coleman?

6   A    Maybe once or twice a week he would just want to know an

7   update on what was going on or different things.  I just can't

8   recall right now what exactly we talked about every time.

9   Q    Did Mr. Adams ever discuss with you his perception of how

10  Mr. Coleman conducted his business in the conspiracy?

11            MR. BUTLER:  Objection.

12            THE COURT:  Sustained.

13  Q    Did you ever discuss with Mr. Adams, for example, defense

14  strategy for Mr. Coleman?

15            MR. BUTLER:  Objection.

16            THE COURT:  Overruled.

17            THE WITNESS:  On -- I'm not really clear what you

18  mean, as far as, if he should go to trial, or if he should

19  plead guilty, or --

20            MR. BUTLER:  Well, objection, Your Honor.

21            THE COURT:  I'll sustain the objection.

22            MR. KAUFMAN:  No further questions, Your Honor.

23            THE COURT:  Mr. Butler, I think before you begin

24  your cross, I think we'll take our morning break at this time.

25            MR. BUTLER:  Yes.

1    THE COURT:  Members of the Jury, again, keep an open

2  mind.  You've heard a lot of evidence, but not all of the

3  evidence.  Haven't heard the instructions of the Court.  So

4  keep an open mind.  Don't talk about the case and we'll see

5  you in 15 minutes.

6    (The jury was escorted from the courtroom at

7  11:44 a.m.)

8    THE COURT:  We ready for the jury?

9    MR. KAUFMAN:  Yes, Your Honor.

10    MR. BUTLER:  Yes, Your Honor.

11    THE COURT:  Call the jury.

12    (The jury was returned to the courtroom.)

13    THE COURT:  Mr. Butler, you can begin your cross

14  whenever you're ready.

15    MR. BUTLER:  Thank you, very much, Your Honor.

16                    CROSS EXAMINATION

17  BY MR. BUTLER:

18  Q    Good afternoon, Ms. Peppers.

19  A    Good afternoon.

20  Q    Now, Ms. Peppers, you indicated that you had a Bachelor's

21  degree from UNCC; is that right?

22  A    Yes.

23  Q    In what field do you have that in?

24  A    Criminal justice.

25  Q    And other than working for Attorney David Lange, the

1    Mecklenburg County Clerk's Office and the Probation

2    Department, what other jobs have you had in criminal justice?

3    A    I did brief work at Pinkerton, doing criminal background

4    checks, pre-employment at one point, and that's all.

5    Q    Now when you were a probation officer, what was your

6    title I, II what?

7    A    It was a PPO II.

8    Q    PPO II.  And who was your immediate supervisor when you

9    were employed at the probation department?

10   A    I had a couple of different ones.  My first was, I can't

11   remember her name --

12   Q    Okay.

13   A    And I had -- I had about three of them.  I know the last

14   one was Verdan.

15   Q    Verdan St. Amie.

16   A    Yes.  And before that it was John Cyrus and before that

17   was Susan Rust.

18   Q    Now, when you resigned from probation, do you recall that

19   you gave your reason for resigning as seeking valid

20   employment?

21   A    Yes.

22   Q    But now, after leaving probation, you didn't really have

23   a legitimate job, did you?

24   A    No.

25   Q    So you were in the drug business, marijuana business?

1   A    No.

2   Q    Okay.  Well, I thought you testified that you took money

3   out to California to buy marijuana and brought marijuana back?

4   A    Yes, that was a year later.

5   Q    A year later.  Okay.

6        And you -- when you transported money out to California,

7   you knew what you were doing; isn't that right, ma'am?

8   A    Yes.  Parker would tell me to and I would --

9   Q    Well, but -- but you were the one that did it.  I mean,

10  nobody forced you to do it; isn't that right?

11  A    They told me to do it.

12  Q    Okay.  But my question is, were you forced to do it?

13  A    I wasn't forced to do it.

14  Q    All right.  And when you came back -- well, strike that.

15       I mean, you could have said, no, I'm not going to do it;

16  isn't that right?

17  A    We had had previous arguments and stuff where, you know,

18  he would punch the wall and other things, and I never said no

19  to him.

20  Q    Well, but that was your choice.  You made a choice not to

21  say no; isn't that right?

22  A    I had no -- I didn't have a choice.  If I said something

23  to him he said, and what?  Like, I had no options.  I had --

24  Q    So you felt like you had no options.  But now, you

25  have -- you have -- strike that.

1       Where did you grow up?

2   A    I lived part of my childhood in Charlotte.  I lived part

3   of my childhood in Maryland.

4   Q    Now, in 2008, 2009, 2010 did you have relatives in this

5   area?

6   A    Yes.

7   Q    In fact, your father was in law enforcement?

8   A    Yes.

9   Q    Is he still in law enforcement?

10  A    No, he's retired.

11  Q    Okay.  And he was -- he used to work down at the

12  courthouse here?

13  A    Yes.

14  Q    Mecklenburg County?

15  A    Yes.

16  Q    State courthouse.  And he lived -- did he live in Union

17  County or Mecklenburg County?

18  A    Mecklenburg.

19  Q    Okay.  So you had relatives here during this time,

20  correct?

21  A    Yes.

22  Q    Well, do you recall, either during the time that you were

23  supervising Mr. Coleman or shortly thereafter, you left

24  probation -- well, actually, I believe it was during the time

25  you were supervising, that you called him up on a restricted

1   phone and invited him out to dinner?

2   A    No, I don't recall.

3   Q    You ever been to Villa Antonio's Restaurant, I think, in

4   Ballantyne.

5   A    Yes.

6   Q    And do you recall an occasion that you were at that

7   restaurant and Mr. Coleman was there?

8   A    Yes.

9   Q    And some of your friends that you had gone to high school

10  were there?

11  A    Yes.

12  Q    And were you a probation officer then or not?

13  A    Yes.

14  Q    Okay.  And you don't recall calling him and inviting him

15  out?

16  A    No.  I recall -- I did see him there.  And I remember

17  seeing him.  I remember seeing him leave with Shondu and some

18  other girls.  And that was it.

19  Q    Well, now, you're talking about Shondu Lynch?

20  A    Yes.

21  Q    That's a male, correct?

22  A    Yes.

23  Q    Do you remember Jerry Davis being there?

24  A    No.

25  Q    Now, you were smoking marijuana after you left the

1   probation department, were you not?

2   A    In 2010 I did.

3   Q    Smoked every day?

4   A    No.  Before I got arrested, maybe five times.

5   Q    Are you sure about that?

6   A    Yes.

7   Q    Now you -- you indicated that you met a person by the

8   name of Champ; is that right?

9   A    Yes.

10  Q    And it's your understanding that Jerry Davis introduced

11  Champ to Mr. Coleman?

12  A    Yes.

13  Q    And Champ is Gerren Darty.  You identified him on the

14  screen?

15  A    Yes.

16  Q    Do you know -- did you know that Jerry Davis was

17  originally from California?

18  A    At that time?  Yes.

19  Q    And you knew that Champ was from California, correct?

20  A    Yes.  Parker had said he was.

21  Q    And did you know that Jerry Davis and Gerren Darty knew

22  each other prior to coming to North Carolina?  Did you know

23  that?

24  A    No.

25  Q    Now, when you leased the U-Haul, did you lease the U-Haul

1   or a car, did you lease?

2   A    He had asked me to rent a car for Champ.

3   Q    And you put down some people as references; is that

4   right?

5   A    Yes.

6   Q    Put your son's name down?

7   A    I thought I put Parker and Champ down.  I don't remember

8   whose names I put.

9   Q    What's your son's name?

10  A    Alex.

11  Q    What's his last name?

12          MR. KAUFMAN:  Objection.

13          THE COURT:  Overruled.

14  Q    What's his last name?

15  A    Bell.

16  Q    Okay.  So if Alex Bell is on the agreement, then -- the

17  lease agreement, then you had to tell them to put it down,

18  right?

19  A    No.  As references, as far as if something -- emergency

20  contact information, is that what you're asking?

21  Q    What I'm asking ma'am, is, if Alex Bell's name is on the

22  lease agreement that you signed, his name had to come from

23  you; isn't that right?

24  A    I didn't put him on as someone who leased the car with

25  me.

1    Q    Okay.

2    A    I don't remember doing that.

3    Q    Okay.  Do you remember putting his name -- giving the

4    U-Haul people that name?

5    A    I didn't go to U-Haul.

6    Q    Okay.  That's fine.  Well did you sign the lease

7    agreement?

8    A    For U-Haul?

9    Q    Yes, ma'am.

10   A    No.  I never went to U-Haul.

11   Q    You never went.  Well, what about the rental agreement

12   for the car?

13   A    I rented a car for Champ.

14   Q    Okay.  The car.  Do you remember telling -- put your

15   son's name on that contract?

16   A    No.

17   Q    Now, you indicated that at some point you're saying that

18   you had some discussions with Mr. Coleman about starting a

19   marijuana business, so to speak; is that right?

20   A    Yes.

21   Q    And you indicated that you gave him some money?

22   A    Yes.

23   Q    And it was a tax refund; is that right?

24   A    Yes.  He told me to give him my tax -- some tax refund

25   money for him to --

1   Q    For what year?  What was the tax refund year?

2   A    2008.

3   Q    Okay.  And the check was in your name; is that right?

4   A    Yes.

5   Q    Was it the federal income tax or state income tax?

6   A    It was both of them.

7   Q    Okay.  And, well, do you have any records of that tax

8   refund?

9   A    I didn't bring them with me.  I have it at home.

10  Q    Okay.  Did you ever show it to Mr. Kaufman, the

11  prosecutor?

12  A    I brought it to the office one day, but I don't think he

13  looked at it.

14  Q    Okay.

15  A    I can't recall.

16  Q    Okay.  So you told the ladies and gentlemen of the jury

17  that at some point you were in love with Mr. Coleman; is that

18  right?

19  A    Yes.

20  Q    When you began making these trips to California, were you

21  working anywhere?

22  A    Yes.  Family Dollar Corporate Office.

23  Q    Okay.  That's in Matthews?

24  A    Yes.

25  Q    Now how long did you work there?

1   A    Until, I think it was July of 2009.

2   Q    Okay.  And after you left Family Dollar, where did you

3   work?

4               MR. KAUFMAN:  Your Honor, may we have a brief

5   sidebar?

6               THE COURT:  Yes.

7               (Bench conference as follows:)

8               MR. KAUFMAN:  Your Honor, I just have some witness

9   security issues.  It's fine for him to go into details about

10  her employment.  I just don't want to -- keep him from asking

11  her where she's currently employed.  I don't believe it's

12  relevant.

13              MR. BUTLER:  I don't care if she's currently

14  employed.

15              THE COURT:  We don't have a problem.

16              (Bench conference was concluded.)

17              MR. BUTLER:  May I continue, Your Honor?

18              THE COURT:  You may.

19              MR. BUTLER:  Thank you.

20  Q    So I believe you indicated that you left Family Dollar,

21  was it July 2009?

22  A    I believe so.

23  Q    Where did you work after that?

24  A    I didn't have a job after that.

25  Q    Okay.  So you didn't work at a job where they took out

1   income taxes from July of 2009 until you got arrested; is that

2   right?

3   A      That's correct.

4   Q      And so when did you start the restaurant, Pep's Cafe?

5   A      That was March of 2010.

6   Q      So from July of 2009 to March of 2010, would it be fair

7   to say that you were relying on the marijuana business that

8   you were in for income?

9   A      Yes.  Parker gave me money.

10  Q      Okay.  But -- but you -- you made, I believe you said you

11  made about 20 trips out to California; is that right?

12  A      Approximately.

13  Q      Okay.  Would it also be fair to say that you, during this

14  time, used your credit card to pay for other people to go out

15  to California?

16  A      When he texted me the information, yes.

17  Q      Well, do you have that phone with those texts in it?

18  A      No.

19  Q      Did you ever give that phone to law enforcement?

20  A      I have had more than one phone.

21  Q      Oh.

22  A      I'm not sure which phone it was.

23  Q      I'm sorry.

24  A      It -- you know, I'm not sure which phone it was.

25  Q      Okay.  Now you indicated that at some point you met

1    Turtle, Milton Adams; is that right?

2    A    Yes.

3    Q    And when you went out to California, sometimes you would

4    stay at his house, sometimes you would stay in a hotel or -- a

5    hotel; is that right?

6    A    Yes.

7    Q    And you stayed at both the houses, the one in Carson City

8    and the one in Tarzana?

9    A    Yes.

10   Q    And Tarzana, that house is a pretty big mansion type

11   house, isn't it?

12   A    Yes.

13   Q    And out there you met Mark Dorsey; is that right?

14   A    Yes.

15   Q    Was he living at -- with Turtle?

16   A    I remember him telling me one time he had a condo.

17   Q    You remember?

18   A    Him telling me one time that he had his own condo.  I'm

19   not sure if he ever -- I think he lived with Turtle when they

20   were in Carson.  And then I don't think they lived together in

21   Tarzana, but I'm not sure.

22   Q    Okay.  So Turtle didn't tell you that he actually got the

23   house in Carson City for Mark Dorsey?

24   A    No.

25   Q    Okay.  And you indicated that as far as you know, during

1  this time, you only saw Mr. Coleman out in California one

2  time; is that right?

3  A    That's all I can remember seeing him there one time.

4  Q    All right.  I thought you said that initially when you

5  became aware of people bringing drugs or marijuana to

6  Charlotte, it was some girls from California?

7  A    Yes.

8  Q    Who were those girls?

9  A    As far as their names, or?

10  Q    Yes, ma'am.

11  A    I only know one of their name's was Jasmine.  I don't

12  remember the other girls' names.

13  Q    Jasmine.  You don't know the last name?

14  A    No.

15  Q    Can you describe her?

16  A    Not in a good way.

17  Q    Do the best you can?

18  A    She was a black female and she wore, like, a head scarf,

19  probably in her 20s.

20  Q    How many did you meet or did you see?

21  A    Like, two maybe.

22  Q    Describe the second?

23  A    I can't really remember, because I just don't really

24  remember -- I don't really remember what they were like.

25  Q    Okay.  Did you ever have an occasion to meet a person by

1    the name of Ahmed Daniel Crockett?

2    A    One time he came to my house but I didn't know -- I

3    wasn't introduced to him, but Parker told me Daniel was coming

4    over.

5    Q    How about Goldie Crockett, did you ever meet her?

6    A    No.

7    Q    Now this Porsche Cayenne, the white Porsche, you drove

8    that vehicle, didn't you?

9    A    I did a few times.

10   Q    Okay.  And other people drove it too; isn't that right,

11   other than Mr. Coleman?

12   A    I don't know who else drove it.  I never saw anybody else

13   drive it.

14   Q    I'm sorry.

15   A    I never saw anyone else drive it.

16   Q    Okay.  All right.  So you never saw Harold Manigault

17   drive it?

18   A    No.

19   Q    You know Harold, don't you?

20   A    Yes.

21   Q    When you would leave LAX to come back to Charlotte, you

22   would have usually two suitcases; is that right?

23   A    Yes.

24   Q    What types of suitcases were they?

25   A    Hard, big plastic suitcases.

1   Q   Okay.  Would you be able to pull them on rollers?  Would

2   you have to carry them in your hands?

3   A   Pull them on rollers.

4   Q   And would you have seen people put marijuana in them?

5   A   I did on at least one occasion.

6   Q   Okay.  Who was doing the loading of those suitcases?

7   A   I saw Chucky and Mark putting marijuana in the suitcases.

8   Q   Mark Dorsey and Chucky, Glenn Carrera?

9   A   Yes.

10   Q   All right.  The TSA person that would take the suitcases

11   as you described earlier this morning, did you ever have a

12   conversation with that person?

13   A   No.

14   Q   But you saw him at the house, at Turtle's house, at least

15   one occasion; is that right?

16   A   Yes.

17   Q   Did you talk to him on that occasion?

18   A   No.

19   Q   And, but you knew that that person was there, correct?

20   A   Yes.

21   Q   Were you ever shown any photographs of anybody that could

22   have possibly been the TSA connection, so to speak, the person

23   that put the bags on the -- or make sure the bags got on the

24   plane?

25   A   No.

1   Q    Did you ever give a description of them to law

2   enforcement?

3   A    I don't -- I don't think I gave a description.

4   Q    Well, but you could have certainly described him?  I

5   mean, you saw him at the airport.  You saw him at the house,

6   right?

7   A    Yes.

8   Q    Okay.  Well describe him to me.

9   A    I mean, do you want his name?

10  Q    Yeah, if you have one.

11  A    The TSA person?

12  Q    Yes, ma'am.

13  A    The one I met was -- or saw was Deondray.

14  Q    Deondray?

15  A    Yes.  He was a black male.  Somewhere, you know, 5'9".

16  About 30 years old.  He had tattoos on his arm.

17  Q    Do you know what the tattoos were of?

18  A    There were a bunch of them.  I don't know.

19  Q    Any facial hair?

20  A    I don't recall any.

21  Q    You indicate from time to time you counted money, you

22  did?

23  A    I counted money.  It was Parker's money, but I counted

24  it.

25  Q    Okay.  And you never used the wrappers; is that right?

1    The money wrappers that Mr. Kaufman was talking about, $1,000,

2    10,000 -- I mean 1,000, 2,000?

3    A    No.  I used rubber bands.

4    Q    Okay.  Now how many people did you take to the airport,

5    to Charlotte Douglas here in town that were going to LA?

6    A    How many different people?

7    Q    Yes, ma'am.

8    A    I can't remember exactly how many, but maybe two or

9    three.

10   Q    Who were they?

11   A    Megan.

12   Q    Megan Baehr?

13   A    Yes.  Nolan.

14   Q    Nolan Robertson?

15   A    Yes.  That's all I can think of right now.

16   Q    Okay.  And when you were out in LA, there were a number

17   of people that picked you up, including Dorsey, Pierce,

18   Carrera and Turtle; is that right?

19   A    Yes.

20   Q    Sometimes by cab?

21   A    Yes.

22   Q    Okay.  Now Ms. Peppers, when you were coming back with

23   the two suitcases, did you ever come back with no suitcases at

24   all?

25   A    I don't remember any times coming back with none.

1   Q    Okay.  Did you always have two or sometimes maybe it was

2   one, if you can recall?

3   A    I remember one time I had one.

4   Q    Okay.  And, of course, you knew when you got to the

5   airport, LAX, that there was a possibility you could have

6   gotten busted, so to speak, arrested, correct?

7   A    They assured me it was safe.

8   Q    Okay.  But -- but, now, regardless of what they assured

9   you, you have a criminal justice background; isn't that right?

10  A    Yes.

11  Q    Okay.  And you know through your educational background

12  and your work experience in criminal justice that people who

13  traffic marijuana at airports sometimes get arrested; isn't

14  that right?

15  A    I can't recall that I've ever heard of it happening prior

16  to now.  But I'm sure it probably has.

17  Q    Okay.  Well, so, are you telling me then that you had no

18  fear?  You weren't worried about getting arrested?

19  A    No, that's not --

20  Q    Okay.

21  A    -- I mean, it was always there.

22  Q    Ma'am?

23  A    It was always, you know, in the back of your head.  But

24  they had assured me it was okay.

25  Q    Okay.  So you kind of just suppressed that and went on

1   about your business; is that right?

2   A    I just did what they said to do.

3   Q    Well, now wouldn't it be fair to say Ms. Peppers, you're

4   an intelligent young lady, wouldn't that be fair; college

5   degree, good job in the past?

6   A    I like to think so.

7   Q    Okay.  Now, you know Mark Hunt; is that right?

8   A    Yes.

9   Q    Did he ever do any handyman work around your home or

10  apartment?

11  A    No.

12  Q    How did you meet Mr. Hunt?

13  A    On Craigslist he had a painting service.

14  Q    So how many guns did you personally have after you left

15  probation?

16  A    I had this one that was an old .25.

17  Q    You didn't have a Glock?  I thought you testified earlier

18  this morning that you had a Glock, too?

19  A    Not me personally.

20  Q    Okay.  Of course, now, as a probation officer you had to

21  qualify with a firearm; is that right?

22  A    Yes.

23  Q    So you had to go out and shoot it at the shooting range?

24  A    Yes.

25  Q    And that was a requirement to maintain your position as a

1   probation officer?

2   A     Yes.

3   Q     Do you recall what type of weapon you used as a PO?

4   A     I don't.

5   Q     Now, initially when law enforcement came to your home to

6   arrest you, you didn't talk to them, did you?  I mean, you

7   didn't cooperate; is that right?

8   A     I didn't.

9   Q     And they wanted to search your place, and did you tell

10  them that they needed a search warrant?

11  A     I don't remember saying that.

12  Q     Okay.  But you remember signing a waiver of your --

13  signing the waiver saying that, you know, you didn't want to

14  talk to them, that you wanted a lawyer; is that right?

15  A     I don't remember signing anything.

16  Q     Okay.  Okay.  But you do remember that you didn't talk to

17  them?

18  A     Yes.

19  Q     Okay.  And at some point they found the .25 in a drawer

20  in the residence; is that right?

21  A     Yes.

22  Q     But you -- subsequently you began to cooperate, correct,

23  with law enforcement?

24  A     I ended up pleading guilty.

25  Q     And you ended up pleading guilty, and you know that

1  there's provision in your plea agreement that talks about

2  substantial assistance; isn't that right?

3  A    I really can't recall right now exactly what it says in

4  there.  If --

5  Q    Well, you know what substantial assistance means, don't

6  you?

7  A    Yes.

8  Q    Can you tell the ladies and gentlemen of the jury your

9  interpretation what that means?

10  A    Providing assistance to the government.  I guess when

11  they ask, be truthful about what you have to say.

12  Q    As a result of that, you stand to get a benefit, correct?

13  A    It's -- there's nothing guaranteed.  I mean, it's up to

14  the courts.

15  Q    Yes, ma'am.  But there is a -- there's a possibility that

16  you could get a reduced sentence, isn't it?

17  A    There is a possibility.

18  Q    Yes, ma'am.  And you want to get a reduced sentence,

19  don't you?

20  A    I would hope to.

21  Q    Yes, ma'am.  Now Ms. Peppers, now you're not in custody,

22  are you?

23  A    I'm not.  I'm not.

24  Q    Now you've been out of jail for a long time, haven't you?

25  A    I've been out of jail, yes.

1    Q    Do you remember when you got out?

2    A    In November of 2010.  I'm not sure of the exact date.

3    Q    Okay.  Now in regards to the safe that was at the

4    Closeburn residence, you don't know how or when it was placed

5    there; is that right?

6    A    I remember seeing the man -- I was there when actually

7    Parker called me and told me to meet him there.  He was at the

8    front door.  So I went to the front door to meet him, but I

9    don't remember when.

10   Q    So are you saying that Mr. Coleman was there too, when

11   the man came?

12   A    No.  He called me and told me to meet him there -- meet

13   him at the house, that the guy was there to put the safe in.

14   Q    Do you remember what company he was with?

15   A    No.

16   Q    Now did you make any other deposits other than the two

17   that you testified previously about, Kimberly Saulsberry, and

18   Kamia Saulsberry deposit?

19   A    I remember making a few.  I can't remember how many,

20   exactly.

21   Q    But there would be a record of it somewhere if you made

22   it; isn't that right?

23   A    Yes.

24   Q    Now you indicated that at some point after November 2nd

25   of 2010, was it the next day when you went back over to

1  Closeburn and had the police there too, and you showed them

2  the lease and you got back in the place; was it the next day?

3  A    Yes.

4  Q    And you indicated that the Porsche was down in the

5  garage.  You all broke the window and the alarm went off; is

6  that right?

7  A    When I went the next day, I saw Parker and Shaunda.

8  That's not the day that he told me to get the marijuana out.

9  Q    What day was that?  Actually, I'm asking you what day was

10  it when the alarm to the Porsche went off?

11  A    I do not know.

12  Q    Well, that was the day, I thought you said that you took

13  one duffel bag out first, gave it to Jason Banks, then you

14  took the other duffel bag out and gave to it Jason Banks who

15  put it in the back of the truck and left.

16  A    Yes.

17  Q    That day?

18  A    But I don't know what day that was.

19  Q    Okay.  So you don't know if it was November 3rd or 4th?

20  A    (Indicating.)

21  Q    Okay.  That's fine.  But you do recall that the alarm

22  went off?

23  A    Yes.

24  Q    Okay.  And you didn't have -- nobody had a key?  That's

25  why the window was broken, according to you; is that right?

1    A    They told me when they put the marijuana in the Porsche,

2    they lost the key.

3    Q    Okay.  That's fine.  But my question is this,

4    Ms. Peppers, who turned the alarm off?

5    A    I guess it automatically shut off.  I'm not sure.

6    Q    When you all left, the alarm was still on?

7    A    I think it sounded for a little bit, then it turned off.

8    And then it would sound again, and then turn off.  I really am

9    not sure.

10   Q    Yes, ma'am.  And, of course, now, the Closeburn address

11   is a pretty large building, isn't it?

12   A    Yes, it's a condo.

13   Q    Condo.  And the condo that you had leased, Unit 115, it

14   had -- was it three bedrooms?

15   A    Yes.

16   Q    Or two?

17   A    Three.

18   Q    Three?  Okay.

19        You indicated that you saw some pictures on what you

20   stated was Mr. Coleman's phone that depicted women -- naked

21   women; is that right?

22   A    There was all sorts of pictures, yes.

23   Q    Okay.  And now, do you recall which phone that was?

24   A    No, I mean, it was several phones.

25   Q    Okay.  But now, the photograph that you were shown this

1   morning, that was taken at your home, was that the Providence

2   Square residence?

3   A    A photo I was shown this morning?

4   Q    Yes, ma'am, on the screen.  It was Mr. Coleman and the

5   Porsche Cayenne.

6   A    Yes.  That was --

7   Q    Who took that photograph?

8   A    I did.

9   Q    Okay.  And did you take another photograph of Mr. Coleman

10  where his chest area was exposed, it was bare?  Do you

11  remember taking that?

12  A    I have before.

13  Q    Okay.  So Ms. Peppers, when you got involved in taking

14  money and bringing back marijuana, you weren't under the

15  influence of any type of controlled substance, marijuana

16  anything like that, cocaine, Xanax, anything, right?

17  A    Correct.

18  Q    I can't hear you.

19  A    Yes.

20  Q    Okay.  You were not?

21  A    I was not.

22  Q    Okay.  You actually have -- is it two children?

23  A    Yes.

24  Q    Okay.

25           MR. BUTLER:  If I could have a moment, please, Your

1  Honor?

2          THE COURT:  You may.

3          (Pause.)

4  Q   (Mr. Butler) Ms. Peppers, if I may ask, how old are you?

5  A    Thirty-eight.

6  Q    So how old were you when you began supervising Mr.

7  Coleman back in -- what was it, '07?

8  A    I guess I was, like, 33, maybe.

9  Q    Okay.

10 A    I'm just giving a rough estimate.

11 Q    And that's fine.  I appreciate it.

12      How many times would you say you talked to either Agent

13 MacDonald or Detective Beaver in interviews?

14 A    I think I may have seen them about five or six times.

15 Q    Now on any of those occasions, were you shown any type of

16 sexually explicit tapes or videos or photographs of Mr.

17 Coleman and other women?

18 A    No.

19          MR. BUTLER:  If I could have a moment, please.

20          (Pause.)

21          MR. BUTLER:  Thank you, ma'am, for answering my

22 questions.

23          No further questions.

24          THE COURT:  Any brief redirect?

25          MR. KAUFMAN:  I don't know if I can characterize it

1   as brief, but I have a dozen questions or so.

2                  THE COURT:  All right.

3                  MR. KAUFMAN:  Shall I proceed now, Your Honor?

4                  THE COURT:  Yes.

5                  MR. KAUFMAN:  Thank you.

6                          REDIRECT EXAMINATION

7   BY MR. KAUFMAN:

8   Q    Ms. Peppers, you were asked about Shondu Lynch.  Is he

9   another drug dealer by your knowledge?

10  A    Yes.

11  Q    You were asked some questions about whether you had

12  rented a U-Haul.  The vehicle that you rented on January --

13  sorry.  In December of 2008 for Gerren Darty, was that

14  actually rented from Enterprise?

15                 THE COURT:  That's been covered on direct

16  examination.  Exhibits were shown to this witness.  If you

17  have something new, you can ask it on redirect.

18                 MR. KAUFMAN:  Yes, Your Honor.

19  Q    Now you've already been show 54a -- sorry, 54b.  I'd like

20  to show you -- and actually I'm going to show you the physical

21  copy as well as 54a and b; 54a has already been admitted into

22  evidence.

23       You were asked if the documents with Enterprise listed

24  your references.  If you could check 54a or 54b and see if you

25  had to list references in any of those documents which have

1   been received from Enterprise.

2       And Ms. Peppers, what I mean to say, did you fill out any

3   documentation that provided, in writing, any references?

4   A    What type of references?

5           MR. BUTLER:  I would object, Your Honor.  She hadn't

6   answered the first question.

7           THE COURT:  Overruled.

8           THE WITNESS:  I'm not clear as to what kind of

9   references.  I don't see any references of any type.  I don't

10  know what you would mean by reference.

11  Q   (Mr. Kaufman) So in the documents from Enterprise, do you

12  see anything that you wrote that indicated a reference?

13  A    I don't see any references.

14  Q    When you leased the Enterprise, the Caliber, did you

15  provide any information orally?  Did you have a conversation

16  with the people who worked there, or was it done online?

17  A    I think I went to the counter, but I don't, you know, I

18  don't recall what I said to them.

19  Q    Like to turn your attention to a question defense lawyer

20  asked you about phones.  And let me ask you, when you started

21  to cooperate with law enforcement, did you provide phones to

22  them that belonged to you?

23  A    Yes.

24  Q    Did you provide all the phones that you had to them?

25  A    I believe I still had a personal phone for me.  And the

1  phones that I gave them, I had purchased as pay as you go type

2  phones.

3  Q    And that one personal phone, do you recall if that was

4  activated before or after the so-called takedown, the arrests

5  in this case?

6             MR. BUTLER:  Objection.

7             THE COURT:  Overruled.

8             THE WITNESS:  That phone was purchased after.

9  Q    Okay.  So were there any phone that had any sort of

10  evidence related to the conspiracy that you held back from

11  giving to law enforcement?

12  A    No.  They took the phone -- any phones that I had.

13  Q    Defense lawyer asked you about how many times you saw Mr.

14  Coleman in California, and I believe your testimony was that

15  it was once.

16       Did Mr. Coleman ever tell you about other trips that he

17  made to California when you weren't present?

18  A    I know he went for a baby shower.  I think he went for a

19  birthday, so a couple times.

20  Q    The defense lawyer asked you whether you described TSA

21  insiders.  Do you recall law enforcement asking you for

22  description of the law enforcement insiders -- I mean, TSA

23  insiders?

24  A    I don't recall them asking for a description.

25  Q    Would it refresh your recollection to review a report of

1  interview that they had with you?

2  A    Okay.

3        MR. KAUFMAN:  I'm showing defense counsel what's

4  been marked as Government's Exhibit 66 for identification.

5  It's a 10-page document.

6        THE COURT:  If there's a specific portion of that

7  document that you believe might refresh recollection, why

8  don't you direct attention to it.

9        MR. KAUFMAN:  Yes, Your Honor.

10  Q    Like to direct your attention to -- it's a -- as I said,

11  a 10-page document.  I would like to direct your attention to

12  page 7, the last paragraph.  If you could review that

13  paragraph and let me know if that refreshes your recollection.

14  But please don't read from the report.  If you could just read

15  it to see if it refreshes your recollection.

16  A    Okay.

17  Q    Is your recollection refreshed?

18  A    Yes.

19  Q    All right.  I would like to retrieve 66 for

20  identification.  With your refreshed recollection, do you

21  recall now having conversation with law enforcement providing

22  a description to them?

23  A    Yes.

24  Q    And what was that description?

25  A    I said he was a black male, about 5'8" and pudgy.

1  Q    Do you recall providing a name for the person?

2  A    Yes.

3  Q    What did you tell them?

4  A    Deondray.

5  Q    Do you recall whether you had described the procedures

6  that were followed with Deondray?

7  A    Yes.

8  Q    Do you recall providing a full description as to the best

9  of your recollection at the time of this interview?

10 A    Yes.

11 Q    You were asked by the defense lawyer how many couriers

12 you had brought to the airport.  I believe you said two or

13 three mentioning Megan Baehr and Nolan Robertson.  Did you

14 ever take Mark Hunt to the airport?

15 A    Not that -- I don't -- I don't think I ever took him.  I

16 can't recall, but I don't think so.

17 Q    Did you ever take Samantha Schmidlin?

18 A    No.

19 Q    Did you ever take Harold Manigault?

20 A    I don't remember ever taking him.

21 Q    Did you ever take Christopher McKneely, also known as

22 Esco?

23 A    I don't remember taking him.

24 Q    Now, was Mr. McKneely a courier?

25 A    As far as I knew he was.

1  Q    Okay.  You were asked about questions about how secure

2  your activity was in terms of taking money and drugs on the

3  airlines.  Can you tell us how did you feel when you were

4  going through security and getting on to the airplane knowing

5  what you were doing?

6  A    It -- I mean it was -- you know, a feeling of disbelief.

7  Q    How so?

8  A    Just that this, you know, is happening.

9  Q    Can you describe a little bit more?  What do you mean by

10 that?

11            MR. BUTLER:  Objection.

12            THE COURT:  Sustained.

13 Q    Let me ask you, you were asked by the defense lawyer

14 about the .25 caliber handgun that was seized from your

15 residence.

16     Did they find that on their own, or did you in fact

17 direct law enforcement to where they would find it?

18 A    I showed them.  They asked me if I had any, you know,

19 weapons or anything.  And I just showed them where it was,

20 and --

21 Q    You were asked about -- by the defense lawyer, as well as

22 on direct, about Exhibit 44, those deposits, deposit slips to

23 Ms. Saulsberry's accounts -- or account, that is.  Did you

24 just make deposits to Ms. Saulsberry's and Turtle's bank

25 accounts, or were there others too?

1    A    I remember --

2              MR. BUTLER:  Objection.

3              THE COURT:  Basis.

4              MR. BUTLER:  Your Honor, please, I think it's

5    already covered.

6              THE COURT:  I believe it has been.  Sustained.

7    Q    You were asked about the time with the safe and described

8    how Mr. Coleman called you to go to the front door when the

9    person installing the safe was there.  When you received that

10   call from Mr. Coleman, were you inside the unit at Closeburn

11   Road?

12             MR. BUTLER:  Objection.

13             THE COURT:  Overruled.

14             THE WITNESS:  No, I wasn't there.  He had called me

15   and asked me to go to the residence that the man was there.

16   So I went there and met him there.

17   Q    (Mr. Kaufman) The defense lawyer asked you if you've been

18   in custody.  And you stated that you have not.  Have you been

19   under a court ordered bond?

20   A    Yes.

21   Q    Have you been under various court requirements

22   throughout?

23   A    I'm on home detention.

24   Q    And have you been compliant with all terms and conditions

25   of your release?

1   A    Yes.

2   Q    You were asked several questions about whether you were

3   hoping for a lower sentence for your providing truthful

4   testimony.  Who, to your understanding, is it that decides

5   what your sentence will be?

6   A    The judge.

7   Q    Which judge, do you know?

8   A    Judge Conrad.

9          MR. KAUFMAN:  Thank you.  Nothing further.

10         THE COURT:  Any recross?

11         MR. BUTLER:  No, Your Honor.  Thank you, very much.

12         THE COURT:  You may step down and be excused.

13         Members of the Jury, we'll take our lunch break at

14  this time.  Don't talk about the case.  Keep an open mind and

15  we'll see you back at 2:15.

16         (Lunch recess from 1:12 until 2:15)

17         THE COURT:  We ready for the jury?

18         MR. KAUFMAN:  Yes, Your Honor.

19         MR. BUTLER:  Yes, sir.

20         (The jury was returned to the courtroom.)

21         THE COURT:  Call your next witness.

22         MR. KAUFMAN:  The United States calls Mark Hunt.

23           MARK HUNT, GOVERNMENT WITNESS, SWORN

24                    DIRECT EXAMINATION

25  BY MR. KAUFMAN:

1   Q    Good afternoon.

2   A    Good afternoon.

3   Q    In a loud and clear voice, if you could state your full

4   name and spell it for the record, please.

5   A    Mark R. Hunt.  M-A-R-K.  R-E-N-E.  H-U-N-T.

6   Q    Sir, have you pleaded guilty to a conspiracy to traffic

7   in marijuana and to launder the proceeds of that marijuana

8   trafficking?

9   A    Yes, sir, I have.

10  Q    Do you recognize any of your co-conspirators in those

11  conspiracies in court today?

12  A    Yes, sir, I do.

13  Q    Who do you recognize?

14  A    Parker Coleman.

15          MR. KAUFMAN:  And with Mr. Hunt pointing in the

16  correct location, we would like the record to reflect a

17  correct in-court identification of the defendant.

18          THE COURT:  The record will reflect an in-court

19  identification of the defendant.

20          MR. KAUFMAN:  Thank you, Your Honor.

21  Q    Mr. Hunt, what was your role in the conspiracy?

22  A    Basically a gopher, or a mule, as they call it.

23  Q    And so, when you say a gopher or a mule, what

24  specifically did you do?

25  A    I took money from Point A to Point B.

1   Q    And what were those Points A and B?

2   A    Charlotte to California.

3   Q    How many trips did you make?

4   A    To my memory, three to four.

5   Q    Now, did you have, also, legitimate work with Mr.

6   Coleman?

7   A    Yes.  His fiance called, got my number off of Craigslist.

8   And when I first met him, I was to do some work on his

9   condominium; been a contractor for 20 years; condominium

10  design -- painting and design and color schemes.

11  Q    When you say his fiance, who is his fiance?

12  A    At the time she was introduced as his fiance, but it was

13  Stephanie -- Stephanie.

14  Q    I'd like to show you what's been marked as Government's

15  22c, it's been admitted.  Do you recognize this photograph?

16       My apologies.  Do you recognize this photograph?

17  A    Yes.

18  Q    Who is that?

19  A    Stephanie.

20  Q    So, by the way, who introduced you to Stephanie as Mr.

21  Coleman's fiance?

22  A    On the telephone when they were asking me to come out and

23  give them a bid on the townhouse.  She said, I and my fiance

24  need this townhouse painted.

25  Q    Oh, so was it Mr. Coleman who used the term "fiance"?

1   A    I think it was Stephanie.

2   Q    Okay.  Now, have you been convicted of any felonies other

3   than obviously the charges that you've already discussed

4   today?

5   A    No, sir, I haven't.

6   Q    You recall when you first contracted with Mr. Coleman

7   and -- to do the contract work?

8   A    I'm not good with dates at all.

9   Q    Would it help if I showed you a contract?

10  A    Yes, sir.

11  Q    And, in fact, I have what's been marked as Government's

12  39 for identification.  And this is page 1, page 2.  Two-page

13  document.  Do you recognize this?

14  A    Yes, sir, that's my contract.

15  Q    Is this a contract that you create and maintain in the

16  ordinary course of your business?

17  A    That's correct.

18          MR. KAUFMAN:  Your Honor, I would seek to have 39

19  admitted and published to the jury.

20          THE COURT:  Any objection?

21          MR. BUTLER:  No objection.

22          THE COURT:  Let it be admitted.  You may publish.

23          MR. KAUFMAN:  Thank you, Your Honor.

24          (Government's Exhibit No. 39 was received into

25  evidence and published.)

1    Q   (Mr. Kaufman) Now this contract on -- near the top right,

2    it indicates 8/8/09.

3    A    Um-hmm.

4    Q    Is that when you did your first contracting work or at

5    least filled out the paperwork on your first legitimate

6    contracting work for Mr. Coleman?

7    A    That was the first day I met him.  I wrote the contract

8    and he paid me the deposit in cash.

9    Q    Okay.  Did there come a time when anybody involved in the

10   conspiracy asked you to create false documents regarding work

11   that had not been done?

12   A    Against my better judgment, Parker Coleman called me from

13   the Mecklenburg County Jail.

14   Q    And can you tell us what happened?  What was said in that

15   phone call?

16   A    Well, he didn't call me, per se.  But my phone rang a few

17   times a week during late nights, and I think it was him trying

18   to contact me, because --

19                MR. BUTLER:  Well, objection.  Move to strike.

20                THE WITNESS:  Yeah.  He -- I should say --

21                THE COURT:  Sustained as to what you think.

22   Q   (Mr. Kaufman) Mr. Hunt, these phone calls that you

23   received, did you have any way of identifying from whom those

24   calls came?

25   A    The recording led me to believe it was coming from the

1   Charlotte-Mecklenburg County Jail.

2   Q    Was that specifically stated in a voice mail left on your

3   phone?

4   A    (Indicating.)

5   Q    Why do you believe -- what's your basis for believing it

6   came from jail?

7   A    It was a collect call.  I don't get collect calls.

8   Q    All right.  Well, if we can address the issue of the

9   false receipts.  What information, if any, do you have about

10  co-conspirators trying to get those?

11  A    His mother called me and asked me to go see him.

12           MR. BUTLER:  Objection.

13           MR. KAUFMAN:  Whose mother?

14           THE COURT:  Sustained.

15           MR. BUTLER:  Move to strike.

16           THE COURT:  The jury disregard the testimony as to

17  what the mother said.

18  Q    (Mr. Kaufman) Based on conversations with anybody, did you

19  end up going to see Mr. Coleman?

20  A    Yes.

21  Q    Tell us what happened.

22  A    That's when he asked me about false -- making false

23  receipts.

24  Q    Now, if you could help us out a little bit, instead of

25  saying "he," can you use people's names, please?

1   A    That's when Parker Coleman requested that I make phoney

2   receipts from my state -- from my statements.

3   Q    When was that and where did that conversation take place?

4   A    He was behind the glass at the Charlotte-Mecklenburg

5   County Jail.

6   Q    Was anybody else present with you?

7        Let, me rephrase.  Did anybody else at least go to the

8   jail with you?

9   A    Yes, sir.

10  Q    Who was that?

11  A    Jason Banks.

12  Q    Is he a co-conspirator as well?

13  A    Yes, sir.

14  Q    What kind of receipts did Mr. Coleman ask you for?

15  A    The receipt you're looking at on the monitor.

16  Q    Well, this exact receipt?  Are you saying it's this

17  receipt in Exhibit 39, or receipt similar to it?

18            MR. BUTLER:  If Your Honor, please.  Excuse me.

19  When I'm seated, I can barely see Mr. Hunt --

20            THE COURT:  All right.  Let's -- Mr. Hunt, if you

21  would put that screen down unless you're looking at something

22  on the screen.

23            MR. BUTLER:  Thank you.

24            THE WITNESS:  I think the idea was to have one of

25  these receipts with my letterhead made out to his restaurant.

1  Q   (Mr. Kaufman) Now, do you have actual knowledge whether

2  Mr. Coleman had a restaurant?

3  A    I've never been there.

4  Q    Let me ask you about firearms.  Did you ever have any

5  transactions with Mr. Coleman related to firearms?

6  A    When I was working on his condominium, he asked me if I

7  could locate some firearms for him.  This conversation, I was

8  kind of shocked.  Probably because I own some firearms.  I'm

9  not a felon.  And against my better judgment, after he asked

10 me several times, not knowing his history, I carried some

11 firearms from him with the phone call.

12 Q    Okay.  What kind of firearms we talking about?

13 A    He said that he wanted anything above a .9 mm.

14 Q    And what kind of firearms did you in fact get?

15 A    A .45 caliber Smith and Wesson.

16 Q    Can you describe the Smith and Wesson in more detail?

17 You said it was a .45 caliber Smith and Wesson?

18 A    I had it for approximately five days when I sold it to

19 him.  I was basically a middleman.

20 Q    Do you recall what the look of the firearm was?

21 A    Vaguely.

22 Q    Please tell us.

23 A    I don't know if it was nickel plated, or I could identify

24 it in a picture if you had a picture of it.

25           MR. BUTLER:  We would object, Your Honor.

1        THE COURT:  You object to what?

2        MR. BUTLER:  To displaying of the pistol at this

3  point.

4        THE COURT:  Overruled.

5        MR. KAUFMAN:  Again, I just note for the record that

6  the firearm has been cleared by the U.S. Marshals and there

7  has been a plastic band attached so that the mechanism will

8  not fire.

9  Q    I'm showing you what's been admitted already as

10  Government's Exhibit 17b.

11       Do you recognize this?

12  A    That would be it.

13  Q    This would be what?

14  A    That would -- that would be the gun that I sold him.

15  Q    Was this the only firearm that you sold him?

16  A    No, sir.  I had mentioned in conversation when I was

17  driving home from his job, that I had in my collection a

18  Tactical 9 Cobray.  And he basically said, I want it.  And I

19  told him, it's not for sale.  It's my collection.  Parker

20  Coleman does not take no, for an answer.

21       MR. BUTLER:  Objection.

22       THE COURT:  Overruled.

23       THE WITNESS:  He said, name your price.  I says, I'm

24  not selling it.  He says, I'll double your money.  I says,

25  I'll probably see you tomorrow and I'll have it with me.  I

1    was having financial troubles at the time.

2    Q   (Mr. Kaufman) So what happened next?

3    A    I brought it to his condominium and he purchased it,

4    cash.

5    Q    Now, can you describe the weapon for the jury?

6    A    A Tactical 9 is -- it's a -- it's a gun that used to be

7    made in North Carolina.  They -- the company went out of

8    business.  It's a Cobray, it's a collector's item.  They don't

9    make them anymore.  It's a compact type of gun that holds up

10   to 30 rounds of ammunition.

11   Q    Does it hold those rounds in the body of the weapon or

12   does it require a magazine to hold those?

13   A    It requires a factory extended clip.  There's a lot of

14   options that you can buy for this gun.  You can buy any type

15   of add-on you want.  Makes it very attractive for a collector.

16   Q    And what does the standard clip look like?

17   A    The standard clip does not extend -- the standard clip --

18   the added clip extends about 6 inches from the base.

19   Q    And what's the shape of the clip?

20   A    (Indicating) Just --

21   Q    Well, I guess, is it a straight clip or --

22   A    Straight clip.

23   Q    Does the weapon -- does it potentially take anything

24   other than a straight clip, to your understanding?

25   A    Yes, I do.  I've -- I've never seen those -- nothing like

1  a drum clip or banana clip or anything like that.

2  Q    Now, had you ever -- the contract that we just saw in

3  Exhibit 39, it indicates on it 15724 Kensington Palace Lane.

4  Had you in fact been to that location?

5  A    Yes, I have.  On more than one occasion.

6  Q    And do you know who lived there?

7  A    Yes.

8  Q    Who?

9  A    Parker Coleman.

10  Q    Anybody else?

11  A    Not to my knowledge.

12  Q    Did there come a time when you became aware of him moving

13  to any other location?

14  A    Yes, sir.  But I couldn't give you a specific date.

15  Q    Do you have a general recollection of a month or season

16  or year?

17  A    No, sir, I don't.

18  Q    Well, do you recall what that other location was?

19  A    Yes, sir.

20  Q    What was it?

21  A    It's located near South Park mall on -- Fairview and Park

22  Road.

23  Q    And have you been to that location?

24  A    Yes, sir, I have.

25  Q    You've been inside of his apartment?

1   A    On several -- several occasions.

2   Q    For how long?

3   A    Maybe an hour.

4   Q    Each time?

5   A    Um-hmm.

6   Q    Is that a yes?

7   A    Yes, sir.

8   Q    Sorry.  Just for the record.

9            MR. BUTLER:  Again, Your Honor, I can't see Mr.

10  Hunt.

11           THE WITNESS:  (Lowering monitor.)

12  Q    (Mr. Kaufman) So when you went to Mr. Coleman's residence

13  on Closeburn, what were you there for?

14  A    Initially, I think he wanted to do some painting work.

15  Q    And was it just for legitimate work that you were there?

16  A    I think he asked a few questions on what it would take to

17  spruce up the place, because it was just neutral on the walls.

18  Q    So had you been throughout that apartment or was it --

19  were you just in certain rooms?

20  A    I didn't make a habit, unless he took me into a room, to

21  walk through the apartment.  No, sir.

22  Q    Do you know if anybody else lived there?

23  A    Not for certain.  Anybody -- I wasn't under the

24  impression anybody lived there.  I can't say for certain.

25  Q    Did see -- for example, did you see anything other than

 1   men's clothing or men's belongings there?

 2                MR. BUTLER:  Objection.

 3                THE COURT:  Overruled.

 4                THE WITNESS:  No.  Not that -- I didn't get the

 5   impression anybody lived there, but Parker.

 6                MR. KAUFMAN:  Nothing further, Your Honor.

 7                THE COURT:  Any cross?

 8                MR. BUTLER:  Yes, Your Honor.  Thank you.

 9                          CROSS EXAMINATION

10   BY MR. BUTLER:

11   Q    Good afternoon, Mr. Hunt.

12   A    Good afternoon.

13   Q    Mr. Hunt, you -- you indicated you had some financial

14   problems; is that right?

15   A    Yes, sir.  When the housing market crashed, there was not

16   a lot of work back then.  People didn't have equity in their

17   homes to --

18   Q    Well, do you have any documentation that you bought this

19   weapon, the .45 Smith and Wesson?

20   A    The individual I bought it from, I would give him my

21   driver's license.  He would give me his driver's license.  He

22   would not expose himself, as far as if anything were to happen

23   with the weapon that would have a backlash on him.

24   Q    Well, but, are you saying that you don't know if the

25   weapon was dirty or not?

1   A    These weapons were not hot.  They were brand new.  I

2   would --

3   Q    Now -- so you didn't buy it from a gun store, Hyatt or

4   Fire Power or anything like that.  You bought it from an

5   individual?

6   A    I bought it from an individual who would buy it

7   practically new.  He might make $100 on it.

8   Q    Well now, you never told law enforcement that, did you?

9   Who you bought it from?

10  A    I had receipts on my dashboard of when they took my GPS,

11  computers, and things like that, the paperwork I had for these

12  guns got missing out of my van.

13  Q    Well, what about this other gun you were talking about,

14  the one with the clip, 6-inch clip?

15  A    That --

16  Q    Where did you get that from?

17  A    I purchased that from an individual that I buy paint

18  from.  He was having financial hard time and --

19  Q    So what -- I'm sorry --

20  A    And I didn't buy that particular gun with paperwork.  But

21  I was going to get it registered because it was not stolen.

22  Q    So both guns -- are you saying that you didn't have a

23  permit to buy them cause you didn't need one; is that right?

24  A    Well, you should have a permit when a buy a handgun.  But

25  if you don't, you can register that handgun in the state that

1    you live in, if it's not stolen or hot.  I had basically drug

2    my feet about doing -- going through that process.

3    Q    So you were going to register in the state that you live

4    in, which was North Carolina.  Is that what you tell the

5    ladies and gentlemen?

6    A    In Shelby.  I had gun permits for Charlotte.  I didn't

7    have gun permits for Shelby.

8    Q    Now, but you didn't use any gun permits to buy any of

9    these guns that you say you bought; isn't that right?

10   A    Right.

11   Q    Now you talked to Stephanie Peppers before, have you not?

12   A    Yes, sir I have.

13   Q    You met her?

14   A    Um-hmm.

15   Q    Well, didn't you tell law enforcement that you purchased

16   one of the guns off the internet?

17   A    The individual I bought the Tech 9 from, I corresponded

18   with him on the internet.

19   Q    And --

20   A    I don't -- excuse me.

21   Q    I'm sorry.  Go ahead.

22   A    I purchased paint from him previously.  He was having

23   financial hard time.  And that's the business that I'm in.  So

24   during conversation, he says I'm selling a Tactical 9.  And he

25   told me what the make and the model was and the brand.  And I

1    said if it's a Cobray, when I buy the paint, I'll buy it from

2    you as well.  And I bought paint from him, purchased the gun

3    at the same time.

4    Q    Did you have that computer that you used to buy this

5    Cobra when you were arrested?

6    A    Do I have -- yes.

7    Q    Did you have a computer that you used?

8    A    Yes, sir.

9    Q    Sir?

10   A    Yes, sir, I do.

11   Q    Was it seized by law enforcement?

12   A    It was stolen.  If I'm not mistaken, it was stolen.  I

13   had a computer stolen out of my van.  And if it wasn't that

14   one, then I may have corresponded with him on the replacement.

15   Q    But I thought you just told me that you had it when you

16   were arrested by law enforcement.

17   A    Yes.  I have a replacement computer.  But if -- the time

18   that I corresponded with Parker, I don't know if -- which

19   computer I corresponded with this individual on, which laptop

20   it was.  Because I had a computer stolen out of my van, and

21   that's usually the one that I did my business with, because I

22   was mobile.  I was more in the field than I was at home.  And

23   I would correspond with other contractors while I was on the

24   job with my laptop.

25   Q    Now, you pled guilty in this case; is that right?

1   A    Yes, sir I did.

2   Q    And pled guilty to a quantity of at least 100-kilograms

3   but less than 400-kilograms of marijuana; is that right?

4   A    Yes, sir.

5   Q    And you had weapons, you had firearms, correct, during

6   the time that you were in the conspiracy that you pled to?

7   A    I had a few pistols.

8   Q    Okay.  But you didn't plead to a gun charge, a 924(c) gun

9   charge, did you?

10  A    I don't know what a 924(c) gun charge is.

11  Q    Well, did you plead to anything other than the conspiracy

12  and the money laundering count?

13  A    I pleaded guilty to selling Parker Coleman guns, and

14  money laundering, and conspiracy.

15  Q    So you pled guilty to selling Parker Coleman a gun?

16  A    I don't know the technical terminology for it, but

17  whatever is on the indictment is what I pled guilty to.

18  Q    Well, if your plea agreement says you pled to Count One

19  which is a conspiracy, and Count Two which is a money

20  laundering count, are you telling the ladies and gentlemen of

21  the jury that you pled to something else, too?

22  A    I'm not telling them anything.  I'm telling you I pled

23  guilty to what is on the indictment.  That's the Queen's

24  English.  I don't know what else to tell you.

25  Q    Well, you know, Mr. Hunt, that you didn't plead guilty to

1  selling Parker Coleman a gun, did you?

2  A    I have enhancements.

3  Q    You have a two-level gun enhancement, don't you?

4  A    Yes, sir.

5  Q    That's for you having a gun; isn't that right?

6  A    Could you rephrase that?

7  Q    You have a two-level gun enhancement and it doesn't say

8  that you sold anybody a gun?

9              MR. KAUFMAN:  Objection.

10             THE COURT:  Sustained.

11             THE WITNESS:  Well, that's --

12             MR. KAUFMAN:  Objection.

13             THE COURT:  I sustained the objection so don't

14  answer the question ask your next question, Mr. Butler.

15 Q    (Mr. Butler) Mr. Hunt, you -- if I could have a moment?

16             (Pause.)

17 Q    You know William Pierce, did you not, Poo, you know him?

18 A    No, sir.

19 Q    You don't know Poo?

20 A    I have to see his face.

21 Q    Do you know Harold Manigault?

22 A    Yes.

23 Q    He's back in the holding cell with you, isn't he?

24 A    That's correct.

25 Q    He was there yesterday too, correct?

1   A    Yes, sir.

2   Q    And now, you know Nolan Robertson, don't you?

3   A    I never met him until I was incarcerated with him.

4   Q    Okay.  But you know him now?

5   A    Yes, sir.

6   Q    He's back there too, isn't he?

7   A    No, sir.

8   Q    Now, what you -- you're providing substantial assistance

9   to the government, aren't you not?

10  A    Yes, sir.

11  Q    Sir?

12  A    Yes, I am.

13  Q    And you are hoping to get a lighter sentence for your

14  cooperation and your testimony, aren't you?

15  A    Absolutely.

16  Q    And you want to -- strike that.  Let me ask you this.

17       Now, you know Jerry Davis, don't you?

18  A    No, sir, I don't.

19  Q    Well, who else do you know in this case?

20  A    Harold Manigault, Jason Banks, Mark Dorsey, Parker

21  Coleman, Stephanie.

22  Q    You know Turtle?

23  A    Yes, sir.

24  Q    Chucky?

25  A    Yes, I do.

1   Q    Did you know Esco?

2   A    No, sir.

3   Q    You know Poppa?

4   A    No, I don't.

5   Q    Now during the time of your involvement with the

6   conspiracy, were you using any drugs?

7   A    No, sir.

8   Q    Have you ever used any drugs?

9   A    No, I don't.

10  Q    You never had any treatment?

11  A    I've taken prescription medication for --

12  Q    I'm sorry?

13  A    I have taken prescription medication for anxiety attacks,

14  but not street drugs.

15  Q    Now you indicated that you had a conversation with Mr.

16  Coleman about falsifying some receipts; is that right?

17  A    That's correct.

18  Q    You never did that, did you?

19  A    No, sir.

20  Q    Well, now, Mr. Hunt, do you know a Boogie?

21  A    Yes, sir, I do.

22  Q    And who is Boogie?

23  A    What's his real name?

24  Q    Yes, sir.

25  A    I can't tell you.

1  Q    His real name is Jerry Davis, isn't it?

2  A    If you say so.

3  Q    But you know Boogie?

4  A    If -- I know the person they call Boogie.

5  Q    And you know him cause you've talked to him before,

6  haven't you?

7  A    Yes, I have.

8  Q    And you've talked to him about marijuana, haven't you?

9  A    I can't -- I can't recall a conversation I had with him

10  about marijuana.

11  Q    What did you talk to him about?

12  A    I didn't have that much business with Boogie.  Boogie was

13  Parker's friend, as far as I was concerned.

14  Q    Well, you don't remember leaving a message talking about

15  getting some work and you already checked with Boogie or

16  something to that effect?

17  A    No, sir.

18         MR. BUTLER:  Thank you.  I have no further

19  questions.

20         THE COURT:  Any redirect?

21         MR. KAUFMAN:  Yes, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MR. KAUFMAN:

24  Q    Mr. Hunt, are there some people who you know by nickname

25  only, and not their true name?

1    A    That's correct.

2    Q    I would like show you what's been admitted as 22g.  Do

3    you recognize on the screen, the person depicted there?

4    A    If you could tell me his name, I could.  His name slips

5    my mind.

6             MR. BUTLER:  I'm sorry, Your Honor.  I couldn't

7    understand what he said.

8    Q    (Mr. Kaufman) His name slips your mind.  Do you know this

9    person, if not by real name by nickname?

10   A    His face looks familiar, but I'm not even sure if I'd

11   recognize his --

12   Q    Like to show you what's been admitted already as

13   Government's 22f.  Do you recognize this person?

14   A    No, sir.

15   Q    Now with regard to some questions from the defense

16   lawyer, you had indicated that you're hoping for a lighter

17   sentence.  Have there been any promises or guarantees made to

18   you about what your sentence will be?

19   A    No, sir, I don't believe so.

20   Q    Who ultimately is going to decide what your sentence is

21   going to be?

22   A    The courts.  I would assume the courts.

23   Q    And when you say the courts, do you know specifically

24   who?

25   A    The judge.

1    Q    Do you know who the judge is?

2    A    Yes, sir.

3    Q    Who?

4    A    To the left of me.

5    Q    And what's -- with regard to your testimony, what's your

6    understanding as to the key requirement that's incumbent upon

7    you, if you are to receive a downward departure or a lighter

8    sentence?

9    A    Tell the whole truth, nothing but the truth.  To

10   cooperate.

11            MR. KAUFMAN:  Nothing further, Your Honor.

12            MR. BUTLER:  If Your Honor please, may we have a

13   quick sidebar?

14            THE COURT:  Yes.

15            (Bench conference as follows:)

16            MR. BUTLER:  If Your Honor please, Mr. Hunt was also

17   subject of the mental health drug treatment motion.  I was

18   wondering if --

19            THE COURT:  Apparently you filed a motion last week

20   that was referred to Judge Cayer, at least as to the other

21   witness, I can't remember who that was.

22            MR. BUTLER:  Samantha Schmidlin and Megan Baehr.

23            THE COURT:  Well, I think this came up during

24   Schmidlin's examination, and I understand that Judge Cayer has

25   ordered documents to be produced, but there hasn't been any

1  received. And so there's nothing to produce to you there.

2  And I don't know, when did you file this motion with respect

3  to Mr. Hunt?

4      MR. BUTLER: It was last week.

5      THE COURT: Last week too?

6      MR. BUTLER: Yes, sir.

7      THE COURT: So there's nothing the Court has to

8  tender to you, so I think you've asked him about medication.

9  I think he's indicated he took prescription drugs for anxiety

10  attacks. That's about all you would be able to get out of

11  cross, anyways. I don't believe I would let in extrinsic

12  evidence of medical records though. I think -- I don't know

13  what else to tell you about your request from last week.

14      MR. BUTLER: Well, I would just ask that if and when

15  anything gets received, if you would look at it and let me

16  know.

17      THE COURT: Yeah, I'm not -- I mean, I think it's in

18  front of Judge Cayer, at least as to Schmidlin, and he issued

19  process. But when we checked, he hadn't received any. He

20  was -- I think, he granted the relief in camera.

21      MR. BUTLER: That's right.

22      THE COURT: Hadn't received anything.

23      MR. BUTLER: Very well.

24      (Bench conference was concluded.)

25      THE COURT: Any further questioning?

1          MR. BUTLER:  (Indicating.)

2          THE COURT:  All right.  You may step down.  You may

3    be excused.

4          Call your next witness.

5          MR. KAUFMAN:  William Pierce, the United States

6    calls.

7          WILLIAM PIERCE, GOVERNMENT WITNESS, SWORN

8                    DIRECT EXAMINATION

9    BY MR. KAUFMAN:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    Sir, in a loud and clear voice, if you could please state

13   your full name and spell your last name for the record.

14   A    William Pierce.  P-I-E-R-C-E.

15   Q    Now, have you pled guilty to a marijuana trafficking

16   conspiracy and a conspiracy to launder proceeds of the drug

17   trafficking?

18   A    Yes.

19   Q    How much did the conspiracy involve?  How much have you

20   pled guilty to?

21   A    1,000 to 3,000-kilograms.

22   Q    Have you ever been convicted of a felony other than the

23   case that you are talking about right now?

24   A    No.

25   Q    Do you recognize the man to my right in the blue shirt

1    and glasses?

2    A     Yes.

3    Q     Who is he?

4    A     That's Parker.

5    Q     Do you know what his last name is?

6    A     Coleman.

7    Q     Did you know him -- do you know him by any nicknames?

8    A     P, yes.

9    Q     Was he involved in your conspiracy?

10   A     Yes.

11   Q     What was his role?

12   A     He was -- he was the leader.  He was the boss.

13   Q     Now let me ask you, what was your role in the conspiracy?

14   A     I mean, I did whatever they asked me to do.

15   Q     When you say "they," who specifically were you directly

16   working with?

17   A     Milton Adams and Parker Coleman.

18   Q     Generally speaking, where were you located during the

19   conspiracy?

20   A     I lived in Los Angeles, California.

21   Q     Did you ever see Mr. Coleman in Los Angeles?

22   A     Yes.

23   Q     How many times?

24   A     Maybe about five, 10 times.

25   Q     And was it?

1    A    I'm not sure exactly, but around there.

2    Q    What were the nature of those -- what was going on during

3    those times you saw him in California?

4    A    It was either partying or coming to look at stuff, look

5    at marijuana, look at other things.

6    Q    And why was he coming to look at the marijuana?

7    A    To purchase.  I mean, that's what we did.

8    Q    Okay.  Now, specifically about what you did as part of

9    the conspiracy.  Can you tell us what specific things you did?

10   A    I purchased plane tickets.  I took people to and from the

11   airport.  I counted money.  I prepared bags for the airport to

12   be delivered.  I mean, basically whatever -- I mean, whatever

13   else they needed to be done.

14   Q    Now, you said that you pled guilty to 1,000 to

15   3,000-kilograms.  That's based on how much time?  If you could

16   tell us from when to around when you were involved in the

17   conspiracy?

18   A    About June/July 2009 to like maybe January 2010.

19   Q    So are we talking about seven or eight months?

20   A    Roughly.

21   Q    How did you first get involved?

22   A    I was friends with Mark Dorsey, that was my friend.  And

23   he introduced me to Milton Adams.  And Milton Adams initially

24   introduced me to Parker.  That's how I met everybody and

25   everything.

1   Q    Okay.  You mentioned that you purchased tickets.  How did

2   you purchase them?

3   A    Through my bank account.

4   Q    And was it --

5   A    Online, Orbitz, any other -- Cheap Tickets, whatever

6   other website I could.

7   Q    If you can make sure you speak in a loud voice, please.

8        Were those tickets that you purchased, were those all in

9   your name, that is, the cards that you used?

10  A    Yes.

11  Q    Were those all in your name?

12  A    Yes.

13  Q    You mentioned that you counted money.  How much money

14  were you counting at a time?

15  A    The amounts varied.

16  Q    What was the most that you ever counted?

17  A    Probably about $60,000.

18  Q    What was the average or the normal amount that you

19  counted, if there was one?

20  A    Like I said, it varied.  It wasn't an average.  It would

21  probably be 20 here, 30 there, sometimes 60.  But the most it

22  was 60.

23  Q    Okay.  Was Mr. Coleman ever present when you were

24  counting the money?

25  A    Yes.

1    Q    Do you recall how many times?

2    A    No.

3    Q    Did you ever come to Charlotte during the course of the

4    conspiracy?

5    A    Yes.

6    Q    How many times?

7    A    I can't really recall.

8    Q    Who did you see when you came to Charlotte?

9    A    Parker.

10   Q    (Indicating.)

11   A    Parker Coleman.

12   Q    Anybody else in relation to the conspiracy?

13   A    Normally when I would come, he would be the one to pick

14   me up.  But if he wasn't -- like, I remember one occasion he

15   wasn't -- he wasn't here, he was in California, and Pep picked

16   me up.  Stephanie Peppers picked me up.  But other than that,

17   I would only deal with him.

18   Q    When Mr. Coleman was in California, do you have personal

19   information as to what he was doing, or where he was?

20   A    When I was out here?

21   Q    Yes, when you were here but he wasn't?

22   A    No.  I don't have any personal information on what he was

23   doing.

24   Q    Did you learn what he was doing from speaking to

25   co-conspirators?

1           MR. BUTLER:  Objection.

2           THE COURT:  Sustained.

3           THE WITNESS:  No.

4  Q   (Mr. Kaufman) Had you ever been to any residences that

5  belonged to -- or were used by Mr. Coleman?

6  A    Yes.

7  Q    How many?

8  A    One.

9  Q    Do you recall where it was?

10 A    They called it -- like they referred to it as the Beverly

11 Hills of Charlotte.  I think it was Valentine or something

12 like that.  I don't really remember though.

13 Q    And were you inside of his place?

14 A    Yes.

15 Q    Was Mr. Coleman there at the time?

16 A    Yes.

17 Q    What was going on?

18 A    It depends.  Depends on --

19 Q    I'm sorry.  How many -- well, you say it depends?

20 A    Yeah.

21 Q    How many times were you there?

22 A    Every time I came out here I stayed there.

23 Q    And when you stayed there, was Mr. Coleman present with

24 you except for that one time that you mentioned?

25 A    Yes.

1  Q    What if anything relating to the drug trafficking or

2  money laundering was he doing when you were there?

3  A    We would count money there.  We would wait for people.

4  Whoever we needed to wait for it to come and pick up the drugs

5  or whatever.  We would weigh it.

6  Q    So you actually saw the marijuana there and weighed it

7  there?

8  A    Yes.

9  Q    Where -- where was the money -- sorry.  Where was the

10 marijuana located?

11 A    Inside the bags.

12 Q    Well, physically, within his residence where?

13 A    Oh, we would take it in the garage.

14 Q    And how did you weigh it?

15 A    Scale, one of them digital scales.

16 Q    You mentioned that Mr. Coleman would come and pick you up

17 from the airport.  What was he driving?

18 A    I can't really remember every car.  I mean, I remember

19 one time it was a Sentra, like a white Sentra.  Then I

20 remember one time it was in a rented Escalade.  But other than

21 that, I can't remember all the rest.

22 Q    Do you know anybody in this case who had a white Porsche

23 Cayenne SUV?

24 A    Yes.

25 Q    Who?

1    A    Parker Coleman.

2    Q    Did he ever pick you up in the Porsche?

3    A    No.

4    Q    Did anybody pick you up in the Porsche?

5    A    No.

6    Q    How did you know that he had a white Porsche Cayenne?

7    A    Cause I was there when it was purchased for him.

8    Q    Where was it purchased?

9    A    California.

10   Q    By whom?

11   A    Milton Adams.

12   Q    And where was Mr. Coleman at the time?

13   A    He was in Charlotte.

14   Q    So how do you know that it was being purchased for Mr.

15   Coleman?

16            MR. BUTLER:  Objection.

17            THE COURT:  Overruled.

18            THE WITNESS:  Am I allowed to answer that?

19            THE COURT:  Yes.

20            THE WITNESS:  Cause he said -- because Milton told

21   me we needed to get -- we was getting P a car, but I didn't

22   know what kind of car until the guy that does the cars came

23   with the car.

24   Q    (Mr. Kaufman) Were you aware of any sort of special

25   compartments within the Cayenne?

1   A    Yeah, yes.

2   Q    Can you describe what those were, according to your

3   understanding?  And tell us how you knew about it.

4   A     Well, me and -- it was a stash.  Me and Milton took the

5   car to get the stash put in the car.

6   Q    So where in the car was the stash?

7   A    I'm not actually sure.  I didn't see it after it was

8   done.

9   Q    Do you have any understanding as to what the

10  circumstances were surrounding the purchase of the SUV of the

11  Cayenne?

12          MR. BUTLER:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  No.

15  Q    At what kind of location was the Cayenne purchased?

16  A    When we bought it, the guy brung it to the house.  He

17  drove it, actually.

18  Q    Did you ever have any conversations with Mr. Coleman

19  about firearms?

20  A     Not -- not in general, not directly.  Not like me and him

21  talking directly about firearms, no.

22  Q    Was there any indirect conversation about it?

23  A    Yeah.  Yeah.  I mean smart, smart remarks or comments,

24  like people joking around.

25  Q    Such as what?

1           MR. BUTLER:  Objection.

2           THE COURT:  Sustained.

3    Q    What were the comments that Mr. Coleman made about them?

4           MR. BUTLER:  Objection.

5           THE COURT:  Sustained.

6           THE WITNESS:  Um --

7           THE COURT:  You don't answer that.

8           MR. KAUFMAN:  Nothing further.

9           THE COURT:  Any cross?

10          MR. BUTLER:  Yes, Your Honor.  Thank you.

11                    CROSS EXAMINATION

12   BY MR. BUTLER:

13   Q    Good afternoon, Mr. Pierce.

14   A    How you doing?

15   Q    All right.  Now Mr. Pierce, you worked for Turtle, didn't

16   you?

17   A    Yes.

18   Q    Milton Adams?

19   A    Yeah.

20   Q    Stayed at his house?

21   A    Yes.

22   Q    Mark Dorsey were your friends?

23   A    Yes.

24   Q    You knew Dorsey before Turtle?

25   A    Yes.

1  Q    And you were in the drug business with Dorsey and Turtle;
2  is that fair to say?

3  A    Yes.

4  Q    Now you pled guilty in this case; is that right?

5  A    Yes.

6  Q    And you want to get a lighter sentence, don't you?

7  A    Yes.

8  Q    That's one of the reasons why you're testifying, isn't
9  it?

10 A    Yes.

11 Q    And do you remember talking to law enforcement officials
12 back January the 10th of 2012?

13 A    Yes.

14 Q    And do you remember telling them that you never saw Mr.
15 Coleman with the gun?

16 A    Yes.

17 Q    And do you remember also telling them that you never saw
18 a gun at his house?

19 A    No, I don't remember.

20 Q    You don't remember that?

21 A    No.

22 Q    Now, well, wasn't it business as usual out in California
23 when there wasn't nothing going on over here in Charlotte?  I
24 mean, you all didn't just work with Charlotte; isn't that
25 right?

1  A    During my involvement, we only worked with Charlotte.

2  Q    Huh?

3  A    During my involvement?

4  Q    Yes, sir.

5  A    I only -- I only knew -- this is the only place I ever

6  came.

7  Q    Well, didn't you meet the sources, the Hispanics or

8  Mexicans?

9  A    No.

10 Q    But you knew they existed?

11 A    Yes.

12 Q    And you knew Turtle had customers out in California?

13 A    No.  I didn't know he had customers in California.

14 Q    Well, you don't know what Turtle did when you wasn't

15 there?

16 A    No.

17 Q    Isn't that right?  Correct?

18 A    Correct.

19 Q    And you knew Jerry Davis; isn't that right?

20 A    Jerry Davis?

21 Q    Boogie?

22 A    Yes.

23 Q    And you knew his girlfriend, Samantha Schmidlin.

24 A    Yes.

25 Q    And you knew Harold Manigault.

1   A    Yes.

2   Q    Had you ever been out to Jerry Davis' house?

3   A    No.

4   Q    You knew that Turtle had a gun?

5   A    Yes.

6   Q    Isn't that right?

7   A    Yes.

8   Q    What type of gun was that?

9   A    I'm not sure.  I'm not -- I'm not -- not good with that

10  type of stuff.

11  Q    You're not sure?

12  A    No.

13  Q    Describe it.

14  A    Small, it was new.

15  Q    Were you with him when he bought it?

16  A    No.

17  Q    How many times did you take Stephanie Peppers to the

18  airport?

19  A    I can't recall.

20  Q    How many times did you pick her up from the airport?

21  A    I can't recall.

22  Q    But you did pick her up and take her there; is that

23  right?

24  A    Yes.

25  Q    Okay.  And she didn't have any problem walking in the

1    airport with the suitcases, did she?

2    A    No.

3    Q    Just went on in?

4    A    Yes.

5    Q    Correct?  Now, do you remember Detective Beaver telling

6    you that his documents -- those Orbitz documents show that you

7    made six trips?

8    A    I can't really -- I mean, I remember him mentioning that,

9    but I can't really say, specifically.

10           MR. BUTLER:  If I could have a moment please, Your

11    Honor.

12           THE COURT:  You may.

13           (Pause.)

14    Q    Now Mr. Pierce, you were aware that Jerry Davis is

15    originally from California?

16    A    No.

17    Q    You didn't know that?

18    A    No.

19    Q    Well, Jerry Davis -- how many times did Jerry Davis come

20    to California to pick up marijuana?

21    A    I'm not sure.

22    Q    But he did?

23    A    I'm not sure.

24    Q    Not sure?

25    A    Only time I seen him was in Charlotte.

1    Q    I'm sorry?

2    A    Only time I ever seen him was over here, when I came over

3    here to Charlotte.

4    Q    Where did you see him at?

5    A    Normally at Parker's house.

6    Q    Did you ever go to Jerry's house?

7    A    Never.

8    Q    But you were known as Turtle's right-hand man, weren't

9    you?

10   A    Yeah, you could say that.

11   Q    Whatever he told you to do, you did.

12   A    Yes.  But it worked both ways.  I mean, if I was over

13   here and he told me -- Parker told me to do something, I would

14   do it also.

15   Q    So you just do anything that anybody tell you?

16   A    I did what they asked me to do.

17   Q    So you weren't thinking for yourself.  You were thinking,

18   just follow the instructions.

19   A    I had my limits.  I wasn't -- I wouldn't do anything

20   violent or hurt anyone, but, you know what I mean.

21   Q    But you had no problem being involved in the drug trade?

22   A    No.

23   Q    Well, did you ever work anywhere?

24   A    Yes.

25   Q    Have a legitimate job?

1    A    Yes.

2    Q    Where they took out withholding taxes on you?

3    A    Yes.

4    Q    You ever file income taxes?

5    A    Yes.

6    Q    When?

7    A    When?  When did -- the last time I filed income taxes was

8    2010, 2009.

9    Q    Are you sure?

10   A    Last I remember.

11          MR. BUTLER:  I don't have any further questions.

12          THE COURT:  Any redirect?

13          MR. KAUFMAN:  Yes, Your Honor.

14                    REDIRECT EXAMINATION

15   BY MR. KAUFMAN:

16   Q    Mr. Pierce, what have you done for a living?

17   A    I was -- 2005 to 2009 I was a crane operator for

18   Burlington Northern Santa Fe.  I was contracted -- we were

19   contracted by a company called Parsec.

20   Q    Was that a full time position?

21   A    Yes.

22   Q    Defense lawyer asked you if you ever saw Mr. Coleman with

23   firearms.  Were you ever in Mr. Coleman's bedroom?

24   A    Yes.

25   Q    And did you look around his bedroom?

1  A    I seen the bed, TV, and where the restroom was, but that

2  was it.

3  Q    Were you hanging out in his bedroom at all?

4  A    No.

5  Q    You were asked about your hope for a downward departure

6  at the time of sentencing.  What's your understanding as to

7  what's required in your testimony today?

8  A    For me to testify truthfully.

9  Q    Do you have an understanding as to what could potentially

10 happen if you didn't testify truthfully?

11 A    Yes.

12 Q    What would happen?

13 A    My plea agreement would be revoked.

14 Q    Is that it?

15 A    And I could face charges.

16 Q    What do you mean by face charges?

17 A    I'm not sure as to really what charges, but I know I

18 could face criminal charges, perjury, I think it was and

19 another one.

20       MR. KAUFMAN:  Nothing further, Your Honor.

21       MR. BUTLER:  No questions.

22       THE COURT:  You may step down.

23       Call your next witness.

24       MR. KAUFMAN:  We call Special Agent MacDonald.

25        GLEN MacDONALD, GOVERNMENT WITNESS, SWORN

1                     DIRECT EXAMINATION

2    BY MR. KAUFMAN:

3    Q    Sir, if you could, although you've been introduced if you

4    could state your full name for the record.

5    A    Yes.  My name is Glen MacDonald.  Last name is spelled,

6    M-A-C-D-O-N-A-L-D.

7    Q    And where do you work?

8    A    I'm a special agent with Homeland Security Investigations

9    in Charlotte.

10   Q    How long have you been in law enforcement?

11   A    Since 1995.  I started out six years with border patrol,

12   and then I transferred to U.S. Customs as special agent.

13   Since then has gone through some name changes, it's now

14   Homeland Security Investigations.

15   Q    So in total, about how many years have you been involved

16   in investigations into drug trafficking and money laundering?

17   A    Approximately 11 and a half, somewhere right around

18   there.

19   Q    Do you have any specialized training or background in

20   financial investigations?

21   A    Yes.  When we attend the academy, we took at least one

22   course, maybe two courses in financial investigations.  When I

23   graduated, I was assigned to a financial investigations group

24   in San Diego, California.  I was in that group for

25   approximately six years.  During that time I worked -- during

1    and since that time I've worked closely with more experienced

2    agents involved with financial investigations from different

3    agencies to include IRS, DEA, Secret Service, my own agency,

4    as well as investigators from different regulatory agencies.

5    I've gone to -- went to a two-week specialized class that was

6    dealing with financial investigations.  I've also gone to

7    numerous conferences involving money laundering, financial

8    investigations, and just kind of, through my courses as

9    investigator, just going through financial information.

10   Q    And have you conducted financial investigations on the

11   job?

12   A    Yes, I have.

13   Q    As part of your investigations, do you also -- you

14   mentioned various constituencies with whom you work.  Do you

15   also work with compliance and other officials from banking

16   institutions?

17   A    Yes, I do.

18   Q    I would like to direct your attention for now to November

19   2nd of 2012 -- sorry, of 2010.

20        Were you involved in the surveillance and investigation

21   of 5425 Closeburn Road?

22   A    Yes, I was.

23   Q    Can you tell us what you personally observed?

24   A    Sure.  I arrived on the scene in the morning.  As I drove

25   by, it is a -- I believe it's a three -- three or four-story

1   condominium complex.  On both -- it's kind of elongated.  On

2   both ends there is an entrance and exit to the covered

3   parking.  I drove by.  I saw that there was a white Porsche

4   Cayenne.  You can see through the gates, depending on your

5   position, you can see partway into the garage.

6          As I drove by I was able to notice a Porsche Cayenne and

7   a silver vehicle that I thought may have been the silver

8   Infiniti.  I then parked in front of -- there's parking in

9   front of the condominium complex.  I parked there.  And I sat

10  in the back of my car.  Later I observed a Tahoe pull up with

11  Texas plates, a male got out, later identified as Jerry Davis.

12  He was carrying what appeared to be, like, you know, trash

13  from maybe a fast food restaurant.  Approximately 15 to 25

14  minutes later I observed him come back out with a roller type

15  suitcase, put it in the trunk of his vehicle and leave --

16  well, it's an SUV.  So the back area of the SUV and leave.

17  Q    And is it your understanding that shortly thereafter

18  Officer Newman stopped the Tahoe and seized the marijuana from

19  that Tahoe?

20  A    Yes, sir.  From my location I was calling out what was

21  going on over the radio.

22  Q    Later that day were you present for the execution of the

23  court authorized search warrant?

24  A    Yes, I was.  Actually got there after the entry had

25  already been made.

1  Q    And when you got there, was there something that you

2  initially detected?

3  A    Yeah, while I was walking down the hallway towards the

4  apartment complex the door was open.  I could smell a strong

5  odor of marijuana, fresh marijuana.  I could smell that when I

6  was in the apartment as well.

7  Q    Now through the trial you've seen various photographs

8  taken from the search warrant execution.  Did you personally

9  take a couple with your camera as well?

10  A    Yes, I did.

11  Q    I'd like to show you what's been marked for

12  identification purposes as 9b.  Do you recognize this image?

13  A    Yes, I do.  That's a picture of an aquarium that was in

14  the complex or in the unit I took with my phone.  I believe it

15  was my camera phone.

16  Q    The camera on your phone, you said?

17  A    Yes.

18         MR. KAUFMAN:  Your Honor, we'd seek to have 9b

19  admitted and published.

20         THE COURT:  Any objection?

21         MR. BUTLER:  Objection.

22         THE COURT:  Basis?

23         MR. BUTLER:  Duplicitous, Your Honor.

24         THE COURT:  Overruled.

25  Q    (Mr. Kaufman) Next I'd like to show you what has been

1  marked as Government's 9b and 9w.  Do you recognize those

2  images?

3  A    Yes, sir.  I took those pictures as well.

4         MR. KAUFMAN:  All right.  We would seek to have 9b

5  and 9w admitted and published.

6         MR. BUTLER:  Objection.

7         THE COURT:  Overruled.  Let them be admitted and

8  published.

9         MR. KAUFMAN:  Thank you.

10        (Government's Exhibit No. 9b & 9w were received into

11 evidence and published.)

12 Q    Agent MacDonald, what's in 9w?

13 A    Nine-w is a picture of four white -- four white

14 containers.  Two of them have the name "Parker" written on

15 them, among other things.  One also has some other markings.

16 "RO only".  The other one, I'm not quite sure what it says at

17 the bottom.  But they were next to the fish tank.

18 Q    And did it appear to you that there was anything inside

19 of those containers?

20 A    Water.

21 Q    And now to 9v?

22 A    Yeah, I took this picture as well.  That is a -- when I

23 went in the master bedroom, numerous boxes of shoes.  And

24 that's one of the ones I took a picture of.  It shows that the

25 price of the shoe was $495.

1    Q    Were there other shoe boxes that had comparable pricing

2    on them?

3    A    Yes.

4    Q    Did you find any court documentation related to anybody

5    in the apartment?

6    A    Yes, I did.

7    Q    What was it?

8    A    I took a picture of a documentation for a Mr. Parker

9    Coleman.  It had to do with -- I believe it was a Mississippi

10   violation.

11   Q    When you say a violation, a felony conviction?

12   A    Yes.

13   Q    Showing you what's been marked as 12b.

14   A    Yes.

15   Q    Do you recognize that?

16   A    Yes, I do.

17   Q    What is it?

18   A    It's an order accepting a guilty plea and recording

19   sentence.

20   Q    And is it the record of the conviction you just

21   mentioned?

22   A    Yes.

23   Q    And is this the actual photograph that you took?

24   A    Yes, it is.

25           MR. KAUFMAN:  Seek to admit and publish 12b.

1       THE COURT:  Any objection?

2       MR. BUTLER:  Objection.

3       THE COURT:  Overruled.  Let it be admitted.

4       (Government's Exhibit No. 12b was received into

5  evidence and published.)

6  Q    Now, were you involved in the processing of money that

7  was recovered on November 2nd?

8  A    Yes, I was.

9  Q    I would like to show you what's been marked as

10 Government's Exhibit 47 for identification.  It's a two-page

11 document.  This is page 1, and this page 2.  Back to page 1.

12 Do you recognize these two documents?

13 A    Yes, sir.

14 Q    What are they?

15 A    6051 which is basically our chain of custody.  One is for

16 $21,236 that was seized.  It's got my signature on it, seizing

17 officer.  I turned it over to custodian -- our evidence

18 custodian Perez Able (phonetic spelling).

19 Q    From whom was that money seized?

20 A    That was -- well, that was money that was seized from the

21 silver vehicle, it was either an Infiniti or Lexus, I can't

22 remember.  I think it was the Infiniti.

23 Q    I would like to show you what's been admitted as

24 Government's 7d for a moment.  Now making this visible to the

25 jury, as well.  Is this the vehicle you were discussing?

1    A     Yes.

2    Q     Going back to Exhibit 47 for identification.  Now going

3    on to page 2.  What's that?

4    A     That's the 6051 for the money that was seized at

5    Closeburn Road.

6    Q     And do you recognize the signature in the middle of the

7    page --

8    A     Yes, that's mine.

9    Q     -- seizing officer?

10   A     Yes, that's mine.

11             MR. KAUFMAN:  Your Honor, at this time we seek to

12   admit and publish 47.

13             THE COURT:  Any objection?

14             MR. BUTLER:  Objection.

15             THE COURT:  Overruled.  Let it be admitted.

16             (Government's Exhibit No. 47 was received into

17   evidence and published.)

18             THE COURT:  What exhibit number is that, 47?

19             MR. KAUFMAN:  Yes, Your Honor.

20             Forty-seven page 1, and 47, page 2.

21             Now during the course of this investigation, did you

22   obtain official and certified under -- certified under 902.11

23   records from the IRS?

24   A     Yes.

25   Q     Did that include tax records for defendant Parker

1   Coleman?

2   A    Yes.

3   Q    And in your review of those tax records, what did it

4   indicate?

5   A    It indicated minimal income reported, I think it was in

6   2003.  I have to look at the form and refresh my memory.

7   Q    Let me show you what's been marked as Government's

8   Exhibit 34 for identification purposes.  And I'll skim through

9   the pages.  Just to see if this is familiar with you.  What

10  the document is.  Does this start to look familiar now?  I'm

11  up to page 4.

12  A    Yes.

13  Q    Were there numerous pages in this document?

14  A    Yes, there were.

15  Q    Have you reviewed it previous to your testimony,

16  Exhibit 34?

17  A    Yes, I have.

18  Q    And are those in fact the certified records from the IRS?

19  A    Yes, they are.

20       MR. KAUFMAN:  Your Honor, we seek to admit and

21  publish Exhibit 34.

22       MR. BUTLER:  Objection.

23       THE COURT:  Overruled.  Let it be admitted.

24       MR. KAUFMAN:  Thank you, Your Honor.

25       (Government's Exhibit No. 34 was received into

1   evidence and published.)

2   Q   So whose tax documents are these?

3   A   Parker Coleman.

4   Q   I would like to show you page 2.  Are you familiar with

5   this form from your training and experience?

6   A   Yes, I am.

7   Q   What is it?

8   A   This is a certification of lack of record.

9   Q   And what does this form indicate?

10  A   It's indicating that from 2004 to 2010 he did not file

11  income taxes under his name.

12  Q   And in addition to that factor, I'm now on -- let's see,

13  going from -- okay.  On to page 4.  Are you familiar with this

14  form of document?

15  A   Yes, I'm familiar with it.

16  Q   What is it?

17  A   It's part of the form they sent us that shows the amount

18  of taxes that he filed.

19  Q   I'm sorry.  Taxes that he filed?

20  A   Well, amount of income.

21  Q   And what is the source of this data?

22  A   We got it from the IRS.

23  Q   And where does the IRS get this data?

24          MR. BUTLER:  Objection.

25          THE COURT:  Sustained.

1    Q    When you reviewed all of the -- these documents, did you

2    find substantial amounts of income that Mr. Coleman received

3    in any given year?

4    A    No.

5    Q    Would that be consistent with the lack of certification,

6    that is, lack of income tax returns for 2004 through 2010?

7              MR. BUTLER:  Objection.

8              THE COURT:  Sustained.

9              MR. BUTLER:  Move to strike.

10             THE COURT:  There wasn't an answer, there's nothing

11   to strike.

12   Q    (Mr. Kaufman) Now are you familiar with the name Glenn

13   Carrera?

14   A    Yes, I am.

15   Q    Was he one of the people that you had arrested in this

16   case?

17   A    Yes.

18   Q    Did you have an opportunity to obtain certified bank

19   records for Mr. Carrera's account or accounts?

20   A    Yes, we did.

21   Q    In addition, were you able to obtain from the Treasury

22   Department something called a CTR?

23   A    Yes.  We actually received it from FinCEN.

24   Q    I'm sorry.  Do you recall how many CTRs you received in

25   this investigation?

1    A       Numerous.

2    Q       What does CTR stand for?

3    A       CTR stands for Currency Transaction Report.  It's a form

4    that the bank is required to fill out if there's a cash

5    transaction of over $10,000.

6    Q       With regard to a CTR, when the bank completes it, where

7    does it go?

8    A       It gets filed, I believe.  I'm not exactly sure where it

9    goes, but it gets filed.

10   Q       And is it available to law enforcement for review?

11   A       Yes, it is.

12   Q       Are you familiar with the term "structuring"?

13   A       Yes, I am.

14   Q       What does that mean?

15   A       Structuring is the act of making multiple cash

16   transactions in attempt to avoid a currency requirement.

17   Typically when people refer to structuring, referring to

18   structuring at a bank, which is the act of making multiple

19   cash deposits or withdrawals at a bank in order to avoid the

20   filing of a CTR.

21   Q       And again, so if it's below $10,000, are you saying,

22   that's the threshold for the CTR?

23   A       Yes.

24   Q       Are you familiar with the term back-room CTR?

25   A       Yes.  A back-room CTR is a CTR that's referred to in the

1   law enforcement community, is people involved in financial

2   investigations.  A CTR that is created -- is not created at

3   the time of the transaction.  It is created by the bank at a

4   later time if they find out that multiple transactions really

5   should have been included as one.

6          MR. BUTLER:  Objection.  Move to strike.

7          THE COURT:  Overruled.

8   Q    Like to show you what's been marked as Government's 30f

9   for identification.  This is page 1, and 2 and 3.  Do you

10  recognize this?

11  A    Yes.

12  Q    What is it?

13  A    That's a CTR.

14  Q    Is this in fact a certified official record?

15  A    Yes, it is.

16         MR. KAUFMAN:  Your Honor, we would seek to admit 30f

17  and publish it.

18         MR. BUTLER:  Objection.

19         THE COURT:  Basis of the objection?

20         MR. BUTLER:  (No response.)

21         THE COURT:  We'll, I'll admit 30f.

22         (Government's Exhibit No. 30f was received into

23  evidence and published.)

24  Q    (Mr. Kaufman) Going to page 2?

25  A    That's the front page of the CTR, showing that the person

1  on behalf that the transaction was made was a Rico Grier.

2  Q    Is he an individual you had, or personally you were

3  involved in the arrest of in relation to this case?

4  A    Yes.

5  Q    What was the amount of the transaction?

6  A    The amount of the transaction was $10,500.  But based on

7  other information that's on the form, it was -- it appears

8  it -- well, it was multiple transactions.

9      Up at the top of the form there's some check boxes as to

10 why or what applies in the particular case.  In this instance

11 they checked multiple persons, multiple transactions.  If you

12 go further down the page, and it shows the account numbers

13 affected, those -- up a little bit more.

14     Shows account number affected.  Those -- so what that

15 tells the person on the CTR is that money went into both of

16 those accounts.

17 Q    And is that therefore indicative of structuring?

18 A    Yes.  That is the bank location that created the CTR or

19 where -- or where one of the transactions took place.

20 Q    Going to page 3.

21 A    That is listing a person on whose behalf the deposit was

22 made.  So based on that particular CTR, it's listing two

23 individuals on whose behalf the transaction was conducted.

24 There's two accounts.  So one account would belong to Glenn

25 Carrera and one account would belong to Rico Grier.

1   Q    Now based on your investigation, when you obtained this

2   CTR, what did you then obtain?

3   A    We obtained bank records for both subjects.  I can't

4   recall if that was done before or after I obtained the CTR

5   information.

6   Q    Now, the records that you received related to Glenn

7   Carrera, were those certified under 902.11?

8   A    Yes, they were.

9   Q    Like to show you what's been marked as Government's 30a.

10  And this is a, I believe, a six-page document.  Let me just

11  confirm, six-page document.  Do you recognize this?

12  A    Yes.  That's a statement from Glenn Carrera's account.

13  Q    This is one of the records that you received among many

14  for this account pursuant to your subpoena?

15  A    Yes, sir.

16            MR. KAUFMAN:  Your Honor, we'd seek to have 30a

17  admitted and published.

18            MR. BUTLER:  Objection.

19            THE COURT:  Overruled.  Let it be admitted.

20            MR. KAUFMAN:  Thank you, Your Honor.

21            (Government's Exhibit No. 30a was received into

22  evidence and published.)

23  Q    Now, again, so we have Glenn Carrera's account.  I'm

24  going to direct your attention to the last page.

25            Were there certain transactions that were relevant

1   towards your further investigation?

2   A    Yes, there were.

3   Q    And I'm increasing the size here.  What were some of

4   those transactions?

5   A    One in particular was a payment to a Mini Pack.  They're

6   a company that produces -- they seal like heat sealing

7   machines and heat sealing type packaging.

8   Q    Before I go on to Mini Pack, were there other

9   transactions on this page that were of interest to your

10  investigation?

11  A    Yeah.  There are airline purchases on this particular

12  page.  There's also check card purchase in Charlotte, North

13  Carolina which just showed that someone who had that card

14  would have been in Charlotte, North Carolina at some point.

15  Q    Now with regard to Mini Pack, did you obtain certified

16  authentic business documents from that company?

17  A    Yes, we did.

18  Q    I would like to show you what's been marked for

19  identification purposes as Exhibit 31a, and 31b.

20       Do you recognize these documents?  Oh, I'm sorry, 31b,

21  and then going in reverse, 31a.  Do you recognize these

22  documents?

23  A    Yes, I do.

24  Q    What are they?

25  A    They are the information received from Mini Pack.

 1              MR. KAUFMAN:  Your Honor, we seek to admit and

 2   publish 31a and 31b.

 3              MR. BUTLER:  Objection.

 4              THE COURT:  Overruled.  Let them be admitted.

 5

 6              (Government's Exhibit No. 31a & 31b were received

 7   into evidence and published.)

 8   Q    So this the -- what document is this Agent MacDonald?

 9   A    That's the invoice.

10   Q    And this is the invoice connected to the transaction that

11   Mr. Carrera made?

12   A    Yes, sir.

13   Q    And let me have highlighted a portion in the middle.

14   What does it indicate?

15   A    That was the product he purchased, it's actually two.  He

16   bought -- they're like sealer type bags, and he purchased two.

17   Well, you know, it's a package.  He purchased two packages for

18   a total of $428.40.

19   Q    In these packages, how many sealer bags are there?

20   A    Well, according to the description is says 400.

21   Q    Going to 31b.  Actually, let me go back to 31a for a

22   moment, my apologies.  So the item number is listed as what?

23   A    MR-1624.

24   Q    And then with regard to coding by Mini Pack, did they

25   provide in 31b, a way to interpret those codes?

1   A    Yes.

2   Q    And does this match the item that Mr. Carrera had

3   purchased two of?

4   A    That's what's shown on the invoice.

5   Q    Excuse me?

6   A    That's what was reflected on the invoice.

7   Q    Okay.  So 30 pounds -- we look at that chart.  Thirty

8   pound vacuum packages.  Based on your training and experience

9   with drug trafficking, what does this indicate to you?

10  A    It's often -- that type of packaging is often used to

11  package marijuana.

12  Q    Now during the execution of the search warrant at Mr.

13  Coleman's residence on November 2nd, 2010, what if anything

14  did you find that was relevant, not only to your drug

15  trafficking money laundering investigation, but specifically

16  with regard to Mr. Carrera and Mr. Coleman?

17  A    There's some deposit slips that were found at the

18  residence; one of which -- well, I'm sorry.  Deposit slip

19  receipts from -- showing that a deposit had been made into

20  Glenn Carrera's account.  There were other deposit slips as

21  well.

22  Q    Agent MacDonald, I'm showing you 14n, and a document that

23  was contained in that from the search.

24       Do you recognize this particular Bank of America deposit

25  slip?

1   A    Yes, I do.

2   Q    What is that?

3   A    This is a deposit slip that was found at Mr. Coleman's

4   residence.

5        MR. KAUFMAN:  And I would like to put this up on the

6   so called ELMO right now.

7        Do I need to make this a sub-exhibit, Ms. Hankins?

8        COURT CLERK:  If you want it captured, yes.

9        MR. KAUFMAN:  Actually I'm not going to ask for

10  capture.  It's in 14n.

11       And, Your Honor, it's been admitted as part of 14n.

12  We would seek to publish it at this time.

13       THE COURT:  You may.

14       (The exhibit was published to the jury.)

15  Q    Agent MacDonald, are you able to determine from this

16  deposit slip the date of the transaction?

17  A    Yes.

18  Q    What is it?

19  A    06/04/2010.

20  Q    Is that based on the area where my pen is pointing now?

21  A    Yes, sir.

22  Q    Can you tell the last few digits of the account number?

23  A    1731.

24  Q    Based on where my pen is pointing now?

25  A    Yes, sir.

1  Q    And do you -- can you tell the amount -- I'm sorry.  Let

2  me go back up.

3       In terms of the date, is there a time listed?

4  A    There's a time stamp says 1507.

5  Q    Is that military time for 3:07 p.m.?

6  A    Yes, it is.

7  Q    And in terms of the dollar amount?

8  A    Eight thousand five hundred.

9  Q    Dollars?

10 A    Yes, sir.

11 Q    Now, did you in fact find a corresponding bank document

12 in Mr. Carrera's -- now, so that slip was found in Mr.

13 Coleman's house during the execution of the search warrant.

14 Did you find the corresponding document, the bank document

15 from Mr. Carrera's certified bank documents?

16 A    Yes.

17 Q    Like to show you what's been marked for exhibit as

18 Government's 30c.  Do you recognize this?

19 A    Yes, I do.

20 Q    What is this?

21 A    That's the -- one of the pieces of corresponding

22 information that goes along with that deposit receipt.

23 Q    And this is a two-page document.  Is the information on

24 pages 1 and 2 of 31 -- I'm sorry -- of 30c, the same data that

25 is on the deposit slip found in Mr. Coleman's house?

1   A     Yes.

2   Q     And again, this is part of the certified records?

3   A     Yes, sir.

4           MR. KAUFMAN:  Your Honor, we'd seek to admit and

5   publish 30c.

6           MR. BUTLER:  Objection.

7           THE COURT:  Let it be admitted.

8           (Government's Exhibit No. 30c was received into

9   evidence and published.)

10  Q     Page 1.  So just like the deposit slip, what's the date

11  on this?

12  A     6/4/2010.

13  Q     The amount, how does it compare?

14  A     Same.

15  Q     And there's a handwritten number -- well, both

16  handwritten, as well as typed.  The middle one at the bottom

17  row.  How do those compare with the account number belonging

18  to Mr. Carrera?

19  A     That is the account number.

20  Q     Going on to page 2.  Are you able to determine from this

21  page what state in which the deposit was made?

22  A     Based on where you see entity, NNC.  Every time I have

23  ever done -- regarding a deposit slips, any time it's been

24  NNC, it's always been a North Carolina deposit.  So I believe

25  it was North Carolina.

1    Q    Okay.  And the time on this -- sorry.  The time on this

2    page 2 of the bank records, how does that compare with the

3    time on the deposit slip found in Mr. Coleman's residence?

4    A    It's the same.

5    Q    Now, among the certified records, like to show you what

6    has been marked as 30b for identification, page 1, page 2.

7         Do you recognize this document?

8    A    Yes, I do.

9    Q    What is it?

10   A    It's information received from the bank showing an out of

11   state counter deposit into Mr. Carrera's account for $8,000.

12        MR. KAUFMAN:  Your Honor, we would seek to have 30b

13   admitted and published.

14        MR. BUTLER:  Objection.

15        THE COURT:  Let it be admitted.

16        (Government's Exhibit No. 30b was received into

17   evidence and published.)

18   Q    All right.  Now, are you able to read the date on page 1?

19   Why don't I go to page 2.  Can you tell the date and time of

20   this transaction?

21   A    Yes.  April 1st, 2010, 1545 hours.

22   Q    And in what state was the deposit made?

23   A    North Carolina.

24   Q    And the amount was?

25   A    Eight thousand dollars.

1  Q    Now, like to draw your attention to page 1, lower left

2  corner.  Was there any significance to that information?

3  A    Yes, sir.

4  Q    What did that lead you to do?

5  A    Well, based on what if I see here, it's telling me that

6  there's a -- whoever made the deposit associated with a South

7  Carolina driver's license with that number.

8       The other numbers listed below would be the expiration

9  date for that license.  I believe under the other number --

10 the date the license was created, I'm not positive.  But I

11 note the last one is the expiration date of the license.

12 Q    Have you obtained the South Carolina driver's license

13 record, the certified record from DMV for that driver's

14 license number?

15 A    Yes, we have.  We also found a driver's license with

16 that -- during the search of the Closeburn address, that same

17 number, except it has a zero in front of it and belonged to

18 Parker Coleman.

19 Q    All right.  I'd like to show you --

20            MR. BUTLER:  We would object.

21            THE COURT:  Object to?

22            MR. BUTLER:  It wouldn't be the same number, Your

23 Honor.

24            THE COURT:  Overruled.  I'll let you get into that

25 on cross.

1    Q    I would like to show you what's been marked as

2    Government's Exhibit 35 for identification.  Do you recognize

3    this?

4    A    Yes, I do.

5    Q    What is it?

6    A    That's the certified DMV documentation.

7              MR. KAUFMAN:  Your Honor, we seek to admit and

8    publish.

9              THE COURT:  Objection?

10             MR. BUTLER:  Objection.

11             THE COURT:  Overruled.  Let them be admitted.

12             (Government's Exhibit No. 35 was received into

13   evidence and published.)

14   Q    And the driver's license number, how did that compare

15   with the number that was on the deposit slip into -- that was

16   found at Mr. Coleman's residence on Closeburn, that was

17   ultimately deposited into Mr. Carrera's account?

18   A    Matches.

19   Q    And I would like to go back and show you what's been

20   admitted already as 9k.  Is that also consistent?

21   A    That is consistent with the DMV documentation and the

22   deposit slip -- it had that number except without the zero.

23   It did have the 1052019 listed on the top of the deposit slip

24   as well.

25   Q    Now.  Okay.  Now just briefly going back to 30c, this is

1  documenting a January 4th, 2010 transaction.  And in fact, at

2  3:07 p.m. the deposit slip, the customer deposit slip for this

3  transaction, I believe you said was found in Mr. Coleman's

4  residence on November 2nd; is that right?

5  A    Yes, sir.

6  Q    Did you find evidence of structuring in reviewing bank

7  records related not only to this -- for this transaction,

8  belonging to an account held by Kamia Saulsberry and Milton

9  Adams?

10  A    Yes.

11  Q    Have you received certified records from the bank under

12  902.11 for Ms. Saulsberry's and Mr. Adams' bank accounts?

13  A    Yes, I have.

14  Q    Like to show you what's been marked as Government's 49a

15  for identification.  Do you recognize this?

16  A    Yes, I do.

17  Q    What is it?

18  A    That is a copy from the bank of a deposit transaction for

19  the account.  And the account number is listed right there.

20        MR. KAUFMAN:  Your Honor, we seek to admit and

21  publish 49a.

22        MR. BUTLER:  Objection.

23        THE COURT:  Let it be admitted.

24        (Government's Exhibit No. 49a was received into

25  evidence and published.)

1  Q    What's the amount of the deposit Agent MacDonald?

2  A    Eight thousand five hundred.  The date is June 4, 2010.

3  Q    And at what time?

4  A    The time is stamped as 2:46, I believe it was 2:46.

5  Q    Based on your training and experience, if Mr. Carrera and

6  Mr. Adams were co-conspirators, would this be indicative of

7  structuring?

8  A    Yes.

9  Q    With regard to -- like to show you what's been marked as

10  Government's Exhibit 49c for identification.  This is a

11  multi-page document.  Does the first page look familiar?

12  A    Yes.

13  Q    And have you in fact reviewed the entirety of 49c prior

14  to your testimony here today?

15  A    Yes.

16  Q    What is 49c, if you recognize it?

17  A    That is a documentation we received from Wells Fargo for

18  an account belonging to Kamia Saulsberry doing business as KJM

19  Realty Group.

20  Q    And was this part of the certified records you received

21  from the bank, certified under 902.11?

22  A    Yes.

23        MR. KAUFMAN:  Your Honor, we seek to admit and

24  publish.

25        MR. BUTLER:  Objection.

1       THE COURT:  Overruled.  Let it be admitted.

2       (Government's Exhibit No. 49c was received into

3   evidence and published.)

4   Q    Under Ms. Saulsberry's name it has DBA KJM Realty Group.

5   Are you familiar with -- first of all, what do the initials

6   DBA stand for?

7   A    Doing Business As.

8   Q    And are you familiar with the address that's located

9   there?

10  A    Yes, I am.

11  Q    How are you familiar with that address?

12  A    That's an address at which Milton Adams was living, and,

13  in fact, an address in which Detective James Beaver and I

14  observed Mr. Adams while we were out in California.

15  Q    Going to page 2, is that first entry, a 6/4 deposit in

16  that account, is that consistent and in fact the same

17  transaction that was listed on the deposit slip in 49a which

18  I'm now calling up?

19  A    Yes.

20  Q    So on 49a -- sorry, let me get the account number

21  better -- ending 4942; is that correct?

22  A    That's correct.

23  Q    And going back to 49c.  Is that the same bank account

24  number on 49c?

25  A    Yes, it is.

1   Q    I'd like to show you what's been marked for

2   identification purposes as 49b.  Do you recognize this as part

3   of the package of certified records from the bank?

4   A    It's not showing up.

5            MR. KAUFMAN:  My apologies.

6            THE WITNESS:  Yes.

7            MR. KAUFMAN:  Seek to admit and publish, Your Honor.

8            MR. BUTLER:  Objection.

9            THE COURT:  Let it be admitted.

10           (Government's Exhibit No. 49b was received into

11   evidence and published.)

12   Q    And in terms of authorized signatories for the account,

13   who do they list?

14   A    Both Kamia Saulsberry and Milton Adams.

15   Q    Now, did you obtain other bank records from

16   Ms. Saulsberry?

17   A    Yes, we did.

18   Q    Like to show you what's been marked for identification

19   purposes as 50b.  My apologies, the sticker on the electronic

20   version is off the screen.  But the sticker is visible on the

21   physical document.

22        Do you recognize this as being one of the certified

23   records from the bank?

24   A    Yes, I do.

25   Q    And it's two pages.  I'm sorry, four-page document that

1   is -- oh, my apologies, four-page document.

2       Okay.  First of all, do you recognize the first two

3   pages?

4   A    Yes, I do.

5   Q    And then do you recognize page 3 and 4?

6   A    Yes, I do.

7   Q    And are these from -- the official bank records for

8   Ms. Saulsberry?

9   A    Yes, they are.

10          MR. KAUFMAN:  We would seek to admit and publish

11  50b.

12          MR. BUTLER:  Objection.

13          THE COURT:  Overruled.  Let it be admitted.

14          (Government's Exhibit No. 50b was received into

15  evidence and published.)

16  Q    Can you tell the jury what's in 50b?

17  A    It's an out of state counter deposit.  The date listed on

18  it is June 4, 2010.  Showing us -- going into Kamia -- well,

19  going in account number, the account number is listed down

20  below.  The name listed is Kamia Saulsberry and showing that

21  it -- the account was opened in California.

22  Q    And I'm sorry if you already stated the full answer here,

23  what is the date and time of the transaction and where did it

24  take place?

25  A    The date stamp is 6/4/2010.  The time of 1422, military

1    time.  In North Carolina.

2    Q    And then the next slip, what's the relevance of this

3    document?

4    A    It appears just to be some type of copy of the first.

5    Q    So is this a redundant document that's created by the

6    bank itself?

7    A    Yeah.

8              MR. BUTLER:  Objection.

9              THE WITNESS:  That's what we received with the

10   certified records.

11             THE COURT:  Overruled.

12   Q    And in fact, you have information that this was one of

13   the deposits that Stephanie Peppers made?

14   A    Yes.

15   Q    And previously in 49a, there was a deposit made into an

16   account on June 4th at what time?

17   A    It looks like 2:46 or 2:16.  Could you make it a little

18   smaller?  It looks more likely 2:46 than 2:16.

19   Q    When you compare those two bank documents, are those

20   indicative of structuring?

21   A    Yes, sir.

22   Q    Did you obtain Mr. Coleman's bank records?

23   A    Yes, we did.

24   Q    Were those also similarly certified under 902.11?

25   A    Yes, they were.

1  Q    Like to show you what's been marked for identification as

2  Exhibit 58a.  Do you recognize this page?

3  A    Yes, I do.

4  Q    And this a one page document.  Is this in fact one of the

5  pages from the certified record from Mr. Coleman's account?

6  A    Yes, it is.

7       MR. KAUFMAN:  Your Honor, we seek to admit and

8  publish 58a.

9       MR. BUTLER:  Objection.

10       THE COURT:  Overruled.

11       (Government's Exhibit No. 58a was received into

12  evidence and published.)

13  Q    So does this indicate that Mr. Coleman signed on the form

14  on March 20th of 2009?

15  A    Yes, sir.

16  Q    And let's see.  Going next to 58b.  My apologies.  Going

17  to 58b.  Are you familiar with this document?

18  A    Yes.

19  Q    And going to page 2, 3, 4, 5, five-page document.  Are

20  these from the official bank records?

21  A    Yes, they are.

22  Q    And 58c, is this also from those very same bank records?

23  A    Yes, it is.

24       MR. KAUFMAN:  Your Honor, we seek to have 58b and c

25  admitted.

1         MR. BUTLER:  Objection.

2         THE COURT:  Overruled.  Let them be admitted.

3         (Government's Exhibit No. 58b & 58c were received

4    into evidence and published.)

5    Q    What are the documents in 58b?

6    A    That's a withdrawal form.

7    Q    And again, these are for Mr. Coleman's account?

8    A    Yes, sir.

9    Q    And 58c, what's this document?

10   A    That's a list of deposits and it breaks it down, cash

11   deposits if there's checks involved, it has two different --

12   has a total amount and cash amount.

13        So if there was a higher amount, there would have been a

14   cash -- or it would have been some other type of form of a

15   deposit being made.

16   Q    Now these are just a few of the pages from Mr. Coleman's

17   bank records.

18        Would you characterize the sum of the documents that you

19   received from Wells Fargo of Mr. Coleman's account as

20   voluminous?

21   A    I would summarize the content within to be voluminous.

22   Q    Why do you say that?

23   A    The statements were from March of '09 through, I believe,

24   it was December 2010.  Each statement might have multiple

25   pages.  But on those pages numerous transactions could be, I'm

1    estimating, you know, some of the pages could have anywhere

2    from maybe 25 transactions per page.  They're just a lot of

3    transactions if you go throughout the whole thing.

4    Q    Now did you find any transactions involving airline

5    transactions?

6    A    Yes.

7    Q    In fact, did you find -- did you find more than one?

8    A    Yes.

9    Q    Do you recall approximately how many?

10   A    For airline purchases associated with airlines based on

11   price amount, I believe them to be tickets, probably close to

12   75.

13                MR. BUTLER:  Objection.

14                THE COURT:  Overruled.

15   Q    Did you create a spreadsheet with that specific

16   information?

17   A    Yes, I did.

18   Q    When you were creating that, were you in the process of

19   looking at the documents at that very same time, entering the

20   data are from those documents -- from the bank records into

21   your spreadsheet?

22   A    Yes.

23   Q    Did you include any information on your spreadsheet that

24   was not from the documents?

25   A    No.  I did -- there was one notation where I think I put

1  appears to have been a refund on a item that had been

2  purchased.

3  Q    And other than that, is it all data that's solely from

4  those bank documents?

5  A    Yes.

6           MR. KAUFMAN:  Your Honor, we would seek to --

7  Q    Let me show you what's been marked for identification

8  purposes as 59.  It's a three-page document.  Do you recognize

9  this, going on to page 1, 2, and 3?

10 A    Yes.

11 Q    What is this?

12 A    That's a document I created from going through the bank

13 records to reflect purchases that were associated with

14 airlines.

15          MR. KAUFMAN:  Your Honor, we seek to admit

16 Government's Exhibit 59 and publish it to the jury.

17          MR. BUTLER:  Objection.

18          THE COURT:  The underlying records, have been made

19 available to defense counsel in discovery?

20          MR. KAUFMAN:  They have, and in fact, they have been

21 provided to defense counsel.

22          THE COURT:  Then I'll overrule the objection and

23 admit this document pursuant to Rule 1006.

24          MR. KAUFMAN:  Thank you, Your Honor.

25          (Government's Exhibit No. 59 was received into

1    evidence and published.)

2    Q    So just briefly, Agent MacDonald, if you could just

3    explain, if necessary, what your table shows?

4    A    Sure.  The table shows airline purchases associated with

5    airlines that came from his Wachovia account.  I list the

6    date, the airline, the amount, and the post date.

7    Q    And in looking at a few of the entries, what is the order

8    in which you placed the transactions?

9    A    I did the most current to the oldest.

10   Q    So reverse chronological order?

11   A    Yes.

12   Q    And did you, using an automatic function on the

13   spreadsheet, have a total of the dollar amount of

14   transactions?

15   A    Yes, I did.

16   Q    You didn't do that calculation by hand, did you?

17   A    No, sir.

18   Q    Or by calculator?

19   A    No, sir.

20   Q    In that period of time that you mentioned from February

21   of 2009 until the end date, what was the total amount that he

22   spent on airline related transactions?

23   A    $26,040.64.  There may have been a refund in there for

24   like 350 something.

25   Q    Three hundred fifty-seven dollars?

1   A    Something like that.  I might have to look at it again.

2   Q    So that might pull the number down to, in the $25,000

3   range?

4   A    Yes, sir.

5   Q    And is that from just this one account that you're aware

6   of?

7   A    Yes.

8   Q    Are you familiar with the term, "reverse proffer"?

9   A    Yes, I am.

10  Q    What does that mean?

11  A    It's -- in a nutshell it's when the prosecuting attorney

12  and case agent meet with an individual, in order to provide

13  him information about the case in the hopes of obtaining a

14  plea agreement and cooperation, we basically lay the case out

15  to the subject so he knows exactly what we have.

16  Q    I'd like to turn your attention to April 13th of last

17  year, 2011.

18            MR. BUTLER:  Objection.  May we have a sidebar?

19            THE COURT:  Let's have a sidebar.

20            Actually, I'll excuse the jury for -- members of the

21  jury, we're going to take an afternoon break at this time.

22  Take an afternoon break, don't talk about the case, keep an

23  open mind.  See you in 15 minutes.

24            (The jury was escorted from the courtroom at

25  4:19 p.m.)

1    THE COURT:  Agent MacDonald, you can return back to

2  the prosecution table.

3    Glad to hear from you, Mr. Butler.

4    MR. BUTLER:  Thank you, Your Honor.

5    May it please the Court.  We would contend, Your

6  Honor, that any reverse proffer that was conducted in this

7  case was a part of plea negotiations, and therefore it

8  shouldn't be admissible.  I was present, Mr. Coleman was

9  present, so was Mr. Kaufman and Agent MacDonald, and therefore

10  it shouldn't come in as any type of relevant evidence.

11    THE COURT:  What rule are you citing for that

12  proposition?

13    MR. BUTLER:  If I could have a moment, please?

14    THE COURT:  Sure.  Probably Rule 11.

15    MR. BUTLER:  Yes, Your Honor.

16    MR. KAUFMAN:  Your Honor, I believe it's Rule 410.

17  And it may assist, if I just comment that we are not going to

18  go into any communications that took place during the reverse

19  proffer.  The reason why I asked that question before going to

20  the next step was to put into context --

21    THE COURT:  Well, proffer what you are -- briefly,

22  proffer what you want to get with this line of questioning.

23    MR. KAUFMAN:  Your Honor, the next and actually last

24  exhibit, last part of the testimony for the government's case

25  is a recording that Sergeant Clarkson has already identified

1   as a jail call.  And in it, it starts off with Mr. Coleman

2   stating that he had his reverse proffer that day.  So that's

3   why I want to just put it into context so that it shows how

4   Agent MacDonald --

5           THE COURT:  You've done that already.  What else do

6   you -- I mean, that's it, right?

7           MR. KAUFMAN:  That's it, Your Honor.  At this point

8   we're just going to -- I'm going to show him the disk that's

9   already been identified and then play it.

10          THE COURT:  All right.  So does that take care of

11  your objection, Mr. Butler?

12          MR. BUTLER:  Well, not really.  We would contend

13  that it shouldn't come in at all.

14          THE COURT:  Well, I mean, he's testified that a

15  reverse proffer with Mr. Coleman, Mr. Coleman's on the phone

16  talking about a reverse proffer from the jail.  And so what's

17  the relevance of the -- what is that relevant to?  If you

18  establish that fact, what is?

19          MR. KAUFMAN:  Well it's relevant to his

20  consciousness of guilt, among other things.  As we mentioned

21  in the opening, he basically said that, the quote was --

22  "they've got me by the balls.  I'm trying to get --" and then

23  there was other comments about trying to get a better deal.

24  Those demonstrate consciousness of guilt quite strong, Your

25  Honor.

1            THE COURT:  Well --

2            MR. KAUFMAN:  If Your Honor please, I can show you

3    transcript of the call.

4            THE COURT:  No, I think I remember the opening

5    statement reference to that.

6            So Mr. Butler your -- I mean, there's no privilege

7    to the jail call.

8            MR. BUTLER:  Well, I understand that, Your Honor.

9    But we would contend that what the government's position is,

10   is they are making an assumption in regards to any statements

11   that Mr. Coleman may have made reference to the reverse

12   proffer, and they're taking it out of context.  And I know,

13   Your Honor, what context it is, because of an attorney/client

14   conference we've had about it.

15           THE COURT:  Let me see the transcript.

16           MR. KAUFMAN:  Yes, Your Honor.

17           THE COURT:  All right.  So, so far the record before

18   this jury is that Agent MacDonald conducted a -- was involved

19   in a reverse proffer session on April 13th of last year.  Is

20   that what so far is before the jury?

21           MR. KAUFMAN:  Yes, Your Honor.

22           THE COURT:  And Mr. Butler, you object to any

23   further inquiry on those grounds?

24           MR. BUTLER:  Yes, Your Honor.

25           THE COURT:  And I understand the government to be

1    saying, they're not asking anything more about that session,

2    but they intend to play the audio recording of a reported jail

3    house call that's 21a.  And what's your objection to that?

4         MR. BUTLER:  Well, Your Honor, essentially it's

5    letting in what you can't get in through the front door

6    through the back door.

7         THE COURT:  Yeah, but there's no privilege to what

8    Mr. Coleman says on -- from the jail on a telephone call to

9    someone else, I mean.

10        MR. BUTLER:  But, Your Honor, be different if all

11   this information about the reverse proffer hadn't come up,

12   then it would just be another jail call.  Now you have to take

13   it into the context that it's being presented.

14        THE COURT:  Well, I don't think there's been

15   anything objectionable so far with respect to plea

16   negotiations.  And the government indicates that it's not

17   going any farther, and -- but I don't see any -- I don't see

18   any privilege to this jail call.  And so to the extent you

19   object on the grounds that it's taken out of context or for

20   privilege reasons, I don't think Rule -- the Federal Rules of

21   Evidence 408 or 410 -- or no, 408 -- yeah, or 410 cover that,

22   and so I'll overrule your objection as to the jail call.

23        MR. BUTLER:  Very well.

24        THE COURT:  But Mr. Kaufman, I'm explicitly saying,

25   there's to be no questioning concerning the substance of any

 1    conversations between Agent MacDonald and Mr. Coleman and his

 2    attorneys concerning that meeting.

 3              MR. KAUFMAN:  Understood, Your Honor.  I believe it

 4    will be very brief, just to identify voices.

 5              THE COURT:  With respect to the recording I'm not

 6    restricting you.  But I'm restricting any inquiries as to the

 7    actual conference itself.

 8              MR. KAUFMAN:  Understood, Your Honor.

 9              THE COURT:  All right.  How much time do we have

10    left in the 15 minutes we gave the jury?

11              MR. HAYCOX:  Ten minutes.

12              THE COURT:  All right.  We'll break till 4:40.

13              MR. KAUFMAN:  Your Honor, may I have the transcript,

14    just so --

15              THE COURT:  You may.

16              (Recess at 4:30 until 4:40.)

17              THE COURT:  Ready for the jury?

18              MR. KAUFMAN:  Yes, Your Honor.

19              THE COURT:  Isaac, call the jury.

20              (The jury was returned to the courtroom.)

21              THE COURT:  All right.  Mr. Kaufman, when you're

22    ready.

23              MR. KAUFMAN:  Thank you, Your Honor.

24    Q    Agent MacDonald, I would like to show you what's been

25    marked as Government's Exhibit 21 and 21a which have

1    previously been provided to defense in discovery.

2         Do you recognize these two exhibits?

3    A    Yes, I do.

4    Q    What's Exhibit 21 disk?

5    A    This is a disk which I listened to and signed that has a

6    voice -- that has a phone conversation.

7    Q    Between whom and on what date?

8    A    April 13, 2011, between Mr. Parker Coleman and Ramona

9    Gails also known as Moe.

10   Q    And who is Moe?

11   A    Moe was Shaunda McAdoo's girlfriend.

12   Q    And is this a call that took place the afternoon of the

13   date that the reverse proffer was conducted with Mr. Coleman?

14   A    Yeah, it took place on the same date.  I can't remember

15   the exact time, but it was afterwards.

16   Q    Do you see your initials on 21?

17   A    Yes, I do.

18   Q    By initialing it, were you indicating that this is a fair

19   and accurate copy of the recording of that -- sorry, a fair

20   and accurate recording of the phone calls?

21   A    Yes.

22   Q    Now with regard to 21a, have you initialed that as well?

23   A    Yes, I have.

24   Q    What is 21a?

25   A    A transcript of the phone call.

1    Q    And by initialing it, were you indicating that's an

2    accurate transcription of the audio on 21?

3    A    Yes.

4            MR. KAUFMAN:  Your Honor, at this time we would seek

5    to admit 21 and play it along with 21a to be viewed by the

6    jury.

7            MR. BUTLER:  Objection.

8            THE COURT:  Overruled.  Let them be admitted and

9    published.

10           (Government's Exhibit No. 21 & 21a was received into

11   evidence and published.)

12           MR. KAUFMAN:  Nothing further, Your Honor.

13           THE COURT:  Any cross?

14           MR. BUTLER:  Yes, Your Honor.

15                       CROSS EXAMINATION

16   BY MR. BUTLER:

17   Q    Good afternoon, Agent MacDonald.

18   A    Good afternoon, sir.

19   Q    Now Agent MacDonald, you're the lead agent along with

20   Detective Beaver in this case; is that right?

21   A    That's correct.

22   Q    And you testified in front of the grand jury; is that

23   right?

24   A    Yes, I did.

25   Q    How many times did you go to the grand jury?

1    A    Probably, I believe it was around four.

2    Q    Four times?

3    A    Approximately four.

4    Q    Now this case originated back with Ahmed Crockett, Ahmed

5    Daniel Crockett; isn't that right?

6    A    It originated in January 2009.

7    Q    And it involved Ahmed Crockett, Kelsey Brown, Robert

8    Brown; is that correct?

9    A    And numerous others.

10   Q    Shondu Lynch?

11   A    Gerren Darty.

12   Q    Yes.  That was a whole separate conspiracy; isn't that

13   right?

14   A    Well, it's -- members of those conspiracies -- or that

15   conspiracy, kind of morphed into a different conspiracy.  In

16   fact, there's a -- some people who actually are involved in

17   another conspiracy as well.  It kind of morphed, members of

18   that conspiracy.

19   Q    Wouldn't it be fair to say, Agent MacDonald, Ahmed Daniel

20   Crockett and his crew were indicted in one Bill of Indictment?

21   A    That's correct.

22   Q    Okay.  And then you got -- you started out with certain

23   people in this case --

24        MR. KAUFMAN:  Objection, Your Honor.  Leading to a

25   legal conclusion.

1        THE COURT:  Overruled.

2   Q    I believe you went to the grand jury on November 16, 2012

3   in this case; is that right?

4   A    That's correct.

5   Q    And at that time you presented to the grand jury

6   information that included -- and subsequently resulted in an

7   indictment for Jerry Davis, Samantha Schmidlin, Leah Davis,

8   Ryan Louis, and Nolan Robertson, and Parker Coleman; does that

9   sound right?

10  A    That sounds correct.

11  Q    Okay.  So they were the first six people in that alleged

12  conspiracy; is that right?

13  A    There was people in that conspiracy, yes.

14  Q    Now do you recall the next time you went back?

15  A    Not exactly.  I went four or five -- I think it was four

16  or five times.  I believe I went back shortly thereafter.

17  Q    Okay.  Now there was also Goldie Crockett, that's Ahmed

18  Crockett's wife; is that right?

19  A    Yes, sir.

20  Q    She was indicted?

21  A    Yes, she was.

22  Q    Now -- but you all knew about Milton Adams and Mark

23  Dorsey and William Pierce back in November 16, 2010, didn't

24  you?

25  A    One more time?

1    Q    Sir?

2    A    Could you repeat the question?

3    Q    Sure.  When did you -- well strike that, let me ask you

4    another question.

5    A    Okay.

6    Q    Kamia Saulsberry, you indicated in your testimony earlier

7    this afternoon that -- and showed to the ladies and gentlemen

8    of the jury her bank account; is that right?

9    A    That's correct.

10   Q    Okay.  And she's the girlfriend or the mother of Turtle's

11   child; is that right?

12   A    That's correct.

13   Q    Well, but now she's not indicted?

14   A    Excuse me?

15   Q    She has not been indicted?

16   A    She was indicted.

17   Q    She was indicted?

18   A    Yes, sir.

19   Q    But what's the status of her case, if you know?

20   A    I believe she -- I believe she pled guilty already.

21             THE COURT:  In any event, it's not relevant to this

22   matter.

23             I'll sustain an objection to the status of other

24   people's charges, unless offered to impeach the testifying

25   witness.

1    Q    Now Jerry Davis, you interviewed him, correct?

2    A    Yes, sir.

3    Q    And when you interviewed him at some point, you talked to

4    him about a safe in his house, did you not?

5    A    Yes, we did.

6    Q    And at that time -- that was sometime later, other than

7    November the 2nd, 2010 when you arrested him, correct?

8    A    Yes.

9    Q    And were you -- did you go to his house --

10   A    Yes.

11   Q    -- on November 2nd?

12   A    Excuse me?

13   Q    Did you go to Mr. Davis' home on November the 2nd?

14   A    No, I did not.

15   Q    But didn't you later learn there was some money in the

16   safe?

17   A    Yes.

18   Q    About $25,000, wasn't it?

19   A    No, sir.

20   Q    How much was it?

21   A    Five thousand.

22   Q    Five thousand?

23   A    The money he gave us was 5,000.

24   Q    He gave you $5,000.  But didn't he tell you he had about

25   25,000 that he had done something with the 15,000?

1              MR. KAUFMAN:  Objection.

2              THE COURT:  I'll sustain the objection.  That's

3    hearsay.  Sustained objection.

4    Q    Well, you learned that Mr. Davis had a gun, correct?

5    A    We heard.

6    Q    Had a weapon?

7    A    We heard that information, yes.

8              MR. KAUFMAN:  Objection.  Move to strike.

9              THE COURT:  I'll sustain the objection.  Tell the

10   jury disregard the response of the witness.

11   Q    Do you remember, Agent MacDonald, going to the jail and

12   collecting a buccal swab from Mr. Coleman?

13   A    Yes, I do.

14   Q    And that was for DNA purposes; isn't that correct?

15   A    It's for what.

16   Q    DNA purposes.

17   A    Yes, sir.

18   Q    And you are aware, are you not, that --

19             MR. KAUFMAN:  Objection.  Before the cat's out of

20   the bag, Your Honor.

21             THE COURT:  I don't know what cat you're talking

22   about.

23             What's the question, Mr. Butler.

24             MR. BUTLER:  Thank you, Your Honor.

25   Q    You are aware, are you not, that some weapons in this

1  case were swabbed for DNA?

2  A    Yes.

3          MR. KAUFMAN:  Your Honor, may we have a sidebar on

4  this issue?

5          THE COURT:  No.

6  Q    And you are also aware that a DNA analysis comparison

7  between the buccal swab taken from Mr. Coleman and the buccal

8  swabs of the guns were compared; isn't that correct?

9  A    I had heard that, yes.

10 Q    Well, and you know the result, don't you, of the

11 analysis?

12         MR. KAUFMAN:  Objection, Your Honor.

13         THE COURT:  Sustained.

14         MR. BUTLER:  Now -- if I could have a moment,

15 please, Your Honor?

16         THE COURT:  You may.

17         (Pause.)

18 Q    You were present when Turtle was arrested; is that right?

19 A    That's correct.

20 Q    You all have photographs of his arrest, don't you?

21 A    Yes, we do.

22 Q    Okay.  You have photographs of the marijuana that was

23 present when he was arrested, don't you?

24 A    Yes.

25 Q    You have photographs of his big house, don't you?

1    A    We have a picture of his house.

2    Q    You have photographs of some of his cars, don't you?

3    A    We have a picture of the car he was driving in at the

4    time he was arrested.

5    Q    Was that the BMW or the Mercedes?

6    A    It was a Mercedes.

7    Q    And how many times did you interview Turtle?

8    A    I know he was interviewed at the time of his arrest.  And

9    I can't recall if we had a phone interview or not afterwards.

10   I would have to go over the reports, at least once.

11   Q    Now, wouldn't it be fair to say, Agent MacDonald, based

12   on your training and experience, people that are arrested

13   initially like Samantha Schmidlin, will lie to the

14   authorities?

15            MR. KAUFMAN:  Objection.

16            THE COURT:  Sustained.

17   Q    So Agent MacDonald, I believe you testified earlier this

18   afternoon that you have tax records of Mr. Coleman; is that

19   right?

20   A    Yeah, we received tax information from the IRS.

21   Q    And how did you do that?  You just make a request; is

22   that right?

23   A    We fill out an ex-parte order.

24   Q    A what?

25   A    It's called an ex-parte order.

1          MR. KAUFMAN:  Objection.  Relevance.

2          THE COURT:  Overruled.

3  Q    Well, did you get any tax records for Ms. Peppers?

4  A    I believe we did.

5  Q    I'm sorry?

6  A    I believe we did.

7  Q    Okay.  You believe you did or you know you did?

8  A    We got it from several people.  I cannot remember exactly

9  which ones we received the records for.

10  Q    But did you do a spreadsheet on her -- strike that.  Did

11  you get bank records of Ms. Peppers?

12  A    Ms. Peppers, I don't believe we did.

13  Q    So you don't have a spreadsheet on her account; is that

14  right?

15  A    No, sir.

16  Q    Well, did you get tax records of Mr. Davis?

17  A    I don't believe we did.

18  Q    How about -- did you get tax records of Mr. Pierce,

19  William Pierce?

20  A    I can't recall.  We got several -- we got tax records for

21  several of the individuals.  I can't recall which ones.  I

22  know Mr. Coleman is one of them.  I can't -- I'd have to look

23  at the records to see.

24  Q    Did you get tax records for Mr. Glenn Carrera?

25  A    I don't recall which people we received tax records for.

1   It's been a while since I've looked at them.

2   Q    What about Nolan Robertson?

3   A    I don't know, sir.

4   Q    What about Samantha Schmidlin?

5        MR. KAUFMAN:  Objection.  Asked and answered.

6        THE COURT:  Overruled.

7        THE WITNESS:  I don't know.  I don't think we got

8   her's.  I don't know.

9   Q    What about Mark Hunt, you get his tax record?

10  A    I don't believe his was included, no.

11  Q    I'm sorry?

12  A    I don't believe he was included in the request.

13  Q    Now, you explained to the ladies and gentlemen of the

14  jury the term "structuring"?

15  A    Yes.

16  Q    Now that's a term that you all use in law enforcement;

17  isn't that right?

18  A    That is true.

19  Q    And now the Mini Pack, you explained what the Mini Pack

20  was, you remember that?

21  A    Yes, sir.

22  Q    And is it your testimony that the Mini Packs are used to

23  store drugs?

24  A    That is one of the uses.

25  Q    Okay.  What are some of the other uses, if you know?

1   A    Food storage.

2   Q    And you matched up what appeared to be an inventory

3   number or identification number with the purchase and the

4   actual item; is that right?

5   A    Yes, sir.

6   Q    But now you don't know from those documents how the Mini

7   Packs themselves were used; is that right?

8   A    That's correct.

9   Q    Now you interviewed Glenn Carrera; is that correct?

10  A    Yes, I believe we did.

11  Q    And you had his bank account?

12  A    Yes.

13  Q    And you interviewed Mr. Carrera, you were aware that he

14  kind of branched off on his own in this drug business, didn't

15  he?

16  A    Yeah, we had heard.

17  Q    Now, the -- these -- these amounts that were, I think it

18  indicated was an out of state counter deposit.  I believe it

19  was Government's Exhibit 30d, for $8,000 deposited in

20  Mr. Carrera's account.  Now, are you saying that was

21  structuring, too?

22  A    I would have to look at the account.  Typically, I'd have

23  to see if it matched up with another date.  Structuring is the

24  act of making multiple cash -- on this case -- making multiple

25  cash deposits in order to avoid the currency reporting

1  requirement.

2       So if you have deposit slips that show multiple deposits

3  on the same date but at different branches or at different

4  banks, and the people involved are part of an organization, it

5  is indicative of structuring, yes.

6  Q    That's the conclusion you all reach in law enforcement?

7  A    Yes.

8  Q    Okay.  Well, did you ever -- did you ever obtain any

9  records from Pep's Cafe?

10 A    No, we did not.

11 Q    Now the spreadsheet that you discussed, the three-page

12 document, I think it was Government's Exhibit 59, where you

13 totaled up $26,040 and I believe 64-cent and you said minus a

14 refund.  Now you don't know who used -- who paid for those

15 tickets, do you?

16 A    All I know is the money came out of the account.

17 Q    And it came out of the account as a result of using a

18 debit card?

19 A    Yeah, like a bank card.

20 Q    A bank card.  Okay.

21      And you don't know who used the bank card, correct?

22 A    That's correct.

23 Q    Now wouldn't it be fair to say that some of your

24 cooperators were not able to identify some of the other people

25 involved in this case?

1   A    Yeah, that's true.

2   Q    And do you have any personal knowledge as to whether or

3   not -- well, strike that.  Let me ask this question first:

4        There is a procedure for claiming money that was seized

5   by law enforcement; isn't that correct?

6   A    Yes.  With our agency there is.  I can only speak to our

7   agency.

8   Q    Okay.  But you all seized the money in this case, wasn't

9   it your agency?

10  A    Yes.

11  Q    And the --

12  A    Most of the money in this case.

13  Q    I'm sorry?

14  A    Most of the money in the safe case.

15  Q    Well, the $24,000 that was taken out of the --

16  A    Yes, sir.

17  Q    Do you recall whether or not anybody claimed that money?

18  A    To my knowledge there was no petition filed.

19  Q    And the money that was seized from the Closeburn address,

20  do you recall anybody filing a petition for that money?

21  A    To my knowledge, no petition was filed for that money.

22  Q    Do you recall any petition being filed in this case?

23  A    There is a car that was seized from somebody not in the

24  indictment, that they filed a petition for.

25  Q    Okay.  No, I'm talking about -- well, I'm sorry.  Money.

1   I'm really talking about money.

2   A    No, sir, not to my knowledge.

3   Q    Now, would it be true that the TSA agent out at LAX was

4   an essential part of the process of transferring the marijuana

5   back to Charlotte?

6   A    Yes, that's true.

7   Q    Did you ever actually go to LAX and talk to anybody at

8   TSA?

9   A    We are no longer involved in the investigation.

10  Q    But you -- I guess you gave the information to

11  authorities out there?

12  A    That is correct.

13  Q    Now in regards to Turtle, he's on the run; is that right?

14  A    That's correct.

15       MR. BUTLER:  If I could have a moment, please, Your

16  Honor.

17       THE COURT:  You may.

18       (Pause.)

19  Q    Now Agent MacDonald, on the day in question of November

20  the 2nd of 2010, now you -- I thought you indicated earlier

21  that -- had a certain vantage point in the parking lot over at

22  Closeburn Drive or Road.  You could see the garage?

23  A    Not really well sitting in the parking lot.  Certainly

24  not where I was sitting.  When I drove -- there's a garage

25  entrance on either end.  In order to drive to where I was, I

1    had to drive by the first entrance and I parked in front of

2    the building in a space closest to the building.  From my

3    vantage point, I could not see inside the garage.  And if I

4    could have seen, it would have been -- I may have been able to

5    see, like, maybe, you know, a very minimal amount, not into

6    the depths of the garage.

7    Q    Okay.  But now isn't it typical when you have a search

8    warrant, that the search warrant covers more than just the

9    dwelling to be searched, it includes vehicles, too?

10             MR. KAUFMAN:  Objection.

11             THE COURT:  Are you saying this search warrant?

12             MR. BUTLER:  Yes, Your Honor.

13             THE COURT:  Is that what you're asking about?

14             MR. BUTLER:  Yes, sir.

15             THE WITNESS:  I would have to see the search.  I

16   don't know if the car was covered in the search warrant.

17   Q    You certainly knew that the car was relevant to the case.

18   A    Yes, but I didn't write the search warrant.

19   Q    When -- when -- what time did you start your surveillance

20   that day?

21   A    It was in the morning.  I'd -- my best recollection is

22   somewhere probably around 8:00, 8:30, somewhere around there.

23   Q    In the morning?

24   A    Yes, sir.

25   Q    Well, did you -- how did you know if anybody was in the

1    residence?

2    A    We didn't.

3    Q    Well, did you check to see if the Porsche Cayenne was

4    there?

5    A    Yes.  I drove by, I saw -- I saw -- as I drove passed, I

6    saw the white Cayenne, and I saw a silver vehicle which I

7    thought might have been the Infiniti.

8    Q    I'm sorry.

9    A    I saw a silver vehicle parked next to it which I thought

10   might have been the Infiniti.

11   Q    Was that in the garage or parking lot?

12   A    They were both in the garage.

13   Q    Well during your surveillance weren't you concerned about

14   someone leaving the residence as you were with Jerry Davis?

15   A    Yes.

16   Q    But you never saw anyone leave other than Mr. Davis; is

17   that right?

18   A    At one point the silver Infiniti was seen leaving the

19   parking lot, so that vehicle left.  I'm sorry.  They left the

20   garage.

21   Q    I'm sorry?

22   A    They exited the -- or that vehicle exited the garage.

23   Q    And do you recall about what time that was?

24   A    I think it was around 2:30 or so, but I'm not positive.

25   Q    The -- you took custody of the $21,000; is that right?

1   A   That's correct.

2   Q   Well, didn't Davon Harris claim it?

3   A   He said that something --

4           MR. KAUFMAN:  Objection.

5           THE COURT:  Sustained.

6   Q   Now you took photographs of the -- of the box of shoes,

7   correct?

8   A   That's correct.

9   Q   Well, do you know who bought those shoes?

10  A   No, I don't.

11  Q   Do you know whose shoes they were?

12  A   I'm assuming they belong to the person that lived there.

13  Q   You're assuming that; is that right?

14  A   Yes, sir.

15  Q   Okay.  And don't you remember, in regards to the safe,

16  that you all broke in the safe.  Do you remember that?

17  A   I was not there when the safe was opened, but that's not

18  my recollection, no.

19  Q   Okay.  Well, and of course you probably won't know who

20  was there when it was opened, since you weren't there,

21  correct?

22  A   Well, I was in the residence, but I was not in the area

23  where the safe was.

24  Q   Okay.  So you still wouldn't know who opened it if you

25  weren't in there, right?

1   A    Unless they told me.

2   Q    Yes, sir.  And do you know whether or not the money was

3   processed for any type of trace evidence?

4   A    I don't believe it was, no.

5   Q    And you took possession of that money?

6   A    Which money are you referring to?

7   Q    Ninety some thousand dollars that you say was in the

8   safe?

9   A    Some of the money was in the safe, from what --

10  Q    I'm sorry?

11  A    Some of the money was in the safe, and some of the money

12  from different part of the house.  But yes, I did take

13  possession of it.

14  Q    Okay.  And it wasn't counted, correct?

15  A    Not there.  It was counted the next day at Brinks.

16  Q    Now, there wasn't any documentation in regards to the

17  registration of the Porsche Cayenne in the dwelling; is that

18  right?  Other than that insurance matter that you all spoke

19  of?

20  A    I believe there was.

21  Q    You believe that there was what?

22  A    I believe in fact I've gone through the documentation and

23  there was a registration card in the residence.

24  Q    In the what?

25  A    In the residence.

1  Q    Okay.  Did you collect it?

2  A    Yes.  Well, I personally didn't collect it.

3  Q    I can't hear you?

4  A    I personally did not collect it.

5  Q    Okay.  Do you know who did?

6  A    No, sir, I don't.

7  Q    Okay.  When you -- when you were collecting things, were

8  you turning them over to Detective Spears?

9  A    I really wasn't involved in the search, per se.  I was

10  there -- I was looking at items.  I didn't actually collect

11  anything and turn it over to Detective Spears.  I did collect

12  one picture.  I waited around cause they had to secure the

13  door, and I obtained a photograph of that and turned it over

14  to -- I believe Detective James Beaver later on.

15  Q    Were you one of the -- were you a member of the team that

16  actually breached the door?

17  A    No, sir.  I got there afterwards.

18  Q    Okay.  But it was broken down; is that right or broke

19  into?

20  A    Yes, sir.

21  Q    And did you ever get an opportunity to see the .6 grams

22  of marijuana that was actually recovered from that residence?

23  A    I don't recall.

24  Q    When you went to where the silver Infiniti had been

25  stopped and the three individuals had been detained, those

1    three individuals, I believe it was Esco, Davon Harris, and

2    Shaunda McAdoo, they were later released, were they not?

3    A    Yes, they were.

4    Q    And at that time -- at that time on November the 2nd, the

5    vehicle wasn't seized; is that right?

6    A    That's correct.

7    Q    Do you remember whether you were involved in the arrest

8    of Mr. Harris?

9    A    I don't think I would -- no, I wasn't.

10   Q    Okay.  But you were a part of the arrest team of

11   Ms. Peppers, correct?

12   A    No, sir.  I wasn't there.

13   Q    You weren't there?

14   A    No, sir.

15   Q    Okay.  You know that Jerry Davis is originally from

16   California; is that right?

17             MR. KAUFMAN:  Objection.

18             THE WITNESS:  That's what I've heard.

19   Q    And that he played baseball for the Pittsburgh Pirates?

20   A    That's what I've been told.

21   Q    During your investigation you were able to determine that

22   Mr. Coleman was not from California; isn't that correct?

23   A    Yeah, I don't think he's from California.

24   Q    Okay.

25             MR. BUTLER:  If I can have a moment, please, Your

 1  Honor?

 2          (Pause.)

 3  Q    Agent MacDonald, let me just ask you a few more

 4  questions, if I may.

 5      When Mr. Davis left pulling the luggage that you

 6  described, was his vehicle in the parking lot or in the

 7  garage?

 8  A    He was in the parking lot.

 9  Q    And did you have an occasion after Mr. Davis left to go

10  in the garage?

11  A    I don't recall if I was in the garage -- I don't recall

12  if I was in the garage or not.  I may have walked down there

13  during the execution of the search warrant, but I can't

14  remember.

15  Q    And so if you went in the garage, you don't recall

16  smelling a smell of fresh odor of marijuana down there either;

17  is that right?

18  A    Not to my recollection, no.

19          MR. BUTLER:  Thank you, sir.  I have no further

20  questions.

21          THE COURT:  Any redirect?

22          MR. KAUFMAN:  Yes, Your Honor.

23                      REDIRECT EXAMINATION

24  BY MR. KAUFMAN:

25  Q    Agent MacDonald, how big is the garage?

1    A    It's a large garage.  It's -- you can park -- it's

2    elongated run from one end of the complex to the other, kind

3    of not a straight line, but kind of slightly curved.  There's

4    parking on, as you're going lengthwise, there's parking, you

5    know, on both sides.

6        As far as the length of the garage, it's probably of -- I

7    would say at least 100 feet longer, maybe longer, 150 feet,

8    something like that.  It may be longer than that, pretty long

9    garage.

10   Q    So maybe half a football field or longer?

11   A    Yeah.

12   Q    Based on your training and experience, if there was

13   marijuana contained inside of a vehicle, would you expect to

14   be able to smell that in a garage of that size?

15   A    No, sir.

16   Q    Also on November 2nd you were asked if you released

17   Shaunda McAdoo, Davon Harris and Christopher McKneely, who is

18   also known as Esco.  Did you later obtain more evidence

19   regarding their involvement and in fact arrest them?

20   A    Yes.

21   Q    You were asked if you seized the Infiniti in which they

22   were riding that day.  Did you at a subsequent date seize it?

23   A    It was indicted.  We never took possession of it.

24   Q    Okay.  You were asked about the broken door at Closeburn

25   Road.  Are you familiar with the term "knock and announce?"

1    A    Yes.

2    Q    What does that mean?

3    A    When a warrant is served, typically when law enforcement

4    approaches a door, they will knock, say who they are.

5    Basically, in a nutshell, knock on the door, police with a

6    warrant, open the door.  Knock again, police with a warrant,

7    open the door.  And when within a reasonable amount of time,

8    if no one's come to the door, then the door's opened.

9    Q    And if it's locked, what happens?

10   A    Well, then the door is typically opened with a, like, a

11   battering ram type of device.

12   Q    Is that standard operating procedure?

13   A    Yes, it is.

14   Q    You were asked if the search warrant included the Porsche

15   Cayenne in it.  And I believe you had said that you would need

16   to review the search warrant.  Like to show you what's been

17   marked for identification purposes already as Government's

18   Exhibit 63.  Like to turn your attention to page 3.  The

19   portion where it talks about the places to be searched.  If

20   you could review it for a moment.  And when you're done

21   reviewing it, let me know.

22        I'm taking back the exhibit.

23        Agent MacDonald, did the warrant include search for Unit

24   115 at 5425 Closeburn Road?

25   A    Yes, it did.

1    Q    Did it include the search of a person of Parker Antron

2    Coleman?

3    A    I'd have to look at the report again, sir.

4              MR. KAUFMAN:  (Handing paper writing to the

5    witness.)

6    Q    Did it include the search of the person of Parker Antron

7    Coleman?

8    A    Yes, it did.

9    Q    Did it include the search of the white Porsche Cayenne

10   SUV?

11   A    No, it didn't.

12   Q    Would you have expected it to?

13   A    I did not write the search warrant.

14   Q    At the time the search warrant was sought, did law

15   enforcement have any information about marijuana that had been

16   brought after Jerry Davis left, from Mr. Coleman's residence

17   down to the Porsche?

18   A    At that time, no.

19   Q    Now you were asked about the access to the safe.  Close

20   in time to the point when the person accessed the safe, did

21   they advise you as to how they got in?

22   A    I recall --

23             MR. BUTLER:  Objection.

24             THE COURT:  Sustained.

25   Q    With regard to the Cayenne registration, the defense

1    lawyer was asking you some questions about that.  Is that in

2    fact contained -- the document about the registration, is that

3    contained in Exhibit 14 that has been admitted into evidence

4    and that the jury can review during deliberations?

5    A    I'm not sure which exhibit number, but it's in one of the

6    folders that contains -- there's two bags that contain

7    multiple folders.  It's in one of those folders.

8    Q    And in the residence, again, there was the progressive --

9    Progressive Insurance documentation that was found in Mr.

10   Coleman's residence.  What was the address and name listed for

11   the insurance?

12        THE COURT:  That's been gone into with another

13   witness, something new on direct?

14   Q   (Mr. Kaufman) You were asked if Jerry Davis was indicted.

15   Was he in fact charged by indictment?

16        THE COURT:  I said in answer to -- at one point with

17   Mr. Butler's question, whoever was charged in other

18   indictments is not relevant in this case, and so the same

19   applies to you.

20   Q   (Mr. Kaufman) Why did -- why did you end up going before

21   the grand jury four times?

22   A    We had superseding indictments indicting other people.

23   Q    You were asked about money that you obtained from Jerry

24   Davis' safe.  Who told you about the money?

25   A    Jerry Davis.

1    Q    And who guided you to -- and gave you access to the safe

2    to get the money?

3    A    Jerry Davis.

4    Q    You were asked about spreadsheets based on bank accounts

5    and tax records.  Did you create such spreadsheets or obtain

6    such records for defendants who had signed cooperation plea

7    agreements already?

8    A    I don't believe we did, no.

9    Q    And why would you?

10   A    Financial investigations, it's a lot -- it's pretty time

11   consuming.  It takes a long time just getting the

12   documentation.  It's costly.  Everything starts adding up.  If

13   we can do certain things, not everything is gonna require

14   financial work up in great detail.

15   Q    And so why haven't you obtained records for Pep's Cafe to

16   date?

17   A    Well, when we send out a subpoena -- when we send out a

18   subpoena for bank records, the wording on the documentation is

19   such that it includes, for example, Mr. Smith.  We'll ask

20   for -- for all bank accounts, it's bank specific.  All bank

21   accounts for a particular individual, with a particular social

22   security number, and any -- and the wording, paraphrasing,

23   basically any other account that they'll have any type of

24   signatory authority over or any type of control over.  And a

25   lot of times when you do that, if an individual does have a

1   bank, a business associated with them, we'll get those

2   documents as well.  Because although it's, you know, he's

3   got -- typically if he's got control of the account, we

4   typically get the information.

5           THE COURT:  So the question is, "Why haven't you

6   obtained records for Pep's Cafe?"

7           Can you answer that question?

8           THE WITNESS:  We did not specifically request

9   information from Pep's Cafe.  One, because we didn't think

10  there was going to be much, if any, money going into it.  And

11  I thought it also might have been covered by Mr. Coleman's

12  subpoena.

13  Q   (Mr. Kaufman) And Ms. Peppers already pled guilty long

14  ago?

15  A   She had already pled guilty, yeah.  We had no need to get

16  her records after she pled guilty.

17  Q   Defense lawyer asked you if you had heard about

18  Mr. Carrera, Chucky, Glenn Carrera, branching off.  And you

19  said in answer to that, that you had heard of that.  How many

20  transactions or transaction did you hear about?

21  A   We heard that he kind of cut out the middleman, so to

22  speak, and went directly with another co-defendant.

23  Q   And did you, subsequent during your investigation, come

24  to gain information that in fact it was all authorized by Mr.

25  Coleman?

1          MR. BUTLER:  Objection.

2          THE COURT:  Sustained.

3   Q    The defense lawyer asked you some questions about the --

4   Mr. Coleman's credit card documents, and the transactions in

5   his -- the credit card in his name.

6          Are you aware of any credit card companies that don't

7   send statements to their customers?

8          MR. BUTLER:  Objection.

9          THE COURT:  Sustained.

10  Q    You were asked about petitions.  Based on your training

11  and experience, what would be the impact of an individual

12  claiming money that any of these large funds that were seized

13  in this case?

14         MR. BUTLER:  Objection.

15         THE COURT:  Sustained.

16  Q    You were asked about the TSA investigation.  Is that

17  still ongoing?

18         MR. BUTLER:  Objection.

19         THE COURT:  Overruled.

20         THE WITNESS:  To my understanding, yes.

21  Q    And to your understanding, about how many agencies are

22  involved in that investigation?

23         THE COURT:  I'll sustain the objection to that.

24         MR. KAUFMAN:  We have nothing further, Your Honor.

25         THE COURT:  Any recross on something new on

1  redirect?

2          MR. BUTLER:  No, Your Honor.

3          THE COURT:  All right.  You may step down.

4          Call your next witness.

5          MR. KAUFMAN:  Your Honor, with that, the United

6  States rests.

7          THE COURT:  All right.  May I see the attorneys at

8  sidebar?

9          (Bench conference as follows:)

10         THE COURT:  Trying to figure out whether I should

11 let the jury go and deal with whatever we need to deal with,

12 or whether I should keep them here and let you start your

13 case.  But -- so I need to get a ballpark from you for how

14 long you think --

15         MR. BUTLER:  Well, Judge, I would -- I would ask

16 that you let them go and advise Mr. Coleman about his right to

17 testify.  I, quite frankly, I'm not putting up evidence, and

18 we can just go into, you know, closing arguments first thing

19 in the morning.  Because I think the jury's tired, like me.

20         THE COURT:  What I'm going to do is give them a

21 break, and ask those questions.  Because I would like to know

22 for sure going in tomorrow whether we're just instructing and

23 arguing or whether there's going to be any evidence.

24         MR. BUTLER:  Okay.  That's fine.

25         THE COURT:  So, but if you can tell me now that

1   you're not going to put on evidence, then I'll just let them
2   go.
3           MR. BUTLER:  Tell you what, can I confer and come
4   back?
5           THE COURT:  Sure.  The other question is, we can
6   deal with that tomorrow, that's the forfeiture part.
7           MR. BUTLER:  Right.
8           MR. KAUFMAN:  And in fact, Your Honor, I have
9   received communication from law enforcement that there's been
10  an administrative forfeiture of the money, so I believe --
11          THE COURT:  You're dismissing that?  Dismissing the
12  forfeiture count?
13          MR. KAUFMAN:  Yes, Your Honor.
14          THE COURT:  We don't have to worry about that.
15          All right.  So you just need a couple minutes with
16  your client, then I'll ask you if you intend to put on
17  evidence and you can let me know.
18          MR. BUTLER:  Yes, sir.
19          THE COURT:  But we have to deal with Rule 29 stuff,
20  too.
21          MR. BUTLER:  Right.  Right.
22          MR. KAUFMAN:  In terms of the issue of his
23  testifying or not, we need to have the jury excused for that.
24          THE COURT:  Well, yeah.  I would question him
25  outside the presence of the jury.

1      So I'm trying to figure out how to get the answer

2  from you with them here.  Maybe I'll just excuse them and then

3  we'll figure out where we're going.

4      (Bench conference was concluded.)

5      THE COURT:  Members of the jury, there are some

6  scheduling type matters I need to take up with the attorneys,

7  I'd rather do that without whispering so much at sidebar.  If

8  you wouldn't mind, I would ask you to take a break for a short

9  period of time, and then we'll proceed from that point.

10     So if you take just a short break at this time,

11 we'll call you back when we're ready for you.

12     (The jury was escorted from the courtroom at

13 5:44 p.m.)

14     THE COURT:  You all can be seated.

15     (Pause.)

16     MR. BUTLER:  May it please the Court.

17     THE COURT:  Yes, sir.

18     MR. BUTLER:  It is my understanding that on behalf

19 of Mr. Coleman, Mr. Coleman has indicated to counsel that he

20 does not wish to testify or present any evidence.  Is that

21 correct, Mr. Coleman?

22     DEFENDANT COLEMAN:  Yes.

23     MR. BUTLER:  I would ask the Court to make personal

24 inquiry.

25     THE COURT:  I'm going to do that, but I'm going to

1  give Mr. Coleman just a second to think about that.  And while

2  we're doing that, Mr. Butler, I'll be glad to hear from you on

3  any Rule 29 motions.

4       MR. BUTLER:  May it please the Court, on behalf of

5  Mr. Coleman at this point after the government has rested, we

6  would move under Rule 29 for acquittal, and would contend that

7  taking the evidence that has been presented, the government

8  hadn't made out a case of each of the charges in the

9  indictment.  Thank you.

10      THE COURT:  Thank you.  At this stage I'm required

11  to take that evidence in the light most favorable to the

12  government in ruling on a Rule 29 motion for acquittal.

13  Taking the evidence in the light most favorable to the

14  government, I do think that there is evidence sufficient to go

15  to the jury.  So I'll overrule that motion at this time.

16      MR. BUTLER:  Note our objection, Your Honor.

17      THE COURT:  Very well.

18      Mr. Coleman, if you would please stand up at this

19  time.  I do want to talk to you on the record about your

20  choice whether to testify or not.

21      You have a right to testify if you wish to testify,

22  and I think you've heard me tell the jury earlier when the

23  case started, that you also have a right not to testify and if

24  you choose not to testify they can't hold it against you in

25  any way.  It's a constitutional right.  I've told them about

1    it at the beginning of the trial, and I would tell them about
2    it in closing instructions as well.

3              But I wanted to make sure I understood -- or I
4    wanted to make sure that you understood your right whether to
5    testify or not.  Do you know you have an option to do one or
6    the other?

7              DEFENDANT COLEMAN:  Yes.

8              THE COURT:  And I'm sure you've talked to your
9    attorney about that option, but have you made up your mind as
10   to whether you wish to testify or not?

11             DEFENDANT COLEMAN:  No, sir, I do not.

12             THE COURT:  You do not wish to testify?

13             DEFENDANT COLEMAN:  (Shaking head.)

14             THE COURT:  Very well.  Then I will instruct the
15   jury as part of the closing instructions that that's your
16   constitutional right and they cannot hold that against you in
17   any way.

18             All right.  You may sit down at this time.

19             All right.  Well, what I think we'll do at this
20   time, Mr. Butler, is, have the jury come in.  I'll ask you if
21   you intend to put on any evidence.  You can give me the answer
22   then we'll dismiss the jury for the evening.  We'll come back
23   at 9:30 in the morning.  I'll give them general instructions.
24   You all will argue, and then I'll give them the offense
25   specific instructions after argument.

1    MR. BUTLER:  And if Your Honor please, in light of

2  the evidence that was presented this afternoon, I would ask

3  the Court to reconsider about the time length on argument.

4    THE COURT:  I'll increase give each side 40 minutes.

5    MR. BUTLER:  Thank you, very much.

6    THE COURT:  And in light of the evidence in

7  cross-examination, I am going to add an investigative

8  technique instruction to the general instructions.  And I'll

9  give a copy to each of the attorneys before you leave tonight.

10    Anything further?

11    MR. KAUFMAN:  Your Honor, when you say the

12  technique, the one that states that they're not required to

13  use any particular technique?

14    THE COURT:  That's correct.

15    MR. KAUFMAN:  Thank you, Your Honor.

16    THE COURT:  And I will give the multiple jury

17  instruction requested by the defense.  Have you all got a copy

18  of that?

19    MR. BUTLER:  Yes, Your Honor.  Thank you.

20    THE COURT:  All right.  Let's call the jury.

21    (The jury was returned to the courtroom at

22  5:49 p.m.)

23    THE COURT:  Members of the Jury, the government has

24  rested its case.  Does the defendant intend to put on

25  evidence?

1          MR. BUTLER:  May it please the Court.  The defendant

2    does not intend to put on evidence and the defense rests.

3          THE COURT:  All right.  Thank you, Mr. Butler.

4          MR. BUTLER:  Yes, sir.

5          THE COURT:  Members of the jury, it's close enough

6    to 6:00.  The next stage in these proceedings is for me to

7    give you general instructions.  I suspect you don't want to

8    hear from me giving 15, 20 minutes worth of instructions after

9    having heard evidence all day long, so what I'm going to do

10   is, we're going to break for the evening and come back at

11   9:30 in the morning.

12          At 9:30 I'm going to give you some general

13   instructions to guide your deliberations, and then the

14   attorneys are going to make their closing arguments to you.

15   And after they're done with closing argument, I'm going to

16   come back and tell you about the specific counts in the

17   indictment, the language of the indictment, the language of

18   the statute alleged to have been violated, and then the

19   essential elements as to each count in the indictment.  So

20   that's what we'll do tomorrow.

21          Tonight, of course, don't talk about the case with

22   anyone.  Don't do any research about the case, and keep an

23   open mind until you've been instructed.  You've heard the

24   arguments of the attorneys, and you begin deliberation.  Until

25   that point keep an open mind about the case.

1    So with those instructions I'll excuse you for the
2  evening and look forward to seeing you at 9:30 in the morning.
3    (The jury was escorted for the evening at 5:52 p.m.)
4    THE COURT:  All right.  Anything further from either
5  side?
6    MR. KAUFMAN:  No, Your Honor.
7    MR. BUTLER:  No, Your Honor.  Thank you.
8    THE COURT:  All right.  If there is something we
9  have to take up, let my chambers know and we'll get in here at
10 9:00.  Let's be ready to go at 9:30 in the morning otherwise.
11   MR. BUTLER:  So, Your Honor --
12   THE COURT:  9:30 unless there's something --
13   MR. BUTLER:  Okay.
14   THE COURT:  -- that I don't know about that would
15 require us to meet come earlier.
16   MR. BUTLER:  Thank you.
17   THE COURT:  What I'm saying is, whatever we need to
18 take care of, let's take care of it so we're ready to go at
19 9:30.
20   MR. BUTLER:  Yes, sir.
21   (The Court was in recess for the day at 5:53 p.m.)
22          * * * * * *
23
24
25