UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DOCKET NO. 3:10-cr-238 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | VOLUME IV of IV |
| | ) | |
| PARKER ANTRON COLEMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
AUGUST 16, 2012

APPEARANCES:

On Behalf of the Government:

STEVEN R. KAUFMAN, ESQ.,
Assistant United States Attorney
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202

On Behalf of the Defendant:

NORMAN BUTLER, ESQ.,
725 E. Trade Street
Suite 115 Court Arcade Building
Charlotte, North Carolina 28202

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1                        I N D E X

2              AUGUST 16, 2012; VOLUME IV of IV

3  Defense Motion to Reopen                        687
   Court's General Instructions                    689
4  Closing Arguments:
              Mr. Kaufman                          703
5             Mr. Butler                           727
              Mr. Kaufman                          745
6  Court's Substantive Instructions               750
   Verdict                                         779
7  Jury Polled                                     781
   Defense motions                                 785
8                        *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2   AUGUST 16, 2012, COURT CALLED TO ORDER 9:10 a.m.:

3              (Defendant Parker Antron Coleman present.)

4              THE COURT:  I understand there's an issue the

5   parties need to take up before we bring the jury in and

6   instruct them?

7              MR. BUTLER:  Yes, Your Honor.  If it please the

8   Court, Mr. Coleman has asked me to ask the Court to require

9   the government to play the entire tape recording of the

10  conversation that they played yesterday in regards to a call

11  that Mr. Coleman made to someone after the reverse proffer.

12             THE COURT:  All right.  That exhibit number was

13  what?

14             MR. KAUFMAN:  Apologize, Your Honor.  The exhibit

15  number is 21 and the transcript 21b.

16             THE COURT:  And that was a partial recording -- a

17  partial recording of a conversation allegedly between

18  Mr. Coleman and some woman named Moe, in which the government

19  offered certain statements as consciousness of guilt and then

20  rested.  Defense rested after that, and I inquired of

21  Mr. Coleman concerning his testimonial rights.

22             MR. BUTLER:  Yes, sir.

23             THE COURT:  So this morning you're asking to reopen

24  to do what?

25             MR. BUTLER:  To allow the jury to hear the rest of

1    that particular conversation.

2            THE COURT:  What in the rest of the conversation do

3    you think is relevant?

4            MR. BUTLER:  Well, Your Honor, based on information

5    and belief, it would show -- it would put everything in

6    context in regards to the conversation with Moe.

7            THE COURT:  Do you have any specific things that you

8    believe are admissible?  You know, just exculpatory

9    self-serving statements of a defendant, cases -- the Fourth

10   Circuit cases have said they're not admissible under the Rule

11   of Completeness.  There has to be a specific grounds of

12   admission that would permit those kind of statements to come

13   into evidence, and I haven't heard one.

14           MR. BUTLER:  Give me a moment, Your Honor.

15           (Pause.)

16           MR. BUTLER:  May it please the Court, based on

17   information and belief, it would put into context as to the

18   perception of Mr. Coleman regarding the statements of the

19   alleged co-conspirators that were discussed during the reverse

20   proffer, to the extent that Mr. Coleman would explain that

21   they were not true and that they were, in fact, lies.

22           THE COURT:  Very well.  I'm going to deny your

23   request to reopen for the purpose of playing the rest of the

24   conversation.  I do not believe under Rule 106 that a

25   sufficient evidentiary basis has been proffered to play the

1   rest of the conversation.

2            Note your objection.

3            MR. BUTLER:  Thank you.

4            THE COURT:  Overrule your request.

5            Are there any other issues before we call the jury?

6            MR. KAUFMAN:  No, Your Honor.

7            THE COURT:  All right.

8            MR. BUTLER:  No, sir.

9            THE COURT:  Let's call the jury.  I'll give them

10  general instructions, and then you all have 40 minutes each.

11  Same time warnings from each side?

12           MR. BUTLER:  Yes, Your Honor.

13           (The jury returned to the courtroom at 9:32 a.m.)

14           THE COURT:  Good morning, members of the jury.

15           THE JURY:  Good morning.

16           THE COURT:  Now that you've heard the evidence and

17  soon you will hear the arguments of the attorneys, I wanted to

18  instruct you as to the general principles of the law that

19  apply to the case.  And after the attorneys have made their

20  closing arguments to you, I will come back and talk about each

21  of the counts charged, and give the elements of those offenses

22  and other instructions to guide your deliberations.

23           Now as I told you in the preliminary instructions,

24  it is your duty and your responsibility in this case to find

25  the facts.  You may find those facts only from the evidence

1  which has been presented during the trial.  That evidence
2  consists of the witnesses who were sworn, and testified before
3  you, the exhibits which were introduced into evidence, and any
4  stipulation of fact made by the parties.

5          In reaching your decision as to the facts, it is
6  your sworn duty to follow the law as the Court instructs you.
7  You will apply the law given to you by the Court to the facts
8  which you find from the evidence to reach a verdict.

9          Now counsel may refer to some of the governing rules
10  of law in their arguments.  And if any difference appears to
11  you between the law as stated by counsel and that as stated by
12  this Court, you are of course to be governed by the Court's
13  instructions.

14          And you're not to single out any one instruction
15  alone as stating the law, but must consider the instructions
16  as a whole.

17          You may not substitute or follow any personal or
18  private notion or opinion as to what the law is or ought to
19  be.

20          You are required to perform these duties without
21  bias, prejudice, or sympathy for any party.  The law does not
22  permit jurors to decide cases on the basis of bias, prejudice,
23  and sympathy, or on any basis other than solely on the facts
24  and the law arising out of the case.

25          Now this case involves seven charges, by Bill of

1  Indictment, that include conspiracy to distribute and possess

2  with intent to distribute marijuana, conspiracy to launder

3  drug trafficking proceeds, possession of marijuana with intent

4  to distribute, and possession of a firearm on two occasions in

5  furtherance of a drug trafficking crime and after being

6  convicted of a felony.  These charges are brought by the

7  government against Mr. Parker Coleman.

8       And you are instructed that an indictment is but a

9  formal method of accusing the defendant of a crime.  Its

10  purpose is to inform the defendant of the charges against him

11  and to bring him to trial.  It is not evidence of any kind

12  against the defendant, nor does it permit any presumption or

13  inference of guilt.  In other words, an indictment is not

14  consistent either with guilt or lack of guilt.  It simply puts

15  that question at issue for your decision.

16       It is up to you, the jury, to decide whether the

17  government has proved each element of the crime alleged in the

18  Bill of Indictment beyond a reasonable doubt.

19       Now a separate crime is charged in each count of the

20  indictment.  Each count, and the evidence pertaining to it,

21  should be considered separately.  The fact that you may find

22  the defendant guilty or not guilty as to one of the crimes

23  charged should not control your verdict as to the other.

24       You're here to decide whether the government has

25  proved beyond a reasonable doubt that the defendant is guilty

1  of the crimes charged.  The defendant is not on trial for any

2  act, conduct, or offense not alleged in the indictment.

3  Neither are you concerned with the guilt of any other person

4  or persons not on -- I was trying to hold that off.  Neither

5  are you concerned with the guilt of any other person or

6  persons not on trial as a defendant in this case.

7          Now during the trial you heard evidence of a

8  conviction of the defendant in the State of Mississippi, which

9  may be similar to the charges charged in the indictment, but

10 which was committed on a separate occasion.  You must not

11 consider this evidence in deciding if the defendant committed

12 the acts charged in the indictment.  However, you may consider

13 this evidence for other, very limited, purposes.

14         If you find beyond a reasonable doubt from other

15 evidence in the case that the defendant did commit the acts

16 charged in the indictment, then you may consider evidence of

17 other acts allegedly committed on other occasions to

18 determine:

19         Whether the defendant had the state of mind or

20 intent necessary to commit the crime charged in the

21 indictment; or whether he had a motive or opportunity; or

22 whether he acted according to a plan or in preparation for

23 commission of a crime; or whether he acted according to

24 mistake or accident.

25         These are other -- these are the limited purposes

for which evidence of other similar acts may be considered.
Remember, the defendant is on trial only for the crimes
charged in the indictment, and you may consider the evidence
of other acts only for the limited purpose for which it is
offered.

Now every defendant in a criminal case is presumed
to be innocent, and this presumption continues throughout the
course of the trial.  This presumption will end only if you
reach the jury room and arrive unanimously at the conclusion,
if you do, that the government has shown to your satisfaction
that the defendant is guilty beyond a reasonable doubt.  This
burden on the government does not change at any time during
the course of the trial.  The presumption of innocence in
favor of a defendant is not a mere formality to be disregarded
by the jury at its pleasure.  It is a substantive part of our
criminal law.  Accordingly, the government must prove each of
the elements of the crimes charged in this indictment beyond a
reasonable doubt before there can be a conviction.

The term "reasonable doubt" means just what it says.
It is a doubt based upon reason and common sense.  Its meaning
is no doubt self-evident and understood by you, and the Court
will not attempt to define the term further.

Now there are two types of evidence which a jury may
properly assess in determining whether the government has met
its burden of proof as to any offense.

1         One is direct evidence, such as the testimony of an

2 eyewitness. The other is circumstantial evidence, which is

3 evidence of facts or circumstances from which the existence or

4 nonexistence of other facts in controversy may be inferred.

5         As a general rule, the law makes no distinction

6 between direct and circumstantial evidence, but simply

7 requires that, before convicting a defendant, the jury must be

8 satisfied of the guilt of such defendant beyond a reasonable

9 doubt from all of the evidence in the case.

10         Now while you should only consider evidence

11 presented during the trial of this case, you are permitted to

12 draw such reasonable inferences from the testimony and

13 exhibits as you feel are justified in the light of common

14 experience. In other words, you may make deductions and reach

15 conclusions which reason and common sense lead you to draw

16 from the facts which have been established by the testimony

17 and evidence in the case.

18         Now while we were hearing evidence, you were told

19 that the parties had agreed to, or stipulated to certain

20 facts. That means simply that they all accept those

21 particular facts.

22         There's no disagreement over those facts, so there

23 was no need for evidence beyond the stipulation itself by any

24 party on these points. You must accept these stipulations as

25 fact, even if nothing more was said about them one way or the

1  other.

2        Now I'll remind you again that certain exhibits were

3  recordings, and offered with those exhibits were transcripts

4  which purported to -- were intended as an aid to identify who

5  was speaking and what was said on the recording.

6        You are specifically instructed that whether the

7  transcripts correctly or incorrectly reflect the content of

8  the conversation or the identity of the speakers is entirely

9  for you to determine.  Should you determine that the

10 transcripts are incorrect or inaccurate in any respect, you

11 should disregard it to that extent.

12       Now if you find that the defendant voluntarily and

13 intentionally offered an explanation, or made some statement

14 tending to show his innocence, or attempted to obtain false

15 evidence of innocence, then it is for you to weigh such

16 evidence as you have been instructed.  If you should find this

17 explanation or statement to be false, then you may consider

18 whether this circumstantial evidence points to a consciousness

19 of guilt.  Consciousness of guilt is knowledge or awareness on

20 the part of the defendant of his own guilt and is probative of

21 guilt.  However, such consideration of falsity, if you find it

22 to be applicable, does not change the burden on the government

23 to prove each element of the offense beyond a reasonable doubt

24 to support the verdict of guilty.

25       Now during the trial I instructed you to exclude

1    from your consideration certain statements made from the

2    witness stand or to limit your consideration of those

3    statements in certain ways.  I remind you that it is your duty

4    to follow that instruction and consider only that evidence

5    which was duly allowed from the witnesses presented to you for

6    the limited purposes for which they were admitted.

7          You are not required to accept testimony, even

8    though the testimony is uncontradicted and the witness is not

9    impeached.  You may decide, because of the witness's bearing

10   and demeanor, or because of the inherent improbability of his

11   or her testimony, or for other reasons sufficient to you, that

12   such testimony is not worthy of belief.

13         Now the testimony of a witness may be discredited or

14   impeached by showing that the witness previously made oral or

15   written statements which are inconsistent with the present

16   testimony.  The earlier contradictory statements are

17   admissible only to impeach the credibility of the witness and

18   not to establish the truth of those statements.  It is the

19   province of the jury to determine the credibility, if any, to

20   be given the testimony of a witness who has been impeached.

21         If a witness is shown knowingly to have testified

22   falsely concerning any material matter, you have a right to

23   distrust such witness's testimony in other particulars; you

24   may reject all the testimony of that witness or give it such

25   credibility as you may think it deserves.

1          Now an accomplice is one who united with another

2   person in the commission of a crime, voluntarily and with

3   common intent.  Alleged accomplices, including those who of

4   entered into an agreement with the government, do not thereby

5   become incompetent or ineligible as witnesses.  On the

6   contrary, the testimony of such witness alone may be of

7   sufficient weight to sustain a verdict of guilty.  However,

8   the jury should keep in mind that such testimony is always to

9   be received with caution and weighed with great care.  You

10  should never convict a defendant upon the unsupported

11  testimony of alleged accomplices unless you believe that

12  testimony beyond a reasonable doubt.  The fact that alleged

13  accomplices have been convicted of the offense is not

14  evidence, in and of itself, of the guilt of any other person.

15         You may have heard evidence that certain witnesses

16  have pled guilty to a crime which arose out of the same event

17  for which the defendant is on trial.  You must not consider

18  that guilty plea of the defendant's guilt.  You may consider

19  that witness's guilty plea only for the purposes of

20  determining how much, if at all, to rely upon the witness's

21  testimony.

22         Now during the trial you heard testimony from

23  witnesses who were allowed to give opinion testimony in

24  certain fields.  These witnesses were permitted to testify

25  even though they may not have actually witnessed any of the

1  events involved in the trial.

2          A person's training and experience may give him or

3  her specialized knowledge in a technical field.  The law

4  allows that person to state an opinion about matters in that

5  particular field.  Merely because a witness has expressed an

6  opinion does not mean, however, that you must accept it.  Same

7  as with any other witness, it is up to you to decide whether

8  you believe the testimony and choose to rely upon it.  Part of

9  that decision will depend on your judgment about whether the

10  witness's background, training and experience is sufficient to

11  give the opinion that you heard.  You must also decide whether

12  the opinions were based on sound reasons, judgment, and

13  information.

14          Your decision on the facts of this case should not

15  be determined by the number of witnesses testifying for or

16  against a party.  You should consider all the facts and

17  circumstances in evidence to determine which of the witnesses

18  you choose to believe or not believe.

19          While it is not required either the defendant or the

20  government to cross-examine any witness, you may not draw any

21  inference from the fact that the government or the defendant

22  did not cross-examine a witness.

23          Now the Defendant, Mr. Parker Coleman, has elected

24  not to testify in this case.  The Court instructs you that he

25  has a constitutional right not to take the stand and testify

1    and not to speak at all or offer any evidence, the burden of

2    proof being entirely upon the government.  You must draw no

3    adverse inferences of any kind from his exercise of his

4    privilege not to testify.  This right is a fundamental one in

5    America's criminal law and one which cannot be disregarded by

6    the jury at its pleasure.

7          Now you have been told that the defendant has been

8    convicted of a felony.  This conviction has been brought to

9    your attention only because you may wish to consider it when

10   you decide -- strike that.

11         The fact that the defendant was previously found

12   guilty of another crime does not mean that the defendant

13   committed the crime for which he is on trial, and you must not

14   use this prior conviction as proof of the crime charged in

15   this case.

16         Now the lawyers for both sides objected to some of

17   the things that were said or done during the trial.  And I

18   instructed you previously, that's because they have a duty to

19   their clients to object when they believe that something is

20   being offered that is not permitted by the rules of evidence.

21         And I also instructed you that you should not draw

22   any conclusions from those objections.  If I sustained an

23   objection, the witness was not allowed to answer it and you

24   should not attempt to guess what the answer would have been

25   had I allowed the question.

1    And if the objection was overruled, you should treat
2 the answer like any other.

3    And while we're talking about a lawyer's questions,
4 let me emphasize that a lawyer's question is not evidence.  At
5 times a lawyer may have incorporated into a question a
6 statement that assumed certain facts to be true and asked the
7 witness if the statement was true.  If the witness does not
8 answer or denies the truth of the statement and if there's no
9 evidence in the record proving that the assumed fact is true,
10 then you may not consider the fact to be true, simply because
11 it was contained in the lawyer's question.

12    On the other hand, if the witness adopts or agrees
13 to the assumed fact in the answer, then the witness may be
14 considered to have testified to the fact assumed in the
15 question and his or her testimony is evidence of those facts.

16    Now evidence has been introduced about investigative
17 steps taken or not taken in this case, and questions have been
18 raised about the government's failure to use or decision not
19 to employ certain investigative techniques.  You may consider
20 these facts in deciding whether the government has met its
21 burden of proof because you should look to all the evidence,
22 or lack of evidence in deciding whether the government has met
23 that burden.

24    However, you are also instructed that there is no
25 legal requirement that the government use any specific

1  investigative technique to prove its case.

2          Additionally, the fact that a Court has authorized
3  an investigative technique such as a wiretap or collection of
4  cellphone data, does not establish a defendant's guilt beyond
5  a reasonable doubt.

6          In short, law enforcement or investigative
7  techniques are simply not your concern.  Rather, your concern
8  is whether the evidence which was admitted, proved the
9  defendant's guilt beyond a reasonable doubt.

10          Now some of you took notes during the trial, and you
11  are instructed that your notes are a tool to aid your own
12  individual memory and not a substitute for your memory.
13  Moreover, you should not compare your notes with other jurors'
14  notes in comparing the content of testimony or evaluating the
15  importance of any other evidence.  Remember, your notes are
16  not evidence.  If you chose not to take notes, remember it was
17  your own individual responsibility to listen carefully to the
18  evidence.  You cannot give this responsibility to someone who
19  took notes.  We depend on the judgment of all members of the
20  jury.  You must all remember the evidence in the case.

21          Now, of course, you must decide this case solely on
22  the evidence presented in this courtroom.  This means that
23  during your deliberations you must not conduct any independent
24  research about the case, about any matters in the case, any
25  individuals or groups involved in the case, or legal concepts.

1    Your duty to follow this instruction is a serious

2    responsibility and the failure to follow it may result in

3    being found in contempt of court.

4            Now during your deliberations you must not

5    communicate with or provide any information to anyone by any

6    means, including the devices we talked about earlier, such as

7    cellphones, smart phone, iPhones, Blackberry or computer.  The

8    Internet, any internet service, text or instant messaging

9    service, internet chat room, blog, or website such as

10   Facebook, My Space, Linked In, You Tube or Twitter.

11           You can't use any of those devices in anyway to

12   communicate to anyone any information about the case, or to

13   conduct any research about the case while you are serving as

14   jurors.

15           Finally, I'll remind you that punishment, in the

16   event of a verdict, is a matter exclusively within the

17   province of the Court, and should never be considered by the

18   jury in any way in arriving at an impartial verdict as to the

19   guilt or lack of guilt of the defendant.

20           Those are the general instructions I wanted to give

21   to you before the attorneys make their closing arguments.  We

22   will now listen to the closing arguments of the attorneys, and

23   when they are done I'll give you specific instructions on the

24   counts charged in the indictment.

25           Mr. Kaufman.

1          MR. KAUFMAN:  Thank you, Your Honor.

2          May it please the Court, counsel, ladies and

3    gentlemen of the jury, good morning.

4          THE JURY:  Good morning.

5          MR. KAUFMAN:  All right.  Ladies and gentlemen, at

6    the outset of this trial in opening statements I submitted to

7    you that we would prove beyond a reasonable doubt that the

8    Defendant Parker Antron Coleman was a leader of a drug

9    trafficking organization, and we submit now, that the evidence

10   has done just that.

11         Conspiracy.  What's a conspiracy really all about?

12   And what is the structure of a conspiracy?  A conspiracy is

13   very similar to a spider's web.  You've got numerous people

14   who have different roles.

15         You've heard about sources of supply in California,

16   facilitators in California.  Initially you heard that there

17   were couriers in California who came here with marijuana that

18   was sold, the proceeds then were brought back by the female

19   couriers back to California.

20         As the conspiracy developed and evolved over time,

21   Parker Coleman recruited his own people here.  He had one of

22   his primary distributors, Jerry Davis, also assist him by

23   recruiting people he knew, so that Mr. Coleman could take the

24   California folks out of the equation and have more control

25   over the marijuana.

1    So he had a team of couriers who were bringing the

2 marijuana -- sorry, the proceeds of the trafficking and the

3 money that was used to fuse the further conspiracy on carry-on

4 luggage out to California, and then the marijuana back in two

5 suitcases, 50 pounds each.

6    Now, you also heard about facilitators such as Jerry

7 Davis, and Stephanie Peppers who along with Mr. Coleman would

8 pick up couriers from the airport, drop them off.  On the

9 other side you had Poo Pierce, you had Mark Dorsey who were

10 doing the same thing on the California side.  You had

11 redistributors Jerry Davis, BJ, Rico Grier.

12    So there are lots of different parts of this web,

13 many different parts, and they all had different roles.  If

14 one person drops out, the web still is maintained.  Sometimes

15 you have a new person that comes in over the course of the

16 conspiracy.  It morphs over time, but the core was always the

17 same.

18    Once Jerry Davis introduced Gerren Darty to Parker

19 Coleman, Gerren Darty introduced Mr. Coleman to Mr. Adams.

20 And that was the conspiracy throughout, that was the core.

21 People come and go.  Web strings may be broken or reattached

22 by the spider, but it's that one conspiracy that's for your

23 consideration here.

24    Now, here are some of the people involved.  You've

25 heard about even more people than these people depicted in

1    this.  But these are some of the couriers, the facilitators,

2    the redistributors, and yes, source of supply.

3         So what's a conspiracy all about?  Is it about the

4    drugs?  Ladies and gentlemen, is this what the conspiracy is

5    all about?  Is the conspiracy about the marijuana?  Nope.

6    That's not what it's about.  What's the crime about?  The

7    crime's about the money.  The marijuana is just the medium

8    through which the co-conspirators get money, lots and lots of

9    money.  And they're proud of it, and they enjoy it.

10        So how do drug traffickers protect themselves and

11   their things?  They have to protect themselves from whom?  The

12   police, would be robbers, competitor drug dealers.

13        Now, are they always going to have it on their

14   person?  Maybe.  Maybe not.  Will it always be accessible?

15   Maybe.  Maybe not.  Are they going to keep it where they keep

16   their stash, and where they keep their money, and where they

17   lay their beds -- their heads down at night and go to sleep?

18   Certainly.

19        This is the weapon that Stephanie Peppers purchased

20   from Fireworks, and testified she gave it to Parker Coleman

21   upon his request.  She knew he was a convicted felon, not

22   allowed to have a firearm.

23        You heard sworn testimony from Mark Hunt.  The Smith

24   and Wesson, this is the one that he purchased, because again,

25   Mr. Coleman asked him for a firearm.  He got it for him.  You

1    also heard about that other one, the assault rifle, too.  But

2    this is the one that was found.  So the first one, the Glock

3    was found on November 2nd underneath the bed.  This is the one

4    that was found in Parker Coleman's Porsche Cayenne on

5    November 16, 2010.

6             So what are the facts?  We'll talk about the facts,

7    the law and get to that conclusion.

8             So how did Mr. Coleman get on the radar screen?

9             You'll hear that it was just a small lead in the

10   very beginning.  Although that small lead came from a very

11   significant issue.  January 9, 2009 Gerren Darty had used a

12   U-Haul, picked up well over 300 pounds of marijuana in one

13   shot.  And part of it was there was a vehicle used, that

14   Caliber, that was rented by Stephanie Peppers.

15            And, of course, verbally, she had to provide

16   references.  What was one of the three names she provided?

17   Parker Coleman.  You heard law enforcement say, that was how

18   they found out of the name Parker Coleman.  It wasn't

19   significant yet.  But you heard that law enforcement followed

20   every lead, found everybody they could involved in this.  And

21   yes, they followed that small little lead, and Parker Coleman

22   got on their radar screen.

23            Ultimately, the photograph in this image, as you may

24   recall, is one of those documents in 14, there are multiple

25   subparts, some of the materials found are in November 2nd

1 search warrant. And who is in that photograph? You got

2 Parker Coleman, Jerry Davis, Gerren Darty from left to right.

3 That's in Parker Coleman home.

4 Ladies and gentlemen, when I refer to Exhibit 14,

5 law enforcement on the witness stand only touched upon some of

6 it. Please handle the evidence. Look through the evidence.

7 Go through everything in Exhibit 14. You'll see it. There's

8 a wealth of information there. We have only touched upon the

9 highlights, some of them.

10 So what happened? July 12, 2010, Parker Coleman,

11 you heard from Ms. Peppers -- well, first you heard from

12 Officer Lopez, the K-9 officer who was part of the team that

13 conducted the stop early morning on that date, Parker Coleman.

14 Now you happened to have heard that -- from

15 Ms. Peppers, that he was stopped. And he told -- Mr. Coleman

16 told Ms. Peppers that he was stopped for DUI and that he was

17 found with $40,000 in cash. Is that consistent with Officer

18 Lopez's testimony? Yes. They corroborate each other.

19 Corroboration is a word I may use a little bit,

20 because it's key. It's showing that, as Judge Conrad

21 discussed just now during the preliminary instructions, you

22 can actually convict Mr. Coleman based on one co-conspirator's

23 testimony alone, as long as you find that testimony to be

24 credible. You find that that's sufficient beyond a reasonable

25 doubt, that's all you needed to hear.

1    So hypothetically if just Ms. Peppers testified and
2    there was no physical evidence, no photographs, no audio.  But
3    you found her to be credible beyond a reasonable doubt, and we
4    submit that you should, and that that evidence was sufficient,
5    you could convict based just on that alone.  That's a very
6    important starting point to think about.  Because everything
7    else, one person corroborates another.  The testimony was
8    consistent.  The physical evidence, consistent.  The audio
9    from phone calls, jail calls, so -- consensually recorded
10   calls.  The actual physical evidence seized in this case,
11   everything corroborates each other.

12   So while there's a web of a conspiracy, there's a
13   web of evidence.  It's all corroborating each other.

14   July 12, so Mr. Coleman, he's in that white Porsche
15   Cayenne.  There was residue of marijuana.  And even if there
16   wasn't, we know that Bolo alerted to that money.  And how much
17   was there?  Well, is this consistent with $40,000?  Yes.
18   That's a whole lot of money.

19   And, remember, just a small little nit.  But
20   remember, it was in a box for a money counter.  Remember
21   Mr. Coleman's closet?  What was there?  That machine, it's a
22   money counter.  Out in the open there.

23   All right, November 2nd, 2010.  Lots happened that
24   day, ladies and gentlemen.  And I should add, too, that there
25   was surveillance leading up to it.  Detective Spears and

1    Detective Beaver testified about two different dates in late

2    October where they saw Mr. Coleman, either in the proximity of

3    Closeburn Road.  Again, tying him to that location.

4         The defense in their opening said, oh, it's not his

5    residence.  It's not his car.  Well, ladies and gentlemen, we

6    submit that you should find that there was overwhelming

7    evidence that it was his vehicle, it was his car.  And that

8    these firearms are his, the money was his, and the marijuana

9    was part of his conspiracy that he had given to Jerry Davis to

10   further distribute.

11        So, the airport seizures, Leah Davis, Nolan

12   Robertson, look at the amounts, 54,000 and change, 63,000 and

13   change.  That's consistent with everything we've heard.  When

14   money was being counted it was up to 60,000, approximately,

15   said Mr. Pierce.  All the witnesses said it was around $50,000

16   or a little bit more.  Why?  Let's do the math.

17        How much is it per pound of marijuana?  I believe

18   there was some testimony about that.  Approximately $500 a

19   pound, $1,100 a kilo, but $500 a pound.  There were two

20   suitcases, each with 50 pounds; 100 pounds times $500; $50,000

21   ladies and gentlemen, approximately for these two people that

22   were seized even right there.

23        Ms. Schmidlin.  How much was she caught with?  I

24   believe it was 46.  I'll get to that slide in a second.  All

25   consistent.  All corroborating the same facts.

1    Ladies and gentlemen, I might start to pick up the
2  pace.  I'm actually on a tight time limit.  So my apologies if
3  I start to go very quickly.
4    Nolan Robertson, there were the text messages back
5  and forth.  We went through it quickly.  Please, when you're
6  deliberating, look through them.  You'll see that it
7  corroborates, again, the fact that he went on a trip.  There
8  was Exhibit 29 that -- I believe it was 29, that -- yes, that
9  showed the Orbitz/Cheap Tickets records.  You'll see he did do
10 the travel back, stopping through Memphis, consistent also
11 with what?  The text message that was found on Mr. Coleman's
12 iPhone.
13    Nolan.  Speaking of the couriers, Ms. Schmidlin.
14 Here's the dollar amount.  Okay, 46,490 in Phoenix.  Again,
15 consistency, corroboration.
16    And Mr. Coleman's card was the one used for her
17 flight from LAX to Charlotte, December 12, 2009.  And she
18 testified under oath that it was -- that Mr. Coleman was there
19 one time when she was there, one of those trips.  What was
20 going on?  He was getting the Porsche Cayenne.  From whom?
21 Turtle.  Source of supply.  She was cooperated.  She provided
22 information immediately upon her federal arrest.
23    Now after the initial stop at the airport, Jerry
24 Davis' traffic stop.  You've seen the evidence.  The physical
25 evidence is here in court.  And then what happened?  He agreed

1  to cooperate, immediately.  What did he do?  He called

2  Mr. Coleman.  You can listen to Exhibit 16.  What are some of

3  the key points.  Mr. Davis says he gave me a ticket.

4          What was the first thing out of Mr. Coleman's mouth

5  after that?  He didn't ask you to search nothing.  What's that

6  all about?  I got stopped by the police.  He's concerned about

7  the search.  That's consciousness of guilt because he knew

8  what was in the car.

9          Have you ever had a friend say, I got stopped for

10 speeding.  Do you say, did they search your car?  No.  He

11 asked that because he knew what was in the car.

12         Mr. Coleman even asked about K-9s.  Everything cool?

13 And then Mr. Coleman, you still got all the.  Remember, coded

14 language.  It's just a common practice to be careful.

15         You heard the jail calls.  Mr. Coleman tries to be

16 careful.  Sometimes he's not so careful.  But he tries to

17 generally be careful.  And yeah, I got it in my possession,

18 buddy.  They're talking about the marijuana that was just

19 given by Mr. Coleman to Mr. Davis.

20         Mr. Coleman -- Mr. Davis was seen going in with

21 basically empty handed, had the food bag.  Came out with what?

22 The suitcase.  When law enforcement -- we'll get to Closeburn

23 back in a second.

24         November 2nd, 2011 silver Infiniti stop.  Oh, by the

25 way there were two different witnesses that I accidentally

1   asked, I said, was it a Lexus?  That's my mistake.  But the

2   testimony is the evidence.  And the witnesses never agreed

3   that it was a Lexus.  In fact, I was corrected that it was an

4   Infiniti.  And they identified the vehicle, which is an

5   Infiniti.

6        The $21,000 seized.  You heard about what generated

7   all that with Ms. McAdoo leaving with Poppa Harris, and Esco

8   McKneely.  And importantly, on Poppa Harris' phone, what do we

9   find?  A picture of him, himself, and Mr. Coleman's Porsche

10  Cayenne.  Again, connecting him to Mr. Coleman.

11       Shaunda McAdoo.  Doesn't this screen show it all?

12  Here's Ms. McAdoo.  What's on her phone?  She got a picture of

13  marijuana.  She got a picture of -- basically, a confirmation

14  from U.S. Air showing flights for Nolan Robertson who had just

15  that day got caught with well over 60,000 in cash at the

16  airport.  And it's obviously her's.  Not only is her e-mail

17  address there.  You also saw that she had her identification

18  card on another photograph.  And what else?  She got a picture

19  of Mr. Coleman sleeping.

20       Is there a connection between Ms. McAdoo and

21  Mr. Coleman?  All right.  Then the search warrant.  Law

22  enforcement testified that when they went to the apartment

23  they smelled a strong smell of what?  Fresh marijuana.  Not

24  from use.  Fresh marijuana, unburned marijuana.

25       The defense made a big deal that there was only

1    point something gram of marijuana.  Does that help his case or

2    hurt his case?

3            Ultimately, you had testimony saying, oh, there's

4    this pungent smell that you get when you've got -- and Officer

5    Newman, I believe it was said, that kind of marijuana, the

6    Kush, not the compacted stuff.  Okay, that smell came from

7    that material, that was left behind in the enclosed area of

8    this apartment.

9            Now, yes, did they -- did law enforcement smell it

10   wafting from the garage out into the open air later?  No.

11   Would you expect them to?  No.

12           And how do we know it's Coleman's home?  We have

13   mail matter as it's called.  We've got not only -- we've got

14   the Time Warner Cable in Mr. Coleman's name to that address.

15   We've got the Progressive auto mail matter to him at that

16   address.  We have the registration card.  I'm not even showing

17   that, but it's in the physical evidence in that Exhibit 14.

18   It shows that Mr. Coleman had been paying the insurance.

19           You heard testimony from the very experienced law

20   enforcement folks who been doing narcotics investigations for

21   a long time.  They told you what you would probably expect any

22   way, that drug traffickers try to avoid putting things in

23   their name.  They want to do it through a third party or straw

24   person.  They do that with their homes, as Mr. Coleman did

25   having Ms. Peppers do it.  They do it with their vehicles, and

1    this is an example of that.

2             So the vehicle, though, while he wasn't

3    registered -- so if you were to call him up on a DMV search,

4    he's not going to show up as the registered owner.  But he

5    paid the insurance in his name, providing Closeburn Road as

6    his address.  A key piece of physical evidence that we ask

7    you -- invite you to look at.

8             What else?  All the men's clothing.  You heard

9    repeatedly that anybody that was in that apartment, law

10   enforcement and corroborators all consistently corroborate

11   each other.  There was no women's clothing anyway.  So any

12   kind of claim that this belonged to Ms. Peppers, it proves

13   that it was a nominee rental by her on his behalf.  Her stuff

14   wasn't there.

15            In fact, what kind of stuff was there?  That was

16   Mr. Coleman's.  In addition to Exhibit 14, you heard Agent

17   MacDonald testify about how he even made a photograph of the

18   record of conviction for Mr. Coleman's prior conviction for

19   marijuana trafficking.  Is that the kind of thing that you

20   bring if you're staying overnight?  Again, he was seen there

21   leading up to this date.

22            And Fintastic, you may remember that a few years

23   from now -- I don't know what you'll remember of the case.

24   You may think of this as the dragon eel case.  Kind of

25   interesting fact, though.  Top left.  We had from

1   Mr. Coleman's iPhone, three photographs of a dragon eel.

2              You had -- Mr. Sowers, you had the records from

3   Fintastic showing everything you really need except it's very

4   interesting, Mr. Sowers remembers Mr. Coleman very well.  He

5   had the paperwork in his backpack, $8,500 in cash.  You can go

6   through the records.  I mean, we're talking about the initial

7   purchase was 12,000, way up out there that he paid for it.

8   You can see the records.

9              And the records are interesting too.  It shows when

10  he moved from the Kensington Palace to Closeburn Road.  He's

11  got his address and his own Fintastic records.  And the jugs,

12  they got his name on it.  And, you have voice mails on

13  Mr. Coleman's phone where Ryan Gruber, who worked for

14  Mr. Sowers says, hey, Parker, I'm gonna come over and bring

15  you some fish.  Hey, you got to do this about your tank.

16             The money seized.  Is there any question about there

17  being attempt to distribute?  We've got all this money that

18  was seized in the master bedroom where Mr. Coleman slept at

19  night.  Where he had his gun under his bed.  And this was a

20  safe that was not there when it was first leased.  Mr. Coleman

21  had it put in.  Ms. Peppers was even there when the guy came

22  to the door to install it.

23             And the Cayenne SUV, is it his?  We've got him being

24  stopped in it back in July.  We've got surveillance by law

25  enforcement of him in the SUV.  We have the Progressive

1   Insurance document I referenced just now.  And you've got
2   numerous people testifying about it, very consistently.  Not
3   even just, oh, that was his.  They gave descriptions of what
4   he did with it.  Oh, he picked me up with it.  Oh, I remember
5   when he was out in California picking it up.  From whom?
6   Consistency, corroboration.  From Turtle Adams.

7           And of course we've got the Hendrick Porsche
8   business records.  And even on that, he's listed as the owner
9   of the vehicle.

10          Okay.  In terms of evidence, what else do we have?
11  April 13, 2011.  You heard testimony that there was a meeting
12  with Mr. Coleman called a reverse proffer.  He references it
13  in the jail call later that day himself.  He called it -- I
14  think he called it a reverse the proffer, something to that
15  effect.  But there was a reverse proffer, and what does it
16  show?  It shows consciousness of guilt.  There's a lot of that
17  in this case.

18          No, there wasn't no hearing, there was a reverse the
19  proffer.  Made his stomach hurt.  Got him by the balls.  Just
20  looking for a deal now.  An innocent person doesn't look for a
21  deal, ladies and gentlemen.  Somebody who knows they're guilty
22  will just try to get the best deal they can get.

23          And again, in its context, it shows he knows he's
24  guilty.  It's overwhelming, even in his own words.

25          So what's it all mean?  Consciousness of guilt, and

1    what's the law?

2         Judge Conrad is going to be instructing you on the

3    substantive parts of the law.  There are seven counts in this

4    case.  And while all of them are serious charges, and

5    important counts, I'd like to just foot stomp for you, Counts

6    One, the conspiracy charge, and drug amount is very important,

7    ladies and gentlemen.  You've heard lots of testimony about

8    what the conduct was and also the people who were involved

9    told you how much was involved.

10        So in terms of, if you do the math yourself, or when

11   you hear the people who did the math themselves, this was well

12   in excess of 1,000 kilograms.  I'll get to it, but it's well

13   in excess of 3,000 kilograms.

14        Also a foot stomp for Count Four and Six, those are

15   the possession in furtherance of drug trafficking.

16        In terms of liability.  The instruction.  A

17   conspiracy.  Again, it's not about having it in your hands,

18   ladies and gentlemen.  That can be possession with intent to

19   distribute, which is one of the counts, Count Three.

20   Conspiracy is criminalizing just the agreement.  Might be

21   tough to get your hands around, but please listen to Judge

22   Conrad's instruction.  It's the agreement.

23        Oh, and going on that too, each member becomes the

24   agent of every other member.  So again, that web, when you

25   touch one part of the web, it shimmers throughout the web, and

1    it impacts each other, and you're responsible for it.  When

2    you touch one part of the web when one person does something,

3    the other person is responsible for it.  I'll get to that in a

4    second as well.

5              Even if it's outside the presence of the defendant.

6    He doesn't have to have been watching if somebody does

7    something, as long as it's reasonably foreseeable.  What's

8    reasonably foreseeable in a large scale drug trafficking

9    conspiracy?  We submit; a whole lot.

10             So when you're talking about federal conspiracy law,

11   beyond what a person personally does or touches, beyond what

12   they agreed to do themselves, it's for any co-conspirators

13   conduct that is reasonably foreseeable.  It sounds like it

14   covers a broad deal of conduct?  It does.  Congress intended

15   it so.  It's the law.

16             These are the elements of the marijuana trafficking.

17   The agreement itself.  You have long term understandings.  You

18   don't have a one time where somebody did something and you're

19   not sure if there was a misunderstanding.  This is over a long

20   period of time, repeated conduct.  There was agreement.  It

21   doesn't have to be in writing.  It could even be just kind of

22   a wink, wink, nudge, nudge.  As long as the parties have an

23   understanding of what the other is doing, that's all it takes.

24             Corroboration, searches, traffic stops, calls,

25   everything.  Did they know the unlawful purpose?  Of course,

1   the marijuana came from Turtle.  He was getting it, and he was

2   distributing it through Peppers, through BJ, through Jerry

3   Davis, through Rico Grier.  And he joined it willfully.  He

4   was not forced to do this.  He wanted to do it.  Remember the

5   picture, the wads of money.  He wanted to do it.

6           Stephanie Peppers, she gave testimony under oath

7   about the evolution of the conspiracy.  How she got caught up

8   in it.  She was his probation officer.  She fell in love with

9   him.  She said so.  She even said even now that she knows

10  she's going to prison.  Her life is ruined.  Where was she?

11  She was at the top of her game.  She was a college graduate

12  who had gone to work for an attorney.  She was a deputy clerk

13  in court.  She was a probation officer.  She threw it all

14  away.  She did the right thing.  She resigned on her own, very

15  shortly after it became an intimate relationship with

16  Mr. Coleman.  But she loved him.  She even said on the stand,

17  she has a place in her heart for him even now.  She's going to

18  prison, ladies and gentlemen.

19          And do you have any question about whether she loved

20  him?  Do you remember what -- oh, ladies and gentlemen, your

21  memory is going to govern this, not mine.  But do you remember

22  one of the witnesses, was it Mr. Hunt, I think?  What did she

23  tell him?  She told him she was his fiance.

24          Mr. Coleman manipulated women.  You heard what he

25  was doing with Nastasha Rodriguez, with Ms. Peppers, Shaunda

1   McAdoo got wrapped up in this.  He manipulated even his own

2   childhood friend, Harold Manigault.  They grew up in South

3   Carolina and he got involved.  He brought his people in.  Yes,

4   there were other people that got brought in, like

5   Ms. Schmidlin was romantically involved with Mr. Davis, Jerry

6   Davis that is, and he brought her in.

7           I mean, there's a whole lot of trouble being brewed

8   among friends and lovers in this case.  But that's what

9   happened here.

10          She knew the combination for the Cayenne,

11  Ms. Peppers did, which is very interesting, again, because of

12  Mr. Coleman.  And that shows his knowledge of what was in

13  there.  That Smith and Wesson that Mr. Hunt had sold to

14  Mr. Coleman.

15          MR. BUTLER:  Objection.

16          MR. KAUFMAN:  Very important again for, what was it,

17  Count Seven?

18          THE COURT:  Overruled.

19          MR. KAUFMAN:  She also discussed how she deposited

20  proceeds into the bank.  All the couriers consistently.  There

21  was a partnership here, basically, between Mr. Adams and

22  Mr. Coleman.  But Mr. Coleman was seen as the boss.

23          Ms. Schmidlin talked about the suitcases.  Mr.

24  Manigault talked about how many trips he did.  Mr. Hunt, the

25  number of trips, the firearm.  Nastasha Rodriguez.  She's just

1    a girlfriend.  She got caught up in it.  He had her wrapping

2    money -- or there was money wrapped up in clothes.  He had her

3    delivering that out to California.  She met Turtle.  Turtle

4    and Mr. Coleman met her at the airport in the Cayenne that

5    eventually came back here.  One time she saw him reach back

6    into that secret compartment and pull out money.  She saw him

7    weigh marijuana in the garage.  We'll get back to another

8    person who said the same thing.  He asked her to get the fake

9    receipts.  You even could hear it in those jail calls.  He's

10   trying to be clever.  He's frustrated because she's not

11   getting it.  But you all got it.  And she saw him handling the

12   gun with the glove.  She very quickly made some comment

13   about -- saying a comment to him about OJ.

14          William Poo Pierce.  He described the conspiracy

15   from the California side.  He was a facilitator.  He also

16   talked about the Cayenne that Mr. Coleman came to get.  He

17   also corroborated Ms. Rodriguez's testimony about the weighing

18   in the garage.  He says it was over 1,000 kilos.  His

19   reasonably foreseeable amount covered only seven to eight

20   months.  This conspiracy covered 2009 into late 2010.

21          All right.  Now that you've heard ways, and Judge

22   Conrad actually already just discussed with you the ways that

23   you can consider his prior conviction.

24          One, it is an element of the offense for possession

25   of firearm by a convicted felon.  And the other thing is, you

1  can use it because it shows his knowledge, his intent, his

2  lack of mistake in doing what he did this time.  How do you

3  know that?  Because Ms. Peppers said she was induced to give

4  him the seed money from her income tax refund, and was induced

5  to become an active participant.  Why?  He knew the business.

6  This is what he done just before.

7          Okay.  I said let's do the math.  Here it is up

8  here.  Each trip, one trip by one courier is 100 pounds.  So

9  that means that 1,000 kilograms, that threshold that's so

10  important for you all to find, 2,200 pounds.  That's just over

11  1 ton.  Sounds like a lot.  Oh, it's blown out of the water in

12  this case, ladies and gentlemen.  Just 22 trips will get you

13  to 1,000 kilograms.

14          Even based on -- first of all, if you look at those

15  Orbitz records in 29, the number of trips is well over 100.

16  But even based on just the testimony of these people, the

17  trips they personally made, not considering all the other

18  couriers who you've heard about, who were active couriers.

19  Even just based on them, Ms. Peppers alone is 20 trips that

20  she admitted to.  Mr. Manigault, 10 that he did personally.

21  Schmidlin, five, and Hunt three.

22          This is, ladies and gentlemen, we're talking about

23  thousands of kilograms, not just one.

24          Money laundering conspiracy.  Again, it's a

25  conspiracy.  It's just the agreement that can result in a

1   guilty conviction.  And what did happen?  There was actual

2   money laundering.  So it corroborates the fact that there was

3   this agreement.

4           The transaction definition; transfer, delivery or

5   other disposition.  It's very inclusive language.  It's

6   intended to be.  Financial transaction you'll be hearing

7   about.  And interstate commerce.  Was this interstate?  LA and

8   Charlotte, that's interstate.  Moving the funds by wire or

9   other means.  Again, or other means was intended to be put in

10  there by Congress.  It's a very inclusive term.  Other means.

11  What means in this case?  Well, there are a few means, but

12  that does include carry-on bags.  You've got a transaction

13  from one person to the next, to the next.

14          So sending the money, giving the money to a courier

15  to bring out to California, that's one example of money

16  laundering.  And there are two different ways of doing it.

17  You'll hear that you'll have to be unanimous about one or the

18  other or both.  We submit that you should find that way for

19  both.

20          Concealing and disguising is one way.  Concealing

21  can be physically doing it through the couriers like we just

22  mentioned.  Or structuring, you've heard evidence of

23  structuring, too.  So either one of those two ways.  You've

24  got -- you've got concealed, disguise.

25          Structuring.  You're trying to avoid a CTR, currency

1   transaction report that's generated at $10,000.  When you have

2   more than one transaction below that, remember the back-room

3   CTR and how it can be consolidated when you look at what

4   happened on a particular day.  It's because they're trying to

5   avoid detection.  Concealing, disguising what they're doing.

6           In terms of promoting, or carrying on, to promote

7   the carrying on of the conspiracy.  Well, it's making it

8   easier or helping to bring about the specified unlawful

9   activity, the SUA, which is, drug trafficking.

10          And that includes paying for expenses that are

11  ancillary to getting money and drugs.  So what does that

12  include?  We'll get to that in a second, actually.

13          There's also, in addition to the courier -- using

14  the couriers and the expenses, there's actual banking money

15  laundering.  So you've got various types.  How do we know?

16          We found in one of the co-conspirators from

17  California, Glenn Carrera, Chucky, his bank account, $8,000.

18  At the bottom left, remember this, who put that money into

19  Chucky's account?  Parker Coleman.  South Carolina driver's

20  license matches up.  Now only you know it because that

21  driver's license happened to be at Closeburn Road when

22  Mr. Coleman was arrested.  That's not surprising, because we

23  carry our driver's licenses with you.  But it showed the

24  connection.  And when we got the official records, it

25  corroborates this was an accurate ID, and it shows that that

1   driver's license number is the same driver's license number

2   that was for that deposit.

3           We have the two receipts here that Ms. Peppers had

4   deposited into Kamia Saulsberry's account.  Turtle -- the

5   mother of Turtle's baby.  And this shows again, the conspiracy

6   component.  What one member of the conspiracy does that's

7   reasonably foreseeable, is attributable to all.

8           The travel records, you'll be able to look through

9   those in detail when you're deliberating.  I ask that you do

10  that for all the evidence, ladies and gentlemen, exhibit 59.

11          Now again, we're talking about the money laundering,

12  about using money to facilitate to carry on -- promote the

13  carrying on of your conspiracy.  How much did he spend from

14  February 2009 to October 2010?  $26,000 in change, maybe minus

15  $300 for a refund that the agent found as a possibility and

16  wanted to disclose.  That's promotion.

17          How do we know that he didn't have that money

18  legitimately?  He didn't even file taxes from 2004 to 2009,

19  ladies and gentlemen.  But what did he do?  He wanted to now

20  after the fact make it look like he did.  This goes to

21  consciousness of guilt.  False receipts.  You haven't seen any

22  evidence of it, but the attempt to do so shows his

23  consciousness of guilt.

24          You have Ms. Rodriguez, Ms. Peppers, Mr. Hunt, all

25  testifying about it.

1          Count Three, again, we've gone over a great deal of

2   this information, showing why he's guilty for the possession

3   himself.  And just in case you had any concerns about that,

4   please listen to Judge Conrad's instructions about *Pinkerton*

5   liability.  Because even if you do have a question as to

6   whether it came directly from Mr. Coleman's apartment or a

7   different one at 5425 Closeburn Road, he'd still be

8   responsible if he was part of the conspiracy.

9          THE COURT:  Five minutes, counselor.

10          MR. KAUFMAN:  Thank you, Your Honor.

11          Possession of the firearm.  Again, the Glock, it

12   came from Ms. Peppers to him.  Tools of the trade.  It is in

13   furtherance of drug trafficking.  Because they want to protect

14   themselves, their money, their drugs from would-be robbers,

15   the police, and competitor drug dealers.

16          Important issue here, you're not going to hear that

17   the agents saw him holding it.  Constructive possession.  This

18   is a key, key legal concept for these drug charges.  It

19   doesn't require it to be in their hands, or anybody's hands.

20   Constructive possession.  Please listen very carefully to this

21   instruction.

22          More about possessing firearms, you heard it from

23   several witnesses.  Ms. Rodriguez, Ms. Peppers, Mr. Hunt,

24   Mr. Manigault, all, even Mr. Poo heard something from

25   Mr. Coleman when they were talking about it.

1    Count Six, again, the Smith and Wesson.  Where did

2 he get it from?  Mr. Hunt.  You've got corroboration from

3 other witnesses.

4    Ladies and gentlemen, we submit that your conclusion

5 on all these counts are that he should be found guilty.  Thank

6 you.

7    THE COURT:  Mr. Butler, when you're ready.

8    MR. BUTLER:  Thank you.

9    May it please the Court.  Mr. Prosecutor.  Good

10 morning, ladies and gentlemen.

11    THE JURY:  Good morning.

12    MR. BUTLER:  First of all, on behalf of my client,

13 Mr. Parker Coleman, his family, my intern, and myself, I would

14 like to thank you very much for your time and attention

15 throughout this long trial.  It was long.

16    Ladies and gentlemen, you all are about to embark on

17 one of the most serious matters in our system of justice.  You

18 all are about to consider a case that's very, very important

19 case to my client.  Our system of justice is the best system

20 in the world.  I'll tell you that because we don't know each

21 other.  You all don't know Mr. Coleman.  But your duty is to

22 consider the evidence fairly, impartially and completely.  As

23 you sit there, the person to your left, the person to your

24 right, has the same voice as you.  Everybody is equal on the

25 jury.  Nobody has any more power than the other.  I'd ask that

1  you remember that.  That you have one vote, and one vote only.

2  And I'd ask that you look at this case for what it is.

3       So let's talk about what it is.  Well, the

4  government really is saying that Mr. Coleman is like the big

5  bad wolf.  They're saying that Mr. Coleman got all this power,

6  got all this influence over people.  That Mr. Coleman can make

7  people do anything he wants them to do.

8       But ladies and gentlemen, I'd ask that you think

9  about that.  There is absolutely no evidence that at any time

10 throughout the course of the period that's relevant in this

11 case, that any witness said that Parker Coleman had a gun in

12 his hand.  That Parker Coleman pointed a gun at somebody.

13 That Parker Coleman made anybody do anything.  None.

14      Now the government says, well, you know he could --

15 could control everything.  Well, I'll ask that you think about

16 each and every witness that testified.  I ask that you think

17 about the age of the witnesses.  Ms. Stephanie Peppers, older

18 than Mr. Coleman.  Mr. Mark Hunt, you saw him, he's older,

19 he's got gray hair like me.  Harold Manigault, older.

20 Samantha Schmidlin, older.

21      Ladies and gentlemen, what you really got to think

22 about in this case is the confusion.  It's a ball of

23 confusion.  Who was -- who was really in control?  Stephanie

24 Peppers.  Stephanie Peppers said well, you know, I -- I got

25 into the drug business and so I quit my job as a probation

1    officer because I knew it was wrong.

2            Well, her reasons for leaving her job was for better

3    employment.  And what does she do?  Well, she got into the

4    drug business.

5            And the government says, well, you know, the Porsche

6    Cayenne was Mr. Coleman.  And the government says, well, you

7    know, his name was on the insurance papers.  And it was

8    registered.  But it wasn't registered to Mr. Coleman.  Because

9    you all know if it was, you would have seen that on the

10   screen.  That would have been one of the things that they

11   would have shown you, but they didn't.

12           Now the government wants you to believe that

13   Mr. Coleman was in a conspiracy that's charged in the

14   indictment.

15           Well ladies and gentlemen, we would contend that

16   there were conspiracies.  But there were multiple

17   conspiracies.  I believe that the Court will tell you that you

18   must determine whether the conspiracy charged in the

19   indictment existed, and, if it did, whether the defendant

20   Mr. Coleman was a member of it.  If you find that the

21   conspiracy charged did not exist, then you must return a not

22   guilty verdict, even though you find that some other

23   conspiracy existed.

24           Well sure, there was a conspiracy.  There were

25   actually multiple conspiracies.  And if I could just have a

1    moment. I would contend to you that, remember back in '09

2    talking about -- we talked about Gerren Darty and the U-Haul

3    truck. They talked about the marijuana in the barrel where

4    they followed the car. Where they looked at the -- they

5    waited for the truck to be removed, the U-Haul truck; never

6    was, so they took the marijuana. But where was Parker

7    Coleman? The government says, well, that was the beginning.

8         But do you remember now when Ms. Peppers was on the

9    stand, she couldn't even remember putting any references on

10   the lease agreement for the car, including her son.

11         So how in the world was Mr. Coleman involved in that

12   conspiracy? He wasn't.

13         But now Ahmed Crockett, he was the leader of that

14   conspiracy, Goldie Crockett, Sharon Kelsey-Brown, Shondo

15   Lynch, and Gerren Darty. They were involved in that

16   conspiracy.

17         Now, I will tell you that I believe Judge Conrad is

18   going to tell you as a part of the multiple conspiracy rule,

19   if you find the defendant was not a member of the conspiracy

20   charged in the indictment, then you must find him not guilty,

21   even though the defendant may have been a member of some other

22   conspiracy. It has to be this conspiracy that is in the

23   indictment.

24         Now ladies and gentlemen, let me just talk a little

25   bit about some of the things that the government told you

1    about.  Would you please remember who you heard from, from the

2    witness stand and who you didn't.

3              Well where's Jerry Davis?

4              Now the government says the condo over at Closeburn

5    was Mr. Coleman's.  Well, who leased it?  The leader;

6    Ms. Peppers.  The government says that the Cayenne was

7    Mr. Coleman's.  Think about it.  You got Milton Adams, you got

8    Mark Dorsey, you got William Pierce, Poo, the guy that

9    testified.  They all live in California.  Mr. Coleman never

10   lived in California.

11             Ms. Peppers said she -- she saw Mr. Coleman in

12   California one time.  Well, but then -- then she, on redirect,

13   I think she said, well, no, I think I saw him two times or

14   three times.

15             You know, please remember the demeanor of the

16   witnesses.  Please remember how Ms. Peppers was very

17   deliberate, very emotional, very careful as to how she said

18   things and when she said them.

19             And please remember that Ms. Peppers, out of

20   custody, she's been out of custody since November of 2010.

21   She's the only witness, civilian witness that was out of

22   custody.  Because she's the leader of the conspiracy.  And

23   what does she do?  She counted money.  She said she counted

24   $100,000, up to 100.  She said those things.

25             Well where's Jerry Davis?  Now, couldn't Jerry Davis

1   come in here and say, well, yeah, I got the marijuana from

2   Mr. Coleman.  He didn't say that.  He wasn't subject to

3   cross-examination.

4          Jerry Davis is an interesting person.  What did I

5   say that?  Because why would you need 30 pounds of marijuana

6   when you already got 40?  Oh, he's big time.  He's rolling.

7   He's got 40 pounds at his house, and the officer said there

8   were 30 pounds in his car.  Well, and he was treated

9   differently now.  I mean, when did they search his house?

10  When did they look at his safe?  Later.  When did they get his

11  tax records?  Never.  Well, you know, it's too time consuming.

12         Well, I mean, you issue a subpoena and you wait.

13  What's time consuming about that?  It doesn't take all day.

14  It doesn't take all week.  You issue it and you wait, just

15  like we all do.  You know, if you want something, and you got

16  to get it in the mail, you put it in the mail and you wait.

17  So, I mean, that's the natural consequence of business.  So

18  don't -- don't try to make an excuse for not doing what you

19  should have done.  That's a lack of evidence.

20         Okay.  Now Gerren Darty, didn't hear from him.  Not

21  at all.  The government says that the conspiracy is all about

22  money.  Well, you know why they say that?  Because they can't

23  prove that Mr. Coleman ever had any marijuana to sell.

24         And you say -- you probably saying, Butler, what are

25  you talking about?  But this is what I'm talking about.  Did

1  you hear, I think it was Ms. Peppers and some other people

2  said BJ was one of his customers.  Well did you hear from BJ?

3  That Grier, Mr. Grier was one of his customers.  Did you hear

4  from him Rico Grier?  You didn't hear from anybody.  You

5  didn't even hear from Jerry Davis.

6          And now the Agent MacDonald, they were all

7  surveilled in this condo, okay.  They don't know where Davis

8  went.  It's a big condo.  They had photographed it.  You

9  didn't see it.

10         Okay.  Ladies and gentlemen, does it make sense now

11 that there's a fresh smell of marijuana, and when they get

12 there there's .6 grams.  That doesn't make any sense.

13         And then -- then they say, well, remember what

14 Ms. Peppers said.  She said that -- well, at first now, again,

15 at first she said, well, we came back the next day and I

16 called the leasing agent, I had my lease, police came and they

17 let me in.  And then we broke the window of the Cayenne and

18 got two bags, two duffel bags of marijuana.  I gave one to

19 Jason Banks, then I gave the other to Jason Banks.

20         Well, where's Jason Banks?  You didn't hear from

21 him.  You talking about corroboration, what about that?  I

22 mean, you didn't hear anything from Jason Banks.

23         Now where was the key to the Porsche?  She said they

24 lost the key.  Well, who is they?  Who lost the key?  Well

25 they searched the condo.  Mr. Coleman didn't have it.  And it

1 wasn't his vehicle. And the prosecutor said, well, he went

2 out to pick it up. That's no evidence that he drove the

3 vehicle back to Carolina. None.

4 You know what's going on, don't you? The evidence

5 shows it. You got Turtle, the boss, the big man, likes

6 Lamborghini, Ferrari, BMW, Mercedes. Well, I mean, when

7 Turtle comes here, he's not going to ride in anything but

8 luxury. That was for him. The Porsche, that was for him.

9 That was for him to be the big man over here on the east

10 coast. Sure. That's why the car was here.

11 And now, of course Ms. Peppers, she drove it.

12 Harold Manigault drove it. So don't focus to the extent that

13 you say, well, it had to be Mr. Coleman's. If it was his,

14 then, do you think he knew if the police were coming to the

15 extent he did something with the keys? Come on, ladies and

16 gentlemen. Now where in the world were the keys?

17 The picture the government showed you of four men,

18 it was Parker, Darren -- Gerren Darty and Boogie, Jerry Davis.

19 Well, who was the fourth person? But think about this, is it

20 against the law to take a picture with some other people? I

21 mean, what does that prove? Nothing. Except that they know

22 each other, maybe. I mean, it doesn't prove that he was

23 involved in any type of conspiracy.

24 Now the safe. Well, the government talks about the

25 money. Well remember now, again, Ms. Peppers. At first on

1  direct examination she said, well, I don't -- I don't know how
2  the safe got there.  She said, I really don't know.  Then
3  later on she said oh, oh, oh yeah.  He called me and told me
4  to be there.
5          Come on, ladies and gentlemen now, I mean, the truth
6  is easy.  You don't have to think about the truth if you're
7  telling the truth.  You have to think about things to cover
8  yourself.  And that's what this case is all about.  People are
9  trying to cover themselves.  People -- every witness told you
10 that they wanted their time cut.
11         And let me tell you this, except Nastasha Rodriguez.
12 She got the best deal ever.  Got her a lawyer.  Went down
13 talked to them.  Mr. Kaufman showed her documents in the case.
14 And she said, you know, she got on board.  Said look, no, I
15 was frightened.  I don't want to be charged, so I'm gonna do
16 what I can to get myself out of this mess.
17         So ladies and gentlemen, I would contend that you
18 shouldn't put any credibility in Nastasha Rodriguez.  I mean,
19 you all saw her demeanor at the beginning.  She was jealous.
20 She said that he was, you know, Parker was messing with other
21 women.  She didn't like that.  It's incredible.
22         November the 2nd of 2010.  Well, Leah Davis had that
23 money; haven't heard from her.  Nolan Robertson had the money;
24 haven't heard from him.  Why not?  Wouldn't it have been
25 simple for them to come in and say, to you, where they got it

1  from.  How they got it?  But no, they didn't do that.

2        And I believe the Court's going to tell you about

3  acts and statements of co-conspirators.  I believe the Court

4  will tell that you evidence has been received in this case

5  that a certain person or persons, who are alleged to have been

6  co-conspirators with the defendant, and oddly the word is

7  allegedly, have done or said things during the existence or

8  life of the alleged conspiracy in order to further or advance

9  its goals.

10       Such acts and statements of alleged co-conspirators

11 may be considered by you in determining whether or not the

12 government has proven their charge or their charges in Count

13 One of the indictment against the defendant.

14       Since these acts may have been performed, or these

15 statements may have been made outside the presence of the

16 defendant, and even done or said without the defendant's

17 knowledge, these acts or statements should be examined by you

18 with particular care before considering whether they may be

19 used against the defendant.  If you find that the acts or

20 statements were in furtherance of the goals of the conspiracy,

21 and you find that the defendant was or became a member of that

22 conspiracy, you may consider those acts or statements as

23 evidence against the defendant.

24       Acts done or statements made by an alleged

25 co-conspirator before the defendant joined the conspiracy may

1  also be considered by you in determining whether the

2  government has sustained its burden of proof on Count One.

3          Acts done or statements made before the alleged

4  conspiracy began or after it ended, however, may only be

5  considered against a person who performed those acts or those

6  statements.

7          Now, ladies and gentlemen, where are those people to

8  be subjected to cross-examination?  They're not -- you haven't

9  heard from them at all.  None of them.  Not a one of them.

10          If I could have a moment, please, Your Honor.

11          (Pause.)

12          Ladies and gentlemen, as the government talked about

13  Mr. Coleman's iPhone and those text messages.  Well, I mean,

14  why didn't they bring in the iPhone and show it to you?

15          I mean, Ms. Schmidlin, remember her?  Well she got

16  caught way back in February of 2010 out in Arizona.  And she

17  lied to the authorities out there.  But she wants you to

18  believe what she says yesterday or the day before, whenever

19  she did testify.

20          And I will contend to you that, again, she, all of

21  them said, I want a time cut.  And I think that Mark Hunt said

22  it the best.  He said something to the effect, certainly -- or

23  sure I want a time cut.

24          And isn't it interesting that he says he sold guns

25  to Mr. Coleman, but couldn't tell you, or wouldn't tell were

1   he got them from. You know, I said, where'd you get them?

2   Well, you know, I got them from a person. I didn't get them

3   from a gun store, but I registered them.

4          Well, for people that own guns, you know you don't

5   register a gun. You need a permit to buy one.

6          So, I mean, he's trying to justify what he's trying

7   to say here so that you won't really know the source of the

8   gun, where he actually got it from. If he got it. Okay.

9          And why do I say if? He says, he really couldn't

10  describe it. But if you show it to me, I could identify it.

11  Don't you all remember that? You know, I can't -- couldn't

12  describe it.

13         And then when you talk about guns, remember what

14  Mr. Manigault said. He said something about a banana clip,

15  you know, a long clip with a curve in it, that Mr. Hunt was

16  supposed to have. Mr. Hunt, he never talked about a banana

17  clip. He talked about a clip, just a regular clip. And you

18  may say, well, that's a little thing. Well, it's an important

19  consideration when you're trying to evaluate a person's

20  credibility. It's an important consideration when you're

21  looking at a serious set of allegations that are in this case.

22         And your job as jurors are to consider all of the

23  evidence and weigh it. And Judge Conrad told you this, he's

24  already read this instruction to you, but I want to make sure

25  that you hear it again.

1          Leah Davis, Nolan Robertson, Harold Manigault,

2   Stephanie Peppers, Mark Hunt, William Pierce, those were all

3   of the alleged accomplices in this case.  And the Court told

4   you this:  An accomplice is one who united with another person

5   in the commission of a crime, voluntarily and with common

6   intent.  Alleged accomplices, including those who have entered

7   into an agreement with the government, do not thereby become

8   incompetent or ineligible as witnesses.  On the contrary, the

9   testimony of such a witness may alone be of sufficient weight

10  to sustain a verdict of guilty.

11          However, the jury should keep in mind that such

12  testimony is always to be received with caution and weighed

13  with great care.  You should never convict a defendant upon

14  the unsupported testimony of alleged accomplices unless you

15  believe that testimony beyond a reasonable doubt; and the fact

16  that alleged accomplices have been convicted of the offense is

17  not evidence, in and of itself, of the guilt of any other

18  person.

19          So ladies and gentlemen, now what you really have to

20  do is weigh that evidence.  Now the government says, well, and

21  what the government's case is all about, they're trying to --

22  to overwhelm you with paperwork, overwhelm you with exhibits,

23  overwhelm you with evidence in this case.  But what you have

24  to do is, you have to determine whether it's proof beyond a

25  reasonable doubt.

1      And you remember the instruction that Judge Conrad

2  told you.  He told you about, there is no requirement for the

3  government to use certain investigative techniques.  They

4  don't have to do that.  That's fine.

5      But ladies and gentlemen, don't you think that they

6  should present you with the best evidence.  I mean, why have

7  these techniques if you're not going to use them?

8      Trace evidence, are things like DNA.  Well, they

9  swabbed Mr. Coleman for DNA.  But did you hear about it from

10  the witness stand?  The results?  Don't you think if it was

11  him on -- his DNA were on the guns, and his DNA on the money,

12  they didn't try that, you would have heard about it.

13      I mean, and ladies and gentlemen now, DNA is so

14  unique.  I mean, as I touch the clerk's desk here --

15      MR. KAUFMAN:  Objection.

16      THE COURT:  Overruled.

17      Mr. Butler, you have 10 minutes left.

18      MR. BUTLER:  Sir?

19      THE COURT:  Ten minutes left.

20      MR. BUTLER:  Thank you.

21      DNA.  As you sit there in your chair, your DNA is

22  left there.  It's unique.  Okay.  But did you hear anything

23  about DNA in this case?  None whatsoever.

24      Let me tell you in my last 10 minutes, I just want

25  to talk to you briefly.  I mean, you all heard the evidence,

1    and I hope you all, out of the 12 of you, 14 of you, you've

2    heard everything.  But I want to talk to you about these

3    alleged weapons.

4          Now the government wants you to just guess, okay,

5    about these weapons.  And why do I say that?  Because there is

6    absolutely no reliable evidence that Mr. Coleman ever

7    possessed a weapon when there was any drugs around.  There's

8    absolutely no evidence that's credible that he ever possessed

9    a weapon.  And why do I say that?

10         Okay.  Well, the law says that he has to possess it

11   in furtherance of a drug trafficking crime.  Okay.  The

12   government wants you to believe that well, it's a tool of the

13   drug trade, so therefore you must assume or conclude that it

14   was in furtherance of a drug trafficking crime.  You can't do

15   that, ladies and gentlemen.  It has to be based on the

16   evidence.

17         Now where is the evidence that somebody came and

18   picked up some drugs, some marijuana and said, well, I see a

19   gun over there?  Remember Detective Spears, he said, well, the

20   gun was under the bed.  You couldn't see it.  I mean, can

21   you -- what the government wants you to do is to fill in the

22   blanks for them.  Well, you can't do that, not in here.  You

23   can't fill in the blanks.  It has to be supported by evidence,

24   not only evidence, but proof beyond a reasonable doubt.  Just

25   because they have evidence, that doesn't mean it's proof

1    beyond a reasonable doubt.  I mean where is the proof?

2            And the Court is gonna tell you that to prove the

3    defendant possessed a firearm in furtherance of a drug

4    trafficking crime, the government must prove that the

5    defendant possessed a firearm that furthers, advances, or

6    helps forward the crime charged.

7            Well where's the proof?  Where is the proof?  There

8    is no proof.

9            And then these -- the guns that were in the vehicle.

10   Now who knew -- who knew how to get in it?  Ms. Peppers.

11           And remember, let me go back to Closeburn about the

12   safe.  Remember Detective Spears says, well, it was one

13   officer, I believe it was Spears, that they found the

14   combination laying around somewhere, okay.  Well ladies and

15   gentlemen now, but Ms. Peppers said, she knew the combination.

16   That's what she said.

17           So ladies and gentlemen now, in regards to

18   possession of the weapon.  Wouldn't it be -- in furtherance of

19   a drug trafficking crime, there has to be some -- some

20   evidence that it facilitated the crime.  There is none.  There

21   absolutely is none.

22           And let me just tell you that there's so many people

23   that you didn't hear from.  There was a big conspiracy that

24   Turtle was running.  They know that Deondray was a TSA part of

25   the conspiracy.  That's what Ms. Peppers said.  She described

1    him.  And he's still at large.

2            My point is this:  There's no evidence that

3    Mr. Coleman knew the TSA, that he ever talked to him, that he

4    ever transported any drugs back to the Charlotte.

5            And please remember this, you know, Ms. Peppers made

6    a decision on her own and, you know, the government says,

7    well, you know, love made her do it.  Well, come on ladies and

8    gentlemen, that's convenient today, this week.  That was

9    convenient back in November when she began to cooperate and

10   get out of jail.  But is it the truth?  What kind of love is

11   that?

12           She's the most intelligent person in this -- or most

13   educated -- and she was intelligent, I mean, I'm not going to

14   deny that.  But sometimes intelligent people use their

15   intelligence the wrong way.  And this is that type of

16   situation.  She tried to control the whole thing.

17           And then they say, well these records show that

18   Mr. Coleman distributed money and tried to launder money.

19   Well, ladies and gentlemen now -- that he paid for -- he sent

20   people over to get drugs.  You don know that.  Those records

21   don't prove that.  And when you look at them.  And they really

22   wasn't that voluminous.  I mean, you haven't seen the records.

23   You saw the spreadsheet.

24           Who used the card?  Come on now.  I mean, who used

25   the card?  They can't prove who used the card.  They can't

1    prove who put the money in any of these places.

2           Mr. Coleman hadn't claimed any money.  Hadn't done

3    any of those things.

4           Ladies and gentlemen, this is a case that the

5    government wants you to look at the 60 some exhibits that they

6    presented, wants you to consider the testimony of these

7    convicted felons that you heard from.

8           MR. KAUFMAN:  Objection.

9           THE COURT:  Overruled.

10          MR. BUTLER:  They want you to be overwhelmed by

11   this -- or these multiple conspiracies.  Because everybody was

12   doing their own thing.  Everybody profited from it.  Everybody

13   got something out of it.  And do you really think that that's

14   all they got; $1,000?  Come on, ladies and gentlemen.

15          You know Manigault, he went into business for

16   himself.  You know Glenn Carrera, he went into business for

17   himself.  They -- they all branched off and did their own

18   thing.

19          But yet and still, they want you to believe that

20   this young man oversaw everything on the east coast.  That's

21   not true.  Not only is it not true, it's not supported by the

22   evidence in this case.

23          So ladies and gentlemen, you have to determine what

24   the facts are.  And you have to determine -- after you

25   determine the facts, whether or not the government has proven

1  their case beyond a reasonable doubt.  I would contend to you

2  that the government has not, because the evidence is lacking.

3        And please remember the essential players that you

4  didn't hear from.  And I would contend to you that you didn't

5  hear from them because it wouldn't help the government's case.

6  That's why you didn't hear from them.

7        I would ask that you do your duty and return

8  verdicts of not guilty.  Thank you very much for listening to

9  me.

10        MR. KAUFMAN:  Ladies and gentlemen, again, have to

11  go quickly here.  But one of the key things here, defense

12  lawyer says you each have one vote.  But the deliberation

13  process requires that you have an open mind and listen to each

14  other.  You have to be able to listen to everyone else's

15  logic, consider the evidence.  If no one will move off of an

16  initial position, then you will be here forever, potentially.

17  That could happen.  So you have to listen.  You have to go

18  with what your firm conviction, what your firm belief is.  And

19  if you are firmly convinced of Mr. Coleman's guilt, you are

20  found bound to return a verdict of guilty.

21        Now, let me run through a couple of things.  First

22  of all, neither side called some of these witnesses --

23        MR. BUTLER:  Objection.

24        THE COURT:  Sustained.

25        MR. KAUFMAN:  Ladies and gentlemen, the Judge is

1   instructing you that it is not a specific type of evidence

2   that's required, as long as you find guilty beyond a

3   reasonable doubt.

4          There are numerous people who took the oath, swore

5   to tell the truth, and we submit that you should find that

6   they did tell the truth.  And their information corroborates

7   each other, corroborates records, corroborates the physical

8   evidence.  And so you would have been here for months if you

9   wanted to hear from all the people's names who you heard.  Are

10  you firmly convinced?

11         Now, with regard to the keys by the way.  Where were

12  the keys?  We know that McAdoo, Esco, and Poppa, took the

13  drugs after the T stop of Jerry Davis down to the Cayenne, put

14  it down there and took off.  And they were traffic stopped by

15  Officer Newman.  Did they chuck the keys because they didn't

16  want to get caught with the keys from the Cayenne?  Doesn't

17  that make sense.  Mr. Coleman never would have had it

18  upstairs.  He had given them the keys to dispose of the

19  marijuana.

20         With regard to the firearms.  Again, in furtherance

21  of drug trafficking is key here.  And it does exist.  It was

22  in furtherance, because he had used his house at Closeburn as

23  his stash, for his money, for the drugs, and for all the

24  paraphernalia.  So he had to protect himself and that stash

25  house.

1       And with regard to November 16th, the Cayenne.  You
2   know that he used that to pick up couriers.  He used to it
3   stash money, and he had the firearm there.  He might have
4   needed it when he was bringing the couriers with the money to
5   the airport or the drugs back.  You never know who's watching
6   you, not just law enforcement, but other bad guys.

7       Now, Ms. Peppers.  Oh, my goodness.  She's breaking
8   bad.  She's the big bad wolf in this case now.  Is that really
9   the defense here?  Come on, folks.  You saw her on the stand.
10  Does that even make any sense?  We're talking about here, the
11  defense's position is, that the world is flat.  The world is
12  round, ladies and gentleman.

13      And it's his position that, well, she's the leader
14  and he was working for her?  That doesn't absolve him of
15  criminal liability.  He was fully involved in this.  By the
16  way, if I had $26,000 of my money and my credit card in my
17  bank accounts were being pulled out for airline tickets, I'd
18  probably notice that happening to my money.  Especially when I
19  don't have any legitimate income.

20      Now with regard to the people who are hoping for
21  time off.  They all said they were hoping, there had been no
22  promises or guarantees.  And who makes the decision?  They all
23  said it, Judge Conrad.  What was the key requirement?  They
24  all understood consistently, they had to tell the truth.  What
25  would happen if they didn't?  Their plea would be dead and

1   they would be facing additional charges, such as perjury, I

2   believe is what you heard from Mr. Pierce.

3          Multiple conspiracies.  Is he simply saying, that

4   well, he was involved in a conspiracy but it was a different

5   one?  Is that really what the defense's position is?

6          Ladies and gentlemen, we've never taken the position

7   that Mr. Coleman was part of a conspiracy with Mr. Crockett

8   and Ms. Crockett and all the other names, Brown, Kelsey-Brown.

9   You even heard testimony from Agent MacDonald that was a

10  separate indictment.

11         The reason why that evidence is important is, that

12  it shows the evolution of the conspiracy, and the evolution of

13  the investigation.  It's how Mr. Coleman came on to the radar

14  screen.

15         We're not shaking that crates with marijuana are

16  part of this conspiracy.  This is the airline.  Homeland

17  Security was investigating Mr. Coleman for airline based

18  trafficking.  The back and forth of the money and drugs.

19  There's one conspiracy.

20         Ms. Peppers, yeah.  She said she went for better

21  employment.  I don't think she was gonna say, I'm going to

22  live with my felon drug-trafficking probationer boyfriend as

23  her reason for leaving.  You saw her, ladies and gentlemen.  I

24  mean, you're the judge of the facts and the witness's

25  credibility here.  I mean, did she really come across as

1   somebody who is lying boldface in front of you, under oath in

2   front of the court and in front of the Judge that's going to

3   sentencing her?

4           MR. BUTLER:  Objection.

5           THE COURT:  Sustained.

6           Mr. Kaufman, you have one minute.

7           MR. KAUFMAN:  Thank you, Your Honor.

8           With regard to all these witnesses.  Think about how

9   they are corroborating each other, the physical evidence,

10  everything.  It all just makes sense.

11          They have everything to lose by saying something

12  untrue.  Everything to gain by being honest and swearing and

13  telling the truth, the whole truth, and nothing but the truth.

14          The tax records and documents that weren't obtained.

15  Again, it's not specific type of evidence and it makes sense

16  that law enforcement didn't obtain certain records or generate

17  spreadsheets for people who are cooperating and had pled

18  guilty.

19          With regard to Deondray.  It's the conspiracy, all

20  different webs.  Mr. Coleman doesn't need to have spoken to

21  anybody from TSA on the inside.  But he knew that the money

22  was coming -- I'm sorry, the drugs were coming thanks to a TSA

23  insider.  That was somebody else's role.  That was reasonably

24  foreseeable.  He knew it was coming.  And he knew how it was

25  coming.  He's responsible for the payments for Turtle his --

1    or the California folks were paying.  It was all one big

2    conspiracy, ladies and gentlemen.  And --

3            THE COURT:  Wrap up, counsel.

4            MR. KAUFMAN:  Yes, Your Honor.  Thank you.

5        Ladies and gentlemen, please think of what I would

6    have addressed and what the evidence shows, based on the case,

7    the arguments.  And ladies and gentlemen, we ask you to return

8    a verdict of guilty as charged.  Thank you.

9            THE COURT:  Members of the jury, you've now heard

10   the arguments of counsel, what I want to do now is read the

11   counts of the indictment to you, discuss the statutes that are

12   alleged to have been violated, then the essential elements of

13   each count.

14        And keep in mind that as I do this, you will have a

15   copy of the Bill of Indictment with you in the deliberation

16   room, so it will not be necessary for you to memorize the

17   counts.  And I also want to remind you that the Bill of

18   Indictment is not evidence.

19        Count One reads that:

20        From in or about 2009 to the present, in Mecklenburg

21   County, within the Western District of North Carolina, and

22   elsewhere, the Defendant, Parker Antron Coleman, did knowingly

23   and intentionally conspire and agree with other persons, known

24   and unknown to the Grand Jury, to distribute and to possess

25   with intent to distribute a mixture and substance containing a

detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Said offense involved 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A).

You will note that the Bill of Indictment charges that the offense was committed "on or about" a certain date or dates. The proof need not establish with certainty the exact dates of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense in question was committed on a date reasonably near the date or dates alleged.

Title 21, United States Code, Section 846 reads, in pertinent part, that any person who conspires to commit any offense defined in this subchapter commits an offense.

One of the offenses referenced in 846 is Section 841, which reads, in pertinent part, it shall be unlawful for any person knowingly or intentionally to distribute or possess with intent to distribute a controlled substance.

Now where a statute specifies several alternative ways in which an offense can be committed in the disjunctive, or using the word "or," the indictment may allege several ways

in the conjunctive, or using the word "and." You may find the defendant guilty of the offense if you find beyond a reasonable doubt that he committed one or more of the means of violating the statute. Thus, where the indictment uses the term "and" you may consider it as "or" unless I specifically instruct you differently.

Now a "conspiracy" is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of "partnership in crime" in which each member becomes the agent of every other member.

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

That on or about the date alleged in the indictment, in the Western District of North Carolina,

1: That two or more persons, directly or indirectly, reached an agreement to distribute, or to possess with intent to distribute, a controlled substance.

I instruct you that marijuana is a controlled substance within the meaning of the law;

2: That the defendant knew of the unlawful purpose of the agreement; and

3: That the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose.

1          Now one may become a member of a conspiracy without

2   knowing all the details of the unlawful scheme or the

3   identities of all the other alleged conspirators.  If the

4   defendant understands the unlawful nature of a plan or scheme

5   and knowingly and intentionally joins in that plan or scheme

6   on one occasion, that is sufficient to convict him for

7   conspiracy even though the defendant had not participated

8   before and even though the defendant played only a minor part.

9          The government need not prove that the alleged

10  conspirators entered into any formal agreement, nor that they

11  directly stated between themselves all the details of the

12  scheme.  Similarly, the government need not prove that all of

13  the details of the scheme alleged in the indictment were

14  actually agreed upon or carried out.  Nor must it prove that

15  all of the persons alleged to have been members of the

16  conspiracy were such, or that the alleged conspirators

17  actually succeeded in accomplishing their unlawful objectives.

18         Mere presence at the scene of an event, even with

19  knowledge that a crime is being committed, or the mere fact

20  that certain persons may have associated with each other and

21  may have assembled together and discussed common aims and

22  interest, does not necessarily establish proof of the

23  existence of the conspiracy.

24         Also, a person who has no knowledge of a conspiracy,

25  but who happens to act in a way which advances some purpose of

1    a conspiracy, does not thereby become a conspirator.

2           Now you must determine whether the conspiracy

3    charged in the indictment existed, and if it did, whether the

4    defendant was a member of it.  If you find that the conspiracy

5    charged did not exist, then you must return a not guilty

6    verdict, even though you find that some other conspiracy

7    existed.  If you find that the defendant was not a member of

8    the conspiracy charged in the indictment, then you must find

9    him not guilty, even though the defendant may have been a

10   member of some other conspiracy.

11          Now I want to define certain terms for you, you are

12   to apply those definitions to the evidence.  And if I do not

13   define a word, you will assign to it its ordinary, everyday

14   meaning.

15          "Possession," as that term is used in this case, may

16   be of two kinds:  Actual possession and constructive

17   possession.  A person who knowingly has direct physical

18   control over a thing, at a given time, is then in actual

19   possession of it.

20          A person who, although not in actual possession,

21   knowingly has both the power and the intention, at a given

22   time, to exercise dominion or control over a thing, either

23   directly or through another person or persons, is then in

24   constructive possession of it.

25          Possession may be sole or joint.  If one person

1 alone has actual or constructive possession of a thing,

2 possession is sole.  If two or more persons share actual or

3 constructive possession of a thing, possession is joint.

4 You may find that the element of possession, as that

5 term is used in these instructions, is present if you find

6 beyond a reasonable doubt that the defendant had actual or

7 constructive possession, either alone or jointly with others.

8 Now the phrase "with intent to distribute" means to

9 have in mind or to plan in some way to deliver or transfer

10 possession or control over a thing to someone else.

11 In attempting to determine the intent of any such

12 person, you may take into consideration all of the facts and

13 circumstances shown by the evidence received in the case

14 concerning that person.

15 In determining a person's "intent to distribute"

16 controlled substances, you may consider, among other things,

17 the quantity of the controlled substance, the presence or

18 absence of equipment used in the processing or sale of

19 controlled substances, and the presence or absence of large

20 amounts of cash or weapons.

21 For you to find the defendant guilty of the charge

22 in Count One of the indictment, the government must prove,

23 beyond a reasonable doubt, that the object of the conspiracy

24 was to distribute a controlled substance or possess with the

25 intent to distribute a controlled substance as alleged in the

1    indictment.  You must be unanimous as to which object, if any,

2    was established by the evidence.

3           Next, you should turn your attention to the issue of

4    the type of illegal drugs involved.

5           As to the drug charged in the Bill of Indictment,

6    you must determine if the substance involved was marijuana.

7    The government may prove this through either direct or

8    circumstantial evidence.  Circumstantial evidence would be

9    evidence from which you could infer that the material was

10   marijuana, such as testimony concerning the names used by the

11   defendant or a co-conspirator to refer to the material or

12   testimony about the material's appearance.  Whether the

13   government relies on direct or circumstantial evidence to

14   prove that the material in issue was marijuana, it must prove

15   so beyond a reasonable doubt.  The parties have stipulated

16   that the materials seized by law enforcement was in fact

17   marijuana.

18          If you conclude unanimously and beyond a reasonable

19   doubt that the substance involved was marijuana, you must then

20   determine the quantity of the substance which was possessed in

21   furtherance of the conspiracy and was reasonably foreseeable

22   to the defendant.

23          You will be provided with a special verdict form,

24   wherein you will be asked to determine the drug and the

25   quantity of drugs specifically attributable to the defendant,

1  if any, as a reasonably foreseeable consequence of the

2  conspiracy.

3      I want to turn to the mental elements of the offense

4  which the government must prove beyond a reasonable doubt.

5      The word "knowingly," as that term has been used

6  from time to time in these instructions, means that the act

7  was done voluntarily and intentionally, not because of mistake

8  or accident.

9      The word "willfully" or intentionally as used in

10 these instructions to determine the alleged mental state of a

11 defendant, means that he knowingly performed an act

12 deliberately or on purpose, as contrasted with acting

13 accidentally or carelessly.

14     Now ordinarily, there is no way that a defendant's

15 state of mind can be proved directly, because no one can read

16 another person's mind and tell what that person is thinking.

17 But a defendant's state of mind can be proved indirectly from

18 the surrounding circumstances.  This includes things like what

19 the defendant said, what he did, how he acted, and any other

20 facts or circumstances in evidence that show what was in the

21 defendant's mind.

22     You may also consider the natural and probable

23 results of any acts that the defendant knowingly did, and

24 whether it is reasonable to conclude that the defendant

25 intended those results.

1          Now evidence has been received in this case that a

2    certain person or persons, who are alleged to have been

3    co-conspirators with the defendant, have done or said things

4    during the existence or life of the alleged conspiracy in

5    order to further or advance its goals.

6          Such acts and statements of alleged co-conspirators

7    may be considered by you in determining whether or not the

8    government has proven the charges in Count One of the

9    indictment against the defendant.

10          Since these acts may have been performed or these

11    statements may have been made outside the presence of the

12    defendant, and even done or said without the defendant's

13    knowledge, these acts or statements should be examined by you

14    with particular care before considering whether they may be

15    used against the defendant.  If you find that the acts or

16    statements were in furtherance of the goals of the conspiracy,

17    and you find that the defendant was or became a member of that

18    conspiracy, you may consider those acts or statements as

19    evidence against the defendant.

20          Acts done or statements made by an alleged

21    co-conspirator before the defendant joined the conspiracy, may

22    also be considered by you in determining whether the

23    government has sustained its burden of proof on Count One.

24          But acts done or statements made before the alleged

25    conspiracy began or after it ended, may not be considered by

1  you -- may only be considered by you against the person who

2  performed the act or made the statement.

3       Now a conspirator is responsible for offenses

4  committed by another conspirator if the conspirator was a

5  member of the conspiracy when the offense was committed and if

6  the offense was committed in furtherance of, and as a

7  foreseeable consequence of, the conspiracy.

8       Therefore, if you have first found the defendant

9  guilty of the conspiracy charged in Count One, and if you find

10 beyond a reasonable doubt that during the time that the

11 defendant was a member of that conspiracy, another conspirator

12 committed an offense in Count Three, Four, Five, Six or Seven

13 in furtherance of and as a foreseeable consequence of that

14 conspiracy, then you may find the defendant guilty of that

15 offense, even though the defendant may not have participated

16 in any of the acts which constitute the offense described in

17 those counts.

18      Count Two reads that:  From in or about 2009 to the

19 present, in Mecklenburg County, within the Western District of

20 North Carolina, and elsewhere, the Defendant, Parker Antron

21 Coleman, did knowingly combine, conspire, and agree with other

22 persons, known and unknown to the Grand Jury, to commit

23 offenses against the United States in violation of Title 18,

24 United States Code, Section 1956, to wit:

25           (a) to knowingly conduct and attempt to conduct a

1  financial transaction affecting interstate and foreign

2  commerce, which involved the proceeds of a specified unlawful

3  activity, that is, the manufacture, importation, sale, or

4  distribution of a controlled substance, with the intent to

5  promote the carrying on of specified unlawful activity, that

6  is, manufacture, importation, sale, or distribution of a

7  controlled substance.

8          And that while conducting and attempting to conduct

9  such financial transaction, knew that the property involved in

10  the financial transaction represented the proceeds of some

11  form of unlawful activity, in violation of Title 18, United

12  States Code, Section 1956(a)(1)(A)(i); and

13          (b) to knowingly conduct and attempt to conduct

14  financial transactions affecting interstate commerce and

15  foreign commerce, which transactions involve the proceeds of

16  specified unlawful activity, that is, the manufacture,

17  importation, sale, or distribution of a controlled substance,

18  knowing that the transactions were designed in whole or in

19  part to conceal and disguise the nature, location, source,

20  ownership, and control of the proceeds of specified unlawful

21  activity, and that while conducting and attempting to conduct

22  such financial transactions, knew that the property involved

23  in the financial transactions represented the proceeds of some

24  form of unlawful activity, in violation of Title 18, United

25  States Code, Section 1956(a)(1)(8)(i)(sic).

1            All in violation of Title 18 United States Code
2    Section 1956(h).

3            That's a mouthful, and in short it is an allegation
4    of a conspiracy to engage in money laundering.  I have
5    instructions to follow on that and other counts, but I think
6    at this time the jury may need a break, and so I'm going to
7    stop right here and continue on after we take a 10 minute
8    break.

9            So while we take a break, remember don't talk about
10   the case, keep an open mind until all these instructions are
11   read to you, and you get the case for deliberation.

12           At this time we'll take a 10-minute break.

13           (Recess at 11:32 until 11:45.)

14           (The jury was returned to the courtroom.)

15   THE COURT:  Members of the jury, before the break I
16   had read to you the Count Two of the statute charging a
17   conspiracy to launder money.

18           I'm now going to read the statute to you, Title 18,
19   United States Code, Section 1956(h), reads in pertinent part
20   that:  Any person who conspires to commit any offense defined
21   in this section, commits an offense.

22           And then one of the parts of that section is
23   1956(a)(1)(A)(i) which reads in pertinent part:  That whoever
24   knowing that the property involved in a financial transaction,
25   represents the proceeds of some form of unlawful activity,

conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity, commits an offense.

And then (a)(1)(B)(i) of that statute reads that: Whoever does that conduct with -- or let me just read it. Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, the source, the ownership, or the control of the proceeds of the specified unlawful activity commits an offense.

That's the statute. And you will notice that the Bill of Indictment alleges a money laundering conspiracy with two different objects, or purposes, one to promote, one to conceal. It is not necessary for the government to prove both purposes. It is sufficient for the government to prove beyond a reasonable doubt that a conspiracy existed to commit one of those purposes.

However, to return a verdict of guilty, you must unanimously agree on one or both objects of the conspiracy. If you cannot unanimously agree as to at least one purpose, you must then find the defendant not guilty.

In order for you to find the defendant guilty of the money laundering conspiracy charged in Count Two, you must find beyond a reasonable doubt that:

1:  Defendant and at least one other person made an agreement to violate 18, United States Code, Section 1956, as charged in the indictment;

2:  That the defendant, knowing the unlawful purpose of the plan, willfully joined in it, that is, with the intent to further the unlawful purpose;

3:  That the defendant or a co-conspirator knowingly conducted, or attempted to conduct, a "financial transaction" as defined hereafter; and

4:  That the defendant knew that the funds or property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

5:  The funds or property involved in the financial transaction did in fact represent the proceeds of "specified unlawful activity," in this case proceeds from dealing in controlled substances; and

6:  That the defendant or a co-conspirator engaged in the financial transaction with the intent

A.  To promote the carrying on of such specified unlawful activity; or

B.  To conceal or disguise the nature, location, source, ownership, or control of the proceeds of such

1   specified unlawful activity.

2          Now I've given you previously, some definitions

3   concerning the law of "conspiracy," and you are to apply those

4   definitions to this count as well.

5          There are certain other terms that I will now define

6   for you.

7          The term "conducts" means initiating, concluding, or

8   participating in initiating or concluding a transaction.

9          The term "transaction" means a purchase, sale, loan,

10  pledge, gift, transfer, delivery, or other disposition of

11  funds or property; and, with respect to a financial

12  institution, includes a deposit, withdrawal, transfer between

13  accounts, exchange of currency, loan, extension of credit,

14  purchase, or sale of any stock, bond, certificate of deposit,

15  or other monetary instrument, or use of a safe deposit box.

16         The term "financial transaction" means a transaction

17  which in any way or degree affects interstate or foreign

18  commerce involving the movement of funds by wire or other

19  means or a transaction which in any way or degree affects

20  interstate or foreign commerce involving one or more "monetary

21  instruments" which includes coins or currency of any country,

22  travelers or personal checks, bank checks or money orders, or

23  investment securities or negotiable instruments in such form

24  that title thereto passes upon delivery or a transaction

25  involving the use of a "financial institution" which is

1    engaged in, or the activities of which affect, interstate or
2    foreign commerce in any way or degree.
3          It is not necessary for the government to show that
4    the defendant actually intended or anticipated an effect on
5    interstate commerce by his actions or that commerce was
6    actually affected.  All that is necessary is that the natural
7    and probable consequences of the acts the defendant took would
8    be to affect interstate commerce.  If you decide there would
9    be any effect at all on interstate commerce, then that is
10   enough to satisfy this element.  The effect can minimal.
11         The term "financial institution" includes an insured
12   bank and an operator of a credit card system.
13         The term "interstate" or "foreign commerce" includes
14   any commercial activity that involves transportation or
15   communication between places in two or more states or between
16   someplace in the United States and someplace outside the
17   United States.
18         The term "knowing that the funds or property
19   involved in the financial transaction represented the proceeds
20   of some form of unlawful activity" means the defendant knew
21   that such funds or property involved in the transaction
22   represented proceeds from some form, though not necessarily
23   which form, of activity that constitutes a felony offense
24   under state or Federal or foreign law.
25         The government need not prove that all of the

property involved in the transaction was the proceeds of
specified unlawful activity.  It is sufficient if the
government proves at least part of the property represents
such proceeds.

The term "specified unlawful activity" includes the
manufacture, importation, sale, distribution, or possession
with intent to distribute a controlled substance, or
conspiracy to commit any of those acts, in violation of
federal law.

The term "with the intent to promote the carrying on
of specified unlawful activity" means that the defendant or a
co-conspirator must have conducted or attempted to conduct the
financial transaction for the purpose of facilitating or
making easier or helping to bringing about the "specified
unlawful activity."

The government must show beyond a reasonable doubt
that the defendant or a co-conspirator knowingly laundered
proceeds from unlawful activity and that the defendant
willfully joined the conspiracy.

I have previously defined the terms "knowingly" and
"willfully."  You are to apply those definitions to this
count.

I will now address Count Three, which reads:

On or about November 2nd, 2010, in Mecklenburg
County, within the Western District of North Carolina, and

1   elsewhere, the Defendant, Parker Antron Coleman, did knowingly

2   and intentionally possess with intent to distribute a

3   controlled substance, that is, a mixture and substance

4   containing a detectable amount of marijuana, a Schedule I

5   controlled substance, a violation of Title 21, United States

6   Code, Section 841(a)(1), and did aid and abet the same.

7          All in violation of Title 21, United States Code,

8   Section 841(a) and 841(b)(1)(D), and Title 18, United States

9   Code, Section 2.

10         Now I have previously defined for you 21, United

11  States Code, Section 841 in relation to Count One.

12         Title 18, United States Code, Section 2 reads that:

13         Whoever commits an offense against the United States

14  or aids, abets, counsels, commands, induces, or procures its

15  commission, is punishable as a principal.

16         For you to find the defendant guilty of the crime

17  charged in Count Three, you must be convinced that the

18  government has proved each of the following beyond a

19  reasonable doubt:  That on or about the date alleged, within

20  the Western District of North Carolina:

21         1:  That the defendant or someone aided and abetted

22  by the defendant, knowingly distributed a controlled

23  substance, and that the substance was in fact marijuana; and

24         2:  That the defendant acted knowingly and

25  intentionally.

1          I've previously defined for you the terms

2     "distribute" and "knowingly" and you will use those

3     definitions here.

4          The parties have stipulated that the substance at

5     issue in this count was marijuana.

6          The guilt of a defendant in a criminal case may be

7     established without proof that the defendant personally did

8     every act constituting the offense alleged.  The law

9     recognizes that, ordinarily, anything a person can do for

10    himself may also be accomplished by him through the direction

11    of another person as his agent, or by acting in concert with,

12    or under the directions of, another person or persons in a

13    joint effort or enterprise.

14         If another person is acting under the direction of

15    the defendant or if the defendant joins another person and

16    performs acts with the intent to commit a crime, then the law

17    holds the defendant responsible for the acts and conduct of

18    such other persons just as though the defendant had committed

19    the acts or engaged in such conduct.

20         Before any defendant may be held criminally

21    responsible for the acts of others, it is necessary that the

22    accused deliberately associate himself in some way with the

23    crime and participate in it with the intent to bring about the

24    crime.

25         However, mere knowledge that a crime is being

committed is not sufficient to establish that a defendant

either directed or aided and abetted the crime, unless you

find beyond a reasonable doubt that the defendant was a

participant and not merely a knowing spectator.

In other words, you may not find any defendant

guilty unless you find beyond a reasonable doubt that every

element of the offense as defined in these instructions was

committed by some person or persons, and that the defendant

voluntarily participated in its commission with the intent to

violate the law.

Count Four reads that:

On or about November 2nd, 2010, in Mecklenburg

County, within the Western District of North Carolina, and

elsewhere, the Defendant, Parker Antron Coleman, during and in

relation to a drug trafficking crime, that is, possession with

intent to distribute marijuana, a violation of Title 21,

United States Code, Section 841, as charged in Count Three,

for which he may be prosecuted in a court of the United

States, did knowingly and unlawfully use and carry one or more

firearms, and in furtherance of such drug trafficking crime,

did possess said firearms, and did aid and abet the same.

All in violation of Title 18, United States Code,

Section 924(c) and 2.

Section 924(c) reads that:

Any person who, during, and in relation to any drug

trafficking crime, for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, commits an offense.

Now I've previously read to you the aiding and abetting statute, 18, United States Code, Section 2.

For you to find the defendant guilty of this crime, you must be convinced that the government has proven each of the following beyond a reasonable doubt:

1: That the defendant, or someone aided and abetted by the defendant, committed a drug trafficking crime, that is, possession with intent to distribute marijuana and one of the following:

A. That the defendant, or someone aided and abetted by the defendant, knowingly used a firearm during and in relation to the crime charged; or

B: That the defendant, or someone aided and abetted by the defendant, knowingly carried a firearm during and in relation to the crime charged; or

C: That the defendant, or someone aided and abetted by the defendant, knowingly possessed a firearm in furtherance of such crime.

A "firearm" means any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosion, and includes any handgun,

1    shotgun, or rifle.

2            To prove the defendant "used" a firearm during and

3    in relation to a drug trafficking crime, the government must

4    prove that the firearm was actively employed in the commission

5    of the alleged crime charged.

6            "Active employment" may include brandishing,

7    displaying, referring to, bartering, striking with, firing, or

8    attempting to fire the firearm.  Use is more than mere

9    possession of a firearm or having it available during the

10   crime charged.

11           The term "brandish" means to display all or part of

12   the firearm, or otherwise make the presence of the firearm

13   known to another person, in order to intimidate that person,

14   regardless of whether the firearm is directly visible to that

15   person.

16           To prove the defendant "carried," the government

17   must prove that the firearm was carried in the ordinary

18   meaning of the word "carry," such as by transporting a firearm

19   on the person or in a vehicle.  The carrying of the firearm

20   cannot be merely coincidental or unrelated to the crime

21   charged.

22           "In relation to" means that the firearm must have

23   some purpose, role, or effect with the respect to the crime

24   charged.

25           Now I've previously defined the term "possess" with

1  regard to Count One.  You should apply that definition here.

2          To prove the defendant possessed a firearm "in

3  furtherance" of a drug trafficking crime, the government must

4  prove that the defendant possessed a firearm that furthers,

5  advances, or helps forward the crime charged.

6          Previously defined the term "knowingly" and you

7  should apply that definition to this count.

8          Now there are three avenues of proof under which a

9  conviction is possible on this count.  The first is using a

10 firearm during and in relation to a drug trafficking crime.

11 The second is carrying a firearm during and in relation to a

12 drug trafficking crime.  And the third is possessing a firearm

13 in furtherance of a drug trafficking crime.

14         In order to convict the defendant of the crime

15 charged, your verdict must be unanimous that at least one

16 avenue of proof was established beyond a reasonable doubt.

17         I will now address Count Five which reads that:

18         On or about November 2nd, 2010, in Mecklenburg

19 County, within the Western District of North Carolina, and

20 elsewhere, the Defendant, Parker Antron Coleman, having

21 previously been convicted of one or more crimes punishable by

22 imprisonment for a term exceeding one year, did knowingly

23 possess, in and affecting commerce, a firearm and ammunition.

24         All in violation of Title 18, United States Code,

25 Section 922(g)(1).

1    That section reads that:

2    It shall be unlawful for any person who has been

3    convicted in court of, a crime punishable by imprisonment for

4    a term exceeding one year; to possess in or affecting

5    commerce, any firearm or ammunition; or to receive any firearm

6    or ammunition which has been shipped or transported in

7    interstate or foreign commerce.

8    For you to find the defendant guilty of the offense

9    charged in Count Five, the government must prove the following

10   essential elements beyond a reasonable doubt:  That on or

11   about the dates alleged, within the Western District of North

12   Carolina:

13   1:  That the defendant had been convicted in any

14   court of a crime punishable by imprisonment for a term

15   exceeding one year;

16   2:  That after this conviction, the defendant

17   knowingly possessed a firearm or ammunition; and

18   3:  The defendant's possession of this firearm or

19   ammunition was in or affecting interstate or foreign commerce.

20   Now the defendant has stipulated that at the time

21   alleged in Count Five, that he had been convicted of a crime

22   punishable by imprisonment for a term exceeding one year that

23   had not been expunged or set aside and that the defendant had

24   not been pardoned or had his civil rights restored.

25   I previously defined the terms "possess," "firearm,"

1   and "knowingly." You should apply those definitions here.

2   The term "ammunition" means ammunition or cartridge

3   cases, primers, bullets, or propellant powder designed for use

4   in any firearm.

5   The phrase "in or affecting interstate or foreign

6   commerce" includes movement of a firearm between any place in

7   a state or country, and any place outside that state or

8   country.

9   Thus, if you find beyond a reasonable doubt that the

10  firearm or ammunition in question was manufactured outside of

11  North Carolina and that the defendant possessed the firearm or

12  ammunition in North Carolina, then you may find that this

13  element has been satisfied.

14  I would now address Count Six which charges another

15  violation of 18, United States Code, 924(c) and (2), this one

16  allegedly occurring on November 16, 2010. You are to apply

17  the instructions that I gave you with regard to Count Four to

18  this count, keeping in mind that you must consider each count,

19  and the evidence pertaining to it, separately.

20  I will now address Count Seven which charges another

21  violation of 18, United States Code, 922(g)(1), this one

22  allegedly occurring on November 16, 2010. And you are to

23  apply the instructions I gave you with regard to Count Five to

24  this count. But I remind you that you must consider each

25  count, and the evidence pertaining to it, separately.

Now members of the jury, you have heard the evidence and the arguments of the attorneys. And it is your duty to remember the evidence whether it has been called to your attention or not, and if your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your recollection of the evidence in your deliberations.

I have not reviewed the contentions of the parties, but it is your duty to not only consider all the evidence, but also to consider the arguments, contentions, and positions urged by the attorneys, and any other contentions that arises from the evidence, and to weigh them all in the light of your common sense, and as best you can, to determine the truth of this matter.

The law, as indeed it should, requires the presiding judge to be impartial. Therefore, do not assume from anything that I may have done or said during the trial that I have any opinion concerning any of the issues in this case.

I instruct you that a verdict is not a verdict until all twelve jurors agree unanimously as to what your decision shall be. You may not render a verdict by majority vote or any other voting mechanism aside from a unanimous verdict of twelve.

The Court suggests that as soon as you reach the jury room, before beginning deliberations, you choose one of your members to serve as foreperson. This individual has the

1    same vote as the rest of the jurors, but simply serves to

2    preside over the discussions.  And once you begin

3    deliberating, if you need to communicate with me, that

4    foreperson will send a written message to me by knocking on

5    the door and handing it to the Marshal.

6            However, any notes that you do send to me, you would

7    not tell me how you stand numerically as to your verdict.  For

8    instance, should you be split in your voting at any one time,

9    you would not tell me the particular numbers of division in

10   your note.

11           We will also send back a verdict sheet, which is

12   simply the written notice of the decision that you reach in

13   the case.  And once you've reached a verdict as to the counts

14   alleged in the Bill of Indictment, you will return to the

15   courtroom and your foreperson will, on request, hand the

16   verdict sheet to the Deputy Clerk.  And there are places on

17   the verdict sheet for the foreperson to enter the verdict,

18   sign it, and date it.

19           Now during the trial there were a number of exhibits

20   that were introduced into evidence.  And we have a computer

21   system in the deliberation room that enables you to view the

22   exhibits and the substantive jury instructions electronically.

23   And will you receive instructions on how to use that system.

24           But if after you have begun your discussion of the

25   case, you think it would be helpful to have any of the actual

1    exhibits with you in the jury room, have the foreperson send a

2    note requesting the actual exhibits.

3          Now if you need a break during deliberations, you of

4    course can take a break.  And if you need a break outside the

5    deliberation room, the Marshal will escort you during that

6    break.  But if you're taking a break and not all twelve of you

7    are together, then don't talk about the case during the break.

8    Wait until all twelve are back together before you resume your

9    deliberations.

10         Does either side wish to have a sidebar on the

11   instructions?

12         MR. KAUFMAN:  No, Your Honor.

13         MR. BUTLER:  No, Your Honor.  Thank you.

14         THE COURT:  All right.  I'm going to ask Ms. Sea and

15   Ms. Alexander, if either of you has any personal effects in

16   the deliberation room.  If you would get those personal

17   effects and then return to the courtroom.

18         The remaining jurors, I'm going to give you a copy

19   of the Bill of Indictment, a copy of the verdict sheet, and

20   ask you to begin your deliberations at this time.

21         (The jury was escorted from the courtroom at

22   2:08 p.m.)

23         (Alternates return to the courtroom.)

24         THE COURT:  Ms. Sea, Ms. Alexander, I want to thank

25   you for your service in the case.  I don't know if you were

1    aware of this, but you served as alternates.

2              ALTERNATE JURORS:  Yes.

3              THE COURT:  Alternate jurors, and what that meant is

4    that if any of the other twelve jurors were not able to

5    continue serving for whatever reason, we wouldn't have to stop

6    and start over again.  We would be able to insert you in their

7    place and keep going with the trial.

8              And so although it might be frustrating for you to

9    have sat in and heard all of the evidence and then not been

10   able to deliberate in the case, I want you to know that your

11   service was of great value to the court, because it gave us

12   the confidence that we could keep going if there was anything

13   that happened to any of the other jurors.  And it was

14   especially significant in this case because there was a week's

15   delay between the time of picking the jury and actually

16   starting the evidence.

17             You performed a very valuable service.  The good

18   news is that this is the end of the term, and so you don't

19   have to call in after 5:00 on any day.  Having served as

20   alternates in this case, your service is at an end and you go

21   with the Court's thanks, but you're free to go at this time.

22             ALTERNATE JURORS:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24             (The alternate jurors were excused.)

25             (The court stood at ease at 12:11 p.m. waiting for a

1   response from the jury.)

2             (The jury knocks at 1:12 p.m.:)

3             (Defendant Parker Antron Coleman is present.)

4             THE COURT:  The jury has indicated it's reached a

5   verdict.  Are we ready for the jury?

6             MR. KAUFMAN:  Yes, Your Honor.

7             MR. BUTLER:  Yes, Your Honor.

8             THE COURT:  Very well.  Before we call the jury,

9   we'll have the jury come in and we'll take the verdict.  And

10  then any issues after the verdict, I'll take that up with the

11  parties.

12            From the time the jury comes back until the time we

13  recess for court, people cannot come in or out of the

14  courtroom, and so if you need to leave the courtroom now, you

15  may do so.  But once the jury is in, everybody is here until

16  the Court's recessed after the taking of the verdict.  So

17  anybody that needs to leave now, leave now, otherwise just

18  realize the next opportunity to leave will be when the court

19  recesses.

20            All right.  Let's call the jury.

21            (The jury was returned to the courtroom at

22  1:22 p.m.)

23            THE COURT:  Members of the jury, has the jury

24  selected a foreperson in this case?

25            THE JURY:  (Indicating.)

1          THE COURT:  Mr. Shaul, is that you?

2          JUROR:  Yes.

3          THE COURT:  Mr. Shaul, as foreperson, can you

4    indicate to the Court whether the jury has reached a verdict

5    in the case?

6          JUROR:  We have.

7          THE COURT:  And have you reduced that verdict to the

8    verdict sheet, signed it, and dated it?

9          JUROR:  Yes.

10         THE COURT:  Very well.  I'm going to ask you at this

11   time to hand that verdict sheet to the Clerk.

12         (Foreperson complies; Clerk handing same to the

13   Court.)

14         THE COURT:  Now that I've gotten the verdict sheet,

15   I will inspect it and then ask the Clerk to publish it in open

16   court.  I would ask the members of the jury to listen

17   carefully to the publishing of the verdict, because either

18   side may wish to have the jury polled and make sure it's your

19   own individual verdict.

20         Madam Clerk, would you publish the verdict in open

21   court.

22         COURT CLERK:  In the matter of United States of

23   America versus Parker Antron Coleman, Docket Number

24   3:10-CR-238, jury verdict:

25         As to Count One, we, the jury, unanimously find the

1  defendant guilty.

2          1a.  If guilty, was at least 1,000 kilograms of a

3  mixture or substance containing a detectable amount of

4  marijuana reasonably foreseeable to the defendant?

5          Yes.

6          As to Count Two, we, the jury, unanimously find the

7  defendant guilty.

8          As to Count Three, we, the jury, unanimously find

9  the defendant guilty.

10         As to Count Four, we, the jury, unanimously find the

11 defendant guilty.

12         As to Count Five, we, the jury, unanimously find the

13 defendant guilty.

14         As to Count Six, we, the jury, unanimously find the

15 defendant guilty.

16         As to Count Seven, we, the jury, unanimously find

17 the defendant guilty.

18         THE COURT:  Does either side wish to have the jury

19 polled?

20         MR. KAUFMAN:  No, Your Honor.

21         MR. BUTLER:  If Your Honor please, we would

22 respectfully request the jury be polled.

23         Madam Clerk, would you poll the jury.

24         COURT CLERK:  Ladies and gentlemen, you've heard the

25 verdict as published.

```
 1              Juror No. 1, was this your verdict; is this still
 2   your verdict?
 3              JUROR:  Yes.
 4              COURT CLERK:  Juror No. 2, was this your verdict; is
 5   this still your verdict?
 6              JUROR:  Yes.
 7              COURT CLERK:  Juror No. 3, was this your verdict; is
 8   this still your verdict?
 9              JUROR:  Yes.
10              COURT CLERK:  Juror No. 4, was this your verdict; is
11   this still your verdict?
12              JUROR:  Yes.
13              COURT CLERK:  Juror No. 5, was this your verdict; is
14   this still your verdict?
15              JUROR:  Yes.
16              COURT CLERK:  Juror No. 6, was this your verdict; is
17   this still your verdict?
18              JUROR:  Yes.
19              COURT CLERK:  Juror No. 7, was this your verdict; is
20   this still your verdict?
21              JUROR:  Yes.
22              COURT CLERK:  Juror No. 8, was this your verdict; is
23   this still your verdict?
24              JUROR:  Yes.
25              COURT CLERK:  Juror No. 9, was this your verdict; is
```

1    this still your verdict?

2              JUROR:  Yes.

3              COURT CLERK:  Juror No. 10, was this your verdict;

4    is this still your verdict?

5              JUROR:  Yes.

6              COURT CLERK:  Juror No. 11, was this your verdict;

7    is this still your verdict?

8              JUROR:  Yes.

9              COURT CLERK:  Juror No. 12, was this your verdict;

10   is this still your verdict?

11             JUROR:  Yes.

12             THE COURT:  Members of the jury, I want to thank you

13   for your service.  As we said at the beginning of the case,

14   our criminal justice system could not function without

15   citizens being willing to serve as jurors.  And you've

16   performed an act of citizenship for which the Court is

17   thankful to you for having done.  And at this point the good

18   news is that the criminal term is at an end, and so your

19   service will no longer be needed.

20             I want to thank you for your service and excuse you

21   at this time.  Thank you so much.

22             (The jury was escorted from the courtroom.)

23             THE COURT:  Madam Clerk, if you would record the

24   verdict.

25             Mr. Coleman, if you would please stand.

1    I want to explain to you what happens next.  In

2 light of the verdict, your case will be sent to the United

3 States Probation Office for the purpose of preparing a

4 presentence report.  As part of that presentence

5 investigation, you may be interviewed and you have a right to

6 have your attorney present with you at any interview conducted

7 by the probation office.

8    Once the report is prepared, it will be sent, both

9 to yourself, the defense counsel, and the government, and

10 there will be a period of time within which both sides can

11 object to any of the factual or legal findings or

12 recommendations of the presentence report.

13    After that period of objection time is over and the

14 probation office has responded to any objections, it will then

15 be calendared for sentencing.  So the next time that I

16 anticipate you appearing before this Court will be at

17 sentencing, sometime after the presentence report is

18 completed.  That will be a matter of months, if it's like any

19 other presentence report that has been prepared in recent

20 times.  And so you could anticipate appearing before this

21 Court for sentencing several months from now.

22    Do you understand the process to follow?

23    DEFENDANT COLEMAN:  (Nodding head.)

24    THE COURT:  Is there anything from either side at

25 this point?

1          MR. BUTLER:  If Your Honor please, on behalf of

2     Mr. Coleman, at this time we would renew or motion under Rule

3     29.

4          We would also move to set aside the jury verdicts.

5     Being against the -- on the grounds that evidence insufficient

6     to support those judgments or verdicts, and we would ask for a

7     new trial.

8          THE COURT:  Very well.  The Court will deny those

9     motions; note your objection for the record.

10          Anything from the government?

11          MR. KAUFMAN:  No, Your Honor.

12          THE COURT:  Very well.

13          Very well.  This matter is done for now.  The Court

14     will recess at this time.  Mr. Coleman will be remanded to the

15     Marshals at this time.

16          (The matter is concluded at 1:31 p.m.)

17                    (End of Proceedings.)

18                    *  *  *  *  *  *

19     UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF NORTH CAROLINA
20     CERTIFICATE OF OFFICIAL REPORTER

21

22          I, Laura Andersen, Federal Official Court Reporter,

23     in and for the United States District Court for the Western

24     District of North Carolina, do hereby certify that pursuant to

25     Section 753, Title 28, United States Code that the foregoing

1  is a true and correct transcript of the stenographically

2  reported proceedings held in the above-entitled matter and

3  that the transcript page format is in conformance with the

4  regulations of the Judicial Conference of the United States.

5

           Dated this the 15th day of April, 2014.

6

7

8                         S/Laura Andersen
                          Laura Andersen, RMR
9                         Federal Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25